**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

| | |
|---|---|
| DR. CYNTHIA E. KEPPEL,             ) <br> *Plaintiff,*          ) <br>      ) <br> v.         ) <br>      ) <br> JEFFERSON SCIENCE ASSOCIATES, LLC,  ) <br> a Virginia limited liability company,     ) <br> its successors and assigns;       ) <br>      ) <br> SOUTHEASTERN UNIVERSITIES      ) <br> RESEARCH ASSOCIATION, INC.,     ) <br> a nonprofit corporation, its successors & assigns;) <br>      ) <br> JENS DILLING, individually and in his    ) <br> official capacity;         ) <br> and          ) <br> SEAN HEARNE,         ) <br> individually and in his official capacity,   ) <br> *Defendants.*         ) <br>      ) | ECF Case <br> Civil Action No: <br><br> COMPLAINT <br><br><br> <u>JURY TRIAL</u> <br> <u>DEMANDED</u> |

Plaintiff, Dr. Cynthia E. Keppel, ("Plaintiff," or "Dr. Keppel") by and through her undersigned attorneys, alleges as follows:

**<u>PRELIMINARY STATEMENT</u>**

1. Dr. Keppel demands a trial by jury of all issues in this action.

2. Dr. Keppel is one of the most decorated female physicists in the United States.

3. Over the course of thirty years at the Thomas Jefferson National Accelerator Facility ("Jefferson Lab") operated by Jefferson Science Associates, LLC ("JSA") and Southeastern Universities Research Association, Inc. ("SURA"), she rose from Jefferson Lab Staff Scientist to Associate Director for the Jefferson Lab Physics

Division, and Director of the BioMedical Research and Innovation Center ("BRIC") (collectively, "Associate Director").

4. During her career she has earned international recognition in her field including the 2024 Physics World Top 10 Breakthrough, 2020 U.S. Department of Energy Office of Science Distinguished Scientist Fellow Award, a 2018 American Physical Division of Nuclear Physics Fellowship, the 2011 Virginia Outstanding Scientist Award, and service on the National Nuclear Science Advisory Committee (2016-2019).

5. In May 2025, Defendant Jens Dilling ("Dilling") was appointed as the new Laboratory Director of Jefferson Lab by JSA/SURA.

6. From the moment of his appointment, Dilling subjected Dr. Keppel to a sustained pattern of gender-based discrimination: routinely bypassing her to contact her male direct reports, interrupting and dismissing her contributions at weekly Directors' Council meetings while treating male colleagues with deference, falsely accusing her of professional misconduct, and implementing under the direction of SURA an unprecedented and discriminatory "Operations Audit" of her Physics Division — an audit targeted at her division alone and never imposed on any division led by a male.

7. On November 21, 2025, JSA/SURA terminated Dr. Keppel, without warning via a written notice stating, "this letter serves as formal notice that your employment with Jefferson Science Associates, LLC is terminated effective immediately."

8. JSA/SURA's stated justification — that her "ability to lead the division is not aligned with the direction of the organization" — was false, pretextual, and rooted in discriminatory animus toward Dr. Keppel's gender.

9. On November 21, 2025, as evidence of JSA/SURA's discriminatory hostility to Dr. Keppel, after 30 years of exemplary service to JSA/SURA at the Jefferson Lab, JSA security personnel immediately escorted her from the facility, disabled her access credentials, and did not permit her adequate time to even collect her personal belongings!

10. Following her termination, Defendants compounded their unlawful conduct by retaliating and defaming Dr. Keppel. On or about December 18, 2025 — two weeks after Dr. Keppel's legal counsel challenged her illegal termination — Defendant Dilling hosted a video conference attended by JSA/SURA employees, clients, customers, and members of the scientific community who had worked with Dr. Keppel for thirty years, and made unsupported, false, and slanderous allegations that Dr. Keppel had mismanaged the fiscal and safety aspects of her position.

11. These statements were deliberately intended to destroy Dr. Keppel's professional reputation, poison her relationships throughout the physics and national laboratory community, and prevent her from obtaining future employment commensurate with her career.

12. Thereafter, JSA/SURA and Dilling continued their retaliation of Dr. Keppel, by among other actions: failing to provide her with required COBRA notices, barring her from accessing her retirement funds held by JSA/SURA and continuing their defamatory campaign against her.

13. Dr. Keppel brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.; the Virginia Human Rights Act, Va. Code Ann. §§ 2.2-3900 et. seq. ("VHRA"); and the District of Columbia Human Rights Law, D.C.

Code §§ 2-1401.01 et seq. ("DCHRA"), the Employee Retirement Income Security Act, 29 U.S.C.A. §1140 et. seq. ("ERISA") and the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C.A. §1166 et. seq ("COBRA"). She seeks compensatory damages, punitive damages, injunctive and equitable relief, attorneys' fees and costs, and all other relief to which she is entitled.

## PARTIES

14. Dr. Keppel is a natural person residing at 30 Walters Road, Newport News, Virginia 23602. She is a citizen of the Commonwealth of Virginia. At all relevant times, Dr. Keppel was employed by JSA and SURA at the Jefferson Lab, 12000 Jefferson Avenue, Newport News, Virginia.

15. Defendant Jefferson Science Associates, LLC ("JSA") is a limited liability company organized under the laws of the Commonwealth of Virginia, with its principal place of business at 12000 Jefferson Avenue, Newport News, Virginia 23606, and its headquarters at 1201 New York Avenue, NW, Suite 430, Washington, DC 20005.

16. During the relevant time period, JSA operated and managed the Jefferson Lab under contract with the United States Department of Energy ("DOE").

17. At all relevant times, JSA employed fifteen (15) or more persons and constitutes an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), the VHRA, Va. Code Ann. § 2.2-3905, and the DCHRA, D.C. Code § 2-1401.02(10).

18. On information and belief, as of June 1, 2026, JSA's successor in interest is SURATech, LLC.

19. Defendant Southeastern Universities Research Association, Inc. ("SURA") is a non-profit corporation headquartered at 1201 New York Avenue, NW, Suite 430, Washington, DC 20005.

20. JSA is a wholly owned subsidiary of SURA.

21. Dr. Keppel was a joint employee of JSA/SURA.

22. SURA, acting through its President and CEO Sean Hearne, participated directly in the decisions to terminate Dr. Keppel and in the post-termination retaliatory and defamatory conduct described herein.

23. SURA exercised joint control over the terms and conditions of Dr. Keppel's employment and co-determined these conditions alongside JSA.

24. At all relevant times, SURA employed fifteen (15) or more persons and constitutes an "employer" within the meaning of Title VII, the VHRA, and the DCHRA.

25. Defendant Jens Dilling ("Dilling") is a natural person who, at all relevant times, served as Laboratory Director of Jefferson Lab, a position held under appointment by JSA/SURA. Dilling is the primary perpetrator of gender discrimination, hostile work environment, retaliatory conduct, and post-termination defamatory statements described herein. Dilling is sued individually and in his official capacity as Laboratory Director.

