**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **DR. CYNTHIA E. KEPPEL,**<br>*Plaintiff,*<br><br>**v.**<br><br>**JEFFERSON SCIENCE ASSOCIATES, LLC,**<br>**a Virginia limited liability company,**<br>**its successors and assigns;**<br><br>**SOUTHEASTERN UNIVERSITIES**<br>**RESEARCH ASSOCIATION, INC.,**<br>**a nonprofit corporation, its successors & assigns;**<br><br>**JENS DILLING, individually and in his**<br>**official capacity;**<br>**and**<br>**SEAN HEARNE,**<br>**individually and in his official capacity,**<br>*Defendants.* | **Civil Action: 4:26-cv-00112**<br>**MSD-LRL** |

**FIRST AMENDED COMPLAINT**

Plaintiff, Dr. Cynthia E. Keppel, ("Plaintiff," or "Dr. Keppel") by and through her undersigned attorneys, alleges as follows:

**PRELIMINARY STATEMENT**

1. Dr. Keppel demands a trial by jury of all issues in this action.
2. Dr. Keppel is one of the most decorated female physicists in the United States.
3. Over the course of thirty years at the Thomas Jefferson National Accelerator Facility ("Jefferson Lab") operated by Jefferson Science Associates, LLC ("JSA") and Southeastern Universities Research Association, Inc. ("SURA"), she rose from Jefferson Lab Staff Scientist to Associate Director for the Jefferson Lab Experimental Physics

Division and Director of the BioMedical Research and Innovation Center ("BRIC") (collectively, "Associate Director for Experimental Physics").

4. During her career she has earned international recognition in her field including the 2024 Physics World Top 10 Breakthrough, 2020 U.S. Department of Energy Office of Science Distinguished Scientist Fellow Award, a 2018 American Physical Division of Nuclear Physics Fellowship, the 2011 Virginia Outstanding Scientist Award, and service on the National Nuclear Science Advisory Committee (2016-2019).

5. In May 2025, Defendant Jens Dilling ("Dilling") was appointed as the new Laboratory Director of Jefferson Lab by JSA/SURA.

6. From the moment of his appointment, Dilling subjected Dr. Keppel to a sustained pattern of gender-based discrimination: routinely bypassing her to contact her male direct reports, interrupting and dismissing her contributions at weekly Directors' Council meetings while treating male colleagues with deference, falsely accusing her of professional misconduct, and implementing under the direction of SURA an unprecedented and discriminatory "Operations Audit" of her Physics Division — an audit targeted at her division alone and never imposed on any division led by a male.

7. On November 21, 2025, JSA/SURA terminated Dr. Keppel, without warning, via a written notice stating, "this letter serves as formal notice that your employment with Jefferson Science Associates, LLC is terminated effective immediately."

8. JSA/SURA's stated justification — that her "ability to lead the division is not aligned with the direction of the organization" — was false, pretextual, and rooted in discriminatory animus toward Dr. Keppel's gender.

9. On November 21, 2025, as evidence of JSA/SURA's discriminatory hostility to Dr. Keppel, after 30 years of exemplary service to JSA/SURA at the Jefferson Lab, JSA security personnel immediately escorted her from the facility, disabled her access credentials, and did not permit her adequate time to even collect her personal belongings.
10. Following her termination, Defendants compounded their unlawful conduct by retaliating and defaming Dr. Keppel. On or about December 18, 2025 — two weeks after Dr. Keppel's legal counsel challenged her illegal termination — Defendant Dilling hosted a Town Meeting, held in the laboratory's auditorium and simultaneously broadcast online, attended by JSA/SURA employees, clients, customers, and members of the scientific community who had worked with Dr. Keppel for thirty years, and made unsupported, false, and slanderous allegations that Dr. Keppel had mismanaged the fiscal and safety aspects of her position.
11. These statements were deliberately intended to destroy Dr. Keppel's professional reputation, poison her relationships throughout the physics and national laboratory community, and prevent her from obtaining future employment commensurate with her career.
12. Thereafter, JSA/SURA and Dilling continued their retaliation against Dr. Keppel by, among other actions, failing to provide her with required COBRA notices, barring her from accessing her retirement funds held by JSA/SURA, and continuing their defamatory campaign against her.
13. Dr. Keppel brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.; the Virginia Human Rights Act, Va. Code Ann. §§ 2.2-3900 et seq. ("VHRA"); and the District of Columbia Human Rights Law, D.C. Code

§§ 2-1401.01 et seq. ("DCHRA"), the Employee Retirement Income Security Act, 29 U.S.C.A. §1140 et seq. ("ERISA") and the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C.A. §1166 et seq. ("COBRA"). She seeks compensatory damages, punitive damages, injunctive and equitable relief, attorney's fees and costs, and all other relief to which she is entitled.

**PARTIES**

14. Dr. Keppel is a natural person residing at 30 Walters Road, Newport News, Virginia 23602. She is a citizen of the Commonwealth of Virginia. At all relevant times, Dr. Keppel was employed by JSA and SURA at the Jefferson Lab, 12000 Jefferson Avenue, Newport News, Virginia.

15. Defendant Jefferson Science Associates, LLC ("JSA") is a limited liability company organized under the laws of the Commonwealth of Virginia, with its principal place of business at 12000 Jefferson Avenue, Newport News, Virginia 23606.

16. During the relevant time period, JSA operated and managed the Jefferson Lab under contract with the United States Department of Energy ("DOE").

17. At all relevant times, JSA employed fifteen (15) or more persons and constitutes an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), the VHRA, Va. Code Ann. § 2.2-3905, and the DCHRA, D.C. Code § 2-1401.02(10).

18. On information and belief, as of June 1, 2026, JSA's successor in interest is SURATech, LLC.

19. Defendant Southeastern Universities Research Association, Inc. ("SURA") is a nonprofit corporation headquartered at 1201 New York Avenue, NW, Suite 430, Washington, D.C. 20005.

20. JSA is a subsidiary of SURA.

21. Dr. Keppel was a joint employee of JSA/SURA.

22. At all relevant times, SURA and JSA operated Jefferson Lab as a single, integrated enterprise. JSA is a subsidiary of SURA, created, on information and belief, with Pacific Architects and Engineers, Inc. ("PAE") for the purpose of holding the Department of Energy Management and Operating contract for Jefferson Lab; JSA's own Administrative Manual describes JSA as a SURA/PAE limited liability company. SURA holds a controlling membership interest in JSA and, on information and belief, appoints the members of JSA's Board of Directors, which is chaired by Defendant Hearne.

23. Dr. Keppel's employment documents reflect her employment by both entities. Her W-2 wage statements were issued by JSA. Her TIAA retirement plan, in which she participated throughout her employment, names SURA as a plan party.

24. SURA sponsors, and is the named administrator of, the employee benefit plans through which Dr. Keppel and the Jefferson Lab workforce received their retirement and health benefits. In the Annual Return/Report of Employee Benefit Plan (Form 5500) filed with the United States Department of Labor for the SURA/Jefferson Science Associates 401(k) Plan, Plan Number 003, Employer Identification Number 54-1156453, SURA is identified as the plan sponsor, and the plan administrator is identified at line 3a as the "Same as Plan Sponsor at line 3a as "Same as Plan Sponsor." The same is true of the Form 5500 filed for the SURA/Jefferson Science Associates, LLC Comprehensive Health and Welfare Benefit Plan, Plan Number 501, Employer Identification Number 54-1156453. Each such return is executed on SURA's behalf under penalties of perjury —

the 401(k) Plan's return for plan year 2024 by William A. Jones, Jr. on October 14, 2025, and the health and welfare plan's return by Treva Ferguson on April 26, 2024.

25. The audited financial statements filed as part of the 401(k) Plan's Form 5500 describe the plan as "a defined-contribution retirement savings plan covering substantially all employees of SURA and JSA (the Plan Sponsor)," treating SURA and JSA together as a single sponsoring employer, and state that the selection and monitoring of the plan's investments is performed by "the Subcommittee for Governance and Fiduciary Oversight of the SURA and JSA Retirement Plans," which reports to SURA's Board of Trustees. The plan provides a fixed employer safe harbor contribution equal to nine percent of eligible compensation, and, effective January 1, 2024, SURA exercised its authority to amend the plan to alter the eligibility of certain SURA employees for that employer contribution. SURA thus determined and administered a material term and condition of Dr. Keppel's employment — her retirement benefits — throughout the relevant period.

26. The group health plan in which Dr. Keppel participated — the SURA/Jefferson Science Associates, LLC Comprehensive Health and Welfare Benefit Plan — has been in effect since October 1, 1984, more than two decades before JSA was formed, and is reported by SURA on its Form 5500 as a single-employer plan sponsored solely by SURA, funded entirely through insurance contracts placed in SURA's name. On that filing SURA further certified that the plan was not subject to the Form M-1 reporting requirements that 29 C.F.R. § 2520.101-2 imposes on a multiple employer welfare arrangement — a welfare benefit plan maintained for the employees of two or more employers that are not under common control. SURA's certification is a representation to the federal government that the employees covered by the plan, including the Jefferson Lab

workforce carried on JSA's payroll, are not employees of an employer outside SURA's own control group.

27. On April 7, 2022, Dr. Keppel executed a Leadership Participation Agreement with respect to her leadership position. Defendant Hearne signed that Agreement "For JSA and SURA" in his capacity as SURA's President and CEO. In the Agreement, JSA committed to retain Dr. Keppel in her leadership position subject to her maintaining a performance appraisal rating of level 3 or above, the continuation of the JSA-DOE contract, and compliance with the Code of Conduct, and SURA separately committed to provide equipment and materials in support of her position. Hearne's execution of this Agreement on behalf of both entities is direct documentary evidence that SURA co-determined the essential terms and conditions of Dr. Keppel's employment.

