**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **DR. CYNTHIA E. KEPPEL,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**JEFFERSON SCIENCE ASSOCIATES, LLC, ET AL.,**<br><br>**DEFENDANTS.** | **Case No.: 4:26-CV-00112-MSD-LRL** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT SOUTHEASTERN UNIVERSITIES RESEARCH ASSOCIATION, INC.'S**
**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant Southeastern Universities Research Association, Inc. ("SURA") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss Plaintiff Cynthia E. Keppel's Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). The FAC adds new allegations regarding SURA's corporate governance activities, benefit-plan filings, and the role of SURA's President and CEO, Sean Hearne, yet these additions do not cure the fundamental deficiency: the FAC fails to allege facts sufficient to establish that SURA was Plaintiff's employer or joint employer under any recognized legal standard. Every material employment action alleged in the FAC was taken by JSA or its employees. The FAC's new allegations regarding SURA's corporate governance activities—signing participation agreements, chairing a search committee for the Lab Director, overseeing benefit-plan filings, and conducting board-level oversight—describe the normal incidents of stock ownership and corporate administration, not the day-to-day control over rank-and-file employees that the Fourth Circuit's joint-employer test requires.

Even if SURA were deemed Plaintiff's employer, each substantive count fails on its own merits. The discrimination claims lack allegations of satisfactory performance under the relevant decision maker's criteria and lack similarly situated comparators. The harassment claim attributes all conduct to JSA personnel with no basis for imputing liability to SURA. The retaliation claim founders on chronology: Plaintiff's termination preceded her protected activity. The DCHRA claim improperly seeks to extend the District of Columbia's employment statute to an employment relationship centered in Virginia. The defamation claim attributes statements to JSA's Lab Director without factual basis for vicarious liability. The COBRA claim fails because the FAC's own theory demonstrates that any failure in notice originated with JSA as employer. And the ERISA claims do not allege that SURA exercised discretionary authority over plan assets or benefit determinations. Accordingly, all claims against SURA should be dismissed with prejudice.

**LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. To survive dismissal, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must accept factual allegations as true but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555. The court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Where "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679.

## ARGUMENT

### I. The FAC Does Not Plausibly Allege That SURA Employed Plaintiff

The threshold question for every claim against SURA is whether Plaintiff has plausibly alleged that SURA was her employer. The FAC's new allegations regarding SURA's corporate governance, benefit-plan administration, and Hearne's role describe the normal incidents of a parent corporation's relationship with its subsidiary—not the day-to-day control over rank-and-file employees required to establish joint-employer status under the Fourth Circuit's *Butler* test.

#### A. The Strong Presumption That the Subsidiary Is the Employer

This Circuit has long recognized that "a corporate parent is generally not the employer of its subsidiary's employees." *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015). This principle reflects the fundamental tenet of corporate law that separate entities maintain separate legal identities. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries."). A plaintiff seeking to hold a parent liable as an employer bears the burden of demonstrating that the parent exercised "sufficient control over the terms and conditions" of the plaintiff's employment. *Butler*, 793 F.3d at 408. The presumption that the subsidiary is the sole employer serves critical policy purposes. Without it, every employee of a subsidiary could sue the parent corporation by alleging that the parent exercised the oversight inherent in any parent-subsidiary relationship. The law draws a bright line between corporate governance and employment control to prevent this.

#### B. The Joint-Employer Test Forecloses Liability Against SURA

The Fourth Court adopted a nine-factor test for determining joint-employer status:

(1) authority to hire and fire the individual;
(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;
(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
(5) the length of time during which the individual has worked for the putative employer;
(6) whether the putative employer provides the individual with formal or informal training;
(7) whether the individual's duties are akin to a regular employee's duties;
(8) whether the individual is assigned solely to the putative employer; and
(9) whether the individual and putative employer intended to enter into an employment relationship.

*Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 414 (4th Cir. 2015). "No one factor is determinative," and control remains the "principal guidepost" of the analysis. *Id.* at 414-15. Critically, Court emphasized that "the normal exercise of oversight by a parent corporation" over its subsidiary, including involvement in major business decisions and corporate governance does not establish joint-employer liability. *Id.* at 410. The distinction between impermissible "control" and permissible "oversight" is the fulcrum on which joint-employer analysis turns.

### C. The FAC Does Not Plausibly Establish An Employment Relationship

#### 1. The Leadership Participation Agreement.

Plaintiff alleges that Hearne signed a Leadership Participation Agreement "For JSA and SURA" as SURA's President and CEO, committing SURA to provide equipment and materials. Am. Compl. ¶ 27. This allegation describes corporate governance, not day-to-day employment control. A parent corporation does not become the employer of a subsidiary's personnel merely by exercising the normal incidents of stock ownership, including selecting directors, setting general policies, and conducting general oversight. *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 981 (4th Cir. 1987). The FAC does not allege that SURA controlled JSA's employment practices or decisions with respect to Plaintiff.

#### 2. Form 5500 Filings and Benefit Plan Administration.

Plaintiff places great weight on SURA's identification as the plan sponsor and administrator on Form 5500 filings. Am. Compl. ¶¶ 24-26, 118, 125. But benefit plan sponsorship and administration is a separate administrative function from day-to-day employment control. *Darden* confirms that ERISA's circular definition of "employee" is construed through traditional common-law agency principles, which assess the incidents of the employment relationship rather than labels alone. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992). Similarly, ERISA fiduciary status turns on whether an entity actually exercised the discretionary authority or control specified in the statute, not simply on an administrative title. *Custer v. Sweeney*, 89 F.3d 1156, 1161–62 (4th Cir. 1996). Form 5500 filings do not, standing alone, establish day-to-day control over JSA's employees. An entity can be a plan administrator without being an employer. *See* 29 U.S.C. § 1002(16)(A) (defining "administrator" as a distinct role from "employer").

**3. The Lab Director Search Committee.**

The FAC alleges that Hearne chaired the search committee that selected Dilling as Lab Director and that this committee met at SURA's DC offices. Am. Compl. ¶¶ 29, 31. A parent corporation's CEO chairing a search committee for the subsidiary's top executive is quintessentially a "normal incident of stock ownership"— the functional equivalent of a parent corporation choosing the directors of its subsidiary. *Bestfoods*, 524 U.S. at 69 ("Activities that involve the facility but which are consistent with the parent's investor status, such as . . . monitoring the subsidiary's performance . . . and involvement in the subsidiary's financial decisions" do not create liability.). The Lab Director is the chief executive officer of JSA's operations at Jefferson Lab. Selecting that individual is a governance decision, not an employment decision affecting rank-and-file employees like Plaintiff.

