**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **DR. CYNTHIA E. KEPPEL,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**JEFFERSON SCIENCE ASSOCIATES, LLC, ET AL.,**<br><br>**DEFENDANTS.** | **Case No.: 4:26-CV-00112-MSD-LRL** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT SEAN HEARNE'S MOTION TO DISMISS**
**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant Sean Hearne ("Hearne"), by counsel, respectfully submits this Memorandum of Law in Support of his Motion to Dismiss Plaintiff Dr. Cynthia E. Keppel's ("Dr. Keppel" or "Plaintiff") First Amended Complaint ("Am. Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The sole claim asserted against Hearne individually is Count XI, which alleges that Hearne aided and abetted unlawful discrimination in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.62. That claim fails for multiple independent reasons and should be dismissed with prejudice.

First, the DCHRA does not apply to Dr. Keppel's employment. Dr. Keppel was employed at the Thomas Jefferson National Accelerator Facility ("Jefferson Lab") located at 12000 Jefferson Avenue, Newport News, Virginia. Am. Compl. ¶¶ 14, 15. She worked in Virginia, was supervised in Virginia, and was terminated from her position in Virginia. The DCHRA protects employees working in the District of Columbia; it does not extend to employment relationships centered in other jurisdictions simply because a parent entity's corporate officers perform governance

functions from the District. The Amended Complaint's new allegations regarding Hearne's activities at SURA's Washington, D.C. headquarters describe precisely the kind of normal corporate oversight that does not transform a Virginia employment relationship into one governed by D.C. law.

Second, even if the DCHRA could somehow reach Dr. Keppel's Virginia employment, the Amended Complaint fails to plead a plausible aiding-and-abetting claim against Hearne. Although the Amended Complaint now alleges additional acts by Hearne—including signing Dr. Keppel's Leadership Participation Agreement, ordering an operations audit, chairing a search committee, and making comments about a non-compete agreement—each of these acts is either a normal corporate officer function or, at most, evidence of a difficult professional relationship. None of these allegations plausibly connects Hearne to any gender-based discriminatory animus or establishes personal participation in discrimination as required to sustain an aiding-and-abetting claim under the DCHRA.

Third, this Court either lacks subject matter jurisdiction over the DCHRA claim or, at minimum, should decline to exercise supplemental jurisdiction over this local statutory claim. Fourth, to the extent Plaintiff's claims against Hearne are brought in his official capacity, they are duplicative of the claims against SURA and should be dismissed.

## STATEMENT OF ALLEGED FACTS[1]

Dr. Keppel alleges that she was employed as Associate Director of Jefferson Lab, a Department of Energy national laboratory located at 12000 Jefferson Avenue, Newport News, Virginia. Am. Compl. ¶¶ 14, 15. Jefferson Lab is operated by Jefferson Science Associates, LLC ("JSA"), a limited liability company whose managing member is Southeastern Universities

[1] Hearne recites the allegations of the Amended Complaint solely for purposes of this motion and does not admit the truth of any allegation.

Research Association, Inc. ("SURA"). Am. Compl. ¶¶ 18-20. Hearne is the President and CEO of SURA, which is headquartered at 1201 New York Avenue NW, Washington, D.C. Am. Compl. ¶¶ 19, 35.

The Amended Complaint alleges multiple specific acts by Hearne, each of which Hearne addresses below. Dr. Keppel alleges that Hearne signed her Leadership Participation Agreement ("LPA") "For JSA and SURA" in his capacity as SURA's President and CEO. Am. Compl. ¶ 27. She alleges that on or about November 4, 2025, Hearne personally ordered an Operations Audit of Jefferson Lab. Am. Compl. ¶ 28(a). She further alleges that Hearne received the written audit report and participated in the audit close-out meeting. Am. Compl. ¶ 28(b). The Amended Complaint alleges that Hearne participated in the decision to withhold severance from Dr. Keppel and maintained a position to TIAA that Dr. Keppel remained employed. Am. Compl. ¶ 28(c).

