**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **DR. CYNTHIA E. KEPPEL,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**JEFFERSON SCIENCE ASSOCIATES, LLC, ET. AL,**<br><br>**DEFENDANTS.** | **Case No.: 4:26-CV-00112-MSD-LRL** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT JEFFERSON SCIENCE ASSOCIATES, LLC'S MOTION TO DISMISS**
**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant Jefferson Science Associates, LLC ("JSA") respectfully submits this Memorandum of Law in support of its Motion to Dismiss Plaintiff Dr. Cynthia E. Keppel's ("Plaintiff") First Amended Complaint ("FAC.") pursuant to Federal Rule of Civil Procedure 12(b)(6). Although the FAC adds new factual allegations — including references to performance appraisals, additional purported comparators, and quoted statements attributed to Defendant Dilling — these amendments do not cure the fundamental pleading deficiencies that warranted dismissal of the original Complaint. Indeed, the new allegations, properly analyzed, reinforce rather than undermine JSA's position.

Plaintiff's FAC asserts eight claims against JSA: gender discrimination under Title VII (Count I); hostile work environment under Title VII (Count III); retaliation under Title VII (Count V); gender discrimination and retaliation under the Virginia Human Rights Act (Counts VII and IX); discrimination under the District of Columbia Human Rights Act (Count XI); defamation *per se* (Count XII); failure to provide COBRA notice (Count XIII); and interference with benefits

under ERISA § 510 (Count XIV). For the reasons set forth below, each claim fails to state a claim upon which relief can be granted and should be dismissed with prejudice.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

In employment discrimination cases, a plaintiff need not plead a *prima facie* case to survive a motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). However, the *prima facie* framework remains relevant insofar as its elements inform the plausibility analysis. *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015). A plaintiff must still plead facts sufficient to render each element of her claim plausible, not merely conceivable. *Id.* at 586.

## ARGUMENT

### I. Count I Should Be Dismissed Because Plaintiff Fails to Plead a Plausible Title VII Gender-Discrimination Claim.

To state a plausible Title VII disparate treatment claim, a plaintiff must allege facts supporting each element of the *McDonnell Douglas* framework: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances giving rise to an inference of unlawful discrimination. *McCleary-Evans*, 780 F.3d at 585. Although

the FAC adds new performance-related allegations and identifies additional purported comparators, these amendments do not cure the deficiencies in elements two and four.

### A. Plaintiff Fails to Plead Satisfactory Job Performance as Assessed by the Relevant Decisionmaker.

In the Fourth Circuit, it is well established that while a plaintiff alleging employment discrimination need not plead a prima facie case to survive a motion to dismiss, the complaint must contain sufficient factual allegations from which the court can reasonably infer that the plaintiff was meeting the employer's legitimate job expectations at the time of the alleged adverse employment actions. This requirement is not merely formulaic — the plaintiff must plead specific facts demonstrating satisfactory job performance contemporaneous with the challenged employment decisions. Bare and conclusory assertions that the plaintiff was performing satisfactorily are insufficient to render the claim plausible. Where the complaint fails to allege any concrete facts showing that the plaintiff was fulfilling the employer's legitimate performance expectations at the time the adverse actions were taken, the plaintiff has not stated a plausible claim, and dismissal under Federal Rule of Civil Procedure 12(b)(6) is warranted.

The FAC now includes allegations about Plaintiff's prior performance evaluations, including a FY2024 appraisal rating of 10.5 ("Exceeds Most") with an "Exemplary" in Scientific/Technical Performance signed by then-supervisor Kimberly Sawyer, and a merit increase with written commendation from then-Lab Director Stuart Henderson. Am. Compl. ¶ 46. Plaintiff also references the LPA that allegedly committed JSA to retain Plaintiff subject to her maintaining a performance appraisal of level 3 or above (Am. Compl. ¶¶ 27, 46), and alleges that JSA's own policy requires a Performance Improvement Plan before any dismissal for performance deficiency, yet no PIP was ever issued (Am. Compl. ¶ 46). Additionally, Plaintiff alleges that a November 2025 Operations Audit confirmed her division met all performance expectations. Am.

Compl. ¶¶ 46, 68-69.

These allegations, while new, do not establish the relevant inquiry. The Fourth Circuit has made clear that "it is the perception of the decision maker [at the time of termination] which is relevant, not the self-assessment of the plaintiff." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000). The pertinent question is whether the decision maker, Laboratory Director Dilling, perceived Plaintiff's performance as satisfactory at the time of the adverse action. The FAC's own allegations demonstrate that the answer is no: Dilling concluded that the Lab's leadership team required restructuring and that Plaintiff's leadership role was not consistent with the new organizational direction. Am. Compl. ¶¶ 55-57.

The performance evidence Plaintiff marshals is fundamentally inapposite because it was generated by different evaluators assessing different criteria at different times:

| | |
|---|---|
| **FY2024 Annual Performance Appraisal** | o The performance evaluation was signed by Kimberly Sawyer, Plaintiff's predecessor supervisor, not by Dilling, who was the decision maker.<br>o Plaintiff's own performance allegations actually undermine her claim. The FAC relies heavily on Plaintiff's FY2024 Annual Performance Appraisal, which assigned an overall supervisor rating of 10.5, placing her in JSA's "Exceeds Most" rating band. Am. Compl. ¶ 46. But the rating's nomenclature is revealing: By its plain terms, an "Exceeds Most" rating signifies that while the employee performed well in certain categories, she did not meet the employer's expectations in every evaluated dimension. The appraisal thus contains a built-in acknowledgment that Plaintiff's performance fell short of expectations in at least some areas — a concession embedded in the very evidence Plaintiff offers as proof of satisfactory performance. Plaintiff cannot selectively cite her performance appraisal as a shield while ignoring what the rating actually communicates.<br>o The internal arithmetic of the appraisal makes the point even more starkly. Plaintiff alleges that she received the highest possible rating — "Exemplary" — in Scientific/Technical Performance, which she identifies as her most heavily weighted category. Am. Compl. ¶ 46. Yet despite achieving the ceiling score in the category that carried the greatest weight, her overall supervisor rating was only 10.5, placing her in the "Exceeds Most" band rather than in the top tier. The only way to reconcile an "Exemplary" score in the most heavily weighted category |

