**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| DR. CYNTHIA E. KEPPEL,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON SCIENCE ASSOCIATES, LLC, SOUTHEASTERN UNIVERSITIES RESEARCH ASSOCIATION, INC., JENS DILLING, and SEAN HEARNE,<br><br>Defendants. | Civil Action No. 4:26-cv-00112-MSD-LRL<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT SOUTHEASTERN UNIVERSITIES RESEARCH ASSOCIATION, INC.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

At the threshold, Dr. Cynthia Keppel ("Plaintiff") is obligated to advise the Court of several significant problems with Southeastern Universities Research Association's ("SURA") memorandum (Dkt. 39) ("SURA Mem.") filed to support its motion to dismiss the First Amended Complaint ("FAC"). SURA's brief attributes to *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404 (4th Cir. 2015), two propositions set out in quotation marks that appear nowhere in that opinion. It cites a decision — "*Elyazidi v. SunTrust Bank*, 780 F. Supp. 2d 1, 10-11 (D.D.C. 2011)" — that does not exist at that citation; the volume and page belong to an unrelated case, and the only published decision by that name is a Fourth Circuit debt-collection case that never mentions the D.C. Human Rights Act ("DCHRA"). See Declaration of Ronald J. Kim Regarding Incorrect Authorities Cited in Defendants' Memoranda ("Kim Decl.") ¶¶ 6-7 & Exs. C–E. It describes *Cole v. Boeing Co.* as adopting a rule that the court expressly did not apply, and omits

the decision of the District of Columbia Court of Appeals from which the actual rule comes. It cites *Magnuson v. Peak Technical Services, Inc.* as supporting dismissal when the court there denied summary judgment. Each of these specific infirmities is addressed in the body of Dr. Keppel's opposition below but they are highlighted here because the defects are not incidental, nor just overstatements by an advocate. Each is cited to support a dispositive argument to dismiss the FAC, but when closely examined, each either does not exist at the citation given, is a quotation that does not appear in the opinion, or misstates the holding. Moreover, as shown below, when the authority SURA cites is accurate, it favors Dr. Keppel and her Amended Complaint. Plaintiff respectfully submits that SURA's motion should be evaluated accordingly and rejected as a whole.

## II. STATEMENT OF FACTS

The following facts are drawn from the FAC (Dkt. 29) and are accepted as true at this stage.

### A. SURA, JSA, and the Laboratory's Structure

SURA is a nonprofit corporation headquartered at 1201 New York Avenue, N.W., Washington, D.C., an office that functions as the administrative and governance hub for the management of Jefferson Lab, hosting SURA's and JSA's board assemblies, executive sessions, and committee meetings. FAC ¶¶ 19, 30. JSA is SURA's subsidiary, created with Pacific Architects and Engineers to hold the Department of Energy management-and-operating contract for Jefferson Lab in Newport News, Virginia; SURA holds a controlling membership interest in JSA and appoints its board, which Hearne chairs. FAC ¶¶ 15-16, 20, 22. SURA and JSA operate the laboratory as a single, integrated enterprise. FAC ¶ 22. Hearne is SURA's President and CEO. FAC ¶ 35. Under the DOE contract and JSA's governing documents, SURA retained authority over senior personnel decisions at the laboratory, including appointment of the Laboratory Director; Hearne chaired the search committee that selected Dilling, a committee that did its work

at SURA's Washington offices, and Dilling reports to and is evaluated by a board Hearne chairs. FAC ¶¶ 29, 31-32.

SURA is the named sponsor and, on its own Form 5500 filings signed under penalty of perjury, the ERISA plan administrator of both the SURA/Jefferson Science Associates 401(k) Plan and the SURA/Jefferson Science Associates, LLC Comprehensive Health and Welfare Benefit Plan. FAC ¶ 24. The audited financial statements describe the 401(k) plan as covering "substantially all employees of SURA and JSA (the Plan Sponsor)," with fiduciary oversight by a subcommittee reporting to SURA's Board of Trustees, and SURA has exercised its authority to amend that plan's eligibility terms. FAC ¶ 25. The health plan predates JSA's formation by two decades and is certified by SURA to the Department of Labor as a single-employer plan that is not a multiple-employer welfare arrangement. FAC ¶ 26. In April 2022, Hearne—signing "For JSA and SURA" as SURA's President and CEO—executed a Leadership Participation Agreement in which JSA committed to retain Dr. Keppel in her leadership position so long as, among other conditions, her appraisals remained at level 3 or above and SURA committed to furnish equipment and materials in support of her position. FAC ¶ 27. Before her 2021 appointment as Associate Director, Dr. Keppel was interviewed by SURA employees in Washington, including Hearne, who made the final decision to appoint her. FAC ¶ 43.

**B. Dr. Keppel's Performance and Removal**

Dr. Keppel was hired in approximately 1995—years before JSA was formed—and led Experimental Hall A from 2012, and became Associate Director for the entire Experimental Physics Division in 2021, one of nine members of the Directors' Council and one of three women on it. FAC ¶¶ 26, 41-43, 47. In thirty years she was never told of any problem with her leadership. FAC ¶ 44. Her FY2024 appraisal rated her overall performance "Exceeds Most" and her

Scientific/Technical Performance, the most heavily weighted category, “Exemplary”; laboratory policy requires a performance improvement plan for any rating below “Achieved” and provides that performance-based dismissal is “normally preceded by corrective action,” yet no plan, warning, or counseling was ever issued; and the Department of Energy awarded the laboratory its only two A-level ratings for work performed largely by her division. FAC ¶¶ 46, 67. Senior scientists at the laboratory customarily engaged in outside scientific collaborations and professional service, and Dr. Keppel did so openly, as her male peers did; she was the only member of senior leadership whom Defendants sought to restrict. FAC ¶¶ 48-50. When, in 2023, she told Hearne that competing bidders for the DOE contract had approached her, he told her that anyone considering another bidder “doesn’t deserve to be a part of the laboratory” and invoked a non-compete that turned out to be an expired document never invoked against any man. FAC ¶¶ 51-54.

