**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| DR. CYNTHIA E. KEPPEL,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON SCIENCE ASSOCIATES, LLC, SOUTHEASTERN UNIVERSITIES RESEARCH ASSOCIATION, INC., JENS DILLING, and SEAN HEARNE,<br><br>Defendants. | Civil Action No. 4:26-cv-00112-MSD-LRL<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT SEAN HEARNE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

At the threshold, Dr. Cynthia Keppel ("Plaintiff") is obligated to advise the Court of a significant problem with the memorandum (Dkt. 41) ("Hearne Mem.") filed by Sean Hearne ("Hearne") to support his motion to dismiss the First Amended Complaint ("FAC"). In connection with Hearne's territorial argument—the argument on which his motion principally depends—he cites a decision, *Elyazidi v. SunTrust Bank*, 780 F.3d 227, 237-38 (4th Cir. 2015), that never mentions the D.C. Human Rights Act, and represents that in it "the Fourth Circuit addressed the territorial scope of the DCHRA and concluded that the relevant inquiry is where the plaintiff's employment was based, not where corporate decisions happened to originate." Hearne Mem. 5. This statement is not true. *See* Declaration of Ronald J. Kim Regarding Incorrect Authorities Cited in Defendants' Memoranda ("Kim Decl.") ¶ 6 & Exs. C–D. In sum, the very foundation of Hearne's motion rests on a Fourth Circuit decision that has nothing to do with the statute at issue. The phrases "District of Columbia" and "Human Rights Act" do not appear anywhere in *Elyazidi*.

Plaintiff raises the matter because this defect is not incidental. Stripped of the misdescribed authority, Hearne's territorial argument rests on nothing, and the one DCHRA decision he cites, *Cole v. Boeing Co.*, 845 F. Supp. 2d 277 (D.D.C. 2012), supports Dr. Keppel's FAC. Plaintiff respectfully submits that Hearne's motion to dismiss should be denied on this basis alone.

## II. STATEMENT OF FACTS

The following facts are drawn from the FAC (Dkt. 29) and are accepted as true at this stage.

### A. SURA, Its Washington Headquarters, and Hearne

SURA is a nonprofit corporation headquartered at 1201 New York Avenue, N.W., Washington, D.C., an office that functions as the administrative and governance hub for the management of Jefferson Lab, hosting SURA's and JSA's board assemblies, executive sessions, and committee meetings. FAC ¶¶ 19, 30. JSA is SURA's subsidiary, created with Pacific Architects and Engineers to hold the Department of Energy management-and-operating contract for Jefferson Lab; SURA holds a controlling membership interest in JSA and appoints its board, which Hearne chairs. FAC ¶¶ 15-16, 20, 22. SURA and JSA operate the laboratory as a single, integrated enterprise. FAC ¶ 22. Hearne is SURA's President and CEO. FAC ¶ 35.

Under the DOE contract and JSA's governing documents, SURA retained authority over senior personnel decisions at the laboratory, including appointment of the Laboratory Director. FAC ¶ 29. Hearne chaired the search committee that selected Dilling, a committee that did its work at SURA's Washington offices, and Dilling reports to and is evaluated by a board Hearne chairs. FAC ¶¶ 31-32. Before her 2021 appointment as Associate Director, Dr. Keppel was interviewed by SURA employees in Washington, including Hearne, who made the final decision to appoint her. FAC ¶ 43. In April 2022, Hearne—signing "For JSA and SURA" as SURA's President and CEO—executed a Leadership Participation Agreement in which JSA committed to retain Dr.

Keppel in her leadership position subject to her maintaining a performance appraisal rating of level 3 or above, the continuation of the JSA-DOE contract, and compliance with the Code of Conduct, and SURA separately committed to furnish equipment and materials in support of her position. FAC ¶ 27.

**B. Hearne's Conduct Toward Dr. Keppel**

Senior scientists at the laboratory customarily engaged in outside scientific collaborations and professional service, and Dr. Keppel did so openly, as her male peers did. FAC ¶¶ 48-49. She was the only member of senior leadership whom Defendants sought to restrict. FAC ¶ 50. When, in 2023, she transparently told Hearne that competing bidders for the DOE contract had approached her, Hearne told her that anyone considering another bidder "doesn't deserve to be a part of the laboratory" and invoked a purported non-compete that turned out to be an expired document; no male leader was told anything of the kind or had that document invoked against him. FAC ¶¶ 51-54.