26. Defendant Sean Hearne ("Hearne") is a natural person who, at all relevant times, served as President and CEO of SURA. In that capacity, Hearne participated in and approved the discriminatory treatment of Dr. Keppel, the decision to terminate her employment, and the post-termination retaliatory conduct. Hearne is sued individually and in his official capacity as President and CEO of SURA.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over Dr. Keppel's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.

28.     This Court has supplemental jurisdiction over Dr. Keppel's state and local law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

29.     Venue is proper in the Eastern District of Virginia, Newport News Division, pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because JSA's principal place of business is in this District, Dr. Keppel was employed in this District, the unlawful employment practices alleged herein were committed principally in this District, and the relevant employment records are maintained in this District.

30.     On or about January 20, 2026, Dr. Keppel filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission against JSA (Charge No. 437-2026-00771) and SURA (Charge No. 437-2026-00772), alleging gender discrimination and retaliation in violation of Title VII. On April 15, 2026, Dr. Keppel received an EEOC Notice of Right to Sue as to Charge No. 437-2026-00772 (SURA).  On April 27, 2026, the EEOC issued a Determination and Notice of Rights to Dr. Keppel as to Charge No. 437-2026-00771 (JSA).

31.     This Complaint is filed within ninety (90) days of Dr. Keppel's receipt of the EEOC's Notice of Rights. All administrative prerequisites to the filing of this action have been satisfied.

## FACTUAL ALLEGATIONS

### A.    Dr. Keppel's Thirty-Year Career at Jefferson Laboratory

32.    Dr. Cynthia E. Keppel is a distinguished experimental nuclear physicist with an international reputation in her field. On or about 1995, Dr. Keppel was hired by JSA/SURA into a 50/50 joint position as Lab Staff Scientist at Jefferson Laboratory and as a Professor of Physics at Hampton University.

33.    In or about 2012, Dr. Keppel was appointed Experimental Hall A Leader at Jefferson Lab, a 100% laboratory position.

34.    JSA/SURA, recognizing her outstanding performance subsequently merged two experimental halls (A and C) under her leadership. In 2021, she was appointed Associate Director for the entire Physics Division at Jefferson Laboratory — one of the most senior scientific leadership positions at the facility.

35.    Throughout her thirty-year career at Jefferson Laboratory, Dr. Keppel performed all of her duties with exceptional skill, vision, and leadership. She founded numerous initiatives and programs both within JSA/SURA and in collaboration with other key national scientific organizations. At no time during her thirty years of service did JSA/SURA inform Dr. Keppel of any performance problem with her leadership, productivity, or management.

36.    To the contrary, Dr. Keppel received sustained and repeated recognition for her outstanding leadership and scientific contributions, including: (a) the 2020 U.S. Department of Energy Office of Science Distinguished Scientist Fellow Award; (b) the 2011 Virginia Outstanding Scientist Award; and (c) the 2010 Influential Women of Virginia Award, among other honors.

37. As Associate Director for Physics, Dr. Keppel served as one of nine members of the Directors' Council — the principal governing and policy-making body, at Jefferson Laboratory. She was one of only three women among the nine members of this council.

**B.  Dilling's Appointment and Immediate Creation of a Gender-Based Hostile Work Environment**

38. In or about May 2025, Defendant Jens Dilling was appointed Laboratory Director of Jefferson Lab by JSA/SURA.

39. Immediately upon his appointment, Dilling created a hostile work environment for Dr. Keppel based on her gender. This pattern of discriminatory conduct included the following.

40. Dilling routinely bypassed Dr. Keppel and contacted *her* male direct reports directly, rather than interacting with her through normal supervisory channels. This conduct was unprecedented and had the impact of undercutting Dr. Keppel's authority on scientific and administrative issues and signaled to her subordinates that her leadership was not respected by the Laboratory Director. Dilling did not engage in this conduct with similarly situated male executives of JSA/SURA.

41. During weekly Directors' Council meetings, Dilling frequently interrupted Dr. Keppel while she was speaking, something he did not do with similarly situated male members of the Council.

42. He repeatedly dismissed Dr. Keppel's opinions, conclusions, and professional recommendations---despite the fact that she had worked at the Jefferson Lab for over 30 years. Dilling did not do this to similarly situated male colleagues on the Council.

43.	Dilling's discriminatory behavior toward Dr. Keppel was observed and then emulated by other male executives. On several occasions during Directors' Council meetings, Dr. Keppel's professional opinions and assertions were belittled, discounted, and silenced by other male members of the Council. For example, David Dean ("Dean"), Deputy Director for Science and Technology, scornfully told Dr. Keppel that she "didn't understand the subtleties" of an issue she had worked on for nearly thirty years. Dean never treated similarly situated male executives in the same manner. Dean, like Dilling, also routinely bypassed Dr. Keppel to contact her direct reports directly, undercutting her authority on a gender basis.

44.	In or about October 2025, during a Directors' Council meeting, Dr. Keppel directly witnessed Dilling insult, scold, and bully Amber Boehnlein — the one other female scientific management member of the Council at the time.

45.	Dilling's scornful and discriminatory belittling of Dr. Boehnlein occurred after she referred to Dr. Keppel while making a point about management issues. Dr. Keppel never witnessed Dilling treat any male member of the Council in a comparable manner.

46.	Dilling chose a less qualified male to deliver a presentation to the Secretary of the Department of Energy in August 2025.

47.	Dilling implemented, under the direction of Hearne at SURA, a discriminatory "Operations Audit" of Dr. Keppel's division—a voluntary action never previously taken by JSA/SURA against any male director of a division.

**C.  JSA and Dilling Attempt to Manufacture Pretextual Reasons for a False Basis for**

**Dr. Keppel's Termination**

48. In or about August 2025, in a futile effort to manufacture a non-discriminatory justification for terminating Dr. Keppel, Dilling baselessly accused her of ignoring his directive that a lesser-qualified male employee deliver a technical presentation to the Secretary of the Department of Energy. Dilling's accusation was false. Dr. Keppel had been specifically requested by JSA/SURA's Chief Communications Officer to deliver the presentation because of her superior experience, competence, and ability to communicate effectively, in lieu of the lesser-qualified male individual whom Dilling had selected.

49. On or about November 4, 2025, again in an effort to manufacture a non-discriminatory justification for terminating Dr. Keppel, Hearne ordered and Dilling implemented an unprecedented "Operations Audit" of Dr. Keppel's Physics Division without legitimate justification.

50. This discriminatory audit was the first such voluntary, targeted review ever imposed on any division at Jefferson Laboratory and was clearly a pretextual attempt to justify terminating Dr. Keppel by manufacturing a non-discriminatory justification.  Only months before, the Department of Energy in its annual operations "report card" recognized Dr. Keppel's superior leadership by awarding the only two A-level ratings to the Lab, for work largely performed by Dr. Keppel's division.