28. SURA, acting through its President and CEO Sean Hearne, participated directly in the employment decisions concerning Dr. Keppel. Specifically: (a) on or about November 4, 2025, Hearne personally ordered the Operations Audit of the Physics Division that Dilling implemented; (b) Hearne received the written audit report delivered to SURA pursuant to the audit Review Team's required deliverable — a "Written Report of Final Presentation to SURA within 30 days of completion of field work" — confirming that Dr. Keppel's division met all performance expectations and applicable safety standards, and participated in or was represented at the audit close-out meeting attended by Dilling and Chief Operating Officer Johnathon Huff; and (c) Hearne participated in the post-termination conduct described below, including, on information and belief, the decision to withhold severance from Dr. Keppel and the position maintained to TIAA that she remained employed after her termination.

29. SURA exercised joint control over the terms and conditions of Dr. Keppel's employment and co-determined these conditions alongside JSA. Under the DOE Management and Operating contract and JSA's governing documents, SURA retained authority over senior personnel decisions at Jefferson Lab, including the appointment of the Laboratory Director. Dilling was appointed Laboratory Director in or about May 2025 through a search process chaired by Hearne, and, on information and belief, reported to a board of directors chaired by Hearne.
30. At all relevant times, SURA's offices at 1201 New York Avenue, NW, Washington, D.C. functioned as the administrative and governance hub for the management of Jefferson Lab, hosting SURA's and JSA's board assemblies, executive sessions, corporate governance and committee meetings, and legislative briefings.
31. Defendant Hearne personally chaired the search committee that selected Defendant Dilling as Laboratory Director. That committee conducted its candidate screenings, portfolio evaluations, and panel reviews at SURA's executive governance offices in Washington, D.C.
32. The Laboratory Director selected by Hearne's committee reports to, and is evaluated by, a board of directors chaired by Hearne. Through Hearne and that board, SURA selected, supervised, and evaluated the executive who in turn supervised Dr. Keppel and effected her termination.
33. At all relevant times, SURA employed fifteen (15) or more persons and constitutes an "employer" within the meaning of Title VII, the VHRA, and the DCHRA.
34. Defendant Jens Dilling ("Dilling") is a natural person who, at all relevant times, served as Laboratory Director of Jefferson Lab, a position held under appointment by JSA/SURA.

Dilling is the primary perpetrator of gender discrimination, hostile work environment, retaliatory conduct, and post-termination defamatory statements described herein. Dilling is sued individually and in his official capacity as Laboratory Director.

35. Defendant Sean Hearne ("Hearne") is a natural person who, at all relevant times, served as President and CEO of SURA. In that capacity, Hearne participated in and approved the discriminatory treatment of Dr. Keppel, the decision to terminate her employment, and the post-termination retaliatory conduct. Hearne is sued individually and in his official capacity as President and CEO of SURA.

**JURISDICTION AND VENUE**

36. This Court has subject matter jurisdiction over Dr. Keppel's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.

37. This Court has supplemental jurisdiction over Dr. Keppel's state and local law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

38. Venue is proper in the Eastern District of Virginia, Newport News Division, pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because JSA's principal place of business is in this District, Dr. Keppel was employed in this District, the unlawful employment practices alleged herein were committed principally in this District, and the relevant employment records are maintained in this District.

39. On or about January 20, 2026, Dr. Keppel filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission against JSA (Charge No. 437-2026-00771)

and SURA (Charge No. 437-2026-00772), alleging gender discrimination and retaliation in violation of Title VII. On April 15, 2026, Dr. Keppel received an EEOC Notice of Right to Sue as to Charge No. 437-2026-00772 (SURA). On April 27, 2026, the EEOC issued a Determination and Notice of Rights to Dr. Keppel as to Charge No. 437-2026-00771 (JSA).

40. This Complaint was filed within ninety (90) days of Dr. Keppel's receipt of the EEOC's Notice of Rights, and this First Amended Complaint is filed as of course pursuant to Fed. R. Civ. P. 15(a)(1)(B) within twenty-one (21) days after service of Defendants' motions under Rule 12(b). All administrative prerequisites to the filing of this action have been satisfied.

## FACTUAL ALLEGATIONS

### A. Dr. Keppel's Thirty-Year Career at Jefferson Laboratory

41. Dr. Cynthia E. Keppel is a distinguished experimental nuclear physicist with an international reputation in her field. On or about 1995, Dr. Keppel was hired by JSA/SURA into a 50/50 joint position as Lab Staff Scientist at Jefferson Laboratory and as a Professor of Physics at Hampton University.

42. In or about 2012, Dr. Keppel was appointed Experimental Hall A Leader at Jefferson Lab, a 100% laboratory position.

43. JSA/SURA, recognizing her outstanding performance, subsequently merged two experimental halls (A and C) under her leadership. In 2021, she was appointed Associate Director for the entire Experimental Physics Division at Jefferson Laboratory — one of the most senior scientific leadership positions at the facility. Prior to being appointed Associate Director for Experimental Physics, Dr. Keppel was interviewed by a number of

SURA employees in Washington DC, including Hearne. On information and belief, Hearne made the final decision to appoint Dr. Keppel to Associate Director for Experimental Physics.

44. Throughout her thirty-year career at Jefferson Laboratory, Dr. Keppel performed all of her duties with exceptional skill, vision, and leadership. She founded numerous initiatives and programs both within JSA/SURA and in collaboration with other key national scientific organizations. At no time during her thirty years of service did JSA/SURA inform Dr. Keppel of any performance problem with her leadership, productivity, or management.

45. To the contrary, Dr. Keppel received sustained and repeated recognition for her outstanding leadership and scientific contributions, including: (a) the 2020 U.S. Department of Energy Office of Science Distinguished Scientist Fellow Award; (b) the 2011 Virginia Outstanding Scientist Award; and (c) the 2010 Influential Women of Virginia Award, among other honors.

46. Dr. Keppel's job performance met or exceeded her employer's legitimate expectations at all times through her termination. In. On or about April 23, 2024 she met with Stuart Henderson, then the Lab Director of JSA and employee of SURA and in the course of awarding her a 4% merit increase, he stated in writing: "Over the past year, the Lab has worked through several challenges which could not have been accomplished without your effort, contributions, and your commitment to the Lab's mission." In her most recent completed Annual Performance Appraisal, covering fiscal year 2024 and signed by her then-supervisor, Laboratory Director Kimberly Sawyer, in March 2025 — approximately eight months before her termination — Dr. Keppel received an overall

supervisor rating of 10.5, placing her in JSA's second-highest rating band ("Exceeds Most") on JSA's published five-tier performance scale, with the highest possible rating ("Exemplary") in Scientific/Technical Performance, her most heavily weighted category. That rating exceeded the "level 3 or above" contractual retention threshold in her Leadership Participation Agreement. JSA's published policy requires that any rating below "Achieved" trigger a Performance Improvement Plan, and that dismissal for performance deficiency be "normally preceded by corrective action." No performance improvement plan, written warning, or oral counseling was ever issued to Dr. Keppel. Dilling, who became Laboratory Director in May 2025, never completed the 2025 appraisal cycle for Dr. Keppel before terminating her in November 2025. In November 2025 — three weeks before her termination — the Operations Audit of her division, ordered by SURA's own chief executive, demonstrated that her division met all performance expectations and applicable safety standards.

47. As Associate Director for Experimental Physics, Dr. Keppel served as one of nine members of the Directors' Council — the principal governing and policy-making body at Jefferson Laboratory. She was one of only three women among the nine members of this council.

**B. Customary Outside Scientific Engagement; Defendants' Selective Restriction of Dr. Keppel**

48. Senior scientists at Jefferson Lab, including Associate Directors and other members of laboratory leadership, customarily engaged in scientific projects, collaborations, advisory roles, and professional service outside their laboratory positions. Such outside engagement was an accepted norm of the profession, was well known to JSA, SURA, and

laboratory leadership, and was understood to benefit the laboratory by extending its scientific standing and its relationships within the national and international physics community.

49. Dr. Keppel engaged in outside scientific projects and professional service openly and consistent with the practice of her male peers in laboratory leadership.

50. Upon information and belief, Dr. Keppel was the only member of senior laboratory leadership whom Defendants sought to restrict or limit in her outside professional engagement. No similarly situated male leader was subjected to comparable restriction or criticism.

51. For example, in or about 2023, at a time when the scientific community anticipated a new competition for the Jefferson Lab management and operations contract, Dr. Keppel was approached by potential competing bidders about serving as Laboratory Director in their proposals. Acting transparently and professionally, Dr. Keppel raised the subject directly with Defendant Hearne,

52. Hearne responded with hostility and told Dr. Keppel that she could not work with anyone else and that anyone considering an association with any bidder other than JSA/SURA "doesn't deserve to be a part of the laboratory." When Dr. Keppel asked on what basis she was so bound, Hearne referred her to a purported non-compete document — which, upon examination, was an expired instrument that SURA/JSA laboratory management and staff had been pressured to sign more than a year earlier and that had never been renewed.

53. No similarly situated male scientist or leader was told that outside professional opportunities or engagement with the broader scientific community rendered him

undeserving of a place at the laboratory, and the expired non-compete was not invoked against any similarly situated male.

54. Defendants' disparate application to Dr. Keppel — and to her alone — of a restriction on outside professional engagement that was never applied to similarly situated men is evidence both of discrimination because of sex and of the pretextual character of the safety- and budget-based justifications Defendants later asserted for her removal.

**C. Dilling's Appointment and Immediate Creation of a Gender-Based Hostile Work Environment**

55. In or about May 2025, Defendant Jens Dilling was appointed Laboratory Director of Jefferson Lab by JSA/SURA.

56. Immediately upon his appointment, Dilling created a hostile work environment for Dr. Keppel based on her gender. This pattern of discriminatory conduct included the following.