**4. Board Oversight of the Lab Director.**

Plaintiff alleges that Dilling reported to and was evaluated by a board chaired by Hearne. Am. Compl. ¶ 32. Board oversight of a subsidiary's chief executive is the paradigmatic exercise of corporate governance. Every parent corporation evaluates its subsidiary's top officers. This establishes nothing about SURA's control over the terms and conditions of Plaintiff's employment. Under the *Butler* framework, the relevant inquiry is whether SURA supervised *Plaintiff*, not whether SURA supervised the person who supervised Plaintiff's supervisor. The chain of oversight from SURA to Hearne to the Board to Dilling to Plaintiff is several levels removed from direct employment control.

**5. The Operations Audit.**

Plaintiff alleges that Hearne "ordered" the Operations Audit, received the report, and participated in its close-out. Am. Compl. ¶¶ 28(a), 28(b). A parent corporation's monitoring of its subsidiary's performance through audits is a textbook exercise of "normal oversight" insufficient to establish employer status. *See Butler*, 793 F.3d at 410; *Johnson*, 814 F.2d at 981. The DOE M&O contract itself requires rigorous oversight of Lab operations. That SURA exercised such oversight through its CEO does not transform corporate governance into employment control.

**6. Participation in Severance and TIAA Position.**

Plaintiff alleges that Hearne "participated in" the severance decision and the position taken regarding Plaintiff's TIAA distribution. Am. Compl. ¶ 28(c). This allegation is vague and conclusory. Even if credited, a parent corporation's involvement in high-level decisions regarding the separation of a senior executive does not establish day-to-day employment control. *See Magnuson v. Peak Tech. Servs., Inc.*, 808 F. Supp. 500, 507 (E.D. Va. 1992) (involvement in personnel decisions regarding senior officers is consistent with normal corporate oversight).

**7. Application of the Butler Factors.**

Applying the nine *Butler* factors confirms that SURA was not Plaintiff's joint employer:

| Factor | Allegations Supporting Factor |
|---|---|
| Factor 1 | The FAC alleges that Hearne "made the final decision" to appoint Plaintiff as Associate Director (Am. Compl. ¶ 43), but the termination notice was issued by Dilling on behalf of JSA, and the termination decision is attributed to Dilling. Am. Compl. ¶¶ 62-63. Even as to her appointment, a parent's involvement in selecting a senior officer of the subsidiary does not establish hiring authority over rank-and-file employees generally. |
| Factor 2 | Plaintiff was supervised by Dilling as JSA's Lab Director. Am. Compl. ¶¶ 45, 49. No allegation suggests SURA supervised Plaintiff's daily work. |
| Factor 3 | The LPA's commitment to provide equipment reflects SURA's role as managing member, not as employer. |
| Factor 4 | JSA set Plaintiff's compensation, hours, and working conditions. No allegation attributes these functions to SURA. |
| Factor 5 | JSA issued Plaintiff's paychecks. Am. Compl. ¶ 26 |
| Factor 6 | JSA promulgated work rules and assignments at Jefferson Lab. Am. Compl. ¶¶ 16, 22, 27, 46, 55-57, 64, 66, 71, 75, 77. |
| Factor 7 | JSA maintained Plaintiff's employment records. Am. Compl. ¶¶ 23, 38, 46, 71, 128-32. |
| Factor 8 | While SURA is identified as plan administrator on Form 5500 filings, this reflects an ERISA administrative function, not an employment relationship. JSA's payroll funded the benefits. |
| Factor 9 | SURA's role was that of a parent corporation exercising normal corporate governance. The day-to-day employment relationship was entirely between Plaintiff and JSA |

In sum, the FAC's new allegations bolster the picture of SURA as a parent corporation engaged in corporate governance, not as a joint employer exercising day-to-day control over Plaintiff's employment. The motion to dismiss on the threshold ground that SURA was not Plaintiff's employer should be granted as to all employment-based claims.

## II. Count II: The Discrimination Claims Fail Even If SURA Were Deemed A Joint

**Employer**

Even assuming, *arguendo*, that the FAC adequately alleges an employment relationship with SURA, Plaintiff's Title VII, VHRA, and DCHRA claims fail because she does not plead facts sufficient to establish a prima facie case of discrimination. To state a plausible Title VII disparate treatment claim, a plaintiff must allege facts supporting each element of the *McDonnell Douglas* framework: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances giving rise to an inference of unlawful discrimination. *McCleary-Evans*, 780 F.3d at 585. Although the FAC adds new performance-related allegations and identifies additional purported comparators, these amendments do not cure the deficiencies in elements two and four.

**A. Plaintiff Fails to Plead Satisfactory Job Performance as Assessed by the Relevant Decisionmaker.**

A plaintiff alleging employment discrimination need not plead a prima facie case to survive a motion to dismiss, but the complaint must contain sufficient factual allegations from which the court can reasonably infer that the plaintiff was meeting the employer's legitimate job expectations at the time of the alleged adverse actions. The plaintiff must plead specific facts demonstrating satisfactory job performance contemporaneous with the challenged decisions. Bare and conclusory assertions of satisfactory performance are insufficient. Where the complaint fails to allege concrete facts showing that the plaintiff was fulfilling the employer's legitimate expectations at the time the adverse actions were taken, dismissal is warranted.

The FAC now includes allegations about Plaintiff's prior performance evaluations, including a FY2024 appraisal rating of 10.5 ("Exceeds Most") with an "Exemplary" in Scientific/Technical Performance signed by then-supervisor Kimberly Sawyer, and a merit increase with written commendation from then-Lab Director Stuart Henderson. Am. Compl. ¶ 46.

Plaintiff also references the LPA that allegedly committed JSA to retain Plaintiff subject to her maintaining a performance appraisal of level 3 or above (Am. Compl. ¶¶ 27, 46), and alleges that JSA's policy requires a Performance Improvement Plan before dismissal for performance deficiency, yet no PIP was issued (Am. Compl. ¶ 46). Plaintiff also alleges that a November 2025 Operations Audit confirmed her division met all performance expectations. Am. Compl. ¶¶ 46, 68-69. These allegations, while new, do not establish the relevant inquiry. The Fourth Circuit has made clear that "it is the perception of the decision maker [at the time of termination] which is relevant, not the self-assessment of the plaintiff." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000). The pertinent question is whether the decision maker, Laboratory Director Dilling, perceived Plaintiff's performance as satisfactory at the time of the adverse action. The Amended Complaint's own allegations demonstrate that the answer is no: Dilling concluded that the Lab's leadership team required restructuring and that Plaintiff's leadership role was not consistent with the new organizational direction. Am. Compl. ¶¶ 55-57.