The Amended Complaint also alleges that Hearne chaired the search committee that selected Dr. Jens Dilling as Jefferson Lab's Director, and that this committee conducted screenings at SURA's D.C. offices. Am. Compl. ¶¶ 29, 31. Dr. Keppel alleges that Dilling reported to and was evaluated by a board chaired by Hearne. Am. Compl. ¶ 32. She further alleges that Hearne personally made the final decision to appoint Dr. Keppel as Associate Director. Am. Compl. ¶ 43.

With respect to alleged hostility, the Amended Complaint alleges that in 2023—more than two years before the adverse employment actions at issue—Hearne responded with hostility when Dr. Keppel raised the topic of other bidders for the Jefferson Lab contract, told her that she "doesn't deserve to be a part of the laboratory," and cited an expired non-compete agreement. Am. Compl. ¶¶ 51-53. The Amended Complaint also alleges that neither Dilling nor Hearne informed the two women on the SURA Board about Dr. Keppel's removal from her position. Am. Compl. ¶ 83.

Critically, the Amended Complaint does not allege that Dr. Keppel ever worked in the District of Columbia, that she reported to any office in the District, or that the terms and conditions of her employment were governed by D.C. law. Her employment was at all relevant times based in Newport News, Virginia.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. The plaintiff bears the burden of establishing that subject matter jurisdiction exists. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Where the Court's jurisdiction is premised on supplemental jurisdiction under 28 U.S.C. § 1367, the Court has discretion to decline jurisdiction over state or local law claims.

## ARGUMENT

### I. Count XI Should Be Dismissed Because the DCHRA Does Not Apply Extraterritorially to Dr. Keppel's Virginia Employment.

The DCHRA prohibits discrimination in employment within the District of Columbia. D.C. Code § 2-1402.11. It does not have extraterritorial reach. Like other local antidiscrimination statutes, the DCHRA applies to employment relationships with a sufficient nexus to the District,

specifically, where the situs of employment is within the District. The DCHRA does not govern employment relationships centered in other states simply because a corporate parent happens to be headquartered in Washington, D.C.

### A. The Situs of Employment Determines DCHRA Applicability.

Courts consistently hold that local antidiscrimination statutes apply based on the situs of the employment relationship, not the location of a parent company's corporate headquarters. In *Cole v. Boeing Co.*, 845 F. Supp. 2d 277, 284-85 (D.D.C. 2012), the court held that the DCHRA's employment provisions apply to employees working in the District of Columbia, not to employees working elsewhere whose employer maintains offices in the District. The court reasoned that the statute's protections are tied to the location where the employment relationship is carried out—where the employee works, is supervised, and experiences the conditions of employment.

Similarly, in *Elyazidi v. SunTrust Bank*, 780 F.3d 227, 237-38 (4th Cir. 2015), the Fourth Circuit addressed the territorial scope of the DCHRA and concluded that the relevant inquiry is where the plaintiff's employment was based, not where corporate decisions happened to originate. The court emphasized that extending local employment protections based solely on the location of a corporate decision-maker's office would impermissibly expand the statute beyond its intended territorial scope, effectively transforming a local law into one with nationwide reach.

Here, the facts are clear and undisputed: Dr. Keppel was employed at Jefferson Lab in Newport News, Virginia. Am. Compl. ¶¶ 14, 15. Her office was in Virginia. Her laboratory was in Virginia. She was supervised day-to-day in Virginia. She was terminated from her position in Virginia. No amount of recharacterization can transform this Virginia employment into District of Columbia employment subject to the DCHRA.

### B. The Amended Complaint's New D.C. Nexus Allegations Do Not Change the Analysis.

The Amended Complaint adds detailed allegations about activities conducted at or from SURA's D.C. headquarters. Specifically, the Amended Complaint alleges that SURA's D.C. offices functioned as an "administrative and governance hub" (Am. Compl. ¶ 30); that Hearne's search committee conducted screenings at D.C. offices (Am. Compl. ¶ 31); that Hearne ordered the Operations Audit from D.C. and the audit report was delivered to D.C. headquarters (Am. Compl. ¶¶ 28, 55); that Hearne executed the Leadership Participation Agreement from D.C. (Am. Compl. ¶ 55); that adverse employment decisions were made "in substantial part" in the District of Columbia (Am. Compl. ¶ 199); and that Form 5500 filings identify the D.C. office as the plan sponsor address (Am. Compl. ¶ 199).