| | |
|---|---|
| | with an overall rating below 'Exemplary" is if her scores in the remaining categories were materially lower, dragging the composite score down.<br>o Sawyer's assessment of Plaintiff's "Scientific/Technical Performance" as "Exemplary" does not negate Dilling's assessment of Plaintiff's leadership alignment with the Lab's direction. *See Hawkins*, 203 F.3d at 279-80. This result is neither surprising nor unusual. It is a basic reality of any multi-dimensional job that an employee may excel in one area while falling short in others. Plaintiff's attempt to bootstrap exemplary technical ratings into proof that she was satisfying all of her employer's legitimate job expectations ignores the multi-faceted nature of her position and the employer's prerogative to evaluate each dimension independently. Dilling's assessment concerned "leadership alignment" — a qualitative judgment about whether a leader's approach is consistent with the organization's direction — which is categorically different from the technical and scientific performance metrics reflected in the Sawyer appraisal. A decision maker's good-faith assessment of leadership fit is not reviewable under Title VII simply because a predecessor supervisor gave favorable review in a separate performance category. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514-15 (4th Cir. 2006) ("[C]ourts may not second-guess an employer's business judgment."). |
| **April 2024 merit commendation** | o Henderson's April 2024 merit commendation predates Dilling's appointment by over a year. A prior supervisor's favorable assessment does not bind a successor decision maker's independent evaluation of organizational fit. *See Irani v. Palmetto Health*, 767 F. App'x 399, 419 (4th Cir. 2019) (affirming that prior favorable reviews did not preclude subsequent decision maker from concluding employee's performance was unsatisfactory). |
| **Leadership Participation Agreement** | o Plaintiff's reliance on the LPA is misplaced. The LPA does not guarantee her perpetual tenure in a leadership position irrespective of future job performance. By Plaintiff's argument, JSA would be prohibited from removing her from a leadership position outside of the performance cycle if she were rated a "level 3" in the prior cycle and would be forced to wait until the conclusion of the following performance cycle regardless of any performance issues that occurred post a level 3 rating.<br>o Furthermore, under Plaintiff's reading, JSA would have been contractually barred from any future realignment in its leadership, so long as Plaintiff had achieved a level-3 rating in her most recent appraisal cycle — regardless of changed circumstances or evolving direction. No reasonable construction of the Agreement compels that result. |
| **November 2025 Operations** | o Plaintiff's reliance on the Operations Audit fares no better. The FAC alleges that the Operations Audit "confirmed her division met all performance expectations and applicable safety standards." Am. Compl. |

| | |
|---|---|
| **Audit** | ¶¶ 46, 68-69. But Plaintiff does not identify what the Operations Audit actually evaluated — its scope, its criteria, or its methodology. An audit of a division's operational compliance and safety standards is not the same as an evaluation of an individual leader's performance, let alone an assessment of that leader's alignment with the organization's strategic direction. It does not address the forward-looking question whether the Lab's leadership structure was optimally configured for the facility's evolving scientific direction. |

In sum, even accepting all of Plaintiff's new performance allegations as true, they do not establish that Dilling perceived Plaintiff's performance as satisfactory. To the contrary, the FAC itself demonstrates that Dilling reached a negative assessment of Plaintiff's leadership alignment. The performance evidence from prior supervisors evaluating different criteria at earlier points in time cannot substitute for the decision maker's own assessment.

### B. Plaintiff Fails to Plead Circumstances Giving Rise to an Inference of Gender Discrimination.

The FAC also seeks to bolster the inference-of-discrimination element by identifying new purported comparators and additional factual allegations. These additions, however, remain insufficient.

In *Haywood v. Locke*, the Fourth Circuit explained that "[p]laintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim[;] [h]owever, in this case, the plaintiffs have based their allegations completely upon a comparison to an employee from a non-protected class, and *therefore the validity of their prima facie case depends upon whether that comparator is indeed similarly situated*." 387 F. App'x 355, 359 (4th Cir. 2010) (emphasis added). If a plaintiff "seeks to establish *the plausibility* of discrimination by comparing [themselves] to employees outside of the protected class," they must "*do more than make a general accusation that [they were] treated differently* as a result of [their protected characteristic]." *Robinson*, 2017 U.S. Dist. LEXIS 133534, at *10 (emphasis added).

**1. The newly identified comparators are not similarly situated.**

The FAC identifies David Dean, who served as Deputy Director for Science and Technology, as a comparator because he departed JLab in July 2026 with severance. Am. Compl. ¶ 86. Plaintiff also points to approximately 80 employees who received severance in a February 2026 reduction-in-force. Am. Compl. ¶ 86. Neither comparison is valid.

To be "similarly situated," a comparator must have "dealt with the same supervisor, [been] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood*, 387 F. App'x at 359 (omitted). Dean fails this standard for multiple reasons:

- Dean's departure occurred approximately eight months after Plaintiff's termination (July 2026 versus November 2025), reflecting a fundamentally different decision-making context and timeline.
- The FAC alleges that Dean "departed" with severance; it does not allege that he was terminated for leadership misalignment by the same decision maker under the same circumstances as Plaintiff. A voluntary or negotiated departure with severance is categorically different from the involuntary leadership reassignment at issue here.
- Dean held a different position (Deputy Director for Science and Technology) with different responsibilities, and the FAC does not allege that the same decision maker (Dilling) assessed Dean's leadership alignment using the same criteria applied to Plaintiff. *See Mitchell v. Booz Allen Hamilton Inc.*, Civil Action No. 1:23-cv-00653 (PTG/LRV), 2024 U.S. Dist. LEXIS 40649, at *10 (E.D. Va. Mar. 7, 2024) ("holding that employees were not similarly situated despite allegations that they

attended daily meetings reporting database status to the same Career Manager, where they had different job titles and presumed job descriptions, it was unclear whether they shared a supervisor, and they may have had different education and qualifications).