Dilling became Laboratory Director in May 2025. FAC ¶ 55. He bypassed Dr. Keppel to deal directly with her male direct reports, interrupted and dismissed her at Directors’ Council meetings, and did none of those things to the men on the Council; other male executives followed his lead. FAC ¶¶ 57-60. In October 2025 Dr. Keppel watched him insult, scold, and bully Amber Boehnlein, the only other female scientific manager on the Council, after Boehnlein referred to Dr. Keppel; she never saw him treat a man that way. FAC ¶¶ 61-62. On November 4, 2025, Hearne ordered, and Dilling implemented, an Operations Audit of Dr. Keppel’s division alone—the first such targeted review ever imposed on any division and one never imposed on a male-led division; it found that the division met all performance expectations and applicable safety standards, and its report was delivered to SURA and Hearne. FAC ¶¶ 28(a)-(b), 46, 64, 66-69, 99-101.

On November 21, 2025, JSA handed Dr. Keppel a Termination Notice stating that her employment "is terminated effective immediately" because Dilling had "determined that your ability to lead the division is not aligned with the direction of the organization." FAC ¶¶ 71-72. SURA and Hearne directed and approved the termination. FAC ¶¶ 35, 71. She was escorted from the building, replaced by a less-qualified man, and her female deputy of ten years was passed over; the two women on SURA's Board of Trustees, one of whom chaired its Science and Technology Committee, were neither consulted nor informed in advance. FAC ¶¶ 76-77, 82-84. A departing male Deputy Director received a severance package, and each of the eighty employees separated in a February 2026 reduction in force was offered severance; Dr. Keppel received none, and Hearne participated in that decision. FAC ¶¶ 28(c), 85-86.

**C. Protected Activity and What Followed**

Dr. Keppel retained counsel on November 25, 2025; counsel notified JSA's General Counsel on November 26 and wrote on December 3 that the termination "was based on illegal discrimination in violation of Title VII . . . ." FAC ¶¶ 88-90. JSA's General Counsel reported the assertion of Title VII claims to SURA's leadership, including Hearne, in the ordinary course. FAC ¶ 90.

Fifteen days later, on December 18, 2025, Dilling hosted a Town Meeting convened at the request of the scientific user community to explain the abrupt leadership changes. It filled the laboratory's 300-seat auditorium; a significant portion of the audience were not JSA or SURA employees but university physicists, laboratory users, and leaders of the nuclear physics community. FAC ¶¶ 91-92. Dilling opened by identifying the Experimental Physics Division as a focus of his remarks and attributed safety failures and a depleted budget reserve to "line management," which every member of the audience understood to mean Dr. Keppel. FAC ¶¶ 93,

95-96. The statements were false, and both reports were in Defendants' possession—and had been delivered to SURA—before he spoke. FAC ¶¶ 99-101, 103. At the direction of Hearne and SURA, Dilling separately told leaders of the nuclear physics community privately that Dr. Keppel had mismanaged funds. FAC ¶¶ 108-109, 209.

Four days later JSA offered Dr. Keppel a short-term "Nuclear Physics Special Advisor" position at a substantial salary reduction, on terms that removed her from the laboratory's scientific work. FAC ¶¶ 105, 110-111. Under the SURA-sponsored 401(k) plan a participant is entitled to a distribution upon termination of employment, and Dr. Keppel's account was fully vested; when she requested distributions on January 14, February 26, and March 6, 2026, TIAA denied each request because JSA and SURA maintained that she remained employed. FAC ¶¶ 126, 128-132. No COBRA election notice was sent to Plaintiff by anyone, although a male employee whose employment ended at about the same time received one. FAC ¶¶ 114-120, 124.

## III. LEGAL STANDARD

A complaint survives a Rule 12(b)(6) motion if it contains sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court draws all reasonable inferences in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). An employment discrimination plaintiff need not plead a prima facie case. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-12 (2002); *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017). Intent and knowledge "may be alleged generally." Fed. R. Civ. P. 9(b). A party may plead in the alternative and inconsistently. Fed. R. Civ. P. 8(d)(2)-(3). The Court may not consider matters outside the pleadings without converting the motion. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015).

## VI. ARGUMENT

### A. The First Amended Complaint Plausibly Alleges That SURA Was Dr. Keppel's Employer.

#### 1. SURA's Authorities Do Not Support the Rule It Asks the Court to Apply.

SURA places two propositions in quotation marks and attributes them to *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404 (4th Cir. 2015): that "a corporate parent is generally not the employer of its subsidiary's employees," SURA Mem. 3, and that "the normal exercise of oversight by a parent corporation" cannot establish joint-employer liability, *id.* at 4. Neither sentence appears in *Butler*. The word "parent" appears once in the entire opinion, in footnote 3, where the court distinguished the joint-employer doctrine from the separate "single employer" or "integrated employer" doctrine, under which "a parent company and its subsidiary can be considered a single employer for purposes of Title VII liability." 793 F.3d at 408 n.3 (quoting *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 725 (D. Md. 2013)). That footnote describes a doctrine the First Amended Complaint affirmatively invokes, that "SURA and JSA operated Jefferson Lab as a single, integrated enterprise." FAC ¶ 22. Accordingly, once the questionable quotations SURA offers are set aside, as they should be, and the motion is measured against what *Butler* and cases such as *Murphy-Taylor* actually hold, SURA's argument fails. What *Butler* does hold is that the joint-employer inquiry is a fact-bound, multi-factor analysis in which "control remains the principal guidepost." 793 F.3d at 414-15. It is a staffing-agency case, and nothing in it suggests that governance-level control is discounted.

Moreover, *United States v. Bestfoods*, 524 U.S. 51 (1998), on which SURA also relies, cuts against its motion. *Bestfoods* is explicit that a parent is directly liable for its own participation in the subsidiary's operations. *Id.* at 64-65. The opinion shields "[a]ctivities . . . consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the

subsidiary's finance and capital budget decisions, and articulation of *general* policies and procedures," *id.* at 72 (emphasis added; citation omitted), but not a parent that itself "manage[s], direct[s], or conduct[s] operations" of the subsidiary, *id.* at 66-67 (defining operator liability under CERCLA). The question is whether the parent's actions "are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* at 72. SURA invokes the first rule and omits the second. And although *Bestfoods* presumes that an officer of both companies acts for the subsidiary when he acts on its business, *id.* at 69-70, the FAC alleges conduct Hearne undertook expressly for SURA: he signed the Leadership Participation Agreement "For JSA and SURA," and the report of the audit he ordered was delivered to SURA. FAC ¶¶ 27, 28(a)-(b). The FAC plausibly alleges that SURA managed JSA, hired Dilling, hired and terminated Dr. Keppel, and ordered the discriminatory audit.