On November 4, 2025, Hearne ordered an Operations Audit of Dr. Keppel's division alone—the first targeted review of its kind ever imposed on any division at the laboratory, and one never imposed on a male-led division. FAC ¶¶ 28(a), 64, 66-69. The audit found that the division met all performance expectations and applicable safety standards; Hearne received its written report and participated in or was represented at its close-out. FAC ¶¶ 28(b), 46, 68, 99-101.

Seventeen days later, on November 21, 2025, JSA terminated Dr. Keppel "effective immediately." FAC ¶¶ 71-72. SURA and Hearne directed and approved the termination. FAC ¶¶ 35, 71. She was replaced by a less-qualified man while her female deputy of ten years was passed over; neither Hearne nor Dilling consulted the two women on SURA's Board of Trustees, one of whom chaired its Science and Technology Committee. FAC ¶¶ 82-84. A departing male Deputy

Director received a severance package, and each of the approximately eighty employees separated in a February 2026 reduction in force was offered severance; Dr. Keppel received none, and Hearne participated in that decision. FAC ¶¶ 28(c), 85-86. Hearne also participated in the position maintained to TIAA that Dr. Keppel remained employed, which blocked her access to her fully vested retirement account on January 14, February 26, and March 6, 2026. FAC ¶¶ 28(c), 126, 128-132.

After Dr. Keppel's counsel notified JSA's General Counsel on December 3, 2025, that the termination violated Title VII, and after that assertion was reported to SURA's leadership including Hearne, Dilling told a Town Meeting of roughly three hundred people that "line management" had presided over a safety review whose result "was not positive" and a depleted budget reserve. FAC ¶¶ 89-93, 95-96. Separately, and at the direction of Hearne and SURA, Dilling privately told leaders of the nuclear physics community that Dr. Keppel had mismanaged funds. FAC ¶¶ 108-109.

## III. LEGAL STANDARD

A complaint survives a Rule 12(b)(6) motion if it contains sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts the allegations as true and draws all reasonable inferences in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). Intent and knowledge "may be alleged generally." Fed. R. Civ. P. 9(b). The Court may not consider matters outside the pleadings without converting the motion. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015).

## IV. ARGUMENT

One count of the First Amended Complaint is directed at Sean Hearne: Count XI, which alleges that he aided and abetted discrimination in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.62. Hearne's motion rests on two propositions. The first is that the Fourth Circuit has held that the DCHRA reaches only employment "based" in the District. The second is that everything the FAC alleges about him is "normal corporate governance."

The first proposition advanced by Hearne rests on a case that has nothing to do with the DCHRA. Hearne represents that in *Elyazidi v. SunTrust Bank*, 780 F.3d 227, 237-38 (4th Cir. 2015),[1] "the Fourth Circuit addressed the territorial scope of the DCHRA and concluded that the relevant inquiry is where the plaintiff's employment was based." Hearne Mem. 5. This is simply not true. *Elyazidi* is an appeal from the dismissal of Fair Debt Collection Practices Act and Maryland consumer-protection claims brought by a bank customer who overdrew her checking account. It is not an employment case. The phrases "District of Columbia" and "Human Rights Act" do not appear anywhere in the opinion. The two pages Hearne pin-cites address whether the Maryland Consumer Debt Collection Act and the Maryland Consumer Protection Act reach conduct that occurred in Virginia—a question about the extraterritorial reach of two *Maryland* consumer statutes. 780 F.3d at 237-38. Compounding this, Hearne's only other DCHRA authority, *Cole v. Boeing Co.*, 845 F. Supp. 2d 277 (D.D.C. 2012), states the opposite of the rule he draws from it: where an employee is not employed in the District, "[e]ither the [adverse employment] decision must be made, or its effects must be felt, or both must have occurred, in the District of

---

[1] In contrast to SURA's memorandum, Hearne's citation for *Elyazidi* is correct. *Compare* Hearne Mem. 5, *with* SURA Mem. (Dkt. 39) 20. Neither memorandum, however, identifies *Elyazidi* as a Fair Debt Collection Practices Act and Maryland consumer-protection case rather than a DCHRA decision.