51. JSA/SURA had never ordered a comparable operations audit for any division headed by a male executive. The discriminatory purpose of this audit was to tarnish Dr. Keppel's reputation and that of her division and to provide a pretextual business

rationale for her termination. The audit itself demonstrated that Dr. Keppel's division met all performance expectations and applicable safety standards.

52.    The audit ordered by Hearn/SURA and implemented by Dilling/JSA was gender-based discrimination.

**D.    Dr. Keppel's Unlawful Termination on November 21, 2025**

53.    On November 21, 2025 — less than seven months after Dilling was appointed Laboratory Director — JSA issued Dr. Keppel a written Termination Notice that expressly stated: "After careful consideration, this letter serves as formal notice that your employment with Jefferson Science Associates, LLC is terminated effective immediately." The Termination Notice checked the box marked "Termination" (in bold).

54.    The stated justification for Dr. Keppel's termination was that "the Lab Director (Dilling) determined that your ability to lead the division is not aligned with the direction of the organization."

55.    This justification was false and pretextual. It was the product of Dilling's discriminatory evaluation of Dr. Keppel's leadership — an evaluation infected from the outset by his documented gender bias — and bore no relationship to Dr. Keppel's actual performance, which had been exemplary throughout her career.

56.    Moreover, at no time during the seven months that Dilling supervised Dr. Keppel did he discuss or evaluate Dr. Keppel's leadership performance nor did he counsel her on these alleged deficiencies.

57. Keppel's termination for alleged leadership failures was pretextual as evidenced by the fact that it violated the Jefferson Laboratory Code of Conduct, the Administrative Manual, and standard Human Resource practices employed by JSA.

58. Immediately upon delivering the Termination Notice, JSA security personnel escorted Dr. Keppel from the facility, disabled her security badge, and did not give her adequate time to collect her personal belongings.

59. The head of JSA Human Resources, who presided over Dr. Keppel's summary termination, told Dr. Keppel that someone would arrange for her to retrieve her personal items "after hours." At no time was Dr. Keppel informed by that the Termination Notice was not operationally effective or that its plain terms were anything other than an immediate and irreversible termination by JSA.

60. Attached to the Termination Notice was an unsigned letter, also dated November 21, 2025, offering Dr. Keppel "the opportunity to transition to an individual contributor role." The letter did not specify the salary or duties of the proposed role; required, as a condition of acceptance, that Dr. Keppel submit "a letter of resignation indicating your decision to step down as Division Head; imposed a one-business-day deadline of Monday, November 24, 2025, for her decision; and required her agreement to a sweeping non-disparagement provision applicable both during and indefinitely after her employment. The letter stated that if written notification was not received by November 24, 2025, "your termination from JSA will be effective on Tuesday, November 25, 2025."

61. The clear purpose of this letter was to "strong-arm" Dr. Keppel into silence about the discriminatory treatment by JSA/SURA.

62. Dr. Keppel rejected this offer. Accepting it would have required her to falsely state that she had voluntarily resigned from a position from which she had in fact been terminated and would have subjected her to a non-disparagement agreement whose conditions were discriminatory and retaliatory.

63. JSA/SURA's demand that Dr. Keppel falsely represent that she resigned, as a condition of receiving what was in effect a demotion, was itself independently discriminatory and retaliatory, and on information and belief violated federal government contract regulations.

64. JSA/SURA reinforced the discriminatory nature of its decision by: (a) immediately replacing Dr. Keppel with a less qualified male; (b) failing to elevate Dr. Keppel's female deputy — who had served in that role for ten years — to the position; (c) eliminating one-third of the female representation on the nine-member Directors' Council; and (d) leaving only three women among approximately thirty high-level supervisors in the science and direct-funding arm of Jefferson Lab.

65. JSA/SURA further discriminated against Dr. Keppel by refusing to offer her any severance pay upon her sudden termination after thirty years of service, notwithstanding a pattern and practice of offering severance to departing male executives.

66. Each of these acts is additional evidence of the severe or pervasive hostile work environment based on gender created by Dilling/JSA under the direction of Hearne/SURA.

**E.  Dilling's Post-Termination Retaliatory and Defamatory Statements to the Scientific Community that Dr. Keppel had served with distinction for 30 years.**

67. On or about November 25, 2025, Dr. Keppel engaged in protected activity under Title VII, the VHRA, and the DCHRA by retaining legal counsel to challenge her unlawful termination.

68. On or about November 26, 2025, Dr. Keppel's counsel of record informed JSA General Counsel, Rhonda Scales, that it had been retained and was the plaintiff's legal representative.

69. On or about December 3, 2025, Dr. Keppel's counsel of record sent a letter to Scales stating in pertinent part: "…JSA's termination of our client was based on illegal discrimination in violation of Title VII of the Civil Rights Act of 1964, (42 U.S.C.A. §2000e-2(a) and the Virgina Human Rights Act (Chapter 39 of the Virginia Code) …" On information and belief, SURA was contemporaneously made aware of the occurrence of these numerous protected actions.

70. On or about December 18, 2025, in direct retaliation for this protected act and also as further evidence of gender discrimination, Defendant Dilling hosted a live and video conference attended by JSA/SURA employees, clients, customers, business partners, and other members of the scientific and national laboratory community who had worked with Dr. Keppel over the course of her thirty-year career. On information and belief, approximately three hundred (300) people attended this defamatory and retaliatory conference organized by Dilling/JSA/SURA.

71. At this video conference, Dilling made unsupported, false, and defamatory statements alleging that Dr. Keppel had mismanaged the fiscal, safety and operational aspects of her position at JSA/SURA.

72. These statements were false, retaliatory and discriminatory.

73. Dr. Keppel had not mismanaged the fiscal operations or safety program of the Physics Division. The November 2025 Operations Audit — which Dilling/JSA and Hearne/SURA had ordered as a pretextual exercise — confirmed that under her direction, Dr. Keppel's division met all performance expectations and safety standards. The financial management of her division was sound. Dilling knew these statements were false when he made them or made them with reckless disregard for their truth or falsity.

74. Dilling's false statements at the December 18, 2025, conference were made with actual malice and for the specific purpose of punishing Dr. Keppel for retaining counsel to oppose her unlawful termination, and to destroy her professional reputation in the physics and national laboratory community that she had assiduously built for 30 years, to prevent her from obtaining future employment.

75. Dilling made these false and defamatory statements within the scope of his employment with JSA and was authorized by both JSA and SURA to make these statements, which were ratified by both JSA and SURA.

76. Due to Dilling's false and defamatory statements, Dr. Keppel was forced to oppose the discrimination and retaliation by issuing her own email defending her reputation and record.

## F.     Continued Retaliation: The December 22, 2025, Demotion Offer

77. On December 22, 2025, JSA further retaliated against Dr. Keppel by offering her a "conversion position" as "Nuclear Physics Special Advisor" at a salary reduction of approximately $100,000 per year. This offer was retaliatory as it was made after Dr. Keppel's protected acts to oppose discrimination.