57. Dilling routinely bypassed Dr. Keppel and contacted her male direct reports directly, rather than interacting with her through normal supervisory channels. This conduct was unprecedented and had the impact of undercutting Dr. Keppel's authority on scientific and administrative issues and signaled to her subordinates that her leadership was not respected by the Laboratory Director. Dilling did not engage in this conduct with similarly situated male executives of JSA/SURA.

58. During weekly Directors' Council meetings, Dilling frequently interrupted Dr. Keppel while she was speaking, something he did not do with similarly situated male members of the Council.

59. He repeatedly dismissed Dr. Keppel's opinions, conclusions, and professional recommendations — despite the fact that she had worked at the Jefferson Lab for over 30 years. Dilling did not do this to similarly situated male colleagues on the Council.

60. Dilling's discriminatory behavior toward Dr. Keppel was observed and then emulated by other male executives. On several occasions during Directors' Council meetings, Dr. Keppel's professional opinions and assertions were belittled, discounted, and silenced by other male members of the Council. For example, David Dean ("Dean"), Deputy Director for Science and Technology, scornfully told Dr. Keppel that she "didn't understand the subtleties" of an issue she had worked on for nearly thirty years. Dean never treated similarly situated male executives in the same manner. Dean, like Dilling, also routinely bypassed Dr. Keppel to contact her direct reports directly, undercutting her authority on a gender basis.

61. In or about October 2025, during a Directors' Council meeting, Dr. Keppel directly witnessed Dilling insult, scold, and bully Amber Boehnlein — the one other female scientific management member of the Council at the time.

62. Dilling's scornful and discriminatory belittling of Dr. Boehnlein occurred after she referred to Dr. Keppel while making a point about management issues. Dr. Keppel never witnessed Dilling treat any male member of the Council in a comparable manner.

63. Dilling chose a less qualified male to deliver a presentation to the Secretary of the Department of Energy in August 2025.

64. Dilling implemented, under the direction of Hearne at SURA, a discriminatory "Operations Audit" of Dr. Keppel's division. This was a voluntary action never previously taken by JSA/SURA against any male director of a division.

**D. JSA and Dilling Attempt to Manufacture Pretextual Reasons for a False Basis for Dr. Keppel's Termination**

65. In or about August 2025, in a futile effort to manufacture a non-discriminatory justification for terminating Dr. Keppel, Dilling baselessly accused her of ignoring his directive that a lesser-qualified male employee deliver a technical presentation to the Secretary of the Department of Energy. Dilling's accusation was false. Dr. Keppel had been specifically requested by JSA/SURA's Chief Communications Officer to deliver the presentation because of her superior experience, competence, and ability to communicate effectively, in lieu of the lesser-qualified male individual whom Dilling had selected.

66. On or about November 4, 2025, again in an effort to manufacture a non-discriminatory justification for terminating Dr. Keppel, Hearne ordered and Dilling implemented an unprecedented "Operations Audit" of Dr. Keppel's Physics Division without legitimate justification.

67. This discriminatory audit was the first such voluntary, targeted review ever imposed on any division at Jefferson Laboratory and was clearly a pretextual attempt to justify terminating Dr. Keppel by manufacturing a non-discriminatory justification. Only months before, the Department of Energy in its annual operations "report card" recognized Dr. Keppel's superior leadership by awarding the only two A-level ratings to the Lab, for work largely performed by Dr. Keppel's division.

68. JSA/SURA had never ordered a comparable operations audit for any division headed by a male executive. The discriminatory purpose of this audit was to tarnish Dr. Keppel's reputation and that of her division and to provide a pretextual business rationale for her

termination. The audit itself demonstrated that Dr. Keppel's division met all performance expectations and applicable safety standards.

69. At the time Hearne ordered the Operations Audit, no other divisions of Jefferson Lab headed by male Associate Directors, was audited no other division of Jefferson Lab headed by a male Associate Director was audited.

70. The audit ordered by Hearne/SURA and implemented by Dilling/JSA was gender-based discrimination and was an attempt to manufacture a pre-textual, non-discriminatory basis to terminate Dr. Keppel.

**E. Dr. Keppel's Unlawful Termination on November 21, 2025**

71. On November 21, 2025 — less than seven months after Dilling was appointed Laboratory Director — JSA issued Dr. Keppel a written Termination Notice that expressly stated: "After careful consideration, this letter serves as formal notice that your employment with Jefferson Science Associates, LLC is terminated effective immediately." The Termination Notice checked the box marked "Termination" (in bold). On information and belief, SURA and Hearne directed and approved Dr. Keppel's termination.

72. The stated justification for Dr. Keppel's termination was that "the Lab Director (Dilling) determined that your ability to lead the division is not aligned with the direction of the organization."

73. This justification was false and pretextual. It was the product of Dilling's discriminatory evaluation of Dr. Keppel's leadership — an evaluation infected from the outset by his documented gender bias — and bore no relationship to Dr. Keppel's actual performance, which had been exemplary throughout her career.

74. Moreover, at no time during the seven months that Dilling supervised Dr. Keppel did he discuss or evaluate Dr. Keppel's leadership performance nor did he counsel her on these alleged deficiencies.

75. Keppel's termination for alleged leadership failures was pretextual as evidenced by the fact that it violated the Jefferson Laboratory Code of Conduct, the Administrative Manual, and standard Human Resource practices employed by JSA.

76. Immediately upon delivering the Termination Notice, JSA security personnel escorted Dr. Keppel from the facility, disabled her security badge, and did not give her adequate time to collect her personal belongings.

77. The head of JSA Human Resources, who presided over Dr. Keppel's summary termination, told Dr. Keppel that someone would arrange for her to retrieve her personal items "after hours." At no time was Dr. Keppel informed that the Termination Notice was not operationally effective or that its plain terms were anything other than an immediate and irreversible termination by JSA.

78. Attached to the Termination Notice was an unsigned letter, also dated November 21, 2025, offering Dr. Keppel "the opportunity to transition to an individual contributor role." The letter did not specify the salary or duties of the proposed role; required, as a condition of acceptance, that Dr. Keppel submit "a letter of resignation indicating your decision to step down as Division Head"; imposed a one-business-day deadline of Monday, November 24, 2025, for her decision; and required her agreement to a sweeping non-disparagement provision applicable both during and indefinitely after her employment. The letter stated that if written notification was not received by November

24, 2025, "your termination from JSA will be effective on Tuesday, November 25, 2025."

79. The clear purpose of this letter was to "strong-arm" Dr. Keppel into silence about the discriminatory treatment by JSA/SURA.

80. Dr. Keppel rejected this offer. Accepting it would have required her to falsely state that she had voluntarily resigned from a position from which she had in fact been terminated and would have subjected her to a non-disparagement agreement whose conditions were discriminatory and retaliatory.

81. JSA/SURA's demand that Dr. Keppel falsely represent that she resigned, as a condition of receiving what was in effect a demotion, was itself independently discriminatory and retaliatory, and on information and belief violated federal government contract regulations.

82. JSA/SURA reinforced the discriminatory nature of its decision by: (a) immediately replacing Dr. Keppel with a less qualified male; (b) failing to elevate Dr. Keppel's female deputy — who had served in that role for ten years — to the position; (c) eliminating one-third of the female representation on the nine-member Directors' Council; and (d) leaving only three women among approximately thirty high-level supervisors in the science and direct-funding arm of Jefferson Lab.

83. Neither Dilling nor Hearne consulted, or informed in advance, the two women serving on the SURA Board of Trustees — Dr. Haiyan Gao, who served on (and upon information and belief chaired) the Board's Science and Technology Committee, and Dr. Sue Seestrom — regarding the decision to remove Dr. Keppel.

84. If, as Defendants publicly claimed, budget stewardship had driven the leadership change, the selection of the least budget-experienced available candidate — a man — over a markedly more experienced woman exposes that claim as pretext. The succession decision is at once evidence of discrimination because of sex and evidence that the safety and budget justifications were manufactured.

85. JSA/SURA further discriminated against Dr. Keppel by refusing to offer her any severance pay upon her sudden termination after thirty years of service, notwithstanding a pattern and practice of offering severance to departing male executives.

86. Departing male executives of comparable seniority received severance. David Dean, Deputy Director for Science and Technology, departed Jefferson Lab in approximately July 2026 and, on information and belief, received a severance package. In approximately February 2026, JSA conducted a reduction-in-force affecting approximately eighty employees at various levels, each of whom received a severance offer. Dr. Keppel, who was terminated individually in November 2025 after thirty years of service, received no severance and was instead offered a position at a salary reduction of approximately $100,000.

87. Each of these acts is additional evidence of the severe or pervasive hostile work environment based on gender created by Dilling/JSA under the direction of Hearne/SURA.

**F. Dilling's Post-Termination Retaliatory and Defamatory Statements to the Scientific Community That Dr. Keppel Had Served with Distinction for Thirty Years**

88. On or about November 25, 2025, Dr. Keppel engaged in protected activity under Title VII, the VHRA, and the DCHRA by retaining legal counsel to challenge her unlawful termination.

89. On or about November 26, 2025, Dr. Keppel's counsel of record informed JSA General Counsel, Rhonda Scales, that it had been retained and was the plaintiff's legal representative.

90. On or about December 3, 2025, Dr. Keppel's counsel of record sent a letter to Scales stating in pertinent part: "…JSA's termination of our client was based on illegal discrimination in violation of Title VII of the Civil Rights Act of 1964, (42 U.S.C.A. §2000e-2(a) and the Virgina [sic] Human Rights Act (Chapter 39 of the Virginia Code) …" On information and belief, SURA was contemporaneously made aware of the occurrence of these numerous protected actions. JSA is SURA's subsidiary, and, on information and belief, JSA's General Counsel reported the assertion of Title VII claims against the enterprise to SURA's leadership, including Hearne, in the ordinary course.