The performance evidence Plaintiff marshals is fundamentally inapposite because it was generated by different evaluators assessing different criteria at different times:

| | |
|---|---|
| **FY2024 Annual Performance Appraisal** | o The performance evaluation was signed by Kimberly Sawyer, Plaintiff's predecessor supervisor, not by Dilling, who was the decision maker.<br>o Plaintiff's own performance allegations actually undermine her claim. The FAC relies heavily on Plaintiff's FY2024 Annual Performance Appraisal, which assigned an overall supervisor rating of 10.5, placing her in JSA's "Exceeds Most" rating band. Am. Compl. ¶ 46. But the rating's nomenclature is revealing: By its plain terms, an "Exceeds Most" rating signifies that while the employee performed well in certain categories, she did not meet the employer's expectations in every evaluated dimension. The appraisal thus contains a built-in acknowledgment that Plaintiff's performance fell short of expectations in at least some areas—a concession embedded in the very evidence Plaintiff offers as proof of satisfactory performance. Plaintiff cannot selectively cite her performance appraisal as a shield while ignoring |

| | |
|---|---|
| | what the rating actually communicates.<br>o The internal arithmetic of the appraisal makes the point even more starkly. Plaintiff alleges that she received the highest possible rating — "Exemplary" — in Scientific/Technical Performance, which she identifies as her most heavily weighted category. Am. Compl. ¶ 46. Yet despite achieving the ceiling score in the category that carried the greatest weight, her overall supervisor rating was only 10.5, placing her in the "Exceeds Most" band rather than in the top tier. The only way to reconcile an "Exemplary" score in the most heavily weighted category with an overall rating below 'Exemplary" is if her scores in the remaining categories were materially lower, dragging the composite score down.<br>o Sawyer's assessment of Plaintiff's "Scientific/Technical Performance" as "Exemplary" does not negate Dilling's assessment of Plaintiff's leadership alignment with the Lab's direction. *See Hawkins*, 203 F.3d at 279-80. This result is neither surprising nor unusual. It is a basic reality of any multi-dimensional job that an employee may excel in one area while falling short in others. Plaintiff's attempt to bootstrap exemplary technical ratings into proof that she was satisfying all of her job expectations ignores the multi-faceted nature of her position and the employer's prerogative to evaluate each dimension independently. Dilling's assessment concerned "leadership alignment" — a qualitative judgment about whether a leader's approach is consistent with the organization's direction — which is categorically different from the technical and scientific performance metrics reflected in the Sawyer appraisal. A decision maker's good-faith assessment of leadership fit is not reviewable under Title VII simply because a predecessor supervisor gave favorable review in a separate performance category. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514-15 (4th Cir. 2006) ("[C]ourts may not second-guess an employer's business judgment."). |
| **April 2024 merit commendation** | o Henderson's predates Dilling's appointment by over a year. A prior supervisor's favorable assessment does not bind a successor decision maker's independent evaluation of organizational fit. *See Irani v. Palmetto Health*, 767 F. App'x 399, 419 (4th Cir. 2019) (affirming that prior favorable reviews did not preclude subsequent decision maker from concluding employee's performance was unsatisfactory). |
| **Leadership Participation Agreement** | o Plaintiff's reliance on the LPA is misplaced. The LPA does not guarantee her perpetual tenure in a leadership position irrespective of future job performance. By Plaintiff's argument, JSA would be prohibited from removing her from a leadership position outside of the performance cycle if she were rated a "level 3" in the prior cycle and would be forced to wait until the conclusion of the following performance cycle regardless of any performance issues that occurred |

| | |
|---|---|
| | post a level 3 rating.<br>o Furthermore, under Plaintiff's reading, JSA would have been contractually barred from any future realignment in its leadership, so long as Plaintiff had achieved a level-3 rating in her most recent appraisal cycle — regardless of changed circumstances or evolving direction. No reasonable construction of the Agreement compels that result. |
| **November 2025 Operations Audit** | o Plaintiff's reliance on the Operations Audit fares no better. The FAC alleges that the Operations Audit "confirmed her division met all performance expectations and applicable safety standards." Am. Compl. ¶¶ 46, 68-69. But Plaintiff does not identify what the Operations Audit actually evaluated — its scope, its criteria, or its methodology. An audit of a division's operational compliance and safety standards is not the same as an evaluation of an individual leader's performance, let alone an assessment of that leader's alignment with the organization's strategic direction. It does not address the forward-looking question whether the Lab's leadership structure was optimally configured for the facility's evolving scientific direction. |

In sum, even accepting all of Plaintiff's new performance allegations as true, they do not establish that Dilling perceived Plaintiff's performance as satisfactory. To the contrary, the FAC itself demonstrates that Dilling reached a negative assessment of Plaintiff's leadership alignment. The performance evidence from prior supervisors evaluating different criteria at earlier points in time cannot substitute for the decision maker's own assessment.

### B. Plaintiff Fails to Plead Circumstances Giving Rise to an Inference of Gender Discrimination.

The FAC also seeks to bolster the inference-of-discrimination element by identifying new purported comparators and additional factual allegations. These additions, however, remain insufficient. In *Haywood v. Locke*, the Fourth Circuit explained that "[p]laintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim[;] [h]owever, in this case, the plaintiffs have based their allegations completely upon a comparison to an employee from a non-protected class, and *therefore the validity of their prima facie case depends upon whether that comparator is indeed similarly situated*." 387 F. App'x 355, 359 (4th

Cir. 2010) (emphasis added). If a plaintiff "seeks to establish *the plausibility* of discrimination by comparing [themselves] to employees outside of the protected class," they must "*do more than make a general accusation that [they were] treated differently* as a result of [their protected characteristic]." *Robinson*, 2017 U.S. Dist. LEXIS 133534, at *10 (emphasis added).

**1. The newly identified comparators are not similarly situated.**

The FAC identifies David Dean, who served as Deputy Director for Science and Technology, as a comparator because he departed JLab in July 2026 with severance. Am. Compl. ¶ 86. Plaintiff also points to approximately 80 employees who received severance in a February 2026 reduction-in-force. Am. Compl. ¶ 86. Neither comparison is valid.