These allegations, even taken as true, do not establish that the DCHRA governs Dr. Keppel's employment. Every one of these activities describes a normal incident of corporate governance conducted from a parent entity's headquarters. That SURA's headquarters is in D.C. is unremarkable—a parent entity must be headquartered somewhere, and the mere fact that corporate officers conduct oversight from that location does not mean that employees at subsidiary operations across the country are "employed" in D.C. for purposes of the DCHRA.

The distinction between the situs of corporate governance and the situs of employment is well established. In *Johnson v. Flowers Industries, Inc.*, 814 F.2d 978, 981-82 (4th Cir. 1987), the Fourth Circuit distinguished between the "normal incidents of stock ownership" that a parent corporation exercises from its headquarters and the operational control of day-to-day employment that determines the locus of an employment relationship. Corporate governance activities, such as chairing search committees, signing agreements, ordering audits, reviewing reports, making strategic personnel decisions are precisely the kind of oversight functions that a corporate parent's

officers routinely perform from headquarters. They do not convert the employment relationship into one based at the headquarters location.

Plaintiff's allegation that adverse employment decisions were made "in substantial part" in D.C. (Am. Compl. ¶ 199) is a legal conclusion couched as a factual allegation that the Court need not accept as true. *Iqbal*, 556 U.S. at 678. The actual factual allegations that corporate officers at corporate headquarters performed corporate governance functions do not support the conclusion that Dr. Keppel's employment was located in D.C. The Form 5500 filings identifying D.C. as the plan sponsor address (Am. Compl. ¶ 199) likewise reflect nothing more than the location of the plan sponsor's corporate headquarters and do not establish D.C. as the situs of any individual employee's employment.

To hold otherwise would mean that any employee of any subsidiary managed by a D.C.-headquartered entity could invoke the DCHRA regardless of where they actually work. That result would give the D.C. Human Rights Act nationwide reach, a result neither intended by the D.C. Council nor supported by any authority. The DCHRA's focus is on the employment relationship's location, not where corporate officers perform governance functions. Because Dr. Keppel's employment was in Virginia, the DCHRA does not apply to her claims, and Count XI must be dismissed.

## II. Count XI Fails to State a Plausible Aider and Abettor Claim Against Hearne Under D.C. Code § 2-1402.62.

Even assuming the DCHRA could reach Dr. Keppel's Virginia employment, the Amended Complaint fails to state a plausible claim that Hearne aided and abetted unlawful discrimination. The DCHRA's aiding-and-abetting provision makes it unlawful "for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of [the DCHRA]." D.C. Code § 2-1402.62. To state an aiding-and-abetting claim, a plaintiff must allege that the

individual defendant personally participated in or facilitated *discriminatory* conduct, not merely that the individual was involved in employment decisions that the plaintiff found adverse.

The D.C. Court of Appeals addressed the standard for individual aiding-and-abetting liability in *Purcell v. Thomas*, 928 A.2d 699, 714 (D.C. 2007). Under *Purcell*, a plaintiff must allege facts showing that the individual defendant personally participated in the alleged discriminatory conduct with knowledge that it was unlawful. The aiding-and-abetting provision is not a vehicle for imposing individual liability on every corporate officer involved in an adverse employment action; rather, it requires a showing that the individual affirmatively facilitated or encouraged discrimination on a prohibited basis.

The Amended Complaint's allegations regarding Hearne, examined individually and collectively, fail to satisfy this standard. Plaintiff alleges several specific acts by Hearne, but not one of them supports a plausible inference of personal participation in gender-based discrimination.