The February 2026 RIF employees fare no better as comparators. Those employees received severance as part of a structured reduction-in-force program, a programmatic, institution-wide downsizing with distinct legal obligations and operational justifications. The RIF was not an individual leadership reassignment decision, and the employees' circumstances bear no meaningful resemblance to Plaintiff's. *See Haywood*, 387 F. App'x at 359.

**2. The "replacement" and "DOE presentation" allegations do not raise an inference of discrimination.**

Plaintiff alleges that she was replaced by a "less qualified male" and that an experienced female deputy with ten years of service was bypassed. Am. Compl. ¶ 82. She further alleges that a DOE presentation was assigned to a "lesser-qualified male." Am. Compl. ¶ 65. These allegations are conclusory. In fact, Plaintiff's allegations are consistent with those rejected by the *McCleary-Evans* court. These allegations are conclusory and resemble those rejected in *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 586 (4th Cir. 2015) (holding that allegations that non-Black decisionmakers hired non-Black applicants instead of the plaintiff, without facts showing that the selected applicants were less qualified, performed worse in interviews, or were less suited based on experience and personality). The FAC does not plead any facts establishing that the replacement or the presentation assignee was actually less qualified; it merely asserts the conclusion. Conclusory allegations of inferior qualifications, without factual support, do not satisfy the *Iqbal* plausibility standard. *See McCleary-Evans*, 780 F.3d at 586.

**3. The FAC's remaining allegations do not support a plausible inference of**

**gender-based animus.**

Stripped of conclusory assertions, the factual allegations in the FAC describe an incoming Lab Director who restructured the facility's leadership team. There are no allegations that Dilling made any gender-based comments, expressed any gender-based animus, or applied any gender-based criteria. The allegation that other employees (male and female) were treated differently in different circumstances at different times does not give rise to a plausible inference that gender motivated the decision regarding Plaintiff.

## II. Count III Should Be Dismissed Because Plaintiff Fails to Plead a Plausible Hostile-Work-Environment Claim.

A hostile work environment claim under Title VII requires that the plaintiff allege: (1) unwelcome conduct; (2) based on the plaintiff's sex; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) imputable to the employer. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207-08 (4th Cir. 2019). The FAC's amendments, including the Boehnlein incident and the 2023 non-compete incident with Hearne, still fail to satisfy elements two and three. The "Boehnlein incident" is an alleged instance where Dr. Dilling "insult[ed], scold[ed], and bull[ied]" Dr. Boehnlein (female) during a Directors' Council meeting. Am. Compl. ¶ 61.

### A. The Alleged Conduct Was Not Based on Sex.

The hostile work environment claim rests on a collection of workplace interactions that bear no connection to Plaintiff's sex. The FAC describes disagreements about organizational direction, leadership restructuring, and workplace communications. None of these interactions involved gendered language, sexual comments, or conduct directed at Plaintiff because of her sex. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at [harassment] because of

sex.”) (emphasis in original).

The FAC now includes the Boehnlein incident, but this allegation involves conduct by a separate actor, not Dilling, and not part of the leadership restructuring decision. The Boehnlein incident is not alleged to involve sex-based language or conduct, and the involvement of a separate actor with no alleged connection to the termination decision does not transform facially neutral workplace conduct into sex-based harassment. Courts in this District have consistently held that “[p]laintiff cannot assert a hostile work environment claim on her own behalf based on observing unwelcome conduct directed at others.” *Robinson v. Prince William-Manassas Reg’l Adult Det. Ctr.*, No. 1:22-cv-00744, 2022 U.S. Dist. LEXIS 209708, 2022 WL 17085916, at *3 (E.D. Va. Nov. 18, 2022); *see also Carter v. Virginia Dep’t of Game & Inland Fisheries*, No. 3:16-cv-661, 2017 U.S. Dist. LEXIS 161496, 2017 WL 4413192, at *15 (E.D. Va. Sept. 29, 2017) (“Ms. Easter’s contention that she observed others experiencing hostile acts does not, as alleged, plausibly assert a hostile work environment claim on her own behalf.”).

Similarly, the 2023 non-compete incident with Hearne, which occurred approximately two years before Plaintiff’s termination does not support a sex-based hostile environment claim. The FAC does not allege that this incident involved any gender-based animus or that it was motivated by Plaintiff’s sex. A workplace disagreement about non-compete restrictions, without a gender nexus, is not actionable under Title VII.

**B. The Alleged Conduct Was Neither Severe nor Pervasive.**

Even if the conduct were plausibly based on sex—which it is not—it does not approach the threshold of severity or pervasiveness required by the Fourth Circuit. To be clear, “‘general allegations’ regarding a hostile work environment without ‘accounts of specific dates, times or circumstances’ are insufficient.” *Coleman v. Kettler Mgmt.*, Civil Action No. 1:22-cv-84

(RDA/JFA), 2022 U.S. Dist. LEXIS 223787, at *17 (E.D. Va. Dec. 12, 2022) (quoting *Carter v. Ball*, 33 F.3d 450, 461 (4th Cir. 1994)). Indeed, where a plaintiff does not "provide any details as to the specific dates on which her supervisors allegedly harassed her or even the frequency of the purported harassment," those incidents "do not amount to severe or pervasive harassment." *Id.* at *18.

The standard is demanding. Title VII "does not establish a general civility code for the American workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Notably, "[w]orkplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Sunbelt Rentals,* 521 F.3d at 315-16. "Title VII was not designed to create a federal cause of action for all combative or abrasive workplace interactions." For example, Title VII does not reach "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)). Likewise, conduct that is merely "rude" or "callous," personality conflicts, or isolated incidents (unless extremely serious) are insufficient. *Sunbelt Rentals,* 521 F.3d at 315-16; *Baqir v. Principi*, 434 F.3d 733, 746–47 (4th Cir. 2006). The Fourth Circuit has consistently held that "callous behavior by [one's] superiors" and "rude treatment by [coworkers]" are insufficient to sustain a hostile-work-environment claim. *Bass*, 324 F.3d at 765.