SURA then goes on to cite *Magnuson v. Peak Technical Services, Inc.*, 808 F. Supp. 500 (E.D. Va. 1992), as though it supports its motion to dismiss the FAC. SURA Mem. 6. Judge Ellis denied summary judgment in *Magnuson* and held that whether the dealership where the plaintiff worked was her joint employer, together with the staffing firm and/or Volkswagen, was "a disputed factual matter to be resolved at trial." *Id.* at 510. The governing standard reaches entities that "share or co-determine those matters governing the essential terms and conditions of employment." *Butler*, 793 F.3d at 408 (quoting *Bristol v. Board of County Commissioners*, 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc)). The FAC has sufficiently alleged that SURA and JSA shared and co-determined the essential terms and conditions of Dr. Keppel's employment. The motion to dismiss should be rejected.

**2. Measured Against What the Cases Hold, the FAC Pleads an Employment Relationship.**

The FAC pleads facts going to the *Butler* factors that matter most. "Three factors are the most important": authority to hire and fire, day-to-day supervision, and where and how the work takes place. 793 F.3d at 414. In *Butler* itself, the entity that did not formally fire the plaintiff was found to exercise control because it directed the termination that the other entity carried out. *Id.* at 415. The FAC alleges:

(1) SURA was Dr. Keppel's original employer. She was hired in approximately 1995. FAC ¶ 41. JSA did not then exist. SURA's group health plan has been in effect since October 1, 1984, "more than two decades before JSA was formed," FAC ¶ 26, so JSA came into being no earlier than the mid-2000s, as the subsidiary SURA created to hold the Department of Energy management-and-operating contract, FAC ¶ 22. The only defendant that could have hired Dr. Keppel in 1995 was SURA; the FAC's use of "JSA/SURA" as shorthand for the enterprise does not alter that chronology. Nothing in the FAC suggests that SURA relinquished that employment relationship when it later interposed JSA. To the contrary, decades later Hearne, as SURA's CEO, personally interviewed Dr. Keppel in Washington and made the final decision to appoint her to the position from which she was removed. FAC ¶ 43. SURA thus both hired Dr. Keppel into the enterprise and made the final decision to elevate her to the position from which she was removed. This goes to the first and most important *Butler* factor, the authority to hire and fire—and SURA and Hearne then directed and approved her termination, FAC ¶¶ 35, 71;

(2) SURA retained, under the DOE contract and JSA's governing documents, authority over senior personnel decisions at the laboratory, FAC ¶ 29;

(3) Hearne signed, for SURA and JSA jointly, the agreement governing Dr. Keppel's retention in her leadership role and committing SURA to furnish the equipment and materials for her position, FAC ¶ 27—the third *Butler* factor;

(4) Although Dr. Keppel's W-2s were issued by JSA, FAC ¶ 23, SURA is the sponsor and self-designated plan administrator of both benefit plans under which Dr. Keppel was covered, plans that by their audited terms cover "substantially all employees of SURA and JSA," and, as the FAC alleges, SURA's certification to the Department of Labor represents that the JSA workforce is within SURA's own control group, FAC ¶¶ 23-26—the insurance component of the fourth factor, "possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes," *Butler*, 793 F.3d at 414;

(5) Hearne ordered an audit directed at Dr. Keppel's division alone, received its report, and participated in or was represented at its close-out, FAC ¶¶ 28(a)-(b), 64, 66;

(6) Hearne participated in the decision to withhold her severance and maintained to TIAA that she remained employed, FAC ¶¶ 28(c), 131; and

(7) Dilling, the Laboratory Director to whom Dr. Keppel reported, was selected by a committee Hearne chaired and is supervised and evaluated by a board Hearne chairs, FAC ¶¶ 29-32. Dr. Keppel worked for the enterprise for thirty years, has held a 100% laboratory position since 2012, and was hired by the enterprise. FAC ¶¶ 3, 41-42. Those are the fifth, eighth, and ninth *Butler* factors.

SURA's characterization of Dr. Keppel as a "rank-and-file" employee (SURA Mem. 1, 3, 5), and of its own conduct as ordinary parental oversight, is unpersuasive and should be rejected by this Court. Ordering an audit of one division head, receiving the report that clears her, participating in the decision to deny her severance, and taking a position that blocks her retirement

distribution are not "selecting directors" or "monitoring the subsidiary's performance." SURA Mem. 4-5. They are the exercise of control over the terms and conditions of one identified individual's employment, which is what *Butler* asks about. SURA's characterization of FAC ¶ 28(c) as "vague and conclusory," SURA Mem. 6, does not change the analysis. SURA does not dispute that the allegation must be credited at this stage, *id.*, and once credited—together with ¶¶ 35 and 71, which SURA does not mention—it places SURA's CEO inside the termination decision and the post-termination conduct.

SURA's own *Butler* table, SURA Mem. 7, confirms the point in a different way. The table answers four of the nine factors with material belonging to a different factor—it describes paychecks under factor five (length of service), work rules and assignments under factor six (training), employment records under factor seven (duties akin to a regular employee's), and plan administration under factor eight (sole assignment)—and never engages the factors on which the FAC is strongest. Dr. Keppel has plausibly alleged joint employment by SURA, and SURA's misapplication of the *Butler* factors reinforces that conclusion. The remainder of SURA's argument on joint employment is a question for discovery and, if warranted, summary judgment.

### B. The Sex Discrimination Counts State a Claim (Counts II and VIII).

#### 1. The FAC Pleads Satisfactory Performance by Every Available Measure.

SURA acknowledges that a prima facie case need not be pleaded, SURA Mem. 8, and then demands one to dismiss the FAC. Neither *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274 (4th Cir. 2000), nor *Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510 (4th Cir. 2006), holds that a plaintiff must plead the decisionmaker's subjective state of mind, and neither holds that an employer's own contemporaneous evaluations are irrelevant. The Fourth Circuit treats an employer's own ratings

and the absence of documented criticism as probative that the employee was performing satisfactorily. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 224-25 (4th Cir. 2019).