Columbia" for the DCHRA to apply. *Id.* at 284 (quoting *Monteilh v. AFSCME*, 982 A.2d 301, 305 (D.C. 2009)). Hearne does not cite *Monteilh*, the decision of the District's highest court from which that rule comes.

The second proposition advanced by Hearne asks the Court to recharacterize the FAC's allegations and then dismiss his recharacterization. Hearne describes the conduct alleged as chairing committees, signing agreements, and ordering audits in the abstract. What the FAC alleges is very different: it is specific, detailed, and focused. Hearne, the chief executive of the parent organization (SURA), personally ordered the operations audit of Dr. Keppel's division—the first such targeted review of any division in the laboratory's history and one never imposed on a male-led division—received the report that cleared her, participated in or was represented at its close-out, then, shortly afterward, participated in and approved her removal, participated in the decision to withhold her severance, participated in the position taken to her retirement plan's recordkeeper that she was still employed so that she could not reach her own vested funds, and directed the Laboratory Director to tell the leadership of her scientific field that she had mismanaged money. FAC ¶¶ 28(a)-(c), 35, 64, 66-69, 71, 108-109, 131. Several of these allegations are pleaded on information and belief, as they must be at this stage: the details of Hearne's role reside in his own communications and in SURA's files, to which Dr. Keppel has had no access. That is a permissible pleading practice. A plaintiff may plead facts on information and belief "if such plaintiff is in a position of uncertainty because the necessary evidence is controlled by the defendant." *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015) (internal quotation marks omitted). Such allegations "are not categorically insufficient to state a claim for relief where the proof supporting the allegation is within the sole possession and control of the defendant or where the belief is based on sufficient factual material that makes the

inference of culpability plausible." *Lowy v. Daniel Defense, LLC*, 167 F.4th 175, 199 (4th Cir. 2026) (quoting *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023)) (emphasis omitted). The only limit is that such allegations "may not be wholly conclusory." *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023). These are not. They rest on facts pleaded without qualification: Hearne personally ordered the audit of Dr. Keppel's division alone, received its written report, chaired the committee that selected the Laboratory Director who removed her, and signed her Leadership Participation Agreement for both entities. FAC ¶¶ 27, 28(a)-(b), 31. In *Ridenour*, the court sustained information-and-belief allegations that a third party took an active role in the employer's hiring decision because the details of the two companies' relationship were "known only to defendants." 147 F. Supp. 3d at 456-57. The same is true here. These are not abstract actions of a corporate president in the ordinary course, and whether he took these actions because of Dr. Keppel's sex is not a question that can be resolved on the pleadings.

**A. Rule 12(b)(1) Is Not the Proper Vehicle for Hearne's Territorial Argument.**

Hearne moves in part under Rule 12(b)(1), asserting that this Court "lacks subject matter jurisdiction" over Count XI. Hearne Mem. 2, 12. Plaintiff acknowledges that *Cole* and other decisions of the District Court for the District of Columbia have used jurisdictional language in this setting. The Supreme Court has since instructed that a statutory limitation on a claim's coverage is an element of the claim, not a jurisdictional bar, unless the legislature has clearly ranked it as jurisdictional. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006). Nothing in the DCHRA does so, and in any event the D.C. Council cannot define the subject-matter jurisdiction of a federal court; jurisdiction over Count XI rests on 28 U.S.C. § 1367(a). A claim that may fail on the merits is still a claim the court has jurisdiction to decide. *Bell v. Hood*, 327 U.S. 678, 682 (1946). The distinction has no practical consequence here, because Hearne's challenge is a facial

one and the allegations of the First Amended Complaint are taken as true either way. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

**B. Hearne's DCHRA Authority Does Not Support the Rule He Asks the Court to Adopt.**

**1. *Elyazidi* Is Not a DCHRA Case.**

Hearne's lead authority is *Elyazidi*, which he describes as a Fourth Circuit decision "address[ing] the territorial scope of the DCHRA" and emphasizing that "extending local employment protections based solely on the location of a corporate decision-maker's office would impermissibly expand the statute beyond its intended territorial scope." Hearne Mem. 5. No such holding and no such discussion appear in that opinion, for the reasons given above. Kim Decl. ¶ 6 & Exs. C–D. Plaintiff respectfully submits that the Court should disregard the citation and the proposition offered with it. Because *Elyazidi* is the only authority Hearne represents as construing the DCHRA's territorial reach, its removal leaves his argument resting on a district court decision that states the rule against him and on an age-discrimination parent-liability case that says nothing about geography.