78. Dr. Keppel rejected this discriminatory and retaliatory offer. The proposed position bore no reasonable relationship to her experience, qualifications, or career trajectory, and the salary reduction was punitive and without legitimate justification.

79. Since her termination, Dr. Keppel, at great personal expense, has consistently and publicly represented to the scientific and laboratory community that she is no longer employed by JSA/SURA.

80. On January 5, 2026, Dr. Keppel engaged in the protected act of sending an email to colleagues, associates, and members of the scientific community describing her termination and the discrimination and retaliation she experienced during her final year of employment.

**G.    JSA/SURA Retaliate Against Dr. Keppel by Failing to Timely Provide COBRA Notices**

81. On November 21, 2025, JSA and SURA terminated Dr. Keppel.

82. Dr. Keppel's termination was a qualifying event under COBRA.

83. On information and belief, upon Dr. Keppel's illegal termination, JSA terminated her health insurance.

84. JSA, as Dr. Keppel's employer and the party responsible for administering or ensuring compliance with the group health plan's COBRA notice obligations, was required to provide Dr. Keppel with timely written notice of her right to elect COBRA continuation coverage following her termination.

85. JSA failed to provide Dr. Keppel with the COBRA election notice within the time required by 29 U.S.C. § 1166, and to date has failed to provide proper notice.

86.    JSA's failure to provide timely COBRA notice was willful, and deprived Dr. Keppel of a meaningful opportunity to elect and maintain continuous group health coverage during a critical period following her unlawful termination.

87.    Because of JSA's failure, Dr. Keppel was forced to obtain health insurance on her own.

88.    JSA's failure to provide the legally required COBRA Notice was retaliation for Dr. Keppel's protected acts.

89.    JSA's failure to provide the legally required COBRA Notice is also additional evidence of discrimination, as on information and belief, all similarly situated male employees receive this notice and Dr. Keppel is aware that at the same time she was terminated a similarly situated male employee who was also terminated was provided with proper COBRA Notice.

## H.    JSA/SURA Retaliate Against Dr. Keppel by Denying access to her Retirement Funds

90.    By virtue of her thirty years of employment by JSA/SURA, Dr. Keppel was a participant in an employee retirement plan sponsored and/or maintained in connection with her employment by JSA/SURA, and she possessed vested and/or accrued rights to retirement benefits thereunder.

91.    Following her termination on November 21, 2025, and continuing after her protected act of retaining legal counsel to oppose JSA/SURA's discrimination, on or about December 3, 2025, JSA denied Dr. Keppel access to her retirement funds, without legitimate explanation or justification.

92. On January 14, 2026, Dr. Keppel attempted to withdraw from her SURA/Jefferson Science Associates 401K and the holder of these funds, TIAA denied her request, purportedly because JSA/SURA falsely maintained that she was still employed by JSA/SURA and she was therefore ineligible to receive a distribution.

93. On February 26, 2026, Dr. Keppel attempted to withdraw from her SURA/Jefferson Science Associates 401K and the holder of these funds, TIAA denied her request, purportedly because JSA/SURA falsely maintained that she was still employed by JSA/SURA and she was therefore ineligible to receive a distribution.

94. On March 6, 2026, Dr. Keppel attempted to withdraw from her SURA/Jefferson Science Associates 401K and the holder of these funds, TIAA denied her request, purportedly because JSA/SURA falsely maintained that she was still employed by JSA/SURA and she was therefore ineligible to receive a distribution.

95. JSA/SURA's denial of access to Dr. Keppel's retirement funds was undertaken for the purpose of interfering with her attainment of rights to which she was or may have become entitled under the plan, and/or in retaliation for her exercise of protected rights, including her opposition to unlawful discrimination and retaliation, in violation of 29 U.S.C. § 1140.

96. JSA/SURA's conduct was willful and undertaken with knowledge of, or reckless disregard for, Dr. Keppel's rights under the plan and under ERISA.

97. JSA's failure to allow Dr. Keppel access to her retirement funds was a retaliation for Dr. Keppel's protected acts and additional evidence of discrimination, as Dr. Keppel is not aware of a similarly situated male employee who was denied access to his retirement funds after termination.

## I.      Dr. Keppel's Separation from JSA/SURA and Ongoing Harm

98.    As a direct and proximate result of Defendants' conduct, Dr. Keppel has suffered and continues to suffer loss of employment; loss of income and benefits commensurate with her position as Associate Director for Physics; severe reputational harm within the national and international physics and laboratory community; loss of professional relationships and future employment opportunities; and significant emotional distress, pain, suffering, and mental anguish.

## CAUSES OF ACTION

### COUNT I
### Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964
*42 U.S.C. §§ 2000e-2(a)*
*(Against Defendant JSA)*

99.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

100.   Title VII, 42 U.S.C. § 2000e-2(a), makes it an unlawful employment practice for an employer to discharge or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment because of her sex, or to limit, segregate, or classify employees in any way that deprives any individual of employment opportunities because of sex.

101.   Dr. Keppel is a woman. She was indisputably qualified for her position after thirty years of distinguished service.

102.   JSA subjected Dr. Keppel to gender discrimination in violation of Title VII through: (a) the imposition of a hostile work environment in which her professional authority was systematically bypassed, her contributions to the Directors' Council were interrupted, dismissed, and silenced in ways that did not occur with male colleagues, and gender-based disparate treatment pervaded her daily professional interactions; (b) the imposition of a

pretextual Operations Audit on her division alone, a form of heightened scrutiny never applied to male-led divisions; (c) the false accusation that she had violated a directive from Dilling regarding the DOE presentation; (d) the pretextual termination of her employment on November 21, 2025, based on the false assertion that her "ability to lead is not aligned with the direction of the organization"; (e) the immediate replacement of Dr. Keppel with a less qualified male; (f) the denial of severance despite a pattern and practice of providing it to departing male executives; and (g) the demand that she falsely represent that she had voluntarily resigned as a condition of any continued employment.

103.    JSA's conduct was willful, intentional, and motivated by discriminatory animus toward Dr. Keppel on account of her sex or was undertaken with reckless indifference to her federally protected rights.

104.    As a direct and proximate result of JSA's gender discrimination, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees in amounts to be proven at trial. Dr. Keppel is further entitled to punitive damages under 42 U.S.C. § 1981a for JSA's malicious and reckless conduct.

**COUNT II**
**Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964**
*42 U.S.C. §§ 2000e-2(a)*
*(Against Defendant SURA)*

105.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

106.    Title VII, 42 U.S.C. § 2000e-2(a), makes it an unlawful employment practice for an employer to discharge or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment because of her sex, or to

limit, segregate, or classify employees in any way that deprives any individual of employment opportunities because of sex.