91. On or about December 18, 2025, in direct retaliation for this protected act and also as further evidence of gender discrimination, Defendant Dilling hosted a Town Meeting, convened at the request of the scientific user community, which sought an explanation of the abrupt leadership changes at the laboratory. The meeting was held in the laboratory's auditorium, which seats approximately 300 people, and was simultaneously broadcast online to an additional audience of attendees who had registered in advance and been approved to attend. It was attended by JSA/SURA employees, clients, customers, business partners, and other members of the scientific and national laboratory community who had worked with Dr. Keppel over the course of her thirty-year career. A significant

portion of the attendees were not employees of JSA/SURA, but rather independent scientists and others employed by separate organizations who had utilized the Jefferson Lab. On information and belief, approximately three hundred (300) people, most of whom had directly worked with Dr. Keppel during her thirty year career at the Lab, attended this defamatory and retaliatory conference organized by Dilling/JSA/SURA.

92. The audience included not only JSA employees but hundreds of members of the external scientific community — university physicists, laboratory users, and leaders in the field of nuclear physics — the very professional community in which Dr. Keppel's reputation and standing reside and for which she had worked for and with for her entire career and with and for which she had worked her entire career.

93. Addressing that audience, Dilling directly referred to Dr. Keppel in his opening remarks by identifying the Experimental Physics Division, which Dr. Keppel had served as Director as a focus of his comments. Dilling falsely stated "this year we had again unfortunately some safety related issues, and it was at a level where the board … brought in an external review and looked at what's happening with safety," the result of which "was not positive"; and that, as to "responsibility and management of the budget," the laboratory "only had 23 days of reserve" when "[w]e were supposed to have 41 days," because "plans and hopes … hadn't worked out."

94. Dilling's statement that there had been some safety related issues and it was at a level where the board brought in an external review was false and defamatory.

95. Dilling's statements that there were safety and budget failures by line management (Dr. Keppel) was false and defamatory (Dr. Keppel) were false and defamatory.

96. Every member of the audience understood that the "line management" allegedly responsible for the safety and budget failures Dilling described referred to Dr. Keppel.

97. At this Town Meeting, Dilling made unsupported, false, and defamatory statements alleging that Dr. Keppel had mismanaged the fiscal, safety, and operational aspects of her position at JSA/SURA.

98. These statements were false, retaliatory, and discriminatory.

99. Dr. Keppel had not mismanaged the fiscal operations or safety program of the Physics Division. The November 2025 Operations Audit — which Dilling/JSA and Hearne/SURA had ordered as a pretextual exercise — confirmed that under her direction, Dr. Keppel's division met all performance expectations and safety standards. The financial management of her division was sound. Dilling knew these statements were false when he made them or made them with reckless disregard for their truth or falsity.

100. Dilling's statements were false in their factual assertions and in their plain implication that Dr. Keppel had failed in the management of safety and budget: (a) the Physics Division under Dr. Keppel's leadership operated at greater than 90% efficiency in every measured area — an exceptional level of performance in the field; (b) the external review to which Dilling referred had itself found that the Physics Division reviewed well and had characterized the safety matters at issue as relatively minor; (c) the November 2025 Operations Audit ordered by Defendant Hearne/SURA had confirmed, weeks before, that Dr. Keppel's division met all performance expectations and safety standards; (d) the Physics Division never exceeded the budget allocated to it by the Director's office; (e) the laboratory's budget reserve is determined by the Laboratory Director, not by the divisions, and no mechanism existed by which Dr. Keppel's division

could cause a reserve shortfall other than exceeding its budget — which it never did; and (f) the laboratory's overhead rate is set by JSA and SURA, and was entirely outside Dr. Keppel's control.

101. Dilling made these statements with knowledge of their falsity or with reckless disregard for their truth. The Operations Audit results and the external review report were in Defendants' possession, had been delivered to SURA, and contradicted the account Dilling gave his audience.

102. Dilling's false statements at the December 18, 2025, conference were made with actual malice and for the specific purpose of punishing Dr. Keppel for retaining counsel to oppose her unlawful termination, and to destroy her professional reputation in the physics and national laboratory community that she had assiduously built for 30 years, to prevent her from obtaining future employment.

103. Dilling made these false and defamatory statements within the scope of his employment with JSA and was authorized by both JSA and SURA to make these statements, which were ratified by both JSA and SURA. Dilling, and through him JSA and SURA, knew the statements were false: the November 2025 Operations Audit — ordered by Hearne and reported in writing to SURA and Hearne pursuant to the audit Review Team's required deliverable — had concluded weeks earlier that the division met all performance expectations and applicable safety standards.

104. In the same address, Dilling assured the audience, referring to Dr. Keppel, that "we're still working … [toward] a solution where she … stays at the lab" in an advisory capacity, invoking her "30 years of experience" and "wisdom."

105. Four days later, on December 22, 2025, JSA transmitted its actual “solution”: a short-term “Nuclear Physics Special Advisor” position at a reduction of approximately $100,000 in salary, on terms that removed Dr. Keppel from the laboratory’s scientific work. The public assurance of December 18 was crafted for audience consumption, to defuse the community’s anger at Dr. Keppel’s removal, while the terms actually offered were additional evidence of discrimination and retaliation.

106. No other similarly situated male was treated in this manner and it is further evidence of gender based discrimination.

107. Due to Dilling’s false and defamatory statements, Dr. Keppel was forced to oppose the discrimination and retaliation by issuing her own email defending her reputation and record.

**G. Dilling’s Private Defamatory Statements to Leaders of the Field**

108. Separately from the December 18, 2025, Town Meeting, and in or about the same period, Defendant Dilling made private, unequivocal statements to a number of leaders in the nuclear physics community, including its governing organizations, that Dr. Keppel had mismanaged funds in her capacity as Associate Director of Experimental Physics.

109. On information and belief Dilling at the direction of Hearne and SURA sought out these leaders in an effort to further defame and damage Dr. Keppel’s career.

**H. Continued Retaliation: The December 22, 2025, Demotion Offer**

110. On December 22, 2025, JSA further retaliated against Dr. Keppel by offering her a “conversion position” as “Nuclear Physics Special Advisor” at a salary reduction of approximately $100,000 per year. This offer was retaliatory as it was made after Dr. Keppel’s protected acts to oppose discrimination.

111. Dr. Keppel rejected this discriminatory and retaliatory offer. The proposed position bore no reasonable relationship to her experience, qualifications, or career trajectory, and the salary reduction was punitive and without legitimate justification.

112. Since her termination, Dr. Keppel, at great personal expense, has consistently and publicly represented to the scientific and laboratory community that she is no longer employed by JSA/SURA.

113. On January 5, 2026, Dr. Keppel engaged in the protected act of sending an email to colleagues, associates, and members of the scientific community describing her termination and the discrimination and retaliation she experienced during her final year of employment.

**I. JSA/SURA Retaliate Against Dr. Keppel by Failing to Timely Provide COBRA Notices**

114. On November 21, 2025, JSA and SURA terminated Dr. Keppel.

115. Dr. Keppel's termination was a qualifying event under COBRA, 29 U.S.C. § 1163(2).

116. On information and belief, upon Dr. Keppel's illegal termination, JSA terminated her health insurance.

117. JSA, as Dr. Keppel's employer, and SURA, as the administrator of the group health plan, were each required by 29 U.S.C. § 1166 to take the steps necessary to provide Dr. Keppel with timely written notice of her right to elect COBRA continuation coverage following her termination.

118. The group health plan in which Dr. Keppel participated is the SURA/Jefferson Science Associates, LLC Comprehensive Health and Welfare Benefit Plan, Plan Number 501, Employer Identification Number 54-1156453. SURA is the sponsor of that plan and

its administrator within the meaning of 29 U.S.C. § 1002(16)(A). SURA has so certified to the United States Department of Labor on the plan's Form 5500, on which the plan administrator is identified at line 3a as the "Same as Plan Sponsor at line 3a as "Same as Plan Sponsor," and which is signed on SURA's behalf under penalties of perjury.

119. COBRA divides the notice obligation between the employer and the plan administrator. Under 29 U.S.C. § 1166(a)(2), the employer must notify the plan administrator of a qualifying event within thirty (30) days of the event. Under 29 U.S.C. § 1166(a)(4) and (c), the plan administrator must then notify the qualified beneficiary of her election rights within fourteen (14) days of receiving the employer's notice. On information and belief, JSA did not notify SURA of Dr. Keppel's qualifying event, and SURA did not notify Dr. Keppel of her election rights.

120. JSA never notified SURA, the plan administrator, of Dr. Keppel's qualifying event within the thirty days allowed by 29 U.S.C. § 1166(a)(2), and SURA never furnished Dr. Keppel with the election notice required of a plan administrator by 29 U.S.C. § 1166(a)(4) and (c). Neither JSA nor SURA provided Dr. Keppel with the COBRA election notice within the time required by 29 U.S.C. § 1166, and to date neither has provided proper notice.

121. JSA's failure to provide timely COBRA notice was willful and deprived Dr. Keppel of a meaningful opportunity to elect and maintain continuous group health coverage during a critical period following her unlawful termination.

122. Because of JSA's failure, Dr. Keppel was forced to obtain health insurance on her own.

123. JSA's and SURA's failure to provide the legally required COBRA Notice was retaliation for Dr. Keppel's protected acts.

124. JSA's and SURA's failure to provide the legally required COBRA Notice is also additional evidence of discrimination and retaliation. On information and belief, JSA routinely provides departing male employees with timely COBRA election notices, and Dr. Keppel is aware that a male employee whose employment with JSA ended at or about the same time as hers was provided with a timely and proper COBRA election notice, while Dr. Keppel was not.