To be "similarly situated," a comparator must have "dealt with the same supervisor, [been] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood*, 387 F. App'x at 359 (omitted). Dean fails this standard for multiple reasons:

- Dean's departure occurred approximately eight months after Plaintiff's termination (July 2026 versus November 2025), reflecting a fundamentally different decision-making context and timeline.
- The FAC alleges that Dean "departed" with severance; it does not allege that he was terminated for leadership misalignment by the same decision maker under the same circumstances as Plaintiff. A voluntary or negotiated departure with severance is categorically different from the involuntary leadership reassignment at issue here.
- Dean held a different position (Deputy Director for Science and Technology) with different responsibilities, and the FAC does not allege that the same decision maker (Dilling) assessed Dean's leadership alignment using the same criteria applied to Plaintiff. *See*

*Mitchell v. Booz Allen Hamilton Inc.*, Civil Action No. 1:23-cv-00653 (PTG/LRV), 2024 U.S. Dist. LEXIS 40649, at *10 (E.D. Va. Mar. 7, 2024) ("holding that employees were not similarly situated despite allegations that they attended daily meetings reporting database status to the same Career Manager, where they had different job titles and presumed job descriptions, it was unclear whether they shared a supervisor, and they may have had different education and qualifications).

The February 2026 RIF employees fare no better as comparators. Those employees received severance as part of a structured reduction-in-force program, a programmatic, institution-wide downsizing with distinct legal obligations and operational justifications. The RIF was not an individual leadership reassignment decision, and the employees' circumstances bear no meaningful resemblance to Plaintiff's. *See Haywood*, 387 F. App'x at 359.

**2. The "replacement" and "DOE presentation" allegations do not raise an inference of discrimination.**

Plaintiff alleges that she was replaced by a "less qualified male" and that an experienced female deputy with ten years of service was bypassed. Am. Compl. ¶ 82. She further alleges that a DOE presentation was assigned to a "lesser-qualified male." Am. Compl. ¶ 65. These allegations are conclusory. In fact, Plaintiff's allegations are consistent with those rejected by the *McCleary-Evans* court. These allegations are conclusory and resemble those rejected in *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 586 (4th Cir. 2015) (holding that allegations that non-Black decisionmakers hired non-Black applicants instead of the plaintiff, without facts showing that the selected applicants were less qualified, performed worse in interviews, or were less suited based on experience and personality). The FAC does not plead any facts establishing that the replacement or the presentation assignee was actually less qualified; it merely asserts the conclusion. Conclusory allegations of inferior qualifications, without factual support, do not satisfy the *Iqbal*

plausibility standard. *See McCleary-Evans*, 780 F.3d at 586.

**3. The FAC's remaining allegations do not support a plausible inference of gender-based animus.**

Stripped of conclusory assertions, the factual allegations in the FAC describe an incoming Lab Director who restructured the facility's leadership team. There are no allegations that Dilling made any gender-based comments, expressed any gender-based animus, or applied any gender-based criteria. The allegation that other employees were treated differently in different circumstances at different times does not give rise to a plausible inference that gender motivated the decision regarding Plaintiff.

## III. Count IV: The Hostile Work Environment Claim Fails

Even if SURA were Plaintiff's employer, she nonetheless fails to plead sufficient facts to support a plausible claim. A harassment claim under Title VII requires that the plaintiff allege: (1) unwelcome conduct; (2) based on the plaintiff's sex; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) imputable to the employer. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207-08 (4th Cir. 2019). The FAC's amendments, including the Boehnlein incident and the 2023 non-compete incident with Hearne, still fail to satisfy elements two and three. The "Boehnlein incident" is an alleged instance where Dilling "insult[ed], scold[ed], and bull[ied]" Boehnlein (female) during a Directors' Council meeting. Am. Compl. ¶ 61.

### A. The Alleged Conduct Was Not Based on Sex.

The harassment claim rests on a collection of workplace interactions that bear no connection to Plaintiff's sex. The FAC describes disagreements about organizational direction, leadership restructuring, and workplace communications. None of these interactions involved gendered language, sexual comments, or conduct directed at Plaintiff because of her sex. *See*

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at [harassment] because of sex.") (emphasis in original).

The FAC now includes the Boehnlein incident, but this allegation involves conduct by a separate actor, not Dilling, and not part of the leadership restructuring decision. The Boehnlein incident is not alleged to involve sex-based language or conduct, and the involvement of a separate actor with no alleged connection to the termination decision does not transform facially neutral workplace conduct into sex-based harassment. Courts in this District have consistently held that "[p]laintiff cannot assert a hostile work environment claim on her own behalf based on observing unwelcome conduct directed at others." *Robinson v. Prince William-Manassas Reg'l Adult Det. Ctr.*, No. 1:22-cv-00744, 2022 U.S. Dist. LEXIS 209708, 2022 WL 17085916, at *3 (E.D. Va. Nov. 18, 2022); *see also Carter v. Virginia Dep't of Game & Inland Fisheries*, No. 3:16-cv-661, 2017 U.S. Dist. LEXIS 161496, 2017 WL 4413192, at *15 (E.D. Va. Sept. 29, 2017) ("Ms. Easter's contention that she observed others experiencing hostile acts does not, as alleged, plausibly assert a hostile work environment claim on her own behalf.").

Similarly, the 2023 non-compete incident with Hearne, which occurred approximately two years before Plaintiff's termination does not support a sex-based hostile environment claim. The FAC does not allege that this incident involved any gender-based animus or that it was motivated by Plaintiff's sex. A workplace disagreement about non-compete restrictions, without a gender nexus, is not actionable under Title VII.

### B. The Alleged Conduct Was Neither Severe nor Pervasive.

Even if the conduct were plausibly based on sex—which it is not—it does not approach the threshold of severity or pervasiveness required by the Fourth Circuit. To be clear, "'general

allegations' regarding a harassment without 'accounts of specific dates, times or circumstances' are insufficient." *Coleman v. Kettler Mgmt.*, Civil Action No. 1:22-cv-84 (RDA/JFA), 2022 U.S. Dist. LEXIS 223787, at *17 (E.D. Va. Dec. 12, 2022). Where a plaintiff does not "provide any details as to the specific dates on which her supervisors allegedly harassed her or even the frequency of the purported harassment," those incidents "do not amount to severe or pervasive harassment." *Id.* at *18.