**A. Signing the Leadership Participation Agreement Is a Normal Corporate Officer Function.**

The Amended Complaint alleges that Hearne signed Dr. Keppel's Leadership Participation Agreement "For JSA and SURA" as SURA's President and CEO. Am. Compl. ¶ 27. Signing an employment agreement in one's capacity as a corporate officer is a routine corporate function, not personal participation in discrimination. Indeed, this allegation cuts against Plaintiff's theory: Hearne signed the very agreement that appointed Dr. Keppel to her leadership role. There is nothing in this allegation that supports an inference of gender-based animus. Corporate officers sign employment agreements as a matter of course; attributing discriminatory intent to this ministerial act would effectively make every officer who signs an employment document a potential aider and abettor in any subsequent discrimination claim.

### B. Ordering the Operations Audit Is a Neutral Management Action.

The Amended Complaint alleges that Hearne personally ordered an Operations Audit on or about November 4, 2025, received the written audit report, and participated in the audit close-out meeting. Am. Compl. ¶¶ 28(a)-(b). Ordering an audit of a Department of Energy national laboratory is squarely within the duties of the President and CEO of the entity that manages the lab. Operations audits are a standard corporate governance tool—they are neither unusual nor inherently adverse.

Moreover, the Amended Complaint does not allege that the audit was pretextual, fabricated, or motivated by gender animus. It does not allege that the audit was conducted differently because of Dr. Keppel's sex, or that Hearne ordered the audit with the purpose of discriminating against her. Ordering a facially neutral audit, receiving its results, and participating in a close-out meeting are precisely the kinds of routine oversight activities that a parent entity's CEO would be expected to perform. These allegations do not give rise to a plausible inference of aiding and abetting discrimination.

### C. Chairing the Search Committee and Making Appointment Decisions Are Normal Governance Functions.

The Amended Complaint alleges that Hearne chaired the search committee that selected Dr. Dilling as Lab Director, that the committee conducted screenings at SURA's D.C. offices, and that Dilling reported to and was evaluated by a board chaired by Hearne. Am. Compl. ¶¶ 29, 31, 32. The Amended Complaint also alleges that Hearne personally made the final decision to appoint Dr. Keppel as Associate Director. Am. Compl. ¶ 43.

These are quintessential corporate governance activities. The CEO of a university research association that manages a national laboratory is expected to chair search committees, participate in the selection of laboratory leadership, and oversee the appointment of senior personnel. These

activities are the very "normal incidents of stock ownership" that *Johnson v. Flowers Industries* identified as insufficient to establish individual liability. Notably, the allegation that Hearne personally selected Dr. Keppel for the Associate Director position undermines any inference that Hearne harbored gender-based animus toward her; he selected her for one of the most prominent roles at the laboratory.

**D. The 2023 Non-Compete Comments Do Not Support an Inference of Gender Discrimination.**

The Amended Complaint alleges that in 2023, Hearne responded with hostility when Dr. Keppel raised the topic of other bidders for the Jefferson Lab contract, told her that she "doesn't deserve to be a part of the laboratory," and cited an expired non-compete agreement. Am. Compl. ¶¶ 51-53. Even taken as true and viewed in the light most favorable to Plaintiff, these allegations do not support an inference of gender-based discrimination.

On their face, these comments concern competitive loyalty and contractual obligations, not sex. Hearne's alleged statement that Dr. Keppel "doesn't deserve to be a part of the laboratory" was made in the context of Dr. Keppel raising the topic of competing bidders for the DOE contract. The reference to a non-compete agreement relates to competitive restrictions, not gender. The Amended Complaint does not allege that Hearne made any reference to Dr. Keppel's sex, used gender-based language, or treated similarly situated male employees differently in the context of discussing competing bids.

Moreover, these comments were made in 2023, more than two years before the adverse employment action alleged in the Amended Complaint. Temporal remoteness further undermines any inference that these comments were connected to the subsequent employment decisions. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) ("[A]ction taken . . . 20 months later suggests, by itself, no causality at all."). A stray comment about competitive loyalty

made years before any adverse action is insufficient to establish the kind of discriminatory animus required to support an aiding-and-abetting claim under the DCHRA.