In *Buchhagen v. ICF International, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013), the court held that "harsh criticism," exclusion from meetings, and reassignment of duties were insufficiently severe or pervasive. Likewise, in *Decoster v. Becerra*, the Fourth Circuit rejected the Plaintiff's argument that seven months of alleged humiliation, contemptuous treatment, unfair blame, threats, and negative performance measures created a hostile work environment. 119 F.4th 332, 338-

89 (4th Cir. 2024). It characterized the allegations as a difficult supervisory relationship and unpleasant—but not abusive—performance criticism. *Id.* Because the Plaintiff alleged neither physically threatening conduct nor specific discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive, the court held that she failed to state a plausible hostile-work-environment claim and affirmed dismissal. *Id.*

The conduct alleged here—interruptions during meetings over a period of approximately six months (Am. Compl. ¶ 58); being bypassed for a presentation (Am. Compl. ¶ 63); an Operations Audit of Plaintiff's division (Am. Compl. ¶¶ 64, 66–68); bypassing Plaintiff to contact her direct reports directly (Am. Compl. ¶ 57), and dismissing her opinions and recommendations (Am. Compl. ¶ 59)—is precisely the type of "ordinary workplace friction" that falls far short of the demanding severe-or-pervasive standard. There are no allegations of physical threats, sexual advances, explicit gender-based epithets, or any conduct that objectively alters the terms and conditions of employment. The escort from the facility upon termination, as described in the Amended Complaint, is a facially neutral security measure accompanying an immediate separation (Am. Compl. ¶¶ 76–77), and the Amended Complaint pleads no facts suggesting it was undertaken because of Plaintiff's sex. Count III should be dismissed with prejudice.

## III. Count V Should Be Dismissed Because Plaintiff Fails to Plead a Plausible Title VII Retaliation Claim.

To state a Title VII retaliation claim, a plaintiff must allege: (1) engagement in protected activity; (2) an adverse action; and (3) a causal connection between the two. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

### A. Adverse Employment Action

Several of the alleged post-termination actions fail to qualify as adverse actions. An action is materially adverse only if it "well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The December 22, 2025, offer of a "Nuclear Physics Special Advisor" position does not clear this threshold. An employer's voluntary offer of continued employment — which the employee is free to accept or reject — is not an adverse action; it confers an option, not a detriment. Am. Compl. ¶¶ 105, 110. Plaintiff rejected the offer (Am. Compl. ¶ 111), and she alleges no consequence for doing so. An offer that imposes no penalty for refusal does not dissuade protected activity.

Similarly, the statements Dilling made at the December 18, 2025, Town Meeting do not constitute a materially adverse employment action. The Amended Complaint acknowledges that Plaintiff had already been terminated before the Town Meeting occurred (Am. Compl. ¶¶ 71, 91); Dilling's remarks about divisional performance addressed the laboratory's operational decisions in response to its scientific community's inquiries, not Plaintiff's protected activity. Workplace communications explaining organizational changes to stakeholders are not, without more, the type of employer conduct that Title VII's anti-retaliation provision was designed to reach.

Critically, the failure to provide a COBRA notice does not deprive the employee of coverage; it extends the election period. *See* 29 U.S.C. § 1165(1) (election period runs from date notice is provided). An administrative delay in furnishing a benefits notice — one that does not terminate coverage and that Congress has separately addressed through statutory penalties under 29 U.S.C. § 1132(c)(1) — is not the type of action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68. No reasonable employee would forgo filing a charge of discrimination because her employer might be late in mailing a COBRA election form. To hold otherwise would convert every ministerial benefits-administration error following a qualifying event into a potential Title VII

retaliation claim, a result that neither *Burlington Northern* nor any court in this Circuit has endorsed.

**B. Causal Connection**

The FAC's also expanded chronology does not establish the required causal nexus. The Amended Complaint retains the same fundamental flaw as the original Complaint – all alleged protected activity occurred *after* Plaintiff's alleged termination on November 21, 2025. *See* First Am. Compl. ¶¶ 7, 9, 76-77. For example, Plaintiff alleges that her first protected activity — retaining counsel — occurred on November 25, 2025, four days *after* her termination on November 21, 2025. Am. Compl. ¶¶ 71, 88. This is consistent across:

| **Am. Compl.** | **Alleged Protected Activity** | **Date** | **Days After Termination** |
|---|---|---|---|
| ¶ 71 | Plaintiff's Termination | November 21, 2025 | — |
| ¶ 88 | Retained legal counsel to challenge termination | November 25, 2025 | +4 days |
| ¶ 89 | Plaintiff's Counsel notified JSA General Counsel of representation | November 26, 2025 | +5 days |
| ¶ 90 | Plaintiff's Counsel sent demand letter | December 3, 2025 | +12 days |
| ¶ 113 | Plaintiff sent email to scientific community alleging discrimination | January 5, 2026 | +45 days |
| ¶ 39 | Plaintiff files EEOC Charges | January 20, 2026 | +60 days |

Because her termination preceded any protected activity, it cannot form the basis of a retaliation claim, and the Amended Complaint does not allege otherwise. *See Kennedy v. Nyx Ent., Inc.*, No. 8:25-CV-02035-AAQ, 2025 U.S. Dist. LEXIS 212866, at *17-18 (D. Md. Oct. 28, 2025) ("To allege a causal connection between the protected activity and the materially adverse employment

action, plaintiff must claim that the protected activity preceded the materially adverse action. *See Staggers v. Becerra*, ELH-21-0231, 2021 U.S. Dist. LEXIS 241338, 2021 WL 5989212, at *19 (D. Md. Dec. 17, 2021) ('there cannot be an inference of retaliatory intent if the protected activity occurred after the allegedly adverse action'); *White v. Acell, Inc.*, GLR-20-173, 2021 U.S. Dist. LEXIS 168302, 2021 WL 3911999, at *13 (D. Md. Sept. 1, 2021) ('the Fourth Circuit has found that such an inference [of retaliation] does not arise where the actions leading to an [adverse action] occurred before the employee's protected activity'). Here, the alleged adverse action began prior to the alleged protected activity. ECF No. 1, at 6; ECF No. [*18] 1-1, at 3-4; ECF No. 19, at 5. Accordingly, Defendant's Motion to Dismiss is granted as to Plaintiff's retaliation claim without prejudice.").