The FAC pleads that evidence from five independent sources: the FY2024 appraisal rating her "Exceeds Most" overall and "Exemplary" in her most heavily weighted category; a merit increase with written commendation from the Laboratory Director; DOE's award of the laboratory's only two A-level ratings for work performed largely by her division; a retention agreement signed by SURA's own CEO whose performance floor she exceeded; and an Operations Audit commissioned by SURA's CEO weeks before her termination finding that her division met all performance expectations and safety standards. FAC ¶¶ 27, 46, 67-68. It further pleads that laboratory policy provides that dismissal for performance deficiency is "normally preceded by corrective action," that none was taken, that Dilling never discussed her leadership with her, and that in thirty years no one had raised a performance concern. FAC ¶¶ 44, 46, 74-75.

SURA's contention that an "Exceeds Most" rating is a "built-in acknowledgment" that Dr. Keppel "fell short of expectations in at least some areas," supported by an "arithmetic" analysis of component scores, SURA Mem. 9-10, finds no support in the FAC, which alleges that the rating placed her in the second-highest of five bands on the laboratory's published scale, FAC ¶ 46. On a motion to dismiss the inference runs the other way. SURA's assertion that the audit's scope, criteria, and methodology are unknown, SURA Mem. 11, is an invitation to discovery, not a reason to dismiss. The FAC alleges what the audit found. And SURA's argument that the Leadership Participation Agreement does not guarantee "perpetual tenure," *id.* at 10-11, answers a claim Dr. Keppel has not made: the Agreement is pleaded as evidence that Defendants themselves defined satisfactory leadership performance as a level-3 appraisal.

Most tellingly, the FAC pleads that Defendants have given three different explanations for the same decision. The Termination Notice said Dr. Keppel's "ability to lead the division is not aligned with the direction of the organization." FAC ¶ 72. Four weeks later, explaining the decision to three hundred people, Dilling's remarks, as quoted in the FAC, did not invoke alignment; he attributed the removal to safety failures and a budget shortfall, the first of which the SURA-commissioned audit had just refuted, and the second of which the FAC alleges was false because the division never exceeded its budget and did not set the reserve. FAC ¶¶ 93-100. Now SURA tells the Court that Dilling "concluded that the Lab's leadership team required restructuring" and cites the FAC for that proposition. SURA Mem. 9 (citing FAC ¶¶ 55-57). The cited paragraphs allege no such thing. These specific paragraphs focus on Dilling's appointment and his bypassing of Dr. Keppel in favor of her male subordinates. Shifting explanations are themselves evidence of pretext. *EEOC v. Sears, Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001); *Haynes*, 922 F.3d at 225.

**2. The FAC Pleads Circumstances Supporting an Inference of Sex Discrimination.**

SURA next argues that the sex discrimination allegations are insufficient by misreading the FAC to rest entirely on comparators. The case SURA cites to buttress its argument makes the point for Dr. Keppel: comparator evidence is required only where plaintiffs have "based their allegations completely upon a comparison to an employee from a non-protected class." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoted at SURA Mem. 11).

*First*, the FAC alleges that Dr. Keppel was immediately replaced by a less-qualified man—"the least budget-experienced available candidate"—while her female deputy of ten years was passed over. FAC ¶¶ 82, 84. Replacement by a person outside the protected class is the paradigmatic fourth element of a discriminatory-discharge claim. *Holland v. Washington Homes,*

*Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). *McCleary-Evans v. Maryland Department of Transportation*, 780 F.3d 582, 585-86 (4th Cir. 2015), involved a failure-to-hire plaintiff who alleged nothing about the successful candidates beyond their race; here the FAC pleads the specific qualification on which the replacement and the bypassed deputy differed: the man who replaced her had less budget-management experience than the female deputy who was passed over, an allegation that goes directly to one of the shifting explanations given for the termination. FAC ¶ 84.

*Second*, the FAC alleges a pattern: Dilling bypassed, interrupted, and dismissed Dr. Keppel and did none of those things to the men on the Council, FAC ¶¶ 57-59; other male executives followed his lead, FAC ¶ 60; and he insulted, scolded, and bullied the only other female scientific manager on the Council after she referred to Dr. Keppel, FAC ¶¶ 61-62. Her removal left three women among roughly thirty senior supervisors in the science arm. FAC ¶ 82(d). *See Ziskie v. Mineta*, 547 F.3d 220, 224-26 (4th Cir. 2008) (evidence of how other women in the same workplace were treated is probative of whether conduct was based on sex).

*Third*, the FAC alleges that Dr. Keppel was the only member of senior leadership restricted in outside professional engagement, and that Hearne invoked an expired non-compete against her that was never invoked against a man. FAC ¶¶ 48-54. SURA treats this as a two-year-old dispute with no gender nexus, SURA Mem. 15, but the FAC pleads the gender nexus directly: the restriction was applied to her alone and not to the men doing the same thing. Selective enforcement of a rule against a woman is sex-based conduct whether or not anyone mentions her sex. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998).

*Fourth*, the FAC alleges that the process itself was irregular: an audit of her division alone, ordered by SURA's CEO; no corrective action despite a policy under which performance-based

dismissal is "normally preceded by" it; no completed 2025 appraisal; a one-business-day ultimatum to resign and accept a gag provision; and a removal on which the two women on SURA's own Board of Trustees were neither consulted nor informed in advance. FAC ¶¶ 46, 64-69, 75, 78-79, 83. Departures from an employer's own procedures support an inference of discriminatory motive. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

Finally, Dr. Keppel plausibly pleads that when a male Deputy Director departed the laboratory he received a severance package, when eighty other employees were separated in a reduction in force each was offered severance, and when it separated Dr. Keppel after thirty years it did not. FAC ¶¶ 85-86. These facts support her discrimination claim.

**C. The Hostile Work Environment Counts State a Claim (Counts IV and VIII).**

A hostile work environment claim requires unwelcome conduct, based on sex, sufficiently severe *or* pervasive to alter the conditions of employment, and imputable to the employer. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc). The standard is disjunctive and the inquiry looks to the totality of the circumstances. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). Whether an environment is objectively hostile "is quintessentially a question of fact." *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994).

The FAC alleges a six-month course of conduct by the Laboratory Director, together with SURA's CEO, directed at the most senior woman in his reporting line: repeated interruptions and dismissals in leadership meetings; deliberate bypassing of her authority by dealing directly with her male subordinates; emulation of that conduct by other male executives; reassignment of a high-visibility DOE presentation to a less-qualified man followed by a false accusation of

insubordination; the singling out of her division for an unprecedented audit ordered by SURA's CEO; public abuse of the only other female scientific manager on the Council; and, at the end, summary termination and an escort from the premises. FAC ¶¶ 55-70, 76-77, 151.