**2. *Cole* States the Rule Hearne Denies, and It Comes From *Monteilh*.**

*Cole* did not hold that the DCHRA protects only employees who physically work in the District. It held that where an employee is not employed in the District, "[e]ither the [adverse employment] decision must be made, or its effects must be felt, or both must have occurred, in the District of Columbia." 845 F. Supp. 2d at 284 (quoting *Monteilh*, 982 A.2d at 305). It added that "the most important factor . . . is not whether the plaintiff was actually employed in the District of Columbia, but whether the alleged discriminatory acts occurred in the District." *Id.* (quoting *Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 104 (D.D.C. 2009)). *Cole* dismissed the Virginia-based claims before it because "neither the decision to act, nor the effects of the acts were

felt in the District of Columbia." *Id.* at 285. Hearne's argument that the statute's reach turns exclusively on "the situs of the employment relationship," Hearne Mem. 5, is an argument against *Cole* and *Monteilh*, not an application of them.

*Johnson v. Flowers Industries, Inc.*, 814 F.2d 978 (4th Cir. 1987), does not fill the gap. Hearne cites it for a distinction between the "normal incidents of stock ownership" and "operational control" that supposedly "determines the locus of an employment relationship." Hearne Mem. 6. *Johnson* is an Age Discrimination in Employment Act parent-subsidiary liability case decided on summary judgment; it says nothing about the DCHRA or about geography. What it does say is that the presumption against parent liability yields where the parent "exercises a degree of control that exceeds the control normally exercised by a parent corporation," including control over the subsidiary's employment decisions. *Id.* at 981 (quoting *Armbruster v. Quinn*, 711 F.2d 1332, 1338 (6th Cir. 1983)). On the FAC's allegations that is this case.

**C. The First Amended Complaint Pleads a District of Columbia Nexus.**

The FAC alleges that SURA is headquartered in the District; that its Washington office is the administrative and governance hub for the management of Jefferson Lab, hosting board assemblies, executive sessions, and committee meetings; that Hearne performs his duties from that office; that he interviewed Dr. Keppel in Washington and made the final decision to appoint her; that in his SURA capacity he executed the agreement governing her retention and chaired, at SURA's Washington offices, the committee that selected the Laboratory Director who removed her; that from that office he ordered the audit that preceded her removal, whose written report was delivered there, and participated in the decision to terminate her; that he participated in the decision to withhold severance, and participated in the position taken to TIAA; and that "[t]he adverse

employment decisions at issue were, in substantial part, made in the District of Columbia." FAC ¶¶ 19, 27-32, 35, 43, 71, 199.

Hearne answers that Paragraph 199 is "a legal conclusion couched as a factual allegation." Hearne Mem. 7. It is not offered in isolation: it follows specific allegations—in Paragraphs 27 through 32 and 43, and in Paragraph 199 itself—each tied to a place and an actor. Where a decision was made is a question of fact, and the FAC alleges facts placing a decisionmaker, and part of the decision, in the District. Whether the decision was "made" in the District, or its effects "felt" there, within the meaning of *Cole* and *Monteilh*, will be answered by discovery into Hearne's communications—not by Hearne's assurance that it was not.

Hearne also recasts the pleading, asserting that Dr. Keppel "was supervised in Virginia," Hearne Mem. 1, and that "[h]er office was in Virginia. Her laboratory was in Virginia. She was supervised day-to-day in Virginia. She was terminated from her position in Virginia," Hearne Mem. 5. Plaintiff does not dispute that she worked at Jefferson Lab in Newport News, FAC ¶¶ 14-15, 76-77, or that the FAC alleges, for venue purposes, that the unlawful practices were committed "principally" in this District, FAC ¶ 38. But "principally" is not "exclusively," and Hearne's summary omits what the FAC also alleges: that the decisions at issue were made in substantial part in the District of Columbia by a decisionmaker working there. FAC ¶¶ 28-32, 199. Nor does the FAC allege that Dr. Keppel was "supervised day-to-day" anywhere. A Rule 12(b)(6) movant may not supply the facts he wishes the complaint alleged. *Zak*, 780 F.3d at 606-07. Plaintiff objects to consideration of any characterization beyond what the FAC alleges.