107. Dr. Keppel is a woman. She was indisputably qualified for her position after thirty years of distinguished service.

108. As joint employer, SURA subjected Dr. Keppel to gender discrimination in violation of Title VII through: (a) the authorization and ratification of a hostile work environment in which her professional authority was systematically bypassed, her contributions to the Directors' Council were interrupted, dismissed, and silenced in ways that did not occur with male colleagues, and gender-based disparate treatment pervaded her daily professional interactions; (b) the imposition of a pretextual Operations Audit on her division alone, a form of heightened scrutiny never applied to male-led divisions; (c) the false accusation that she had violated a directive from Dilling regarding the DOE presentation; (d) the pretextual termination of her employment on November 21, 2025, based on the false assertion that her "ability to lead is not aligned with the direction of the organization"; (e) the immediate replacement of Dr. Keppel with a less qualified male; (f) the denial of severance despite a pattern and practice of providing it to departing male executives; and (g) the demand that she falsely represent that she had voluntarily resigned as a condition of any continued employment.

109. SURA's conduct was willful, intentional, and motivated by discriminatory animus toward Dr. Keppel on account of her sex or was undertaken with reckless indifference to her federally protected rights.

110. As a direct and proximate result of SURA's gender discrimination, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other

compensatory damages, including attorney's fees, in amounts to be proven at trial. Dr. Keppel is further entitled to punitive damages under 42 U.S.C. § 1981a for SURA's malicious and reckless conduct.

**COUNT III**
**Hostile Work Environment Based on Sex in Violation of Title VII**
*42 U.S.C. §§ 2000e-2(a)*
*(Against Defendant JSA)*

111. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

112. Title VII prohibits an employer from subjecting an employee to a hostile or abusive work environment based on sex. A hostile work environment exists where the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

113. Beginning with Dilling's appointment in May 2025 and continuing through her termination on November 21, 2025, Dr. Keppel was subjected to a hostile work environment based on her sex. The hostile environment was created by Dilling, acting within the scope of his authority as Laboratory Director, appointed by JSA. It consisted of persistent circumvention of Dr. Keppel's managerial authority; repeated interruptions and public dismissal of her professional contributions at the Directors' Council in front of her peers; the selection of an underqualified male to deliver a presentation to a government official; demeaning treatment by other male members who took their cues from Dilling's discriminatory behavior; fabricated professional accusations; a pretextual Operations Audit; and the compounded humiliation of her public ejection from the facility immediately upon receiving her termination notice.

114.   This conduct was severe and pervasive, was based on Dr. Keppel's sex, and unreasonably interfered with her ability to perform her duties as Associate Director for Physics. JSA knew or should have known of this hostile environment and failed to take prompt corrective action.

115.   As a direct and proximate result of the hostile work environment created by JSA/Dillings, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Dr. Keppel is further entitled to punitive damages under 42 U.S.C. § 1981a for JSA/Dilling's malicious and reckless conduct.

**COUNT IV**
**Hostile Work Environment Based on Sex in Violation of Title VII**
*42 U.S.C. §§ 2000e-2(a)*
*(Against Defendant SURA)*

116.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

117.   Title VII prohibits an employer from subjecting an employee to a hostile or abusive work environment based on sex. A hostile work environment exists where the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

118.   As joint employer, SURA authorized and ratified a gender based hostile work environment directed at Dr. Keppel.   SURA began this with Dilling's appointment in May 2025 by selecting him as the JSA Lab Director. SURA authorized and ratified Dilling's discriminatory actions to circumvent Dr. Keppel's managerial authority through repeated interruptions and public dismissal of her professional contributions at the Directors' Council in front of her peers; demeaning treatment by other male members who took their

cues from Dilling's discriminatory behavior and fabricated professional accusations. In addition, SURA ordered Dilling to implement the discriminatory and pretextual Operations Audit and authorized and ratified the humiliation of her public ejection from the facility immediately upon receiving her termination notice.

119. This conduct was severe and pervasive, was based on Dr. Keppel's sex, and unreasonably interfered with her ability to perform her duties as Associate Director for Physics. SURA knew or should have known of this hostile environment and failed to take prompt corrective action.

120. As a direct and proximate result of SURA's gender discrimination, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Dr. Keppel is further entitled to punitive damages under 42 U.S.C. § 1981a for SURA's malicious and reckless conduct.

**COUNT V**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
*42 U.S.C. § 2000e-3(a)*
*(Against Defendant JSA)*

121. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

122. Title VII, 42 U.S.C. § 2000e-3(a), prohibits an employer from retaliating against any individual because she has opposed an unlawful employment practice or engaged in any protected activity under Title VII.

123. Dr. Keppel engaged in activity protected under Title VII by, among other things, retaining legal counsel on or about November 25, 2025, and challenging the unlawful, gender-motivated termination of her employment.

124. On or about November 26, 2025 and then again on December 3, 2025, JSA was informed that Dr. Keppel had retained counsel to oppose its unlawful practices. On or about December 3, 2025, Dr. Keppel's counsel asserted violations of Title VII. In direct response to this protected activity, among others, JSA, acting through Defendant Dilling, engaged in materially adverse retaliatory conduct, including but not limited to: (a) on or about December 18, 2025, Dilling hosting a video conference, on behalf of JSA, at which he made false and defamatory statements to members of the scientific and laboratory community—including Dr. Keppel's professional colleagues, clients, and business partners of thirty years—alleging that she had mismanaged the fiscal and safety aspects of her position; (b) on December 22, 2025, JSA offering Dr. Keppel a demotion to a "Nuclear Physics Special Advisor" position at a salary reduction of approximately $100,000, conditioned on her acceptance of a punitive non-disparagement obligation; (c) violating Dr. Keppel's rights under COBRA; and (d) violating Dr. Keppel's rights under ERISA to access her retirement funds.

125. A causal connection exists between Dr. Keppel's protected activity and these adverse actions. The defamatory video conference occurred within fifteen (15) days of her counsel's assertion of her claims. The demotion offer followed days later. Each additional retaliation occurred shortly thereafter. The temporal proximity, combined with the retaliatory nature of these communications and actions establishes causation.

126. JSA's retaliatory conduct was willful, intentional, and malicious, or was undertaken with reckless indifference to Dr. Keppel's federally protected rights.

127. As a direct and proximate result of JSA's retaliation, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial.

**COUNT VI**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
*42 U.S.C. § 2000e-3(a)*
*(Against Defendant SURA)*

128. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

129. Title VII, 42 U.S.C. § 2000e-3(a), prohibits an employer from retaliating against any individual because she has opposed an unlawful employment practice or engaged in any protected activity under Title VII.

130. Dr. Keppel engaged in activity protected under Title VII by, among other things, retaining legal counsel on or about on or about November 25, 2025, to challenge the unlawful, gender-motivated termination of her employment.