**J. JSA/SURA Retaliate Against Dr. Keppel by Denying Access to Her Retirement Funds**

125. By virtue of her thirty years of employment by JSA/SURA, Dr. Keppel was a participant in an employee retirement plan sponsored and/or maintained in connection with her employment by JSA/SURA, and she possessed vested and/or accrued rights to retirement benefits thereunder. The plan is the SURA/Jefferson Science Associates 401(k) Plan, Plan Number 003, Employer Identification Number 54-1156453, an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2). SURA is the plan's sponsor and its named administrator within the meaning of 29 U.S.C. § 1002(16)(A), and is therefore a fiduciary of the plan under 29 U.S.C. § 1002(21)(A)(iii) with respect to the plan's administration. TIAA serves as recordkeeper and custodian, and the plan's participant communications identify SURA as a plan party.

126. Under the terms of the plan, a participant is entitled to a distribution of her account upon the termination of her employment. The audited financial statements filed with the plan's Form 5500 state that "[t]he Plan permits withdrawals when a participant terminates employment," and that "[p]articipants are vested immediately in all

contributions plus actual earnings thereon." Dr. Keppel's account was fully vested; her employment terminated on November 21, 2025; and she was accordingly entitled under the terms of the plan to the distributions she requested. The only basis ever asserted for the denial of those requests was the false assertion that she remained employed.

127. Following her termination on November 21, 2025, and continuing after her protected act of retaining legal counsel to oppose JSA/SURA's discrimination, on or about December 3, 2025, JSA denied Dr. Keppel access to her retirement funds, without legitimate explanation or justification.

128. On January 14, 2026, Dr. Keppel attempted to withdraw funds from her SURA/Jefferson Science Associates 401(k) Plan. TIAA, the holder of those funds, denied her request, purportedly because JSA/SURA falsely maintained that she was still employed by JSA/SURA and she was therefore ineligible to receive a distribution.

129. On February 26, 2026, Dr. Keppel attempted to withdraw funds from her SURA/Jefferson Science Associates 401(k) Plan. TIAA, the holder of those funds, denied her request, purportedly because JSA/SURA falsely maintained that she was still employed by JSA/SURA and she was therefore ineligible to receive a distribution.

130. On March 6, 2026, Dr. Keppel attempted to withdraw funds from her SURA/Jefferson Science Associates 401(k) Plan. TIAA, the holder of those funds, denied her request, purportedly because JSA/SURA falsely maintained that she was still employed by JSA/SURA and she was therefore ineligible to receive a distribution.

131. The position that Dr. Keppel "remained employed," on the basis of which TIAA denied her withdrawal requests on January 14, February 26, and March 6, 2026, was asserted and maintained by SURA as well as JSA, notwithstanding the November 21,

2025, Termination Notice stating that her employment was terminated "effective immediately."

132. Defendants' assertion to TIAA that Dr. Keppel remained employed was knowingly inconsistent with their own Termination Notice and each and every action and statement made by the Defendants after November 21, 2025, and was made for the purpose of preventing Dr. Keppel from accessing her retirement funds. This conduct was not an incidental consequence of her termination; it was affirmative, repeated, post-termination interference with her attainment of rights under the plan, undertaken after and in response to her assertion of Title VII claims, with the specific intent to interfere with her ERISA-protected rights in violation of 29 U.S.C. § 1140.

133. JSA/SURA's denial of access to Dr. Keppel's retirement funds was undertaken for the purpose of interfering with her attainment of rights to which she was or may have become entitled under the plan, and/or in retaliation for her exercise of protected rights, including her opposition to unlawful discrimination and retaliation, in violation of 29 U.S.C. § 1140.

134. JSA/SURA's conduct was willful and undertaken with knowledge of, or reckless disregard for, Dr. Keppel's rights under the plan and under ERISA.

135. JSA's failure to allow Dr. Keppel access to her retirement funds was a retaliation for Dr. Keppel's protected acts and additional evidence of discrimination, as Dr. Keppel is not aware of a similarly situated male employee who was denied access to his retirement funds after termination.

**K. Dr. Keppel's Separation from JSA/SURA and Ongoing Harm**

136. As a direct and proximate result of Defendants' conduct, Dr. Keppel has suffered and continues to suffer loss of employment; loss of income and benefits commensurate with her position as Associate Director for Experimental Physics; severe reputational harm within the national and international physics and laboratory community; loss of professional relationships and future employment opportunities; and significant emotional distress, pain, suffering, and mental anguish.

## CAUSES OF ACTION
## COUNT I
## Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964
## 42 U.S.C. § 2000e-2(a)
## (Against Defendant JSA)

137. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

138. Title VII, 42 U.S.C. § 2000e-2(a), makes it an unlawful employment practice for an employer to discharge or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment because of her sex, or to limit, segregate, or classify employees in any way that deprives any individual of employment opportunities because of sex.

139. Dr. Keppel is a woman. She was indisputably qualified for her position after thirty years of distinguished service.

140. JSA subjected Dr. Keppel to gender discrimination in violation of Title VII through: (a) the imposition of a hostile work environment in which her professional authority was systematically bypassed, her contributions to the Directors' Council were interrupted, dismissed, and silenced in ways that did not occur with male colleagues, and gender-based disparate treatment pervaded her daily professional interactions; (b) the

imposition of a pretextual Operations Audit on her division alone, a form of heightened scrutiny never applied to male-led divisions; (c) the false accusation that she had violated a directive from Dilling regarding the DOE presentation; (d) the pretextual termination of her employment on November 21, 2025, based on the false assertion that her "ability to lead is not aligned with the direction of the organization"; (e) the immediate replacement of Dr. Keppel with a less qualified male; (f) the denial of severance despite a pattern and practice of providing it to departing male executives; (g) the demand that she falsely represent that she had voluntarily resigned as a condition of any continued employment; (h) the selective restriction of Dr. Keppel's customary outside professional engagement, a restriction never applied to similarly situated male leaders; and (i) the bypassing of her experienced female Deputy in favor of a markedly less experienced male as interim Associate Director.

141. JSA's conduct was willful, intentional, and motivated by discriminatory animus toward Dr. Keppel on account of her sex or was undertaken with reckless indifference to her federally protected rights.

142. As a direct and proximate result of JSA's gender discrimination, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees in amounts to be proven at trial. Dr. Keppel is further entitled to punitive damages under 42 U.S.C. § 1981a for JSA's malicious and reckless conduct.

**COUNT II**
**Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-2(a)**
**(Against Defendant SURA)**

143. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

144. Title VII, 42 U.S.C. § 2000e-2(a), makes it an unlawful employment practice for an employer to discharge or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment because of her sex, or to limit, segregate, or classify employees in any way that deprives any individual of employment opportunities because of sex.

145. Dr. Keppel is a woman. She was indisputably qualified for her position after thirty years of distinguished service.

146. As joint employer, SURA subjected Dr. Keppel to gender discrimination in violation of Title VII through: (a) the authorization and ratification of a hostile work environment in which her professional authority was systematically bypassed, her contributions to the Directors' Council were interrupted, dismissed, and silenced in ways that did not occur with male colleagues, and gender-based disparate treatment pervaded her daily professional interactions; (b) the imposition of a pretextual Operations Audit on her division alone, a form of heightened scrutiny never applied to male-led divisions; (c) the false accusation that she had violated a directive from Dilling regarding the DOE presentation; (d) the pretextual termination of her employment on November 21, 2025, based on the false assertion that her "ability to lead is not aligned with the direction of the organization"; (e) the immediate replacement of Dr. Keppel with a less qualified male; (f) the denial of severance despite a pattern and practice of providing it to departing male executives; (g) the demand that she falsely represent that she had voluntarily resigned as a condition of any continued employment; (h) Hearne's hostile response to, and selective

restriction of, Dr. Keppel's customary outside professional engagement, including his invocation of an expired non-compete against her alone; and (i) the bypassing of her experienced female Deputy in favor of a markedly less experienced male as interim Associate Director.

147. SURA's conduct was willful, intentional, and motivated by discriminatory animus toward Dr. Keppel on account of her sex or was undertaken with reckless indifference to her federally protected rights.

148. As a direct and proximate result of SURA's gender discrimination, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Dr. Keppel is further entitled to punitive damages under 42 U.S.C. § 1981a for SURA's malicious and reckless conduct.

**COUNT III**
**Hostile Work Environment Based on Sex in Violation of Title VII**
**42 U.S.C. § 2000e-2(a)**
**(Against Defendant JSA)**

149. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

150. Title VII prohibits an employer from subjecting an employee to a hostile or abusive work environment based on sex. A hostile work environment exists where the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

151. Beginning with Dilling's appointment in May 2025 and continuing through her termination on November 21, 2025, Dr. Keppel was subjected to a hostile work

environment based on her sex. The hostile environment was created by Dilling, acting within the scope of his authority as Laboratory Director, appointed by JSA. It consisted of persistent circumvention of Dr. Keppel's managerial authority; repeated interruptions and public dismissal of her professional contributions at the Directors' Council in front of her peers; the selection of an underqualified male to deliver a presentation to a government official; demeaning treatment by other male members who took their cues from Dilling's discriminatory behavior; fabricated professional accusations; a pretextual Operations Audit; and the compounded humiliation of her public ejection from the facility immediately upon receiving her termination notice.

152. This conduct was severe or pervasive, was based on Dr. Keppel's sex, and unreasonably interfered with her ability to perform her duties as Associate Director for Experimental Physics. JSA knew or should have known of this hostile environment and failed to take prompt corrective action.

153. As a direct and proximate result of the hostile work environment created by JSA/Dilling, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Dr. Keppel is further entitled to punitive damages under 42 U.S.C. § 1981a for JSA/Dilling's malicious and reckless conduct.