The standard is demanding. Title VII "does not establish a general civility code for the American workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Notably, "[w]orkplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Sunbelt Rentals*, 521 F.3d at 315-16. "Title VII was not designed to create a federal cause of action for all combative or abrasive workplace interactions." For example, Title VII does not reach "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* Likewise, conduct that is merely "rude" or "callous," personality conflicts, or isolated incidents (unless extremely serious) are insufficient. *Sunbelt Rentals*, 521 F.3d at 315-16; *Baqir v. Principi*, 434 F.3d 733, 746–47 (4th Cir. 2006). The Fourth Circuit has consistently held that "callous behavior by [one's] superiors" and "rude treatment by [coworkers]" are insufficient to sustain a hostile-work-environment claim. *Bass*, 324 F.3d at 765.

In *Buchhagen v. ICF International, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013), the court held that "harsh criticism," exclusion from meetings, and reassignment of duties were insufficiently severe or pervasive. Likewise, in *Decoster v. Becerra*, the Fourth Circuit rejected the Plaintiff's argument that seven months of alleged humiliation, contemptuous treatment, unfair blame,

threats, and negative performance measures created a hostile work environment. 119 F.4th 332, 338-89 (4th Cir. 2024). It characterized the allegations as a difficult supervisory relationship and unpleasant—but not abusive—performance criticism. *Id.* Because the Plaintiff alleged neither physically threatening conduct nor specific discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive, the court held that she failed to state a plausible hostile-work-environment claim and affirmed dismissal. *Id.*

The conduct alleged here—interruptions during meetings over a period of approximately six months (Am. Compl. ¶ 58); being bypassed for a presentation (Am. Compl. ¶ 63); an Operations Audit of Plaintiff's division (Am. Compl. ¶¶ 64, 66–68); bypassing Plaintiff to contact her direct reports directly (Am. Compl. ¶ 57), and dismissing her opinions and recommendations (Am. Compl. ¶ 59)—is precisely the type of "ordinary workplace friction" that falls far short of the demanding severe-or-pervasive standard. There are no allegations of physical threats, sexual advances, explicit gender-based epithets, or any conduct that objectively alters the terms and conditions of employment. The escort from the facility upon termination, as described in the FAC, is a facially neutral security measure accompanying an immediate separation (Am. Compl. ¶¶ 76–77), and the FAC pleads no facts suggesting it was undertaken because of Plaintiff's sex.

**C. The Alleged Conduct was not Imputable to SURA**

Every incident of alleged harassment is attributed to Dilling or members of the Directors' Council, all JSA personnel. Am. Compl. ¶¶ 49-61. The FAC does not allege that any SURA employee or officer personally engaged in harassing conduct toward Plaintiff. Instead, the FAC relies on the conclusory assertion that SURA "authorized and ratified" the conduct. Am. Compl. ¶ 98. But under *Vance v. Ball State University*, 570 U.S. 421, 431 (2013), employer liability for harassment by a supervisor requires that the harasser be the plaintiff's supervisor, someone

empowered by the employer to take tangible employment actions against the plaintiff. The FAC does not allege that any SURA employee had supervisory authority over Plaintiff.

The conclusory allegation that SURA "authorized and ratified" the hostile conduct is a legal conclusion, not a factual allegation entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678. The FAC does not allege specific facts showing that SURA knew of and approved the alleged harassing conduct. It does not identify any SURA officer or employee who was informed of the conduct and failed to act, or who affirmatively endorsed it. The FAC merely labels the conduct as "authorized" without explaining who at SURA authorized it, when, or how. This is precisely the type of "naked assertion" devoid of "further factual enhancement" that *Iqbal* and *Twombly* require courts to disregard. Count IV should be dismissed as to SURA.

**IV. Count VI: The Retaliation Claim Fails**

To state a retaliation claim, Plaintiff must plausibly allege that (1) she engaged in protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action. *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). Again, even if Plaintiff could establish a joint-employment relationship, the FAC is fundamentally flawed with the alleged adverse action preceding any alleged protected activity. Am. Compl. ¶¶ 7, 9, 71, 76-77. The Amended Complaint's retaliation claim fails on chronology. The FAC alleges that Plaintiff's protected activity, her internal complaints of discrimination, occurred after she received the termination notice. The adverse action preceded the protected activity. A plaintiff cannot establish causation where the alleged retaliatory act occurred before the protected activity. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [actions] upon discovering that [the employee] has filed a charge.").

As to SURA specifically, the FAC compounds this chronological problem with an additional deficiency: the protected activity was directed at JSA's General Counsel, not at any SURA officer or employee. Am. Compl. ¶ 74. The FAC does not allege that any person at SURA had knowledge of Plaintiff's protected activity; to the extent it attempts to do so, it relies on information and belief. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998); *see also Roberts v. Glenn Industrial Group, Inc*., 998 F.3d 111, 122–24 (4th Cir. 2021) (requiring proof that the decisionmaker had actual knowledge of protected activity and declining to impute other employees' knowledge to the sole decisionmaker). Allegations made on information and belief, without supporting factual detail, are insufficient to satisfy *Iqbal*'s plausibility standard in the Fourth Circuit. *See Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). Count VI should be dismissed as to SURA.

## V. Counts VIII and X: The VHRA Claims Fail

Plaintiff asserts claims under the Virginia Human Rights Act ("VHRA"), Va. Code § 2.2-3900 et seq. The VHRA claims track Title VII claims and fail for the same reasons: the FAC does not allege an employment relationship with SURA, and even if it did, Plaintiff fails to plead the elements of discrimination and retaliation. The VHRA provides no broader protection than Title VII in this context. *See Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 194 (4th Cir. 2000). Counts VIII and X should be dismissed.

## VI. Count XI: The DCHRA Claim Fails

The FAC asserts a claim under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 et seq. The FAC adds new allegations to strengthen its DC nexus, including that SURA's DC offices serve as a "governance hub," that Hearne conducted activities from DC, and that Form 5500 filings show a DC address. Am. Compl. ¶¶ 20-22, 24. These allegations do

not save Plaintiff's claim. The DCHRA applies to employment relationships with a sufficient nexus to the District of Columbia. The relevant inquiry is the *situs of the employment relationship*, not the location of the employer's headquarters or corporate governance activities. *See Cole v. Boeing Co.*, 845 F. Supp. 2d 277, 284 (D.D.C. 2012) (DCHRA requires nexus between the employment relationship and the District). Plaintiff worked at Jefferson Lab in Newport News, Virginia. Am. Compl. ¶ 14. She was hired, supervised, evaluated, and terminated in Virginia. Her day-to-day work was performed in Virginia. The employment relationship was centered entirely in Virginia.