### E. Participating in Severance Decisions in a Corporate Capacity Does Not Establish Personal Aiding and Abetting.

The Amended Complaint alleges that Hearne participated in the decision to withhold severance from Dr. Keppel and maintained a position to TIAA that Dr. Keppel remained employed. Am. Compl. ¶ 28(c). Decisions about severance and employee benefits administration are corporate decisions made in the ordinary course of business. Participating in such decisions in one's capacity as CEO of the parent entity does not constitute personal aiding and abetting of discrimination.

To hold otherwise would mean that any corporate officer who participates in a business decision that adversely affects an employee is personally liable as an aider and abettor whenever the employee belongs to a protected class. That is not the law. The aiding-and-abetting provision requires personal participation in *discriminatory* conduct, not mere involvement in adverse employment decisions. The Amended Complaint does not allege that Hearne's participation in the severance decision was motivated by Dr. Keppel's sex, and no such inference can be drawn from the allegations.

### F. The Failure to Inform Board Members Does Not Support an Aiding-and-Abetting Claim.

The Amended Complaint alleges that neither Dilling nor Hearne informed the two women on the SURA Board about Dr. Keppel's removal. Am. Compl. ¶ 83. This allegation is legally insufficient to support an aiding-and-abetting claim for several reasons. First, there is no legal obligation to notify particular board members about individual personnel actions. Second, the characterization of the two uninformed board members as women appears designed to create an

inference of gender-based conspiracy, but the Amended Complaint does not allege that these board members were excluded *because* they were women, as opposed to for any number of legitimate corporate governance reasons. Third, even if this allegation raised an inference of unusual secrecy, secrecy about a personnel action does not equate to aiding and abetting discrimination.

### G. Taken Together, the Allegations Still Fail to State a Plausible Claim.

Plaintiff may argue that while each individual allegation standing alone may be insufficient, the totality of the allegations creates a plausible inference of aiding and abetting. This argument fails. A collection of individually neutral acts does not become evidence of discrimination simply because they are aggregated. Each of the acts alleged against Hearne is either a normal corporate governance function (signing agreements, ordering audits, chairing search committees, making personnel decisions, administering severance) or, at most, evidence of a contentious professional disagreement about competitive loyalty (the 2023 comments). None of them, individually or collectively, supports a plausible inference that Hearne personally aided or abetted gender-based discrimination.

The Amended Complaint is fundamentally missing the essential element of an aiding-and-abetting claim: allegations connecting Hearne to discriminatory conduct based on a protected characteristic. Plaintiff has alleged that Hearne was a corporate officer who performed corporate officer functions and who had a disagreement with Plaintiff about competitive bidding. That is not enough to state a plausible claim under D.C. Code § 2-1402.62. *See Purcell*, 928 A.2d at 714. Count XI should be dismissed for failure to state a claim.

## III. This Court Lacks Subject Matter Jurisdiction Over Count XI, or Alternatively Should Decline to Exercise Supplemental Jurisdiction.

The DCHRA is a local statute of the District of Columbia. It does not confer federal subject matter jurisdiction. Dr. Keppel's DCHRA claim against Hearne is before this Court, if at all, only

by virtue of supplemental jurisdiction under 28 U.S.C. § 1367(a). This Court has discretion to decline supplemental jurisdiction where, as here, the local law claim raises novel or complex issues of local law, or where considerations of judicial economy, convenience, fairness, and comity weigh against exercise of jurisdiction. 28 U.S.C. § 1367(c).

**A. The DCHRA Claim Raises Novel Issues of Local Law.**

The question whether the DCHRA extends to the employment of a Virginia-based employee at a Virginia-based laboratory, solely because the parent entity's CEO performed governance functions from D.C., is a novel question of D.C. local law. The D.C. Council, the D.C. Office of Human Rights, and the D.C. courts are the appropriate bodies to determine the geographic scope of D.C.'s own antidiscrimination statute. A federal court sitting in Virginia should not be the first to resolve this uncharted question of D.C. law.