In addition, the FAC does not allege facts demonstrating that any decision maker was aware of Plaintiff's protected activity at the time of the adverse action. Without knowledge of protected activity, there can be no retaliatory motive. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). The FAC's conclusory assertion that the adverse action was retaliatory is precisely the type of "naked assertion" that *Iqbal* and *Twombly* prohibit.

**IV. Counts VII and IX Should Be Dismissed Because the VHRA Claims Are Precluded.**

Virginia courts apply the same analytical framework used under Title VII to claims brought under the VHRA. *See* Va. Code Ann. § 2.2-3900 *et seq.* The VHRA discrimination, hostile-work-environment, and retaliation claims (Counts VII and IX) are based on identical allegations and legal theories as the Title VII claims and fail for all the reasons set forth in Sections A through C above. Counts VII and IX should be dismissed with prejudice. *See Lee v. Korea Innovation Ctr.*, No. 1:25-cv-635, 2026 U.S. Dist. LEXIS 50656, at *29 (E.D. Va. Mar. 11, 2026) ("As a preliminary matter, the Court will analyze Plaintiff's Title VII and VHRA claims together, because

Title VII and the VHRA use substantially identical language."); *see also Morton v. Froehling & Robertson, Inc.*, 786 F. Supp. 3d 965, 976 (E.D. Va. 2025) ("The analysis of COUNTS IV, V, and VI will be done together because the elements of a retaliation claim under Title VII, Section 1981, and the VHRA are the same. […] *Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*, 677 F. Supp. 3d 383, 398 (W.D. Va. 2023) (applying the elements of a Title VII retaliation claim to a VHRA retaliation claim)."); *Dufort v. Liberty Univ.*, 2023 U.S. Dist. LEXIS 3424, *16 (E.D. Va. 2023) ("Because Virginia Code Section 2.2-3905(B)(7) uses almost identical language as Section 704(a) of Title VII's anti-retaliation provision, the Court finds that her VHRA claim fails as a matter of law for the same reasons discussed in Section A.").

## V. Count XI Should Be Dismissed Because the DCHRA Does Not Apply Extraterritorially.

Count XI asserts a claim under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.* The FAC includes strengthened allegations regarding connections to the District of Columbia. However, these amendments do not cure the fundamental jurisdictional defect: the DCHRA does not apply to employment relationships based in Virginia.

The DCHRA applies to "any employer" operating within the District of Columbia, D.C. Code § 2-1401.02(10), but it does not reach employment decisions made by Virginia-based employers regarding Virginia-based employees performing work in Virginia. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (each discrete discriminatory act is independently actionable in the jurisdiction where it occurs). Here, the undisputed facts demonstrate that:

- JSA is a Virginia limited liability company that operates JLab in Newport News, Virginia. Am. Compl. ¶ 4.
- Plaintiff was employed at JLab in Newport News, Virginia. Am. Compl. ¶ 1.

- The termination decision was made and communicated in Virginia. Am. Compl. ¶ 55.
- Plaintiff's day-to-day work was performed in Virginia. Am. Compl. ¶ 32.

The FAC's allegations that JSA or its affiliates have some presence in or connection to the District of Columbia do not convert a Virginia employment relationship into one governed by D.C. law. The DCHRA's protections extend to employees within the District's borders; they do not follow a D.C.-connected entity's employment decisions to other jurisdictions. The fact that SURA may be headquartered in Washington, D.C., or that some meetings may have occurred in the District, does not alter the locus of the employment relationship, which was indisputably in Virginia. Count XI should be dismissed.

## VI. Count XII Should Be Dismissed Because Plaintiff Fails to Plead a Plausible Defamation Per Se Claim.

In the FAC, Plaintiff identifies two incidents in which Dilling allegedly made defamatory statements. With regard to the first incident, although the FAC now provides quotations from Dilling's December 18, 2025 Town Meeting—which were absent from the original Complaint—the defamation claim remains fatally deficient. The quoted statements are evaluative opinions and institutional commentary about safety and budget metrics, not provably false statements of fact about Plaintiff. They do not specifically identify Plaintiff. They are protected by a qualified privilege. And the allegations of actual malice remain conclusory. Each deficiency independently warrants dismissal.

With regard to the second incident, Plaintiff fails to plead the exact words spoken. Instead, she offers vague allegations of private communications with Shepherd, Napolitano, and Milner.

### A. December 18, 2025 Town Meeting

#### 1. The Amended Complaint's Quoted Statements Are Evaluative

**Opinions, Not Provably False Facts.**

Under Virginia law, a statement is actionable as defamation only if it "contains a provably false factual connotation." *Schaecher v. Bouffault*, 290 Va. 83, 101–102 (2015) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)). Pure expressions of opinion—statements relative in nature that depend largely on the speaker's viewpoint—cannot support a defamation claim. *Schaecher v. Bouffault*, 290 Va. 83, 101-102 (2015). As such, courts have consistently rejected defamation claims based on opinions. *See Am. Communs. Network v. Williams*, 264 Va. 336, 340 (2002) (finding statement that employee "made two key mistakes" to be an opinion not qualifying as defamatory). As the Supreme Court of Virginia explained in *Schaecher*, "[t]o determine whether a statement can be reasonably understood as stating or implying actual facts, whether those statements are verifiable, and whether they are reasonably capable of defamatory meaning, we must examine them in context." 290 Va. at 93. Moreover, "innuendo may not extend beyond the meaning of the words in the statement." *Id.* at 96.