This conduct followed Hearne's 2023 restriction of her outside professional work, a restriction never imposed on her male peers. FAC ¶¶ 51-54. SURA parses each incident and pronounces it "ordinary workplace friction." SURA Mem. 17. The Supreme Court has rejected that method. *Harris*, 510 U.S. at 23; *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008). Nor do SURA's cases support dismissal. *Sunbelt* reversed a grant of summary judgment to the employer and sent the hostile environment claim to trial. 521 F.3d at 321. In *Buchhagen v. ICF International, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (per curiam), the plaintiff alleged yelling, "snide comments," and unfair scrutiny by a supervisor, allegations the court found largely "conclusory"—and even there the Fourth Circuit reversed the dismissal of the discrimination and retaliation claims on allegations of disparate treatment, pretext, and timing. *Id.* at 220-21. In *Decoster v. Becerra*, 119 F.4th 332, 337-39 (4th Cir. 2024), the plaintiff alleged that her supervisor "spoke to [her] with contempt," "treated her with disdain," and issued negative performance assessments; the court held that the claim "centers on a difficult working relationship with [the supervisor] and criticisms of her work performance that she believes were unfair," the plaintiff was never removed, and her only allegation of a racial motive was "conclusory." *Id.* at 338-40 & n.2. The FAC is different in kind. It does not rest on performance evaluations or a supervisor's tone: Dr. Keppel's most recent appraisal rated her "Exceeds Most" and no corrective action was ever taken. FAC ¶¶ 44, 46. It pleads specific acts, each paired with an allegation that the men on the Council were not treated the same way, culminating in her summary removal and replacement by a man. FAC ¶¶ 57-64, 71, 76-77, 82, 84.

On the "because of sex" element, Plaintiff acknowledges that the FAC does not allege gendered epithets. It does not need to. The sex-based character of conduct may be inferred from disparate treatment of women and men, from a pattern of hostility toward women, and from selective enforcement. *Oncale*, 523 U.S. at 80-81. The FAC alleges all three. FAC ¶¶ 50, 53, 57-62, 64, 68-69. SURA's argument that Dr. Keppel cannot rely on Dilling's treatment of Boehnlein, SURA Mem. 15, misreads the FAC: she does not sue for what Boehnlein experienced, but alleges that she witnessed the Laboratory Director publicly abuse a female peer in a meeting she attended, after that peer invoked her name, and that this contributed to the environment she experienced. SURA cannot have the argument both ways: one page earlier its brief describes the incident as one in which Dilling "insult[ed], scold[ed], and bull[ied]" Boehnlein, SURA Mem. 14, and it then disclaims the same incident as the conduct of "a separate actor, not Dilling," SURA Mem. 15. That is the use the Fourth Circuit approved in *Ziskie*, 547 F.3d at 224-26.

SURA's reliance on *Vance v. Ball State University*, 570 U.S. 421 (2013), also is misplaced given the well-pleaded allegations of joint employment. Dilling was a supervisor in the *Vance* sense—he was empowered to, and did, take a tangible employment action against Dr. Keppel. Where a supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. *Vance*, 570 U.S. at 424; *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 762-63 (1998). SURA's only answer is that Dilling worked for JSA. That is the joint-employer question again, addressed in Part I. The FAC additionally alleges that SURA selected Dilling, that Hearne ordered the audit and received its report, and that SURA and Hearne directed and approved the termination. FAC ¶¶ 28, 31-32, 71, 156.

**D. The Retaliation Counts State a Claim (Counts VI and X).**

SURA's retaliation argument rests on the premise that the only adverse action is the November 21 termination, which preceded the protected activity. SURA Mem. 18. The FAC does not plead the termination as a retaliatory act. Title VII protects former employees from post-termination retaliation. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

The FAC pleads four adverse actions taken *after* counsel's November 26 and December 3, 2025 notices: (1) on December 18, fifteen days after the December 3 letter, Dilling's public statements to three hundred colleagues and field leaders, and, in the same period, his private statements to leaders of the field that Dr. Keppel had mismanaged funds, made at the direction of Hearne and SURA, FAC ¶¶ 91-102, 108-109; (2) on December 22, the offer of a "special advisor" role at a substantial pay cut conditioned on a non-disparagement obligation, FAC ¶¶ 105, 110-111, 169(b), 193(b); (3) the position, communicated to TIAA and maintained through at least March 2026, that Dr. Keppel remained employed and could not access her vested retirement funds, FAC ¶¶ 127-133; and (4) the failure to provide any COBRA notice, which a male employee separated at the same time received, FAC ¶¶ 114-124. Each "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). The anti-retaliation provision is not limited to workplace harms, *see id.* at 63-64, and public disparagement before the leadership of one's scientific field readily meets that standard. So does an offer of re-employment only in a diminished role and on condition of silence. *See id.* at 70-71 (reassignment to less desirable duties may be materially adverse).

SURA's suggestion that the FAC alleges a termination "effective January 10, 2026," SURA Mem. 27 (citing "Am. Compl. ¶ 63"), is unexplained. Paragraph 63 concerns the DOE

presentation,[1] and the FAC alleges a termination "effective immediately" on November 21, 2025, FAC ¶¶ 7, 71. That is precisely the point—everything alleged in Counts VI and X happened afterward, and after the protected activity. *Clark County School District v. Breeden*, 532 U.S. 268 (2001), on which SURA relies, held that an employer need not suspend a previously planned action upon learning of a charge; it says nothing about new adverse actions taken after the charge, and it recognized that temporal proximity "very close" in time can itself establish causation. *Id.* at 273-74. Fifteen days is very close. *See also Strothers v. City of Laurel*, 895 F.3d 317, 335-36 (4th Cir. 2018) (employer knowledge plus close temporal proximity supports causation).

Causation is adequately pleaded under *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013). The FAC alleges that the Town Meeting statements were made "for the specific purpose of punishing Dr. Keppel for retaining counsel"; that the position maintained to TIAA was adopted after and in response to her assertion of Title VII claims; and that the December 18 assurance that Defendants were still working toward a solution in which she "stays at the lab" was crafted for audience consumption while the terms offered four days later removed her from scientific work. FAC ¶¶ 102, 104-105, 132, 170, 194. Rule 9(b) permits motive to be alleged generally.