**D. The First Amended Complaint Pleads Hearne's Personal Participation Under D.C. Code § 2-1402.62.**

The DCHRA makes it unlawful "for any person to aid, abet, invite, compel, or coerce" a violation. D.C. Code § 2-1402.62. Hearne, citing *Purcell v. Thomas*, 928 A.2d 699, 714 (D.C. 2007), argues that the FAC does not allege his personal participation in discriminatory conduct. Hearne Mem. 7-8. To the contrary, the FAC alleges that Hearne was personally involved in far more than "a business decision." Hearne Mem. 11.

*First*, Hearne ordered an operations audit of one division—Dr. Keppel's—on November 4, 2025. FAC ¶¶ 28(a), 64. The FAC alleges that this was the first such targeted review ever imposed on any division at the laboratory and that no male-led division was ever audited. FAC ¶¶ 66-69. Hearne's response is that "[o]perations audits are a standard corporate governance tool" and that the FAC "does not allege that the audit was conducted differently because of Dr. Keppel's sex." Hearne Mem. 9. The FAC alleges that it was *ordered* differently because of her sex—that hers was the first division ever subjected to such a targeted review, and no division led by a man ever was. Subjecting a woman to a measure never applied to any man in a comparable position is comparative evidence that the measure was sex-based, whether or not anyone mentions sex. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998) (plaintiff may offer "direct comparative evidence about how the alleged harasser treated members of both sexes").

*Second*, Hearne received the audit report—which cleared the division—and participated in or was represented at its close-out, and shortly afterward directed and approved her termination on the stated ground that her "ability to lead the division is not aligned with the direction of the organization." FAC ¶¶ 28(b), 35, 71-72, 99-101. An officer who commissions a review of a subordinate, learns the result clearing her, and then removes her anyway is not performing an oversight function; the sequence is itself evidence that the stated reason was not the real one.

*Third*, Hearne participated in the decision to withhold severance from Dr. Keppel while a departing male Deputy Director received a severance package and each of the approximately eighty employees separated in the February 2026 reduction in force was offered severance. FAC ¶¶ 28(c), 85-86.

*Fourth*, Hearne participated in the position maintained to TIAA that Dr. Keppel remained employed—a position the FAC alleges was knowingly inconsistent with the Termination Notice and with every statement Defendants had made since November 21—with the effect of blocking her access to her own fully vested retirement account on three occasions between January 14 and March 6, 2026. FAC ¶¶ 28(c), 126, 128-132.

*Fifth*, the FAC alleges that Dilling sought out leaders of the nuclear physics community "at the direction of Hearne and SURA" and privately told them that Dr. Keppel had mismanaged funds. FAC ¶¶ 108-109.

*Sixth*, the 2023 incident is pleaded not as a stray remark but as an instance of the selective restriction alleged throughout: Dr. Keppel was the only member of senior leadership whose outside professional engagement Defendants sought to limit, and the expired non-compete Hearne invoked against her was never invoked against a man. FAC ¶¶ 48-54.

Hearne's answer to each allegation is the same—that the act, viewed alone and stripped of the FAC's surrounding allegations, is something a CEO might lawfully do. Hearne Mem. 8-12. That "blinders" approach is not available on a motion to dismiss. Plausibility is assessed on the complaint as a whole, and a court must "draw on its judicial experience and common sense" in doing so. *Iqbal*, 556 U.S. at 679. Hearne's assertion that "[a] collection of individually neutral acts does not become evidence of discrimination simply because they are aggregated," Hearne Mem. 12, inverts the inquiry: circumstantial cases are built from acts that are individually capable of an

innocent explanation. The question is whether the whole permits a reasonable inference, and here it does.

Hearne's same-actor argument—that because he appointed Dr. Keppel in 2021 he cannot have participated in discrimination against her in 2025, Hearne Mem. 8, 10—fails for two reasons. The same-actor inference is an evidentiary inference available at summary judgment or trial, not a pleading rule. And it depends on a short interval between hiring and firing. *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (inference arises where termination "occurs within a relatively short time span following the hiring"). Four years elapsed, the Laboratory Director who effected the removal was a man selected in 2025 by a search committee Hearne chaired, and the FAC alleges that in 2023, when Dr. Keppel asked on what basis she was bound, Hearne responded with hostility and invoked an expired non-compete against her alone. FAC ¶¶ 29, 31-32, 43, 51-53, 55.