131. On or about November 26, 2025, and then again on December 3, 2025, JSA, and on information and belief, SURA, was informed that Dr. Keppel had retained counsel to oppose its unlawful practices. On or about December 3, 2025, Dr. Keppel's counsel asserted violations of Title VII. In direct response to this protected activity, among others, joint employer, SURA engaged in materially adverse retaliatory conduct by authorizing and ratifying the following actions: (a) on or about December 18, 2025, Dilling hosted a video conference, on behalf of SURA, at which he made false and defamatory statements to members of the scientific and laboratory community—including Dr. Keppel's professional colleagues, clients, and business partners of thirty years—alleging that she had mismanaged the fiscal and safety aspects of her position; and (b) on December 22, 2025, Dr. Keppel was offered a retaliatory demotion to a "Nuclear Physics Special

Advisor" position at a salary reduction of approximately $100,000, conditioned on her acceptance of a punitive non-disparagement obligation; (c) violating Dr. Keppel's rights under COBRA; and (d) violating Dr. Keppel's rights under ERISA to access her retirement funds.

132. A causal connection exists between Dr. Keppel's protected activity and these adverse actions. The defamatory video conference occurred within fifteen (15) days of her counsel's assertion of her claims. The demotion offer followed days later. Each additional retaliation occurred shortly thereafter. The temporal proximity, combined with the retaliatory nature of these communications and actions establishes causation.

133. SURA's retaliatory conduct was willful, intentional, and malicious, or was undertaken with reckless indifference to Dr. Keppel's federally protected rights.

134. As a direct and proximate result of SURA's retaliation, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial.

**COUNT VII**
**Gender Discrimination and Hostile Work Environment in Violation of the Virginia Human Rights Act**
*Va. Code Ann. §§ 2.2-3900 et seq.*
*(Against Defendant JSA)*

135. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

136. The VHRA, Va. Code Ann. § 2.2-3905(B)(1), prohibits an employer from discriminating against any individual in the terms, conditions, or privileges of employment because of sex. The VHRA also prohibits the creation or maintenance of a hostile work environment based on sex. Va. Code Ann. § 2.2-3905(B)(1)(a).

137. JSA employed fifteen (15) or more employees at all relevant times and constitutes a covered employer under Va. Code Ann. § 2.2-3905(A).

138. JSA discriminated against Dr. Keppel because of her sex in violation of the VHRA by: systematically undermining her authority and contributions through gender-based conduct by Dilling and Dean; imposing a pretextual Operations Audit on her division alone; appointing an underqualified male to make a presentation to a government official; falsely accusing her of professional misconduct regarding that presentation; terminating her employment based on a pretextual leadership assessment; replacing her with a less qualified male; denying her severance offered to comparable male executives; and demanding she falsely represent a resignation as a condition of continued employment.

139. JSA also created and maintained a hostile work environment based on Dr. Keppel's sex in violation of the VHRA.

140. As a direct and proximate result of JSA's discrimination, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Because JSA's conduct was willful and in knowing violation of the VHRA, Dr. Keppel is entitled to punitive damages pursuant to Va. Code Ann. § 2.2-3908(B).

**COUNT VIII**
**Gender Discrimination and Hostile Work Environment in Violation of the Virginia Human Rights Act**
*Va. Code Ann. §§ 2.2-3900 et seq.*
*(Against Defendant SURA)*

141. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

142. The VHRA, Va. Code Ann. § 2.2-3905(B)(1), prohibits an employer from discriminating against any individual in the terms, conditions, or privileges of employment because of

sex. The VHRA also prohibits the creation or maintenance of a hostile work environment based on sex. Va. Code Ann. § 2.2-3905(B)(1)(a).

143. SURA employed fifteen (15) or more employees at all relevant times and constitutes a covered employer under Va. Code Ann. § 2.2-3905(A).

144. SURA discriminated against Dr. Keppel because of her sex in violation of the VHRA by authorizing and ratifying the following illegal conduct: systematically undermining her authority and contributions through gender-based conduct by Dilling and Dean; imposing a pretextual Operations Audit on her division alone; appointing an underqualified male to make a presentation to a government official; falsely accusing her of professional misconduct regarding that presentation; terminating her employment based on a pretextual leadership assessment; replacing her with a less qualified male; denying her severance offered to comparable male executives; and demanding she falsely represent a resignation as a condition of continued employment.

145. SURA also created and maintained a hostile work environment based on Dr. Keppel's sex in violation of the VHRA.

146. As a direct and proximate result of SURA's discrimination, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Because JSA's conduct was willful and in knowing violation of the VHRA, Dr. Keppel is entitled to punitive damages pursuant to Va. Code Ann. § 2.2-3908(B).

**COUNT IX**
**Retaliation in Violation of the Virginia Human Rights Act**
*Va. Code Ann. §§ 2.2-3900 et seq.*
*(Against Defendant JSA)*

147. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

148. The VHRA, Va. Code Ann. § 2.2-3905(B)(1)(f), prohibits retaliation against any person because she has opposed a practice made unlawful by the VHRA or participated in any investigation, proceeding, or hearing under the VHRA.

149. On or about November 26, 2025 and then again on December 3, 2025, JSA was informed that Dr. Keppel had retained counsel to oppose its unlawful practices. On or about December 3, 2025, Dr. Keppel's counsel asserted violations of Title VII. In direct response to this protected activity, among others, JSA, acting through Defendant Dilling, engaged in materially adverse retaliatory conduct, including but not limited to: (a) on or about December 18, 2025, Dilling hosting a video conference, on behalf of JSA, at which he made false and defamatory statements to members of the scientific and laboratory community—including Dr. Keppel's professional colleagues, clients, and business partners of thirty years—alleging that she had mismanaged the fiscal and safety aspects of her position; (b) on December 22, 2025, JSA offering Dr. Keppel a demotion to a "Nuclear Physics Special Advisor" position at a salary reduction of approximately $100,000, conditioned on her acceptance of a punitive non-disparagement obligation; (c) violating Dr. Keppel's rights under COBRA; and (d) violating Dr. Keppel's rights under ERISA to access her retirement funds.

150. A causal connection exists between Dr. Keppel's protected activity and these adverse actions. The defamatory video conference occurred within fifteen (15) days of her counsel's assertion of her claims. The demotion offer followed days later. Each additional retaliation occurred shortly thereafter. The temporal proximity, combined with the retaliatory nature of these communications and actions establishes causation.

151. JSA's retaliatory conduct was willful, intentional, and malicious, or was undertaken with reckless indifference to Dr. Keppel's protected rights under the VHRA.

152. As a direct and proximate result, Dr. Keppel has suffered reputational harm, lost income and opportunities, emotional distress, and other compensatory and punitive damages in amounts to be proven at trial.

153. As a direct and proximate result of JSA's retaliation, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Because JSA's conduct was willful and in knowing violation of the VHRA, Dr. Keppel is entitled to punitive damages pursuant to Va. Code Ann. § 2.2-3908(B).

**COUNT X**
**Retaliation in Violation of the Virginia Human Rights Act**
*Va. Code Ann. §§ 2.2-3900 et seq.*
*(Against Defendant SURA)*

154. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

155. The VHRA, Va. Code Ann. § 2.2-3905(B)(1)(f), prohibits retaliation against any person because she has opposed a practice made unlawful by the VHRA or participated in any investigation, proceeding, or hearing under the VHRA.