**COUNT IV**
**Hostile Work Environment Based on Sex in Violation of Title VII**
**42 U.S.C. § 2000e-2(a)**
**(Against Defendant SURA)**

154. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

155. Title VII prohibits an employer from subjecting an employee to a hostile or abusive work environment based on sex. A hostile work environment exists where the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

156. As joint employer, SURA authorized and ratified a gender-based hostile work environment directed at Dr. Keppel. SURA began this with Dilling's appointment in May 2025 by selecting him as the JSA Lab Director. SURA authorized and ratified Dilling's discriminatory actions to circumvent Dr. Keppel's managerial authority through repeated interruptions and public dismissal of her professional contributions at the Directors' Council in front of her peers; demeaning treatment by other male members who took their cues from Dilling's discriminatory behavior and fabricated professional accusations. In addition, SURA ordered Dilling to implement the discriminatory and pretextual Operations Audit and authorized and ratified the humiliation of her public ejection from the facility immediately upon receiving her termination notice.

157. This conduct was severe or pervasive, was based on Dr. Keppel's sex, and unreasonably interfered with her ability to perform her duties as Associate Director for Experimental Physics. SURA knew or should have known of this hostile environment and failed to take prompt corrective action.

158. As a direct and proximate result of SURA's gender discrimination, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be

proven at trial. Dr. Keppel is further entitled to punitive damages under 42 U.S.C. § 1981a for SURA's malicious and reckless conduct.

**COUNT V**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-3(a)**
**(Against Defendant JSA)**

159. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

160. Title VII, 42 U.S.C. § 2000e-3(a), prohibits an employer from retaliating against any individual because she has opposed an unlawful employment practice or engaged in any protected activity under Title VII.

161. Dr. Keppel engaged in activity protected under Title VII by, among other things, retaining legal counsel on or about November 25, 2025, and challenging the unlawful, gender-motivated termination of her employment.

162. On or about November 26, 2025, and then again on December 3, 2025, JSA was informed that Dr. Keppel had retained counsel to oppose its unlawful practices. On or about December 3, 2025, Dr. Keppel's counsel asserted violations of Title VII. In direct response to this protected activity, among others, JSA, acting through Defendant Dilling, engaged in materially adverse retaliatory conduct, including but not limited to: (a) on or about December 18, 2025, Dilling hosting a Town Meeting, on behalf of JSA, at which he made false and defamatory statements to members of the scientific and laboratory community — including Dr. Keppel's professional colleagues, clients, and business partners of thirty years — alleging that she had mismanaged the fiscal and safety aspects of her position; (b) on December 22, 2025, JSA offering Dr. Keppel a demotion to a "Nuclear Physics Special Advisor" position at a salary reduction of approximately

$100,000, conditioned on her acceptance of a punitive non-disparagement obligation; (c) violating Dr. Keppel's rights under COBRA; and (d) violating Dr. Keppel's rights under ERISA to access her retirement funds.

163. A causal connection exists between Dr. Keppel's protected activity and these adverse actions. The defamatory Town Meeting occurred within fifteen (15) days of her counsel's assertion of her claims. The demotion offer followed days later. Each additional retaliation occurred shortly thereafter. The temporal proximity, combined with the retaliatory nature of these communications and actions, establishes causation. Dr. Keppel's protected activity was the but-for cause of the adverse actions described herein; those actions would not have been taken absent her protected activity.

164. JSA's retaliatory conduct was willful, intentional, and malicious, or was undertaken with reckless indifference to Dr. Keppel's federally protected rights.

165. As a direct and proximate result of JSA's retaliation, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial.

**COUNT VI**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-3(a)**
**(Against Defendant SURA)**

166. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

167. Title VII, 42 U.S.C. § 2000e-3(a), prohibits an employer from retaliating against any individual because she has opposed an unlawful employment practice or engaged in any protected activity under Title VII.

168. Dr. Keppel engaged in activity protected under Title VII by, among other things, retaining legal counsel on or about November 25, 2025, to challenge the unlawful, gender-motivated termination of her employment.

169. On or about November 26, 2025, and then again on December 3, 2025, JSA and, on information and belief, SURA were informed that Dr. Keppel had retained counsel to oppose their unlawful practices. On or about December 3, 2025, Dr. Keppel's counsel asserted violations of Title VII. In direct response to this protected activity, among others, SURA, as joint employer, engaged in materially adverse retaliatory conduct by authorizing and ratifying the following actions: (a) on or about December 18, 2025, Dilling hosting a Town Meeting, on behalf of SURA, at which he made false and defamatory statements to members of the scientific and laboratory community — including Dr. Keppel's professional colleagues, clients, and business partners of thirty years — alleging that she had mismanaged the fiscal and safety aspects of her position; (b) on December 22, 2025, Dr. Keppel was offered a retaliatory demotion to a "Nuclear Physics Special Advisor" position at a salary reduction of approximately $100,000, conditioned on her acceptance of a punitive non-disparagement obligation; (c) violating Dr. Keppel's rights under COBRA; and (d) violating Dr. Keppel's rights under ERISA to access her retirement funds.

170. A causal connection exists between Dr. Keppel's protected activity and these adverse actions. The defamatory Town Meeting occurred within fifteen (15) days of her counsel's assertion of her claims. The demotion offer followed days later. Each additional retaliation occurred shortly thereafter. The temporal proximity, combined with the retaliatory nature of these communications and actions, establishes causation. Dr.

Keppel's protected activity was the but-for cause of the adverse actions described herein; those actions would not have been taken absent her protected activity.

171. SURA's retaliatory conduct was willful, intentional, and malicious, or was undertaken with reckless indifference to Dr. Keppel's federally protected rights.

172. As a direct and proximate result of SURA's retaliation, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial.

**COUNT VII**
**Gender Discrimination and Hostile Work Environment in Violation of the Virginia Human Rights Act**
**Va. Code Ann. §§ 2.2-3900 et seq.**
**(Against Defendant JSA)**

173. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

174. The VHRA, Va. Code Ann. § 2.2-3905(B)(1), prohibits an employer from discriminating against any individual in the terms, conditions, or privileges of employment because of sex. The VHRA also prohibits the creation or maintenance of a hostile work environment based on sex. Va. Code Ann. § 2.2-3905(B)(1)(a).

175. JSA employed fifteen (15) or more employees at all relevant times and constitutes a covered employer under Va. Code Ann. § 2.2-3905(A).

176. JSA discriminated against Dr. Keppel because of her sex in violation of the VHRA by: systematically undermining her authority and contributions through gender-based conduct by Dilling and Dean; imposing a pretextual Operations Audit on her division alone; appointing an underqualified male to make a presentation to a government official; falsely accusing her of professional misconduct regarding that presentation;

terminating her employment based on a pretextual leadership assessment; replacing her with a less qualified male; denying her severance offered to comparable male executives; demanding she falsely represent a resignation as a condition of continued employment; selectively restricting her customary outside professional engagement; and bypassing her experienced female Deputy in favor of a markedly less experienced male.

177. JSA also created and maintained a hostile work environment based on Dr. Keppel's sex in violation of the VHRA.

178. As a direct and proximate result of JSA's discrimination, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Because JSA's conduct was willful and in knowing violation of the VHRA, Dr. Keppel is entitled to punitive damages pursuant to Va. Code Ann. § 2.2-3908(B).

**COUNT VIII**
**Gender Discrimination and Hostile Work Environment in Violation of the Virginia Human Rights Act**
**Va. Code Ann. §§ 2.2-3900 et seq.**
**(Against Defendant SURA)**

179. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

180. The VHRA, Va. Code Ann. § 2.2-3905(B)(1), prohibits an employer from discriminating against any individual in the terms, conditions, or privileges of employment because of sex. The VHRA also prohibits the creation or maintenance of a hostile work environment based on sex. Va. Code Ann. § 2.2-3905(B)(1)(a).

181. SURA employed fifteen (15) or more employees at all relevant times and constitutes a covered employer under Va. Code Ann. § 2.2-3905(A).

182. SURA discriminated against Dr. Keppel because of her sex in violation of the VHRA by authorizing and ratifying the following illegal conduct: systematically undermining her authority and contributions through gender-based conduct by Dilling and Dean; imposing a pretextual Operations Audit on her division alone; appointing an underqualified male to make a presentation to a government official; falsely accusing her of professional misconduct regarding that presentation; terminating her employment based on a pretextual leadership assessment; replacing her with a less qualified male; denying her severance offered to comparable male executives; demanding she falsely represent a resignation as a condition of continued employment; selectively restricting her customary outside professional engagement, including through Hearne's invocation of an expired non-compete against her alone; and bypassing her experienced female Deputy in favor of a markedly less experienced male.

183. SURA also created and maintained a hostile work environment based on Dr. Keppel's sex in violation of the VHRA.

184. As a direct and proximate result of SURA's discrimination, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Because SURA's conduct was willful and in knowing violation of the VHRA, Dr. Keppel is entitled to punitive damages pursuant to Va. Code Ann. § 2.2-3908(B).

**COUNT IX**
**Retaliation in Violation of the Virginia Human Rights Act**
**Va. Code Ann. §§ 2.2-3900 et seq.**
**(Against Defendant JSA)**

185. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

186. The VHRA, Va. Code Ann. § 2.2-3905(B)(1)(f), prohibits retaliation against any person because she has opposed a practice made unlawful by the VHRA or participated in any investigation, proceeding, or hearing under the VHRA.