That SURA maintains its corporate headquarters in Washington, D.C. is irrelevant to the DCHRA analysis. Corporate governance from a headquarters location is not employment activity directed at the District. *See Elyazidi v. SunTrust Bank*, 780 F. Supp. 2d 1, 10-11 (D.D.C. 2011) (an employer's presence in the District does not create DCHRA jurisdiction over an employment relationship centered elsewhere). The fact that Form 5500 filings list a DC address reflects the location of SURA's administrative offices, not the situs of Plaintiff's employment. And the fact that Hearne conducted corporate governance activities from DC, chairing board meetings, overseeing filings, says nothing about where Plaintiff's employment was located. Plaintiff cannot bootstrap DCHRA jurisdiction from the mere fact that SURA's corporate headquarters, which she claims constitutes the employer—is in DC. The DCHRA protects employees working in the District, not employees working in Virginia whose putative employer has a DC office. Count XI should be dismissed.

**VII. Count XII: The Defamation / Vicarious Liability Claim Fails**

The FAC asserts a defamation claim against SURA based on statements attributed to Dilling and other JSA personnel. Am. Compl. ¶¶ 106-110. The FAC now includes specific quoted

statements. *Id.* ¶¶ 106-108. Even with these additions, the claim against SURA fails for multiple reasons.

**A. No Factual Basis for Vicarious Liability.**

Dilling was employed by JSA, not by SURA. Am. Compl. ¶ 17. The FAC provides no factual basis for attributing Dilling's statements to SURA. It relies on the conclusory assertion that SURA "authorized and ratified" the allegedly defamatory statements. Am. Compl. ¶ 110. As discussed above, "authorized and ratified" is a legal conclusion, not a factual allegation. The FAC does not identify any SURA officer or employee who directed Dilling to make the statements, who knew of the statements and endorsed them, or who otherwise created a basis for SURA's vicarious liability. The allegations of SURA's corporate governance role do not create an agency relationship between SURA and Dilling with respect to statements made in Dilling's capacity as JSA's Lab Director.

**B. The Statements Are Protected Opinion or Subject to Qualified Privilege.**

Even if vicarious liability could be established, the quoted statements are expressions of managerial opinion regarding Plaintiff's leadership and performance. The FAC identifies two incidents in which Dilling allegedly made defamatory statements. As to the first, although the FAC now provides quotations from Dilling's December 18, 2025 Town Meeting, the defamation claim remains fatally deficient. The quoted statements are evaluative opinions about safety and budget metrics, not provably false statements of fact about Plaintiff. They do not specifically identify Plaintiff. They are protected by a qualified privilege. And the allegations of actual malice remain conclusory. Each deficiency independently warrants dismissal. As to the second incident, Plaintiff fails to plead the exact words spoken, offering only vague allegations of private communications with Shepherd, Napolitano, and Milner.

### A. December 18, 2025 Town Meeting

#### 1. 1. The FAC's Quoted Statements Are Evaluative Opinions, Not Provably False Facts.

Under Virginia law, a statement is actionable as defamation only if it "contains a provably false factual connotation." *Schaecher v. Bouffault*, 290 Va. 83, 101–102 (2015). Pure expressions of opinion—statements relative in nature that depend largely on the speaker's viewpoint—cannot support a defamation claim. *Schaecher v. Bouffault*, 290 Va. 83, 101-102 (2015). As such, courts have consistently rejected defamation claims based on opinions. *See Am. Communs. Network v. Williams*, 264 Va. 336, 340 (2002) (finding statement that employee "made two key mistakes" to be an opinion not qualifying as defamatory). As the Supreme Court of Virginia explained in *Schaecher*, "[t]o determine whether a statement can be reasonably understood as stating or implying actual facts, whether those statements are verifiable, and whether they are reasonably capable of defamatory meaning, we must examine them in context." 290 Va. at 93. Moreover, "innuendo may not extend beyond the meaning of the words in the statement." *Id.* at 96.

The statements now quoted in the FAC fall squarely on the opinion side of this line. Dilling's comments at the Town Meeting concerned three categories of institutional information:

| | |
|---|---|
| **Safety review commentary** | Dilling stated that "this year we had again unfortunately some safety related issues, and it was at a level where the board…brought in an external review and looked at what's happening with safety" and that the result "was not positive." Am. Compl. ¶ 93. This is a description of an institutional process, the board's decision to commission a review, and a characterization of the review's outcome. The existence of a board-ordered safety review is a matter of institutional record, not a secret defamatory assertion. Characterizing the result as "not positive" is a classic evaluative assessment, not a statement susceptible to being proved true or false. |
| **Budget commentary** | Dilling stated that *the laboratory* "only had 23 days of reserve" when "[w]e were supposed to have 41 days," because "plans and hopes…hadn't worked out." Am. Compl. ¶ 93. The reserve-day figures describe institutional finances—not personal conduct by Plaintiff. Moreover, the statement that "plans and hopes hadn't worked out" is unmistakably an expression of |

| | |
|---|---|
| | opinion about organizational direction, not a factual assertion about any individual |
| **References to “line management** | The term “line management” is a generic organizational term that refers to the chain of management responsible for direct operations. Am. Compl. ¶ 96. This is discussed further in Section I.B below |

None of these statements asserts a provably false fact ***about Plaintiff***. The safety review was an institutional event; the budget figures are organizational data; and the evaluative characterizations (“not positive,” “hadn’t worked out”) are subjective assessments of institutional performance. Virginia courts have consistently held that such evaluative characterizations are protected opinion. For example, in *Boyer v. Smith & Nephew, Inc.*, the Virginia Court of Appeals upheld the sustaining of a demurrer based on non-actionable opinion statements regarding job performance. No. 1634-24-3, 2025 Va. App. LEXIS 576, at *6-7 (Ct. App. Sep. 23, 2025) (holding that, viewed as a whole, a statement characterizing Boyer as a poor leader because he caused sales representatives to resign was a subjective opinion not subject to proof, even though it included a factual justification). The context reinforces this conclusion. The Town Meeting was an institutional forum at which the Lab Director addressed the laboratory community about organizational matters. Am. Compl. ¶¶ 91–93. A reasonable listener in this setting would understand Dilling’s remarks as a director’s assessment of laboratory performance—the sort of organizational commentary that managers routinely provide—not as specific factual charges against any individual. Because the Amended Complaint’s quoted statements are evaluative opinions and institutional commentary rather than provably false facts, Count XII fails to state a claim and should be dismissed.