**B. Comity and Fairness Weigh Against Exercising Jurisdiction.**

If the Court were to conclude that Plaintiff has stated a cognizable claim under the DCHRA, exercising supplemental jurisdiction over a D.C. statutory claim in a Virginia federal court raises significant comity concerns. The DCHRA reflects the policy choices of the District of Columbia, and its interpretation should be guided by D.C. courts and administrative bodies familiar with the statute's purposes and history. Adjudicating this claim in the Eastern District of Virginia, where neither the alleged discriminatory conduct nor the employment relationship had any connection to D.C., is inconsistent with principles of comity and fairness.

Moreover, if the federal claims in this action are resolved at an early stage, the Court should decline supplemental jurisdiction over the DCHRA claim under the framework of *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988), and *United Mine Workers of Am. v. Gibbs*, 383

U.S. 715, 726 (1966). Judicial economy is not served by a Virginia federal court interpreting and applying a D.C. local statute to a Virginia employment relationship.

### IV. To the Extent Plaintiff Asserts Claims Against Hearne in His Official Capacity, Those Claims Are Duplicative and Should Be Dismissed.

To the extent any claims in the Amended Complaint are asserted against Hearne in his official capacity as President and CEO of SURA, those claims are duplicative of the claims asserted against SURA itself and should be dismissed. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Because SURA is already a named defendant in this action, any official-capacity claims against Hearne are redundant and serve no independent purpose. Maintaining duplicative claims against both SURA and its officer in his official capacity would be inefficient and prejudicial, and such claims should be dismissed.

The Amended Complaint alleges that Hearne acted in his capacity as "President and CEO of SURA" throughout the events at issue. Am. Compl. ¶¶ 22, 27, 28, 29, 32, 43. To the extent these allegations form the basis for official-capacity claims, they are claims against SURA by another name and should be dismissed as duplicative.

## CONCLUSION

For all the foregoing reasons, Defendant Sean Hearne ("Hearne

") respectfully requests that this Court enter an Order:

1. Dismissing all claims against Hearne with prejudice;
2. Awarding Hearne his attorney's fees and costs incurred in defending this action; and
3. Granting such other and further relief as the Court deems just and proper.

Date: September 8, 2026

**JENS DILLING**

/s/ Kristina H. Vaquera
Kristina H. Vaquera (VSB No. 43655)
Milena Radovic (VSB No. 91000)
N. Winston West, IV (VSB No. 92598)
Jackson Lewis P.C.

*Physical Addresses:*
701 E. Byrd Street, 17th Floor
Richmond, Virginia 23219

Dominion Tower
999 Waterside Dr., Ste. 2525
Norfolk, VA 23510

*Mailing Address:*
P.O. Box 85068
Richmond, Virginia 23285

Tel: (757) 648-1448
Fax: (804) 649-0403
Kristina.vaquera@jacksonlewis.com
Milena.radovic@jacksonlewis.com
Winston.west@jacksonlewis.com
*Counsel for Defendant Sean Hearne*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of September 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including

Deborah Y. Collins
Brittany C. Robbins
Yeng Collins Law, PLLC
440 Monticello Avenue, Suite 1875
Norfolk, VA 23510
deb@yengcollinslaw.com
brittany@yengcollinslaw.com

Ronald J. Kim
Solomon Law Firm, PLLC
1025 Connecticut Avenue, NW, Suite 1000,
Washington, DC 20036
rkim@fedemploylaw.com

*Counsel for Plaintiff*

/s/ Kristina H. Vaquera
Kristina H. Vaquera (VSB No. 43655)
Milena Radovic (VSB No. 91000)
N. Winston West, IV (VSB No. 92598)
Jackson Lewis P.C.

*Physical Addresses:*
701 E. Byrd Street, 17th Floor
Richmond, Virginia 23219

Dominion Tower
999 Waterside Dr., Ste. 2525
Norfolk, VA 23510

*Mailing Address:*
P.O. Box 85068
Richmond, Virginia 23285

Tel: (757) 648-1448
Fax: (804) 649-0403
Kristina.vaquera@jacksonlewis.com

Milena.radovic@jacksonlewis.com
Winston.west@jacksonlewis.com
*Counsel for Defendant Sean Hearne*