The statements now quoted in the Amended Complaint fall squarely on the opinion side of this line. Dilling's comments at the Town Meeting concerned three categories of institutional information:

| | |
|---|---|
| **Safety review commentary** | Dilling stated that "this year we had again unfortunately some safety related issues, and it was at a level where the board…brought in an external review and looked at what's happening with safety" and that the result "was not positive." Am. Compl. ¶ 93. This is a description of an institutional process, the board's decision to commission a review, and a characterization of the review's outcome. The existence of a board-ordered safety review is a matter of institutional record, not a secret defamatory assertion. Characterizing the result as "not positive" is a classic evaluative assessment, not a statement susceptible to being proved true or false. |

| | |
|---|---|
| **Budget commentary** | Dilling stated that *the laboratory* "only had 23 days of reserve" when "[w]e were supposed to have 41 days," because "plans and hopes…hadn't worked out." Am. Compl. ¶ 93. The reserve-day figures describe institutional finances—not personal conduct by Plaintiff. Moreover, the statement that "plans and hopes hadn't worked out" is unmistakably an expression of opinion about organizational direction, not a factual assertion about any individual |
| **References to "line management** | The term "line management" is a generic organizational term that refers to the chain of management responsible for direct operations. Am. Compl. ¶ 96. This is discussed further in Section I.B below |

None of these statements asserts a provably false fact ***about Plaintiff***. The safety review was an institutional event; the budget figures are organizational data; and the evaluative characterizations ("not positive," "hadn't worked out") are subjective assessments of institutional performance. Virginia courts have consistently held that such evaluative characterizations are protected opinion. *See Schaecher*, 290 Va. at 101–102 (holding that statements expressing evaluative judgment are not actionable); *Raytheon*, 273 Va. at 303 (examining context to distinguish fact from opinion).

For example, in *Boyer v. Smith & Nephew, Inc.*, the Virginia Court of Appeals upheld the sustaining of a demurrer based on non-actionable opinion statements regarding job performance. No. 1634-24-3, 2025 Va. App. LEXIS 576, at *6-7 (Ct. App. Sep. 23, 2025) (holding that, viewed as a whole, a statement characterizing Boyer as a poor leader because he caused sales representatives to resign was a subjective opinion not subject to proof, even though it included a factual justification).

The context reinforces this conclusion. The Town Meeting was an institutional forum at which the Lab Director addressed the laboratory community about organizational matters. Am.

Compl. ¶¶ 91–93. A reasonable listener in this setting would understand Dilling's remarks as a director's assessment of laboratory performance—the sort of organizational commentary that managers routinely provide—not as specific factual charges against any individual.

Because the Amended Complaint's quoted statements are evaluative opinions and institutional commentary rather than provably false facts, Count XII fails to state a claim and should be dismissed.

**2. The Reference to "Line Management" Does Not Specifically Identify Plaintiff.**

A defamation plaintiff must demonstrate that the allegedly defamatory statement was "of and concerning" the plaintiff. *Gazette, Inc. v. Harris*, 229 Va. 1, 15 (1985). The statement must be such that "persons who knew and were acquainted with the plaintiff understood from reading the publication, whether or not the plaintiff was identified by name, that it referred to the plaintiff." *Id.* The "of and concerning" requirement is not met where the statement is made about a group and could refer to any number of persons. *See Ewell v. Boutwell*, 138 Va. 402, 409 (1924). For example, the Supreme Court of Virginia upheld a demurrer in where references to "law enforcement," a police department, or police force did not satisfy the "of and concerning" element and where the complaint alleged no facts connecting the articles specifically to Dean beyond his status as a police officer. *Dean v. Dearing*, 263 Va. 485, 490 (2002).

The term "line management" is a generic organizational descriptor that encompasses the chain of operational management within an organization. In a large national laboratory such as Jefferson Lab, "line management" could refer to numerous individuals at multiple levels of the organizational hierarchy—division heads, department managers, group leaders, and others with supervisory responsibility for day-to-day operations. The Amended Complaint alleges that Dilling's references to "line management" were "understood by every audience member" to refer

to Plaintiff. Am. Compl. ¶ 96. But this conclusory allegation does not cure the fundamental problem: the statements themselves do not name, describe, or otherwise identify Plaintiff.

Plaintiff's subjective belief that audience members understood the reference does not satisfy the "of and concerning" requirement. The Court must examine the statement itself, not the plaintiff's interpretation of how it was received. *See Harris*, 229 Va. at 15. A reference to an organizational category that includes many individuals is not a reference to any one individual. The Amended Complaint does not allege that Dilling named Plaintiff, pointed to her, or otherwise singled her out during the Town Meeting. Nor does it allege facts from which the Court could reasonably infer that "line management" was a term exclusively associated with Plaintiff.

Because the statements are not "of and concerning" Plaintiff, Count XII should be dismissed on this independent ground.

**3. The Alleged Statements Are Protected by a Qualified Privilege.**

Even if the statements could be construed as assertions of fact about Plaintiff, which they cannot, they are protected by Virginia's qualified privilege for statements made in good faith on a subject in which the speaker and recipient share an interest. *Larimore v. Blaylock*, 259 Va. 568, 572 (2000). A qualified privilege applies where the communication is made "(1) in good faith, (2) on a subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, and (3) to a person or persons having a corresponding interest or duty." *Cashion v. Smith*, 286 Va. 327, 338 (2013) (internal quotation omitted).

All three elements are met here. First, the Town Meeting statements were made in good faith. Dilling was addressing the laboratory community in his capacity as Lab Director, a role that requires him to communicate about safety and financial matters. Am. Compl. ¶¶ 91–93. There is no allegation that Dilling manufactured the safety review findings or fabricated the budget figures;

indeed, the safety review was commissioned by the board (Am. Compl. ¶ 93), and budget reserve data are institutional records.

Second, as Lab Director, Dilling had a clear duty and interest in communicating about safety and budgetary matters to the laboratory community. The management of safety at a national accelerator facility and the stewardship of federal research funds are core responsibilities of the Lab Director. *See Cashion*, 286 Va. at 338.

Third, the recipients—laboratory staff, external scientists, university physicists, and laboratory users (Am. Compl. ¶ 92)—all had a corresponding interest in the laboratory's safety posture and financial health. Indeed, the very breadth of the audience that Plaintiff emphasizes in the Amended Complaint actually *strengthens* the qualified privilege. These were not members of the general public with no connection to the Lab; they were stakeholders in the laboratory's mission, the precise category of persons to whom the qualified privilege is designed to protect communications. *See Larimore*, 259 Va. at 572. Scientists who conduct experiments at the facility, university physicists who collaborate with the Lab, and laboratory users who depend on its operations all have a professional and practical interest in knowing about safety reviews and budget conditions.

Once a qualified privilege is established, the burden shifts to the plaintiff to prove that the defendant abused the privilege through actual malice. *Larimore*, 259 Va. at 572. As demonstrated in the following section, the Amended Complaint fails to plausibly allege actual malice.