SURA's separate contention that it lacked knowledge of the protected activity, SURA Mem. 19, is an argument for summary judgment—*Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653 (4th Cir. 1998), and *Roberts v. Glenn Industrial Group, Inc.*, 998

---

[1] Referring to the Plaintiff's original complaint also does not explain SURA's point, as paragraph 63 states:

> JSA/SURA's demand that Dr. Keppel falsely represent that she resigned, as a condition of receiving what was in effect a demotion, was itself independently discriminatory and retaliatory, and on information and belief violated federal government contract regulations. Complaint ¶ 63 (Dkt. 1).

F.3d 111 (4th Cir. 2021), were both decided on full records—and it is answered by the FAC. The FAC alleges that JSA is SURA's subsidiary and that JSA's General Counsel reported the assertion of Title VII claims to SURA's leadership, including Hearne, in the ordinary course, FAC ¶ 90; that Hearne participated in the position maintained to TIAA, which produced denials in January, February, and March 2026, well after the December 3 letter, as well as in the decision to withhold severance, FAC ¶¶ 28(c), 128-131; that SURA itself asserted and maintained the "remained employed" position, FAC ¶ 131; that Dilling sought out leaders of the field at the direction of Hearne and SURA, FAC ¶ 109; and that Dilling reports to a board Hearne chairs, FAC ¶ 32. Whether and when JSA's General Counsel forwarded the December 3 letter to SURA is a fact exclusively within Defendants' knowledge, which is precisely when pleading on information and belief is appropriate.

**E. The VHRA Counts Rise or Fall With the Title VII Counts (Counts VIII and X).**

SURA argues only that the Virginia Human Rights Act ("VHRA") claims fail for the same reasons as the Title VII claims. SURA Mem. 19. They therefore survive for the same reasons. Count VIII also pleads a VHRA hostile work environment, FAC ¶¶ 180, 183, which survives for the reasons stated in Part III. Plaintiff notes that *Conner v. Schrader-Bridgeport International, Inc.*, 227 F.3d 179 (4th Cir. 2000), on which SURA relies, predates the 2020 amendments that created the VHRA's independent private right of action, Va. Code § 2.2-3908, and that the VHRA now provides remedies, including uncapped compensatory damages and attorney's fees, that Title VII does not. *Id.* § 2.2-3908(B). SURA raises no VHRA-specific defense.

**F. The DCHRA Count States a Claim (Count XI).**

1. **SURA cites a phantom case for the territorial reach of the DCHRA that does not exist at the cite and then compounds this by misconstruing the rule in *Cole.***

SURA cites "*Elyazidi v. SunTrust Bank*, 780 F. Supp. 2d 1, 10-11 (D.D.C. 2011)" for the territorial reach of the DCHRA. SURA Mem. 20. No decision by that name appears at that citation or in that court, yet SURA's parenthetical describes its supposed holding: *an employer's presence in the District does not create DCHRA jurisdiction over an employment relationship centered elsewhere*. The volume and page cited, 780 F. Supp. 2d 1, belong to *Wade v. District of Columbia* (D.D.C. 2011), a case that does not discuss the DCHRA. The only published *Elyazidi v. SunTrust Bank* decision is 780 F.3d 227 (4th Cir. 2015), a Fair Debt Collection Practices Act case that does not mention the DCHRA. Kim Decl. ¶¶ 6-7 & Exs. C–E. Accordingly, the foundation of SURA's argument to dismiss the DCHRA claim is an incorrect citation offered for a "holding" that appears in neither the *Wade* nor the *Elyazidi* opinion.[2]

SURA continues by inaccurately stating that *Cole v. Boeing Co.*, 845 F. Supp. 2d 277 (D.D.C. 2012), stands for the proposition that the "…relevant inquiry is the *situs of the employment relationship*…," SURA Mem. 20, a rule that *Cole* did not apply. *Cole* holds that where an employee is not employed in the District, "[e]ither the [adverse employment] decision must be made, or its effects must be felt, or both must have occurred, in the District of Columbia." *Id.* at 284 (quoting *Monteilh v. AFSCME*, 982 A.2d 301, 305 (D.C. 2009)). The same page states that "the most important factor . . . is not whether the plaintiff was actually employed in the District of Columbia, but whether the alleged discriminatory acts occurred in the District." *Id.* (quoting *Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 104 (D.D.C. 2009)). SURA reports the opposite

[2] As pointed out in Plaintiff's opposition to Hearne's Motion to Dismiss, this same false argument based on a false holding in *Elyazidi* appears again, and should also be rejected there.

rule and does not cite *Monteilh* at all. *Cole* dismissed the Virginia-based claims there because "neither the decision to act, nor the effects of the acts were felt in the District of Columbia." *Id.* at 285. The rule is disjunctive, and SURA incorrectly reports it as though it were a single situs-of-employment test.

**2. The FAC Pleads a District of Columbia Nexus.**

The FAC alleges that SURA is headquartered in the District; that its Washington office is the administrative and governance hub for the management of Jefferson Lab; that Hearne performs his duties from that office; that from that office and in his SURA capacity he interviewed and appointed Dr. Keppel, signed the agreement governing her retention, chaired the committee that selected the Laboratory Director who removed her, ordered the audit that preceded her removal, received its written report, and participated in the decision to terminate her; that "[t]he adverse employment decisions at issue were, in substantial part, made in the District of Columbia"; and that SURA's own federal filings place the administration of Dr. Keppel's retirement plan at 1201 New York Avenue. FAC ¶¶ 19, 28, 30-32, 43, 199. Those allegations plausibly place a decisionmaker, and part of the decision, in the District. Plaintiff does not rest on SURA's headquarters alone, which *Monteilh* holds would not be enough, 982 A.2d at 304-05; she alleges that the decisions themselves were made there. Whether the decision was "made" in the District, or its effects "felt" there, within the meaning of *Monteilh* and *Cole*, is a fact question that discovery into Hearne's communications will answer. It is not a question that can be answered against Plaintiff by asserting, as SURA does, that Hearne's conduct "says nothing about where Plaintiff's employment was located." SURA Mem. 20. Under *Cole* and *Monteilh*, where Dr. Keppel's desk was is not the test.