Finally, Hearne's reliance on *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001), for the proposition that the 2023 comments are too remote in time, Hearne Mem. 10, misplaces the case. *Breeden* addresses temporal proximity as a means of establishing causation in a retaliation claim. Dr. Keppel does not offer the 2023 incident to prove causation by proximity; she offers it as background evidence of Hearne's disparate treatment of her. Prior acts remain admissible as background evidence in support of a timely claim. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

**E. The Court Should Retain Supplemental Jurisdiction.**

Hearne asks the Court in the alternative to decline supplemental jurisdiction under 28 U.S.C. § 1367(c) because the DCHRA question is "novel" and because comity favors a District of Columbia forum. Hearne Mem. 12-14. The question is not novel: *Monteilh* is a decision of the District's highest court squarely on the point, and *Cole* has applied it in federal court. The federal

claims remain in the case, so the *Cohill* framework on which Hearne relies is not triggered. *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988); *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). And Count XI is pleaded against all four Defendants; declining jurisdiction as to Hearne alone would split a single claim between two courts, which serves neither economy nor fairness.

**F. The "Official Capacity" Argument Provides No Basis for Dismissal.**

Hearne argues that any claims asserted against him in his official capacity are duplicative of the claims against SURA. Hearne Mem. 14. Count XI is pleaded against Hearne personally under D.C. Code § 2-1402.62, which by its terms reaches "any person." FAC ¶¶ 35, 201. To the extent the caption's "individually and in his official capacity" designation suggests otherwise, Plaintiff has no objection to the Court's disregarding that designation. It provides no basis for dismissing the count.

**G. The Request for Attorney's Fees Should Be Denied.**

Hearne asks the Court to award him his attorney's fees, Hearne Mem. 14, without identifying any statute, rule, or contract authorizing such an award. Under the American Rule, each party bears its own fees absent express authority. *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015). To the extent the request sounds in Title VII, a prevailing defendant may recover fees only on a finding that the action was frivolous, unreasonable, or without foundation, *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978)—a finding that could not be made here.

**H. Any Dismissal Should Be Without Prejudice and With Leave to Amend.**

If the Court concludes that Count XI is deficient as pleaded against Hearne, Plaintiff requests leave to amend under Rule 15(a)(2). Leave is to be "freely give[n] when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). The case is at its inception: the Rule 26(f) conference was held on September 10, 2026, the Rule 16(b) conference has not yet occurred, initial disclosures are not yet due, and no discovery has been taken. The facts bearing on where and by whom the decision was made are in Defendants' exclusive possession. Nor would amendment be futile: among other things, Plaintiff can allege that her counsel's December 12, 2025 letter asserting sex discrimination was sent directly to Hearne and Dilling, six days before the Town Meeting.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant Sean Hearne's motion to dismiss the First Amended Complaint (Dkt. 40) in its entirety, deny his request for attorney's fees, and, in the alternative, grant Plaintiff leave to amend. Finally, Dr. Keppel respectfully leaves to this Court's sound discretion and judgment what measures should be taken for the concerns raised in her introduction.

Dated: September 22, 2026

Respectfully submitted,

DR. CYNTHIA E. KEPPEL
By Counsel

/s/ Dawn C. Stewart
Dawn C. Stewart, Esq. (VSB No. 27717)
SOLOMON LAW FIRM, PLLC
1025 Connecticut Avenue, NW, Suite 1000
Washington, D.C. 20036
Tel: (202) 963-2116

Fax: (202) 688-1896
dstewart@fedemploylaw.com

/s/ Ronald J. Kim
Ronald J. Kim, Esq. (admitted *pro hac vice*)
SOLOMON LAW FIRM, PLLC
300 Great Oaks Blvd, Suite 312
Albany, NY 12203
Tel: (646) 475-3118
Fax: (202) 688-1896
rkim@fedemploylaw.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including Kristina H. Vaquera, Esq., Milena Radovic, Esq., and N. Winston West, IV, Esq., Jackson Lewis P.C., 701 E. Byrd Street, 17th Floor, Richmond, Virginia 23219, counsel for Defendants.

/s/ Dawn C. Stewart
Dawn C. Stewart, Esq.
SOLOMON LAW FIRM, PLLC