156. On or about November 26, 2025 and then again on December 3, 2025, JSA, and on information and belief, SURA, was informed that Dr. Keppel had retained counsel. Dr. Keppel engaged in protected conduct under the VHRA to oppose her unlawful, gender-motivated termination. SURA retaliated against her by authorizing and ratifying the following actions: (a) on or about December 18, 2025, Dilling hosted a video conference, at which he made false and defamatory statements to members of the scientific and laboratory community—including Dr. Keppel's professional colleagues, clients, and

business partners of thirty years—alleging that she had mismanaged the fiscal and safety aspects of her position; (b) on December 22, 2025, Dr. Keppel was offered a retaliatory demotion to a "Nuclear Physics Special Advisor" position at a salary reduction of approximately $100,000, conditioned on her acceptance of a punitive non-disparagement obligation; (c) violating Dr. Keppel's rights under COBRA; and (d) violating Dr. Keppel's rights under ERISA to access her retirement funds.

157.  A causal connection exists between Dr. Keppel's protected activity and these adverse actions. The defamatory video conference occurred within fifteen (15) days of her counsel's assertion of her claims.  The demotion offer followed days later. Each additional retaliation occurred shortly thereafter.  The temporal proximity, combined with the retaliatory nature of these communications and actions establishes causation.

158.  SURA's retaliatory conduct was willful, intentional, and malicious, or was undertaken with reckless indifference to Dr. Keppel's protected rights under the VHRA.

159.  As a direct and proximate result of SURA's retaliation, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Because SURA's conduct was willful and in knowing violation of the VHRA, Dr. Keppel is entitled to punitive damages pursuant to Va. Code Ann. § 2.2-3908(B).

**COUNT XI**
**Gender Discrimination, Hostile Work Environment, and Retaliation in Violation of the District of Columbia Human Rights Law**
*D.C. Code §§ 2-1401.01 et seq.*
*(Against All Defendants)*

160.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

161. The DCHRA, D.C. Code § 2-1402.11, makes it an unlawful discriminatory practice for an employer to fail or refuse to hire, discharge, or otherwise discriminate against any individual in the terms, conditions, or privileges of employment because of sex. The DCHRA further prohibits retaliation against an employee who has opposed a discriminatory practice. D.C. Code § 2-1402.61.

162. Both JSA and SURA maintain their headquarters at 1201 New York Avenue, NW, Washington, DC, and constitute employers subject to the DCHRA. The discriminatory and retaliatory decisions described herein originated and were transmitted from Defendants' Washington, DC headquarters, giving rise to claims under D.C. law.

163. Defendants discriminated against Dr. Keppel because of her sex, created and maintained a gender-based hostile work environment, and retaliated against her for engaging in protected conduct, all in violation of the DCHRA.

164. Defendants Dilling and Hearne are individually liable under the DCHRA as aiders and abettors of the discriminatory and retaliatory practices described herein, pursuant to D.C. Code § 2-1402.62.

165. As a direct and proximate result of Defendants' violations of the DCHRA, Dr. Keppel has suffered the damage described herein. She is entitled to compensatory damages, punitive damages, injunctive relief, attorneys' fees, and costs under D.C. Code §§ 2-1403.13 and 2-1403.16.

**COUNT XII**
**Post-Employment Defamation Per Se**
*(Virginia Common Law)*
*(Against Defendants Dilling, JSA, and SURA)*

166. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

167. On or about December 18, 2025, Defendant Dilling, acting within the scope of his authority as Laboratory Director of Jefferson Lab and on behalf of JSA and SURA, hosted a video conference attended by JSA/SURA employees, clients, customers, and members of the scientific and national laboratory community—individuals and organizations who had worked with Dr. Keppel over the course of her thirty-year career at Jefferson Lab.

168. At this video conference, Dilling made false statements of fact about Dr. Keppel, including but not limited to that Dr. Keppel had mismanaged the fiscal aspects of her position as Associate Director for Physics; that Dr. Keppel had mismanaged the safety aspects of her division; and related false characterizations of her professional fitness and competence.

169. These statements were false. Dr. Keppel did not mismanage the fiscal or safety operations of her division. The Operations Audit that Dilling himself commissioned in November 2025 confirmed that her division met all performance expectations and safety standards. The fiscal management of the Physics Division was sound. Dilling knew these statements were false when he made them or made them with reckless disregard for their truth or falsity.

170. Dilling's false statements constituted defamation per se under Virginia law because they imputed unfitness to perform the duties of Dr. Keppel's profession and prejudiced her in her profession, trade, and occupation as a senior physicist and scientific administrator.

171. Dilling made these statements with actual malice, with knowledge of their falsity or with reckless disregard for whether they were true or false. His motive was to punish Dr. Keppel for her protected activities, and to destroy her professional standing in the physics and national laboratory community to prevent her from obtaining future employment commensurate with her career.

172. No qualified or absolute privilege protects these communications. The communications were made to a broad audience of professional contacts who had no administrative, supervisory, or legal need to receive information about the internal personnel decisions of JSA/SURA. Dilling exceeded any conceivable legitimate employer purpose by publicly impugning Dr. Keppel's professional competence with her entire professional network.

173. As a direct and proximate result of Dilling's defamatory statements, for which JSA and SURA are vicariously liable as each authorized and ratified these communications, Dr. Keppel has suffered: severe damage to her professional reputation in the national and international physics and laboratory community; loss of professional relationships and future employment opportunities; emotional distress, humiliation, and reputational harm; and other economic and non-economic damages in amounts to be proven at trial.

174. Dr. Keppel is entitled to compensatory damages including lost wages, lost employment opportunities, emotional distress, humiliation and damage to personal reputation. The Plaintiff is also entitled to presumed damages because the defamatory statements imputed her business reputation. Finally, because the defamatory statements were made with actual malice Dr. Keppel is entitled to punitive damages.

**COUNT XIII**
**Failure to Provide Timely COBRA Notice**
*29 U.S.C. § 1166; 29 U.S.C. § 1132(c)*
*(Against Defendant JSA)*

175. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

176. COBRA, 29 U.S.C. § 1161 et seq., requires that the administrator of a group health plan provide a qualified beneficiary, including an employee who has experienced a qualifying event such as termination of employment, with notice of the right to elect continuation of

group health coverage. 29 U.S.C. § 1166(a)(2), (c). Such notice must generally be provided within forty-four (44) days of the qualifying event.

177. Dr. Keppel experienced a qualifying event under COBRA on November 21, 2025, when JSA terminated her employment and, with it, her active coverage under JSA's group health plan.

178. JSA, as Dr. Keppel's employer and the party responsible for administering or ensuring compliance with the group health plan's COBRA notice obligations, was required to provide Dr. Keppel with timely written notice of her right to elect COBRA continuation coverage following her termination.

179. JSA failed to provide Dr. Keppel with the COBRA election notice within the time required by 29 U.S.C. § 1166, and to date has failed to provide proper notice.