187. On or about November 26, 2025, and then again on December 3, 2025, JSA was informed that Dr. Keppel had retained counsel to oppose its unlawful practices. On or about December 3, 2025, Dr. Keppel's counsel asserted violations of Title VII. In direct response to this protected activity, among others, JSA, acting through Defendant Dilling, engaged in materially adverse retaliatory conduct, including but not limited to: (a) on or about December 18, 2025, Dilling hosting a Town Meeting, on behalf of JSA, at which he made false and defamatory statements to members of the scientific and laboratory community — including Dr. Keppel's professional colleagues, clients, and business partners of thirty years — alleging that she had mismanaged the fiscal and safety aspects of her position; (b) on December 22, 2025, JSA offering Dr. Keppel a demotion to a "Nuclear Physics Special Advisor" position at a salary reduction of approximately $100,000, conditioned on her acceptance of a punitive non-disparagement obligation; (c) violating Dr. Keppel's rights under COBRA; and (d) violating Dr. Keppel's rights under ERISA to access her retirement funds.

188. A causal connection exists between Dr. Keppel's protected activity and these adverse actions. The defamatory Town Meeting occurred within fifteen (15) days of her counsel's assertion of her claims. The demotion offer followed days later. Each additional retaliation occurred shortly thereafter. The temporal proximity, combined with the

retaliatory nature of these communications and actions, establishes causation. Dr. Keppel's protected activity was the but-for cause of the adverse actions described herein; those actions would not have been taken absent her protected activity.

189. JSA's retaliatory conduct was willful, intentional, and malicious, or was undertaken with reckless indifference to Dr. Keppel's protected rights under the VHRA.

190. As a direct and proximate result of JSA's retaliation, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Because JSA's conduct was willful and in knowing violation of the VHRA, Dr. Keppel is entitled to punitive damages pursuant to Va. Code Ann. § 2.2-3908(B).

**COUNT X**
**Retaliation in Violation of the Virginia Human Rights Act**
**Va. Code Ann. §§ 2.2-3900 et seq.**
**(Against Defendant SURA)**

191. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

192. The VHRA, Va. Code Ann. § 2.2-3905(B)(1)(f), prohibits retaliation against any person because she has opposed a practice made unlawful by the VHRA or participated in any investigation, proceeding, or hearing under the VHRA.

193. On or about November 26, 2025, and then again on December 3, 2025, JSA and, on information and belief, SURA were informed that Dr. Keppel had retained counsel. Dr. Keppel engaged in protected conduct under the VHRA to oppose her unlawful, gender-motivated termination. SURA retaliated against her by authorizing and ratifying the following actions: (a) on or about December 18, 2025, Dilling hosting a Town Meeting, at which he made false and defamatory statements to members of the scientific

and laboratory community — including Dr. Keppel's professional colleagues, clients, and business partners of thirty years — alleging that she had mismanaged the fiscal and safety aspects of her position; (b) on December 22, 2025, offering Dr. Keppel a retaliatory demotion to a "Nuclear Physics Special Advisor" position at a salary reduction of approximately $100,000, conditioned on her acceptance of a punitive non-disparagement obligation; (c) violating Dr. Keppel's rights under COBRA; and (d) violating Dr. Keppel's rights under ERISA to access her retirement funds.

194. A causal connection exists between Dr. Keppel's protected activity and these adverse actions. The defamatory Town Meeting occurred within fifteen (15) days of her counsel's assertion of her claims. The demotion offer followed days later. Each additional retaliation occurred shortly thereafter. The temporal proximity, combined with the retaliatory nature of these communications and actions, establishes causation. Dr. Keppel's protected activity was the but-for cause of the adverse actions described herein; those actions would not have been taken absent her protected activity.

195. SURA's retaliatory conduct was willful, intentional, and malicious, or was undertaken with reckless indifference to Dr. Keppel's protected rights under the VHRA.

196. As a direct and proximate result of SURA's retaliation, Dr. Keppel has suffered: lost wages, benefits, and earning capacity; reputational harm; emotional distress; and other compensatory damages, including attorney's fees, in amounts to be proven at trial. Because SURA's conduct was willful and in knowing violation of the VHRA, Dr. Keppel is entitled to punitive damages pursuant to Va. Code Ann. § 2.2-3908(B).

## COUNT XI

## Gender Discrimination, Hostile Work Environment, and Retaliation in Violation of the District of Columbia Human Rights Law

**D.C. Code §§ 2-1401.01 et seq.**
**(Against All Defendants)**

197. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

198. The DCHRA, D.C. Code § 2-1402.11, makes it an unlawful discriminatory practice for an employer to fail or refuse to hire, discharge, or otherwise discriminate against any individual in the terms, conditions, or privileges of employment because of sex. The DCHRA further prohibits retaliation against an employee who has opposed a discriminatory practice. D.C. Code § 2-1402.61.

199. SURA maintains its headquarters at 1201 New York Avenue, NW, Washington, D.C., and Defendants constitute employers subject to the DCHRA. The discriminatory and retaliatory decisions described herein originated and were transmitted from SURA's Washington, D.C. headquarters, giving rise to claims under D.C. law. Hearne is SURA's President and CEO and performs his duties from SURA's Washington, D.C. headquarters, which functions as the administrative and governance hub for the management of Jefferson Lab. From that office, Hearne ordered the November 2025 Operations Audit of Dr. Keppel's division and participated in the decision to terminate her; the audit's required deliverable was a written report delivered to SURA at its Washington, D.C. headquarters. Hearne chaired the search committee that selected Dilling as Laboratory Director, which conducted its work at SURA's Washington, D.C. offices, and Hearne executed Dr. Keppel's Leadership Participation Agreement "For JSA and SURA" in his capacity as SURA's Washington-based President and CEO. The adverse employment decisions at issue were, in substantial part, made in the District of Columbia. SURA's federal employee-benefit-plan filings identify SURA's office at 1201

New York Avenue, NW, Washington, D.C. 20005 as the address of the sponsor and administrator of the retirement plan in which Dr. Keppel participated, confirming that the administration of the benefits attendant to her employment was conducted from the District of Columbia.

200. Defendants discriminated against Dr. Keppel because of her sex, created and maintained a gender-based hostile work environment, and retaliated against her for engaging in protected conduct, all in violation of the DCHRA.

201. Defendants Dilling and Hearne are individually liable under the DCHRA as aiders and abettors of the discriminatory and retaliatory practices described herein, pursuant to D.C. Code § 2-1402.62.

202. As a direct and proximate result of Defendants' violations of the DCHRA, Dr. Keppel has suffered the damage described herein. She is entitled to compensatory damages, punitive damages, injunctive relief, attorney's fees, and costs under D.C. Code §§ 2-1403.13 and 2-1403.16.

**COUNT XII**
**Post-Employment Defamation Per Se**
**(Virginia Common Law)**
**(Against Defendants Dilling, JSA, and SURA)**

203. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

204. On or about December 18, 2025, Defendant Dilling, acting within the scope of his authority as Laboratory Director of Jefferson Lab and on behalf of JSA and SURA, hosted a Town Meeting, held in the laboratory's auditorium and simultaneously broadcast online, attended by JSA/SURA employees, clients, customers, and members of the

scientific and national laboratory community — individuals and organizations who had worked with Dr. Keppel over the course of her thirty-year career at Jefferson Lab.

205. At this Town Meeting, Dilling made false statements of fact about Dr. Keppel, including but not limited to that Dr. Keppel had mismanaged the fiscal aspects of her position as Associate Director for Experimental Physics; that Dr. Keppel had mismanaged the safety aspects of her division; and related false characterizations of her professional fitness and competence, including the specific statements alleged above concerning safety "yellow card" warnings, an external safety review whose result "was not positive," and a budget-reserve shortfall, each attributed to the "line management" Dilling had identified as Dr. Keppel.

206. These statements were false. Dr. Keppel did not mismanage the fiscal or safety operations of her division. The Operations Audit that Dilling himself commissioned in November 2025 confirmed that her division met all performance expectations and safety standards. The fiscal management of the Physics Division was sound. The written audit report had been delivered to SURA and Hearne, and the external review report was in Defendants' possession, before Dilling spoke. Dilling knew these statements were false when he made them or made them with reckless disregard for their truth or falsity.

207. Dilling's false statements constituted defamation per se under Virginia law because they imputed unfitness to perform the duties of Dr. Keppel's profession and prejudiced her in her profession, trade, and occupation as a senior physicist and scientific administrator.

208. Dilling made these statements with actual malice, with knowledge of their falsity or with reckless disregard for whether they were true or false. His motive was to punish

Dr. Keppel for her protected activities, and to destroy her professional standing in the physics and national laboratory community to prevent her from obtaining future employment commensurate with her career.

209. No qualified or absolute privilege protects these communications. The communications were made to a broad audience of professional contacts who had no administrative, supervisory, or legal need to receive information about the internal personnel decisions of JSA/SURA. Dilling exceeded any conceivable legitimate employer purpose by publicly impugning Dr. Keppel's professional competence with her entire professional network. The private publications to Shepherd, Napolitano, and Milner were likewise made to persons outside any employment relationship with Defendants, to whom no privilege of any kind attached.

210. As a direct and proximate result of Dilling's defamatory statements, for which JSA and SURA are vicariously liable as each authorized and ratified these communications, Dr. Keppel has suffered: severe damage to her professional reputation in the national and international physics and laboratory community; loss of professional relationships and future employment opportunities; emotional distress, humiliation, and reputational harm; and other economic and non-economic damages in amounts to be proven at trial.

211. Dr. Keppel is entitled to compensatory damages including lost wages, lost employment opportunities, emotional distress, humiliation, and damage to personal reputation. The Plaintiff is also entitled to presumed damages because the defamatory statements impugned her business reputation. Finally, because the defamatory statements were made with actual malice, Dr. Keppel is entitled to punitive damages.