#### 2. The Reference to “Line Management” Does Not Specifically Identify Plaintiff.

A defamation plaintiff must demonstrate that the allegedly defamatory statement was “of and concerning” the plaintiff. *Gazette, Inc. v. Harris*, 229 Va. 1, 15 (1985). The statement must be

such that "persons who knew and were acquainted with the plaintiff understood from reading the publication, whether or not the plaintiff was identified by name, that it referred to the plaintiff." *Id.* The "of and concerning" requirement is not met where the statement is made about a group and could refer to any number of persons. *See Ewell v. Boutwell*, 138 Va. 402, 409 (1924). For example, the Supreme Court of Virginia upheld a demurrer in where references to "law enforcement," a police department, or police force did not satisfy the "of and concerning" element and where the complaint alleged no facts connecting the articles specifically to Dean beyond his status as a police officer. *Dean v. Dearing*, 263 Va. 485, 490 (2002).

The term "line management" is a generic organizational descriptor that encompasses the chain of operational management within an organization. In a large national laboratory such as Jefferson Lab, "line management" could refer to numerous individuals at multiple levels of the organizational hierarchy—division heads, department managers, group leaders, and others with supervisory responsibility for day-to-day operations. The FAC alleges that Dilling's references to "line management" were "understood by every audience member" to refer to Plaintiff. Am. Compl. ¶ 96. But this conclusory allegation does not cure the fundamental problem: the statements themselves do not name, describe, or otherwise identify Plaintiff.

Plaintiff's subjective belief that audience members understood the reference does not satisfy the "of and concerning" requirement. The Court must examine the statement itself, not the plaintiff's interpretation of how it was received. *See Harris*, 229 Va. at 15. A reference to an organizational category that includes many individuals is not a reference to any one individual. The FAC does not allege that Dilling named Plaintiff, pointed to her, or otherwise singled her out during the Town Meeting. Nor does it allege facts from which the Court could reasonably infer that "line management" was a term exclusively associated with Plaintiff.

Because the statements are not "of and concerning" Plaintiff, Count XII should be dismissed on this independent ground.

**3. The Alleged Statements Are Protected by a Qualified Privilege.**

Even if the statements could be construed as assertions of fact about Plaintiff, which they cannot, they are protected by Virginia's qualified privilege for statements made in good faith on a subject in which the speaker and recipient share an interest. *Larimore v. Blaylock*, 259 Va. 568, 572 (2000). A qualified privilege applies where the communication is made "(1) on a subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, and (2) to a person or persons having a corresponding interest or duty." *Cashion v. Smith*, 286 Va. 327, 338 (2013) (good faith element from *Larimore* overruled) (internal quotation omitted). Both elements are met here. First, as Lab Director, Dilling had a clear duty and interest in communicating about safety and budgetary matters to the laboratory community. The management of safety at a national accelerator facility and the stewardship of federal research funds are core responsibilities of the Lab Director. *See Cashion*, 286 Va. at 338.

Second, the recipients, laboratory staff, external scientists, university physicists, and laboratory users (Am. Compl. ¶ 92), all had a corresponding interest in the laboratory's safety posture and financial health. Indeed, the very breadth of the audience that Plaintiff emphasizes in the FAC actually *strengthens* the qualified privilege. These were not members of the general public with no connection to the Lab; they were stakeholders in the laboratory's mission, the precise category of persons to whom the qualified privilege is designed to protect communications. *See Larimore*, 259 Va. at 572. Scientists who conduct experiments at the facility, university physicists who collaborate with the Lab, and laboratory users who depend on its operations all have a professional and practical interest in knowing about safety reviews and budget conditions. Once a

qualified privilege is established, the burden shifts to the plaintiff to prove that the defendant abused the privilege through actual malice. *Larimore*, 259 Va. at 572. As demonstrated in the following section, the FAC fails to plausibly allege actual malice.

**VIII. Count XIII: The COBRA Claim Fails**

The FAC asserts that SURA, as plan administrator, failed to provide the COBRA continuation-coverage notice required by 29 U.S.C. § 1166. Am. Compl. ¶¶ 111-115. The FAC now specifically identifies SURA as the plan administrator based on Form 5500 filings. Am. Compl. ¶¶ 24-26, 118, 125. SURA does not concede any employment relationship with Plaintiff. Even accepting these allegations as true, the COBRA claim fails on the FAC's own theory. COBRA's notice obligations are bifurcated between the employer and the plan administrator. Under 29 U.S.C. § 1166(a)(2), the *employer* must notify the plan administrator of a qualifying event (such as a termination of employment) within 30 days of the event. Under 29 U.S.C. § 1166(a)(4) and (c), the plan *administrator* must then notify the qualified beneficiary of the right to continuation coverage within 14 days of receiving notice from the employer. Critically, the administrator's 14-day notification obligation does not begin to run until the administrator receives notice of the qualifying event from the employer. *See* 29 U.S.C. § 1166(a)(4) (administrator must provide notice "within 14 days of the date on which the administrator is notified under paragraph (2)").

The Amended Complaint's own theory is that JSA, as Plaintiff's employer, terminated her employment effective January 10, 2026. Am. Compl. ¶ 63; *contra* Am. Compl. ¶ 7 (allegation that JSA terminated Plaintiff on November 21, 2025). JSA was therefore the entity obligated under § 1166(a)(2) to notify the plan administrator, SURA, of the qualifying event. The FAC does not allege that JSA provided timely notice to SURA of the qualifying event. The FAC does not allege

that SURA received notice of the qualifying event and then failed to act. Instead, the FAC alleges only that Plaintiff did not receive COBRA notice. Am. Compl. ¶¶ 112-113. If JSA failed to notify SURA of the qualifying event, SURA's 14-day clock under § 1166(a)(4) was never triggered. *See Roberts v. National Health Corp*., 963 F. Supp. 512, 515 (D.S.C. 1997) ("Granting an employer/administrator forty-four days [from the date of the qualifying event] to deliver the COBRA notice will not harm the employee, because, were an employee to choose continuation coverage, the first premium would apply retroactively to provide continuous coverage from the date of the qualifying event.") The FAC's attempt to hold SURA liable for the COBRA notice failure thus suffers from an insurmountable gap: it does not allege the predicate fact—that SURA received timely notice of the qualifying event from JSA—that would trigger SURA's notification obligation. Count XIII should be dismissed as to SURA.