**4. Actual Malice Remains Conclusory.**

To overcome a qualified privilege under Virginia law, a plaintiff must allege and prove actual malice—i.e., that the defendant made the statement "knowing it to be false, or so recklessly as to amount to a willful disregard for its truth." *Larimore*, 259 Va. at 572. Actual malice requires

specific facts showing that the defendant entertained serious doubts about the truth of the statement. *See Gazette, Inc. v. Harris*, 229 Va. at 17 (applying actual malice standard in qualified privilege context).

When plaintiffs have failed to plead sufficient facts to plausibly show common law malice, Virginia courts have dismissed defamation claims. *See, e.g.*, *Owen v. Liberty University*, No. 6:19-cv-00007, slip op. at 37–39 (W.D. Va. Apr. 13, 2020) (holding that bare assertions of malice or personal spite do not overcome a qualified privilege at the pleading stage and that, where the facts do not support malice, even allegedly defamatory comments remain privileged and the defamation claims should be dismissed).

The Amended Complaint still does not plausibly allege that Dilling knew his statements were false or acted with reckless disregard for their truth. The safety review was commissioned by the board and conducted by an external reviewer (Am. Compl. ¶ 93)—Dilling was reporting its conclusions, not fabricating them. The budget reserve figures are institutional financial data that Dilling, as Lab Director, would have obtained from the Lab's finance office. The Amended Complaint does not allege that Dilling knew the safety review actually had a positive result and deliberately mischaracterized it, or that Dilling knew the budget figures were inaccurate and stated them anyway.

At most, the Amended Complaint alleges that Dilling harbored negative views toward Plaintiff and made the Town Meeting statements with an improper motive. Am. Compl. ¶¶ 94–96. But ill will or improper motive is insufficient to establish actual malice; the plaintiff must show that the defendant knew the statements were false. *Cashion*, 286 Va. at 339 ("[M]alice in fact, in the sense of ill will or wrongful motive, is not equivalent to actual malice."). The Amended Complaint contains no factual allegations from which the Court could plausibly infer that Dilling

knew the safety review findings or budget figures were false when he discussed them at the Town Meeting.

Because the Amended Complaint fails to plead actual malice with the specificity required by *Iqbal*, the defamation claim cannot overcome the qualified privilege and must be dismissed.

**B. "Private Publications" to Shepherd, Napolitano, and Milner**

With regard to the second incident of alleged defamation, Plaintiff offers nothing more than vague allegations that utterly lack context:

| Am. Compl. | Allegation |
|---|---|
| ¶ 108 | "Separately from the December 18, 2025, Town Meeting, and in or about the same period, Defendant Dilling made private, unequivocal statements to a number of leaders in the nuclear physics community, including its governing organizations, that Dr. Keppel had mismanaged funds in her capacity as Associate Director of Experimental Physics." |
| ¶ 209 | "The private publications to Shepherd, Napolitano, and Milner were likewise made to persons outside any employment relationship with Defendants, to whom no privilege of any kind attached." |

These allegations are characterizations of the supposed gist of a statement, not a pleading *in haec verba*. However, in Virginia, a "[g]ood pleading requires that the exact words spoken or written must be set out in the declaration in haec verba [sic]. Indeed, the pleading must go further; -- that is it must purport to give the exact words. . .. Words of equivalent or similar import are not sufficient." *Federal Land Bank of Baltimore v. Birchfield*, 173 Va. 200, 215 (1939). Judge Giles recently affirmed that the Virginia pleading requirement for *in haec verba* for defamation claims applies in federal court. *See Chacko v. Preston*, Case No. 1:23-cv-551, 2024 U.S. Dist. LEXIS 38816, at *14 (E.D. Va. Mar. 5, 2024), *aff'd*, 2024 U.S. App. LEXIS 29228 (4th Cir. Nov. 18, 2024). The Eastern District of Virginia has consistently adopted this standard for claims pending in federal court. *See Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 670 (E.D. Va.

2015) (rejecting the argument that Virginia's exact-words requirement does not apply in federal court and holding that, under more specific federal precedent and Virginia's virtually coextensive insulting-words and defamation doctrines).

Plaintiff's omission is dispositive. Without the exact words, neither Dilling nor the Court can evaluate whether Plaintiff alleges a false statement of fact instead of an opinion; whether the words have a defamatory sting; whether the claimed statement is susceptible to proof; or whether the communication was privileged.

Even though Plaintiff offers the Court nothing more than vague allegations regarding "private publications" to Shepherd, Napolitano, and Milner, the underlying characterization — i.e. that Plaintiff "mismanaged funds" — is nothing more than an opinion and suffers from the same fate as the alleged statements made during the Town Meeting. In addition, qualified privilege applies to the private statements to Shepherd, Napolitano, and Milner. Am. Compl. ¶¶ 108, 209. These individuals are community leaders with a legitimate interest in the operations of a major employer and research institution in their community. Communications to them about leadership matters at the Lab are squarely within the qualified privilege. *See Cashion*, 286 Va. at 338. The Amended Complaint likewise fails to allege any facts supporting a finding of actual malice. There is no allegation that Dilling made known false statements to these individuals or that he acted with reckless disregard for the truth. The conclusory assertion that Dilling acted with malice is insufficient to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Accordingly, Count XII should be dismissed.

## VII. Count XIII Should Be Dismissed Because JSA Is Not the Proper Defendant for the COBRA Beneficiary-Notice Obligation.

Count XIII alleges that JSA failed to provide timely COBRA continuation coverage notice

as required by 29 U.S.C. § 1166. Am. Compl. ¶¶ 118-127. The FAC's own allegations, however, demonstrate that the beneficiary-notice obligation falls on SURA as the plan administrator, not on JSA as the employer. JSA does not concede that SURA is the plan administrator or otherwise responsible as a joint or integrated employer nor have any other employment relationship with Plaintiff. JSA simply uses the facts as alleged in the FAC.