### G. The Defamation Count States a Claim Against SURA (Count XII).

#### 1. The Statements Are Provably False Assertions of Fact, and They Are "Of and Concerning" Dr. Keppel.

Under Virginia law a statement is actionable if it contains a "provably false factual connotation," and a statement of opinion that implies undisclosed defamatory facts is actionable. *Schaecher v. Bouffault*, 290 Va. 83, 98, 772 S.E.2d 589, 597, 599-601 (2015); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-20 (1990). Dilling reported what an external review and the laboratory's budget figures showed, and the FAC alleges that they showed the opposite. That an external review of the division came back "not positive" is an assertion about what a document says; that the laboratory "only had 23 days of reserve" when it was "supposed to have 41" is an assertion of two numbers and, in a meeting called to explain Dr. Keppel's removal, an assertion that her management produced the shortfall. The FAC alleges the review found the division reviewed well, that the SURA-ordered audit had confirmed compliance with all safety standards, that the division never exceeded its budget, and that the reserve and overhead rate were set by the Laboratory Director and by JSA and SURA. FAC ¶¶ 94, 100. *See Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 132-33, 575 S.E.2d 858, 861-62 (2003). SURA's characterization of these as "institutional commentary," SURA Mem. 23, ignores the context the FAC pleads. FAC ¶¶ 91, 93.

Virginia does not require that a defamatory statement name the plaintiff; it is enough that persons who knew her understood it to refer to her, which may be established by extrinsic facts pleaded by inducement and colloquium. *Gazette, Inc. v. Harris*, 229 Va. 1, 37, 325 S.E.2d 713, 738 (1985); *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7-8, 82 S.E.2d 588, 591-92 (1954). The FAC pleads those facts. FAC ¶¶ 91, 93, 96. *Dean v. Dearing*, 263 Va. 485, 490, 561 S.E.2d 686, 689 (2002), on which SURA relies, SURA Mem. 24, is a group-libel case about newspaper criticism of a police department; it does not govern a statement explaining the removal of an

identified division head. Indeed, *Dean* recognizes that where defamatory language is directed toward "a comparatively small group of persons . . . and is so framed as to make defamatory imputations against all members of the small or restricted group, any member thereof may sue." *Id.* at 488, 561 S.E.2d at 688 (quoting *Ewell v. Boutwell*, 138 Va. 402, 411, 121 S.E. 912, 914 (1924)). The "line management" of a single division whose head had just been removed is such a group, and at a minimum its size and identity is a question of fact. *General Products Co. v. Meredith Corp.*, 526 F. Supp. 546, 550 (E.D. Va. 1981).

**2. Qualified Privilege Is a Defense, and the FAC Pleads Its Abuse.**

Qualified privilege is an affirmative defense, and it is lost upon a showing of common-law malice, which includes, among other things, knowledge of falsity or reckless disregard for the truth, communication to persons with no corresponding interest in the subject, or a purpose other than the one the privilege protects. *Cashion v. Smith*, 286 Va. 327, 338-39, 749 S.E.2d 526, 532-33 (2013). Whether a defendant has lost or abused the privilege is a question of fact for the jury. *Id.*, 749 S.E.2d at 533 (citing *Fuste*, 265 Va. at 135, 575 S.E.2d at 863). Dismissal on an affirmative defense is proper only where it appears on the face of the complaint. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc).

The FAC pleads abuse on every ground. It alleges that the audit report and the external review were in Defendants' possession, and had been delivered to SURA and Hearne, before the Town Meeting. FAC ¶¶ 28(b), 99, 101, 103, 206. It alleges that the audience included hundreds of external scientists and university physicists with no administrative, supervisory, or legal need to receive information about internal personnel decisions, and that Dilling separately sought out leaders of external organizations to repeat the charge. FAC ¶¶ 91-92, 108-109, 209. SURA argues that the breadth of the audience "actually strengthens" the privilege because the audience consisted

of laboratory "stakeholders." SURA Mem. 25. That is a factual contention about the interests of three hundred people, and it is not the law: the privilege protects communications to persons with a *corresponding* duty or interest in the specific subject—here, why a particular employee was removed. *Cashion*, 286 Va. at 337, 749 S.E.2d at 532. And the FAC alleges that the statements were made fifteen days after counsel asserted Dr. Keppel's claims, "for the specific purpose of punishing Dr. Keppel for retaining counsel." FAC ¶¶ 90-91, 102, 208. SURA's brief twice promises an argument it never makes: first that "the allegations of actual malice remain conclusory," SURA Mem. 21, and then that a "following section" will show malice inadequately pleaded, SURA Mem. 26. No such section appears in its brief. Dr. Keppel has plausibly pleaded common-law malice that defeats the privilege, while SURA fails to keep its promise to demonstrate that malice was inadequately pled. FAC ¶¶ 100-102.

**3. SURA Is Plausibly Liable for Dilling's Statements.**

The FAC alleges that Dilling spoke "on behalf of JSA and SURA"; that he was selected by, reports to, and is evaluated by a board Hearne chairs; that Hearne ordered the audit and received its results; that Dilling made the private statements to leaders of the field at the direction of Hearne and SURA; and that SURA, with knowledge that the audit had cleared the division, authorized and ratified the statements. FAC ¶¶ 28-32, 103, 109, 204, 210. Ratification by a principal with knowledge of the material facts is a recognized basis for liability, and whether SURA ratified is a question of fact. The FAC pleads the facts from which ratification is inferred—Hearne's knowledge, Hearne's authority over Dilling, and SURA's subsequent conduct consistent with the statements.

**H. The COBRA Count States a Claim (Count XIII).**

JSA and SURA have taken mutually exclusive positions. JSA says the beneficiary-notice obligation belongs to SURA as plan administrator, while declining to concede that SURA is the plan administrator. JSA Mem. 26 (Dkt. 43). SURA says the obligation never arose because JSA is not alleged to have notified SURA of the qualifying event under 29 U.S.C. § 1166(a)(2). SURA Mem. 26-27. Neither Defendant disputes, for purposes of its motion, that Dr. Keppel experienced a qualifying event or that she received no election notice; each simply assigns the notice obligation to the other.

That is why Count XIII is pleaded against JSA and SURA together, alleging both that JSA never notified SURA and that SURA never notified Dr. Keppel, and that "to date neither Defendant has provided proper notice." FAC ¶¶ 117, 119-120, 213-216. Rule 8(d)(2) permits pleading in the alternative, and it is the appropriate course where the allocation of responsibility turns on internal communications between affiliated entities exclusively within their possession.