180. JSA's failure to provide timely COBRA notice was willful, or in the alternative, was undertaken without reasonable cause, and deprived Dr. Keppel of a meaningful opportunity to elect and maintain continuous group health coverage during a critical period following her unlawful termination.

181. As a direct and proximate result of JSA's failure to provide timely COBRA notice, Dr. Keppel has suffered damages, including exposure to uninsured medical expenses, loss of continuous health coverage, and related financial and emotional harm.

182. Pursuant to 29 U.S.C. § 1132(c)(1), Dr. Keppel is entitled to statutory penalties of up to $110 per day for each day that JSA has failed to provide the required COBRA notice, measured from the date such notice was due, together with an order compelling JSA to provide the required notice and/or coverage, and such other legal and equitable relief, including attorney fees, as the Court deems appropriate.

**COUNT XIV**
**Interference with ERISA Rights in Violation of ERISA § 510**
*29 U.S.C. § 1140; 29 U.S.C. § 1132(a)(3)*
*(Against Defendant JSA)*

183. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

184. ERISA § 510, 29 U.S.C. § 1140, makes it unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which she is entitled under the provisions of an employee benefit plan, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

185. By virtue of her thirty years of employment at Jefferson Lab, Dr. Keppel was a participant in an employee retirement plan sponsored and/or maintained in connection with her employment and possessed vested and/or accrued rights to retirement benefits thereunder.

186. Following her termination on November 21, 2025, and continuing after she engaged in her protected activities and challenged her unlawful termination, JSA denied Dr. Keppel access to her retirement funds, without legitimate explanation or justification.

187. JSA's denial of access to Dr. Keppel's retirement funds was undertaken for the purpose of interfering with her attainment of rights to which she was or may have become entitled under the plan, and/or in retaliation for her exercise of protected rights, including her opposition to unlawful discrimination and retaliation, in violation of 29 U.S.C. § 1140.

188. JSA's conduct was willful and undertaken with knowledge of, or reckless disregard for, Dr. Keppel's rights under the plan and under ERISA.

189. As a direct and proximate result of JSA's unlawful interference, Dr. Keppel has been denied access to and use of her own retirement savings and has suffered financial loss and other damages in amounts to be proven at trial. Pursuant to 29 U.S.C. § 1132(a)(3), Dr.

Keppel is entitled to injunctive and other equitable relief, including an order compelling JSA to restore her full and unimpeded access to her retirement funds, together with attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).

**COUNT XV**
**Interference with and Denial of ERISA Rights in Violation of ERISA**
*29 U.S.C. §§ 1140, 1132(a)(1)(B), 1132(a)(3)*
*(Against Defendant SURA)*

190. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

191. ERISA § 510, 29 U.S.C. § 1140, makes it unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which she is entitled under the provisions of an employee benefit plan, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. Separately, 29 U.S.C. § 1132(a)(1)(B) permits a participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the plan, or to clarify her rights to future benefits under the plan.

192. By virtue of her thirty years of employment at Jefferson Lab, Dr. Keppel was a participant in an employee retirement plan and possessed vested and/or accrued rights to retirement benefits thereunder. SURA holds and/or administers, or exercises, control over the administration of the retirement funds and accounts in which Dr. Keppel is a participant.

193. Following her termination on November 21, 2025, and continuing after she engaged in protected activities and challenged her unlawful termination, SURA denied Dr. Keppel access to her retirement funds held by SURA, without legitimate explanation or justification.

194. SURA's denial of access to Dr. Keppel's retirement funds constitutes both a wrongful denial of benefits due to her under the terms of the plan, in violation of 29 U.S.C. § 1132(a)(1)(B), and unlawful interference with, and retaliation for, the exercise of her rights under the plan, in violation of 29 U.S.C. § 1140.

195. SURA's conduct was willful and undertaken with knowledge of, or reckless disregard for, Dr. Keppel's rights under the plan and under ERISA.

196. As a direct and proximate result of SURA's unlawful conduct, Dr. Keppel has been denied access to and use of her own retirement savings and has suffered financial loss and other damages in amounts to be proven at trial. Pursuant to 29 U.S.C. § 1132(a)(1)(B) and (a)(3), Dr. Keppel is entitled to recover the benefits due to her under the plan, to enforce and clarify her rights to future benefits, and to obtain injunctive and other equitable relief compelling SURA to restore her full and unimpeded access to her retirement funds, together with attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).

## PRAYER FOR RELIEF

197. WHEREFORE, Plaintiff Dr. Cynthia E. Keppel respectfully requests that this Court enter judgment in her favor and against Defendants, and award the following relief:

a. An award of compensatory damages for lost wages, backpay, and front pay she would have avoided but for Defendants' unlawful conduct.

b. An award of compensatory damages for lost benefits, including retirement, health, and other employment benefits.

c. An award of compensatory damages for harm to Dr. Keppel's professional reputation in the physics and national laboratory community, lost professional opportunities, and diminished future earning capacity.

d.  An award of compensatory damages for emotional distress, mental anguish, humiliation, and loss of enjoyment of life.

e.  An award of punitive damages under Title VII (42 U.S.C. § 1981a), the VHRA (Va. Code Ann. § 2.2-3908(B)), the DCHRA (D.C. Code § 2-1403.13), and Virginia common law, for Defendants' willful, intentional, and malicious conduct.

f.  An award of severance pay and benefits that JSA/SURA discriminatorily withheld from Dr. Keppel but provided to similarly situated departing male executives.

g.  Injunctive relief directing Defendants to issue corrective communications to those who received Dilling's defamatory statements of December 18, 2025, and to refrain from any further defamatory statements about Dr. Keppel.

h.  An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k), Va. Code Ann. § 2.2-3908(A), D.C. Code § 2-1403.13(a), and other applicable law.

i.  Pre-judgment and post-judgment interest as permitted by law;

j.  An award of statutory penalties against JSA pursuant to 29 U.S.C. § 1132(c)(1) for failure to provide timely COBRA notice;

k.  An order under 29 U.S.C. § 1132(a)(1)(B) and (a)(3) compelling JSA and SURA to restore Dr. Keppel's full and unimpeded access to her retirement funds and benefits, and awarding attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

l.  Such other and further relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

198.  Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff Dr. Cynthia E. Keppel hereby demands a trial by jury on all issues so triable.

Respectfully submitted,


\_\_\_//s// Deborah Y. Collins_____

**Deborah Y. Collins, Esq. (VSB No. 82835)**
**Brittany C. Robbins, Esq. (VSB No. 102383)**
Yeng Collins Law, PLLC
440 Monticello Avenue, Suite 1875
Norfolk, VA 23510
deb@yengcollinslaw.com
brittany@yengcollinslaw.com
*Counsel for Plaintiff*


\_\_\_//s// Ronald J. Kim_____

**Ronald J. Kim, Esq.  NYS 2368967**
Of Counsel
Solomon Law Firm, PLLC
1025 Connecticut Avenue, NW, Suite 1000
Washington, DC 20036
rkim@fedemploylaw.com
*pending admittance pro hac vice*
*Counsel for Plaintiff*