**COUNT XIII**
**Failure to Provide Timely COBRA Notice**
**29 U.S.C. § 1166; 29 U.S.C. § 1132(c)**
**(Against Defendants JSA and SURA)**

212. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

213. COBRA, 29 U.S.C. § 1161 et seq., requires that the administrator of a group health plan provide a qualified beneficiary, including an employee who has experienced a qualifying event such as termination of employment, with notice of the right to elect continuation of group health coverage. 29 U.S.C. § 1166(a)(2), (c). The employer must notify the plan administrator of the qualifying event within thirty (30) days, 29 U.S.C. § 1166(a)(2), and the plan administrator must then notify the qualified beneficiary within fourteen (14) days, 29 U.S.C. § 1166(a)(4), (c). Such notice must generally be provided within forty-four (44) days of the qualifying event.

214. Dr. Keppel experienced a qualifying event under COBRA, 29 U.S.C. § 1163(2), on November 21, 2025, when JSA terminated her employment and, with it, her active coverage under JSA's group health plan.

215. JSA, as Dr. Keppel's employer and the party obligated by 29 U.S.C. § 1166(a)(2) to notify the plan administrator of a qualifying event within thirty days, and as the party responsible for administering or ensuring compliance with the group health plan's COBRA notice obligations, was required to provide Dr. Keppel with timely written notice of her right to elect COBRA continuation coverage following her termination.

216. JSA failed to notify SURA of the qualifying event within the time required by 29 U.S.C. § 1166(a)(2), SURA failed to provide Dr. Keppel with the COBRA election notice

within the time required by 29 U.S.C. § 1166(a)(4) and (c), and to date neither Defendant has provided proper notice.

217. JSA's and SURA's failure to provide timely COBRA notice was willful, or in the alternative, was undertaken without reasonable cause, and deprived Dr. Keppel of a meaningful opportunity to elect and maintain continuous group health coverage during a critical period following her unlawful termination.

218. As a direct and proximate result of JSA's and SURA's failure to provide timely COBRA notice, Dr. Keppel has suffered damages, including exposure to uninsured medical expenses, loss of continuous health coverage, and related financial and emotional harm.

219. Pursuant to 29 U.S.C. § 1132(c)(1), Dr. Keppel is entitled to statutory penalties, in the maximum daily amount permitted by law, for each day that SURA, as plan administrator, has failed to provide the required COBRA notice, measured from the date such notice was due, together with an order compelling JSA and SURA to provide the required notice and/or coverage, and such other legal and equitable relief, including attorney's fees, as the Court deems appropriate.

**COUNT XIV**
**Interference with ERISA Rights in Violation of ERISA § 510**
**29 U.S.C. § 1140; 29 U.S.C. § 1132(a)(3)**
**(Against Defendant JSA)**

220. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

221. ERISA § 510, 29 U.S.C. § 1140, makes it unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which she is entitled under the provisions of an employee benefit

plan, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

222. By virtue of her thirty years of employment at Jefferson Lab, Dr. Keppel was a participant in an employee retirement plan sponsored and/or maintained in connection with her employment and possessed vested and/or accrued rights to retirement benefits thereunder.

223. Following her termination on November 21, 2025, and continuing after she engaged in her protected activities and challenged her unlawful termination, JSA denied Dr. Keppel access to her retirement funds, without legitimate explanation or justification, including by falsely maintaining to TIAA that she remained employed notwithstanding its own Termination Notice.

224. JSA's denial of access to Dr. Keppel's retirement funds was undertaken for the purpose of interfering with her attainment of rights to which she was or may have become entitled under the plan, and/or in retaliation for her exercise of protected rights, including her opposition to unlawful discrimination and retaliation, in violation of 29 U.S.C. § 1140. This interference was affirmative, repeated, post-termination conduct undertaken with the specific intent to interfere with Dr. Keppel's ERISA-protected rights, and was not a mere incidental consequence of her termination.

225. JSA's conduct was willful and undertaken with knowledge of, or reckless disregard for, Dr. Keppel's rights under the plan and under ERISA.

226. As a direct and proximate result of JSA's unlawful interference, Dr. Keppel has been denied access to and use of her own retirement savings and has suffered financial loss and other damages in amounts to be proven at trial. Pursuant to 29 U.S.C. §

1132(a)(3), Dr. Keppel is entitled to injunctive and other equitable relief, including an order compelling JSA to restore her full and unimpeded access to her retirement funds, together with attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

**COUNT XV**
**Interference with and Denial of ERISA Rights in Violation of ERISA**
**29 U.S.C. §§ 1104(a)(1), 1140, 1132(a)(1)(B), 1132(a)(3)**
**(Against Defendant SURA)**

227. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

228. ERISA § 510, 29 U.S.C. § 1140, makes it unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which she is entitled under the provisions of an employee benefit plan, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. Separately, 29 U.S.C. § 1132(a)(1)(B) permits a participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the plan, or to clarify her rights to future benefits under the plan.

229. By virtue of her thirty years of employment at Jefferson Lab, Dr. Keppel was a participant in the SURA/Jefferson Science Associates 401(k) Plan, Plan Number 003, Employer Identification Number 54-1156453 — an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2), sponsored by SURA — and possessed vested and accrued rights to retirement benefits thereunder. SURA holds and/or administers, or exercises, control over the administration of the retirement funds and accounts in which Dr. Keppel is a participant. TIAA, the plan's recordkeeper, identifies SURA as a plan party in its participant communications, including its February 26, 2026 service

notification to Dr. Keppel. SURA is the plan's named administrator within the meaning of 29 U.S.C. § 1002(16)(A) and is therefore a fiduciary of the plan under 29 U.S.C. § 1002(21)(A)(iii). SURA has so certified to the United States Department of Labor on the plan's annual Form 5500 returns, including the return for plan year 2024 executed on SURA's behalf under penalties of perjury on October 14, 2025, on which the plan administrator is identified at line 3a as the "Same as Plan Sponsor at line 3a as "Same as Plan Sponsor."

230. Following her termination on November 21, 2025, and continuing after she engaged in protected activities and challenged her unlawful termination, SURA denied Dr. Keppel access to her retirement funds held by SURA, without legitimate explanation or justification, including by maintaining, or acquiescing in the position maintained to TIAA, that she remained employed notwithstanding the Termination Notice.

231. SURA's denial of access to Dr. Keppel's retirement funds constitutes both a wrongful denial of benefits due to her under the terms of the plan, in violation of 29 U.S.C. § 1132(a)(1)(B), and unlawful interference with, and retaliation for, the exercise of her rights under the plan, in violation of 29 U.S.C. § 1140. This interference was affirmative, repeated, post-termination conduct undertaken with the specific intent to interfere with Dr. Keppel's ERISA-protected rights, and was not a mere incidental consequence of her termination.

232. SURA's conduct was willful and undertaken with knowledge of, or reckless disregard for, Dr. Keppel's rights under the plan and under ERISA.

233. As a direct and proximate result of SURA's unlawful conduct, Dr. Keppel has been denied access to and use of her own retirement savings and has suffered financial

loss and other damages in amounts to be proven at trial. Pursuant to 29 U.S.C. § 1132(a)(1)(B) and (a)(3), Dr. Keppel is entitled to recover the benefits due to her under the plan, to enforce and clarify her rights to future benefits, and to obtain injunctive and other equitable relief compelling SURA to restore her full and unimpeded access to her retirement funds, together with attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

## PRAYER FOR RELIEF

234. WHEREFORE, Plaintiff Dr. Cynthia E. Keppel respectfully requests that this Court enter judgment in her favor and against Defendants, and award the following relief:

a. An award of compensatory damages for lost wages, backpay, and front pay she would have earned but for Defendants' unlawful conduct.

b. An award of compensatory damages for lost benefits, including retirement, health, and other employment benefits.

c. An award of compensatory damages for harm to Dr. Keppel's professional reputation in the physics and national laboratory community, lost professional opportunities, and diminished future earning capacity.

d. An award of compensatory damages for emotional distress, mental anguish, humiliation, and loss of enjoyment of life.

e. An award of punitive damages under Title VII (42 U.S.C. § 1981a), the VHRA (Va. Code Ann. § 2.2-3908(B)), the DCHRA (D.C. Code § 2-1403.13), and Virginia common law, for Defendants' willful, intentional, and malicious conduct.

f. An award of severance pay and benefits that JSA/SURA discriminatorily withheld from Dr. Keppel but provided to similarly situated departing male executives.

g. Injunctive relief directing Defendants to issue corrective communications to those who received Dilling's defamatory statements of December 18, 2025, and to refrain from any further defamatory statements about Dr. Keppel.

h. An award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k), Va. Code Ann. § 2.2-3908(A), D.C. Code § 2-1403.13(a), and other applicable law.

i. Pre-judgment and post-judgment interest as permitted by law.

j. An award of statutory penalties against SURA, as plan administrator, pursuant to 29 U.S.C. § 1132(c)(1) for failure to provide timely COBRA notice.

k. An order under 29 U.S.C. § 1132(a)(1)(B) and (a)(3) compelling JSA and SURA to restore Dr. Keppel's full and unimpeded access to her retirement funds and benefits, and awarding attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

l. Such other and further relief as this Court deems just, equitable, and proper.

**DEMAND FOR JURY TRIAL**

235. Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff Dr. Cynthia E. Keppel hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

//s// Deborah Y. Collins
**Deborah Y. Collins, Esq. (VSB No. 82835)**
**Brittany C. Robbins, Esq. (VSB No. 102383)**
Yeng Collins Law, PLLC
440 Monticello Avenue, Suite 1875
Norfolk, VA 23510
Tel: (757) 828-5585
Fax: (757) 687-0702

deb@yengcollinslaw.com
brittany@yengcollinslaw.com
*Counsel for Plaintiff*

//s// Ronald J. Kim
**Ronald J. Kim, Esq. NYS 2368967**
Of Counsel
Solomon Law Firm, PLLC
1025 Connecticut Avenue, NW, Suite 1000
Washington, D.C. 20036
Tel: (866) 833-3529
Fax: (518) 456-4340
rkim@fedemploylaw.com
*pro hac vice admission pending*
*Counsel for Plaintiff*