## IX. Count XV: The ERISA § 510 / Denial-Of-Benefits / Fiduciary Duty Claims Fail

The FAC's ERISA claims against SURA have been significantly expanded. Plaintiff now identifies SURA as the named plan administrator under 29 U.S.C. § 1002(16)(A) and as a fiduciary under § 1002(21)(A)(iii), and asserts claims under § 1132(a)(1)(B) (denial of benefits), § 510 (interference with protected rights), and § 1104(a)(1) (fiduciary duty). Am. Compl. ¶¶ 118, 125, 127-130. Each theory fails.

### A. The § 510 Interference Claim Fails.

Section 510 of ERISA prohibits an employer from discharging or discriminating against a participant "for the purpose of interfering with the attainment of any right to which such participant may become entitled." 29 U.S.C. § 1140. The FAC alleges that SURA and JSA maintained the position that Plaintiff was an "active employee" to prevent her from accessing her vested retirement funds. Am. Compl. ¶¶ 119-121. This theory conflates an employment-status position

with interference in benefit rights. Plaintiff's retirement funds are vested. Am. Compl. ¶ 117. She does not allege that anyone sought to divest her of those funds or to prevent her from ever receiving them. The dispute concerns the *timing* of distribution—whether Plaintiff is eligible for a distribution as a terminated participant or whether she must wait because she is deemed an active employee. But a dispute over employment status affecting distribution timing is not the type of purposeful interference with the "attainment" of rights that § 510 targets. *See Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 238–39 (4th Cir. 1991) (holding that § 510 requires specific intent to interfere with ERISA-protected rights, not merely incidental effects on benefits from employment decisions). Plaintiff does not allege that the employment-status position was adopted *for the purpose of* interfering with her benefits; she alleges a dispute about her employment status that has incidental consequences for distribution timing.

**B. The § 1132(a)(1)(B) Benefits Claim Fails.**

Section 1132(a)(1)(B) permits a participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The FAC alleges that TIAA, not SURA, denied Plaintiff's distribution requests. Am. Compl. ¶¶ 119-121. The FAC attributes the denials to TIAA acting on the "JSA/SURA" position. *Id.* But the FAC does not allege specific facts showing that SURA, as opposed to JSA, directed TIAA to deny the distribution, communicated the employment-status position to TIAA, or otherwise exercised discretionary authority over the benefit determination. Form 5500 filings identify SURA as the plan administrator, but the title of "administrator" does not, standing alone, establish that SURA exercised the discretionary authority necessary to be a proper defendant under § 1132(a)(1)(B). *See Custer v. Sweeney*, 89 F.3d 1156, 1161–62 (4th Cir. 1996) (analyzing whether a named administrator actually exercised

discretionary authority in making benefit determinations). The FAC alleges that TIAA is the holder and distributor of the funds. Am. Compl. ¶ 117. It does not allege that SURA made the benefit determination or that SURA, as administrator, denied Plaintiff's claim for benefits under a formal claims procedure. The benefits claim against SURA should be dismissed.

### C. The § 1104(a)(1) Fiduciary Duty Claim Fails.

Section 1104(a)(1) imposes duties of prudence and loyalty on plan fiduciaries. The FAC identifies SURA as a fiduciary based on its designation on Form 5500 filings. Am. Compl. ¶ 125. But a fiduciary duty claim requires allegations that the fiduciary *breached* a specific fiduciary duty—not merely that it held an administrative title. *See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (fiduciary status under ERISA depends on exercise of discretion in administering the plan). The FAC does not allege that SURA exercised discretionary authority over plan assets or administration in a manner that breached the duties of prudence or loyalty. It does not identify any specific act by SURA, as distinct from JSA or TIAA, that constituted a breach of fiduciary duty. The mere maintenance of an employment-status position, even if incorrect, does not constitute a breach of fiduciary duty under § 1104(a)(1) where the fiduciary is not alleged to have exercised discretion in making a benefit determination. *Cf. Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996) (fiduciary liability attaches to discretionary acts of plan management, not to every employment decision that incidentally affects plan participants). Count XV should be dismissed as to SURA.

## CONCLUSION

For all the foregoing reasons, Defendant Southeastern Universities Research Association, Inc. ("SURA") respectfully requests that this Court enter an Order:

1. Dismissing all claims against SURA with prejudice;
2. Awarding SURA its attorney's fees and costs incurred in defending this action; and

3. Granting such other and further relief as the Court deems just and proper.

Date: September 8, 2026

Respectfully submitted,

**SOUTHEASTERN UNIVERSITIES RESEARCH ASSOCIATION, INC.**

/s/ Kristina H. Vaquera
Kristina H. Vaquera (VSB No. 43655)
Milena Radovic (VSB No. 91000)
N. Winston West, IV (VSB No. 92598)
Jackson Lewis P.C.

*Physical Addresses:*
701 E. Byrd Street, 17th Floor
Richmond, Virginia 23219

Dominion Tower
999 Waterside Dr., Ste. 2525
Norfolk, VA 23510

*Mailing Address:*
P.O. Box 85068
Richmond, Virginia 23285

Tel: (757) 648-1448
Fax: (804) 649-0403
Kristina.vaquera@jacksonlewis.com
Milena.radovic@jacksonlewis.com
Winston.west@jacksonlewis.com
*Counsel for Defendant SURA*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of September 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including:

Deborah Y. Collins
Brittany C. Robbins
Yeng Collins Law, PLLC
440 Monticello Avenue, Suite 1875
Norfolk, VA 23510

Ronald J. Kim
Solomon Law Firm, PLLC
1025 Connecticut Avenue, NW, Suite 1000,
Washington, DC 20036
*Counsel for Plaintiff*

/s/ Kristina H. Vaquera
Kristina H. Vaquera (VSB No. 43655)
Milena Radovic (VSB No. 91000)
N. Winston West, IV (VSB No. 92598)
Jackson Lewis P.C.

*Physical Addresses:*
701 E. Byrd Street, 17th Floor
Richmond, Virginia 23219

Dominion Tower
999 Waterside Dr., Ste. 2525
Norfolk, VA 23510

*Mailing Address:*
P.O. Box 85068
Richmond, Virginia 23285

Tel: (757) 648-1448
Fax: (804) 649-0403
Kristina.vaquera@jacksonlewis.com
Milena.radovic@jacksonlewis.com
Winston.west@jacksonlewis.com
*Counsel for Defendant SURA*