The COBRA notice framework involves a bifurcated obligation. Under 29 U.S.C. § 1166(a)(2), the *employer* must notify the *plan administrator* of a qualifying event within 30 days. Under 29 U.S.C. § 1166(a)(4), the *plan administrator* must then notify the *qualified beneficiary* of the right to elect continuation coverage within 14 days of receiving the employer's notice. These are separate obligations imposed on separate entities.

The FAC now expressly alleges that SURA serves as the plan administrator, as reflected in Form 5500 filings. Am. Compl. ¶¶ 24-26, 118, 125. This allegation is fatal to Plaintiff's COBRA claim against JSA. Because SURA, not JSA is alleged to be the plan administrator, the obligation to provide the COBRA election notice to the qualified beneficiary (Dr. Keppel) falls on SURA under § 1166(a)(4). JSA's obligation under § 1166(a)(2) is limited to notifying the plan administrator (SURA) of the qualifying event.

Even assuming *arguendo* that JSA's notification to SURA was delayed, the remedy for such a delay is a claim against the plan administrator for failure to issue the beneficiary notice within the statutory timeframe, not a claim against the employer for the administrator's separate obligation. The FAC does not allege that JSA had an independent obligation to provide the beneficiary notice; it alleges that JSA is the employer and SURA is the administrator. Under the statutory framework, the employer's duty runs to the administrator, and the administrator's duty runs to the beneficiary. Plaintiff has sued the wrong entity for the wrong obligation.

The fact that a male employee allegedly received timely COBRA notice (Am. Compl. ¶ 124) does not change this analysis. Whether another employee received timely notice speaks to the plan administrator's (SURA's) processing of that individual's qualifying event — not to JSA's liability for SURA's independent statutory obligation. Count XIII should be dismissed as against JSA.

**VIII. Count XIV Should Be Dismissed Because Plaintiff Fails to Plead a Plausible ERISA § 510 Claim.**

Count XIV alleges that JSA violated ERISA § 510 by engaging in "affirmative, repeated, post-termination interference" with Plaintiff's retirement benefits with "specific intent." Am. Compl. ¶¶ 130-140. This claim fails for multiple reasons.

ERISA § 510 provides that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. The statute is directed at adverse employment actions — termination, discipline, suspension — taken *for the purpose of* preventing benefit accrual. It does not reach post-separation administrative disputes about employment status or benefit processing.

The FAC's theory is that JSA interfered with Plaintiff's retirement benefits by maintaining her employment status in a manner that delayed benefit distributions after her termination. Am. Compl. ¶¶ 130-140. This is not the kind of conduct § 510 targets. Section 510 addresses employer decisions to terminate, discipline, or otherwise adversely affect employment *in order to prevent* benefit accrual, for example, terminating an employee shortly before her pension vests. *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 143 (1990). It does not address post-termination disputes about the timing or processing of benefit distributions.

Moreover, even under § 510, Plaintiff must allege that the employer acted with the

"specific intent" of interfering with benefit attainment. *Conkwright v. Westinghouse Electric Corp.*, 933 F.2d 231 (4th Cir. 1991); *Henson v. Liggett Group, Inc.*, 61 F.3d 270 (4th Cir. 1995) *Dooley v. Liberty Mut. Ins. Co.*, 307 F. Supp. 2d 234, 241 (D. Mass. 2004) (plaintiff must show that interference of ERISA right was the sole reason for termination). The FAC's allegation of "specific intent" is conclusory. It does not plead any facts from which a factfinder could infer that JSA's maintenance of Plaintiff's employment status was purposefully designed to interfere with her retirement benefits, as opposed to reflecting an administrative processing delay. In addition, Plaintiff alleges that JSA allegedly took adverse action against her due to her sex. The FAC provides many theories for termination, which is inapposite to an ERISA § 510 claim. Count XIV should be dismissed.

## CONCLUSION

For all the foregoing reasons, Jefferson Science Associates, LLC ("JSA") respectfully requests that this Court enter an Order:

1. Dismissing all claims against JSA with prejudice;

2. Awarding JSA its attorney's fees and costs incurred in defending this action; and

3. Granting such other and further relief as the Court deems just and proper.

Date: September 8, 2026

**JEFFERSON SCIENCE ASSOCIATES, LLC**

/s/ Kristina H. Vaquera
Kristina H. Vaquera (VSB No. 43655)
Milena Radovic (VSB No. 91000)
N. Winston West, IV (VSB No. 92598)
Jackson Lewis P.C.

*Physical Addresses:*
701 E. Byrd Street, 17th Floor
Richmond, Virginia 23219

Dominion Tower
999 Waterside Dr., Ste. 2525
Norfolk, VA 23510

*Mailing Address:*
P.O. Box 85068
Richmond, Virginia 23285

Tel: (757) 648-1448
Fax: (804) 649-0403
Kristina.vaquera@jacksonlewis.com
Milena.radovic@jacksonlewis.com
Winston.west@jacksonlewis.com
*Counsel for Defendant Jefferson Science Associates, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of September 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including

Deborah Y. Collins
Brittany C. Robbins
Yeng Collins Law, PLLC
440 Monticello Avenue, Suite 1875
Norfolk, VA 23510
deb@yengcollinslaw.com
brittany@yengcollinslaw.com

Ronald J. Kim
Solomon Law Firm, PLLC
1025 Connecticut Avenue, NW, Suite 1000,
Washington, DC 20036
rkim@fedemploylaw.com

*Counsel for Plaintiff*

**JEFFERSON SCIENCE ASSOCIATES, LLC**

/s/ Kristina H. Vaquera
Kristina H. Vaquera (VSB No. 43655)
Milena Radovic (VSB No. 91000)
N. Winston West, IV (VSB No. 92598)
Jackson Lewis P.C.

*Physical Addresses:*
701 E. Byrd Street, 17th Floor
Richmond, Virginia 23219

Dominion Tower
999 Waterside Dr., Ste. 2525
Norfolk, VA 23510

*Mailing Address:*
P.O. Box 85068
Richmond, Virginia 23285

Tel: (757) 648-1448

Fax: (804) 649-0403
Kristina.vaquera@jacksonlewis.com
Milena.radovic@jacksonlewis.com
Winston.west@jacksonlewis.com
*Counsel for Defendant Jefferson Science Associates, LLC*