SURA's argument that its fourteen-day clock "was never triggered" treats SURA and JSA as strangers. The FAC alleges the opposite: that SURA and JSA operate as a single integrated enterprise, that the health plan is one SURA sponsors and reports as a single-employer plan, and that SURA's certification to the Department of Labor represents that the JSA workforce is within SURA's own control group. FAC ¶¶ 22, 26. On those allegations SURA cannot disclaim knowledge of a qualifying event that its own subsidiary effected, at SURA's direction, with respect to a participant in SURA's own single-employer plan. SURA's own authority confirms the point: *Roberts v. National Health Corp.*, 963 F. Supp. 512, 515 (D.S.C. 1997), addresses the situation in which the employer and administrator are one enterprise and holds that in that situation the combined period for notice is forty-four days from the qualifying event. *See also* 29 C.F.R. §

2590.606-4(b)(2); FAC ¶ 213. As of the filing of the FAC, nine months after the qualifying event, no notice had been sent by anyone, and a male employee separated at about the same time received his. FAC ¶ 124.

**I. The ERISA Count States a Claim (Count XV).**

**1. § 502(a)(1)(B).**

SURA argues that TIAA, not SURA, denied the distributions and that SURA's designation as plan administrator on its own Form 5500 is a mere "title." SURA Mem. 28-29. SURA's own authority, *Custer v. Sweeney*, 89 F.3d 1156, 1161-62 (4th Cir. 1996), holds that fiduciary status attaches to any entity that exercises discretionary authority over plan administration, and the FAC alleges that SURA did exactly that: the "remained employed" position on which TIAA acted "was asserted and maintained by SURA as well as JSA," and it was that position—not any independent judgment by TIAA—that produced the denials. FAC ¶¶ 125-126, 128-131, 229-230. A named administrator that decides a participant's employment status for purposes of eligibility for a distribution is making a benefits determination, and the claim is properly brought against the entity that made it.

**2. Fiduciary Breach Under § 1104(a)(1).**

SURA invokes *Varity Corp. v. Howe*, 516 U.S. 489 (1996), for the proposition that fiduciary liability does not attach to "every employment decision." SURA Mem. 29. *Varity* held that an employer that, acting in its capacity as plan administrator, conveyed false information to participants about their status under the plan was acting as a fiduciary and breached its duty of loyalty by doing so. *Id.* at 502-06. That is Dr. Keppel's claim. SURA, as administrator, asserted and maintained a false statement of Dr. Keppel's employment status to the plan's recordkeeper in order to deny her a distribution to which the plan entitled her, and did so after, and in response to,

her assertion of Title VII claims, for the purpose of preventing her from accessing her retirement funds. FAC ¶¶ 125-126, 131-132, 229-231. Whether SURA in fact exercised that discretion, and why, are questions for discovery, but Plaintiff has plausibly alleged a breach, and the claim should not be dismissed.

**J. The Court Should Retain Supplemental Jurisdiction.**

SURA asks the Court to decline supplemental jurisdiction over the DCHRA and defamation claims under 28 U.S.C. § 1367(c). The predicate—dismissal of the federal claims—is absent. The Title VII, COBRA, and ERISA claims survive, and the state and District claims arise from the same nucleus of operative fact: the same removal, the same audit, the same Town Meeting, the same actors. 28 U.S.C. § 1367(a). The only § 1367(c) ground SURA identifies is that the DCHRA claim presents a "novel" question of District law. It does not; *Monteilh* is a decision of the District's highest court on the precise question, and *Cole* has applied it in federal court. Judicial economy, convenience, and fairness all favor a single proceeding. *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995).

**K. The Request for Attorney's Fees Should Be Denied.**

SURA requests attorney's fees without identifying any statutory basis. Under the American Rule each party bears its own fees absent express authority. *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015). A prevailing Title VII defendant may recover fees only upon a finding that the action was frivolous, unreasonable, or without foundation. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978). A complaint that survives a motion to dismiss is not frivolous, and a motion to dismiss is not a vehicle for a fee award.

**L. Any Dismissal Should Be Without Prejudice and With Leave to Amend.**

If the Court concludes that any count is deficient in any respect, Plaintiff requests leave to amend under Rule 15(a)(2). Leave is to be "freely give[n] when justice so requires," and denial is appropriate only for futility, bad faith, or prejudice. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). The case is at its inception: the Rule 26(f) conference was held on September 10, 2026, the Rule 16(b) conference has not yet occurred, initial disclosures are not yet due, and no discovery has been taken. Nor would amendment be futile: among other things, Plaintiff can allege that her counsel's December 12, 2025 letter asserting sex discrimination was sent directly to Hearne and Dilling, six days before the Town Meeting.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant Southeastern Universities Research Association, Inc.'s motion to dismiss the First Amended Complaint (Dkt. No. 38) in its entirety, deny its request for attorney's fees, and, in the alternative, grant Plaintiff leave to amend. Finally, Dr. Keppel respectfully leaves to this Court's sound discretion and judgment what measures should be taken for the concerns raised in her introduction.

Dated: September 22, 2026

Respectfully submitted,

DR. CYNTHIA E. KEPPEL
By Counsel

/s/ Dawn C. Stewart
Dawn C. Stewart, Esq. (VSB No. 27717)
SOLOMON LAW FIRM, PLLC
1025 Connecticut Avenue, NW, Suite 1000
Washington, D.C. 20036

Tel: (202) 963-2116
Fax: (202) 688-1896
dstewart@fedemploylaw.com

/s/ Ronald J. Kim
Ronald J. Kim, Esq. (admitted *pro hac vice*)
SOLOMON LAW FIRM, PLLC
300 Great Oaks Blvd, Suite 312
Albany, NY 12203
Tel: (646) 475-3118
Fax: (202) 688-1896
rkim@fedemploylaw.com
Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including Kristina H. Vaquera, Esq., Milena Radovic, Esq., and N. Winston West, IV, Esq., Jackson Lewis P.C., 701 E. Byrd Street, 17th Floor, Richmond, Virginia 23219, counsel for Defendants.

/s/ Dawn C. Stewart
Dawn C. Stewart, Esq.
SOLOMON LAW FIRM, PLLC