**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| DR. CYNTHIA E. KEPPEL,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON SCIENCE ASSOCIATES, LLC, SOUTHEASTERN UNIVERSITIES RESEARCH ASSOCIATION, INC., JENS DILLING, and SEAN HEARNE,<br><br>Defendants. | Civil Action No. 4:26-cv-00112-MSD-LRL<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT JEFFERSON SCIENCE ASSOCIATES, LLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

At the threshold, Dr. Cynthia Keppel ("Plaintiff") is obligated to advise the Court of several significant problems with Jefferson Science Associates, LLC's ("JSA") memorandum (Dkt. 43) ("JSA Mem.") filed to support its motion to dismiss the First Amended Complaint ("FAC"). Several of its arguments rest on cited authority, in quotations with pin cites, that do not stand for the proposition offered, or on record citations to paragraphs of the FAC that say something different. The most egregious example of this is JSA's offering of *Dooley v. Liberty Mutual Insurance Co.*, 307 F. Supp. 2d 234, 241 (D. Mass. 2004), for the proposition that a plaintiff "must show that interference of ERISA right was the sole reason for termination." JSA Mem. 28. *Dooley* is a Fair Labor Standards Act decision concerning whether insurance appraisers' travel time is compensable, and the quoted language does not appear in it. The words "ERISA," "interference," and "termination" appear nowhere in the opinion. See Declaration of Ronald J. Kim Regarding

Incorrect Authorities Cited in Defendants' Memoranda ("Kim Decl.") ¶ 5 & Ex. B.[1] Even if the proposition had a source, it would not be the law of this Circuit, which requires specific intent. *Conkwright v. Westinghouse Electric Corp.*, 933 F.2d 231, 239 (4th Cir. 1991). Plaintiff raises this because the defects are not incidental, nor just overstatements by an advocate. Each supports a dispositive argument, offered to dismiss the FAC. Combined these defects demand that JSA's motion be denied.

## II. STATEMENT OF FACTS

The following facts are drawn from the FAC (Dkt. 29) and are accepted as true at this stage.

### A. The Laboratory and Dr. Keppel's Performance

JSA is a limited liability company created by Southeastern Universities Research Association, Inc. ("SURA") with Pacific Architects and Engineers to hold the Department of Energy management-and-operating contract for Jefferson Lab in Newport News, Virginia. FAC ¶¶ 15-16, 20, 22. SURA holds a controlling membership interest in JSA and appoints its board, which SURA's President and CEO, Sean Hearne, chairs; SURA and JSA operate the laboratory as a single, integrated enterprise. FAC ¶¶ 20, 22, 29-32.

Dr. Keppel was hired in approximately 1995, led Experimental Hall A from 2012, and became Associate Director for the entire Experimental Physics Division in 2021—one of nine members of the Directors' Council and one of three women on it. FAC ¶¶ 41-43, 47. In thirty years she was never told of any problem with her leadership, productivity, or management. FAC ¶ 44. In April 2024, Laboratory Director Stuart Henderson awarded her a four-percent merit increase with written commendation. FAC ¶ 46. Her FY2024 appraisal, signed in March 2025 by then-

[1] Counsel of record for Liberty Mutual in *Dooley* included Andrew C. Pickett of Jackson, Lewis, LLP, Boston. 307 F. Supp. 2d at 237.

Laboratory Director Kimberly Sawyer, rated her overall performance 10.5—the second-highest of five bands, "Exceeds Most"—and rated her Scientific/Technical Performance, the most heavily weighted category, "Exemplary." *Id.* Laboratory policy requires a performance improvement plan for any rating below "Achieved" and provides that dismissal for performance is "normally preceded by corrective action"; no improvement plan, written warning, or counseling was ever issued, and Dilling never completed her 2025 appraisal. *Id.* Months before her termination, the Department of Energy awarded the laboratory its only two A-level ratings for work performed largely by her division. FAC ¶ 67. In April 2022, Hearne executed, for JSA and SURA, a Leadership Participation Agreement in which JSA committed to retain Dr. Keppel in her leadership position so long as, among other conditions, her appraisals remained at level 3 or above. FAC ¶ 27.

**B. Dilling's Arrival, the Audit, and the Termination**

Dilling became Laboratory Director in May 2025. FAC ¶ 55. From the outset he bypassed Dr. Keppel to deal directly with her male direct reports, interrupted her at weekly Directors' Council meetings, and dismissed her recommendations—none of which he did to the men on the Council—and other male executives followed his lead. FAC ¶¶ 57-60. In August 2025 he chose a less-qualified man to present to the Secretary of Energy and then falsely accused Dr. Keppel of ignoring that directive, when the laboratory's Chief Communications Officer asked her to present. FAC ¶¶ 63, 65. In October 2025, Dr. Keppel watched Dilling insult, scold, and bully Amber Boehnlein, the only other female scientific manager on the Council, after Boehnlein referred to Dr. Keppel in making a point; she never saw him treat a man that way. FAC ¶¶ 61-62. On November 4, 2025, Hearne ordered, and Dilling implemented, an Operations Audit of Dr. Keppel's division alone—the first such targeted review ever imposed on any division and one never imposed

on a male-led division. FAC ¶¶ 28(a), 64, 66-69. The audit found that the division met all performance expectations and applicable safety standards. FAC ¶¶ 28(b), 46, 68, 99-101.

On November 21, 2025, JSA handed Dr. Keppel a Termination Notice stating that her employment "is terminated effective immediately," on the stated ground that Dilling had "determined that your ability to lead the division is not aligned with the direction of the organization." FAC ¶¶ 71-72. Dilling had never discussed or evaluated her leadership or counseled her on any deficiency. FAC ¶ 74. Security escorted her from the building, disabled her badge, and did not give her adequate time to collect her belongings. FAC ¶¶ 76-77. Attached to the notice was an unsigned letter offering an unspecified "individual contributor role" on condition that she submit a letter of resignation, accept a sweeping non-disparagement provision, and decide all of this within one business day. FAC ¶¶ 78-80. She was immediately replaced by a less-qualified man—the least budget-experienced candidate available—while her female deputy of ten years was passed over, reducing female representation on the Council by a third. FAC ¶¶ 82, 84. A departing male Deputy Director received a severance package, and each of the eighty employees separated in a February 2026 reduction in force was offered severance; Dr. Keppel received none. FAC ¶¶ 85-86.

**C. Protected Activity and What Followed**

Dr. Keppel retained counsel on November 25, 2025. FAC ¶ 88. On November 26, counsel notified JSA's General Counsel, Rhonda Scales, of the representation, and on December 3 counsel wrote to Scales that the termination "was based on illegal discrimination in violation of Title VII." FAC ¶¶ 89-90. Fifteen days later, on December 18, Dilling hosted a Town Meeting convened at the request of the scientific user community to explain the abrupt leadership changes. It was held in the laboratory's auditorium, which seats approximately 300, with approximately 300 in

attendance, and was broadcast to pre-approved online attendees; a significant portion of the audience were not JSA or SURA employees but university physicists, laboratory users, and leaders of the nuclear physics community. FAC ¶¶ 91-92. Dilling opened by identifying the Experimental Physics Division as a focus of his remarks and stated that "this year we had again unfortunately some safety related issues, and it was at a level where the board . . . brought in an external review" whose result "was not positive," and that as to "responsibility and management of the budget," the laboratory "only had 23 days of reserve" when "[w]e were supposed to have 41 days." FAC ¶ 93. Every member of the audience understood the "line management" he blamed to be Dr. Keppel. FAC ¶ 96. The statements were false, and both the audit report and the external review report were in Defendants' possession before Dilling spoke. FAC ¶¶ 99-101, 103. In the same period, at the direction of Hearne and SURA, Dilling told leaders of the nuclear physics community privately that Dr. Keppel had mismanaged funds. FAC ¶¶ 108-109, 209.

At the Town Meeting Dilling assured the audience that "we're still working . . . [toward] a solution where she . . . stays at the lab." FAC ¶ 104. Four days later JSA transmitted its "solution": a short-term "Nuclear Physics Special Advisor" position at a substantial salary reduction, on terms that removed her from the laboratory's scientific work. FAC ¶¶ 105, 110-111. Under the terms of the SURA-sponsored 401(k) plan, a participant is entitled to a distribution upon termination of employment, and Dr. Keppel's account was fully vested. FAC ¶ 126. When she requested distributions on January 14, February 26, and March 6, 2026, TIAA denied each request because JSA and SURA maintained that she was still employed—a position knowingly inconsistent with the Termination Notice. FAC ¶¶ 128-132. No COBRA election notice was ever sent to her by anyone, although a male employee whose employment ended at about the same time received one. FAC ¶¶ 114-120, 124.

## III. LEGAL STANDARD

A complaint survives a Rule 12(b)(6) motion if it contains sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court draws all reasonable inferences in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). An employment discrimination plaintiff need not plead a prima facie case; *McDonnell Douglas* is an evidentiary standard, not a pleading requirement. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-12 (2002); *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017). The question is whether the facts alleged permit a reasonable inference that the plaintiff suffered an adverse action because of a protected characteristic. *Bing v. Brivo Systems, LLC*, 959 F.3d 605, 616-17 (4th Cir. 2020); *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). Intent and knowledge "may be alleged generally." Fed. R. Civ. P. 9(b). A party may plead claims in the alternative and inconsistently. Fed. R. Civ. P. 8(d)(2)-(3). And the Court may not consider matters outside the pleadings without converting the motion. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015).

## IV. ARGUMENT

Dr. Cynthia Keppel spent three decades at the Thomas Jefferson National Accelerator Facility and rose to lead its Experimental Physics Division. Eight months before she was removed, the laboratory rated her overall performance "Exceeds Most" and her scientific and technical performance "Exemplary," the highest score available in her most heavily weighted category. Weeks before she was removed, an Operations Audit ordered by the President and CEO of JSA's parent found that her division met every performance expectation and every applicable safety standard. The laboratory's own policy provides that dismissal for performance deficiency is "normally preceded by corrective action"; none was taken, and no warning or counseling of any

kind was ever given. Then, on November 21, 2025, less than seven months after Jens Dilling became Laboratory Director, JSA terminated her "effective immediately," had her escorted from the building, replaced her with a less-qualified man, and passed over her experienced female deputy.

JSA's answer is that none of that matters because only "the perception of the decision maker" counts, and Dilling's perception concerned Dr. Keppel's "leadership alignment with the Lab's direction." JSA Mem. 4-5. But *Hawkins* and *Warch*, the cases JSA cites for that proposition, are summary-judgment decisions reviewing full records of contemporaneous employer criticism. Neither holds that a plaintiff must plead the decisionmaker's state of mind—an impossible burden—or that an employer's own performance ratings and its failure to follow its own pre-dismissal process are irrelevant. And JSA's brief asks the Court to accept as established the very fact in dispute: that Dilling's stated reason was his real one.

The FAC pleads that JSA has given three different explanations for the same decision. The Termination Notice said Dr. Keppel's "ability to lead the division is not aligned with the direction of the organization." FAC ¶ 72. Four weeks later, explaining the removal to three hundred people, Dilling offered a different account: in the remarks the FAC quotes, he said nothing about alignment and pointed instead to safety failures and a depleted budget reserve. The SURA-commissioned audit had just found that her division met all applicable safety standards, and her division never exceeded its budget. FAC ¶¶ 93-100. Now JSA tells the Court that Dilling "concluded that the Lab's leadership team required restructuring." JSA Mem. 4 (citing FAC ¶¶ 55-57). The cited paragraphs allege no such thing; they allege Dilling's appointment and his practice of bypassing Dr. Keppel in favor of her male subordinates. Shifting explanations are evidence of pretext, not a ground for dismissal. The "restructuring" rationale is JSA's, offered for the first time in this brief;

it is not an allegation of the pleading, and as shown below, is also the third shifting explanation Defendants have given for Dr. Keppel's termination.

The balance of JSA's motion fares no better. It argues that "Exceeds Most" is an admission of shortfall; that a woman replaced by a man has pleaded nothing; that six months of conduct culminating in removal, replacement, and public humiliation before the leadership of her field is "ordinary workplace friction"; that a retaliation claim fails because the termination came first, while ignoring the four post-termination actions the FAC actually pleads; that the DCHRA does not apply, on the authority of a Title VII limitations case; and that the COBRA obligation belongs to SURA, while SURA tells this Court in a companion brief that it never arose because JSA never notified SURA. JSA's motion should be denied.

**A. The Sex Discrimination Counts State a Claim (Counts I and VII).**

**1. The FAC Pleads Satisfactory Performance by Every Available Measure.**

JSA concedes that a plaintiff need not plead a prima facie case, JSA Mem. 2, and then demands one anyway, insisting that the FAC must plead facts showing satisfactory performance "as assessed by the relevant decisionmaker." JSA Mem. 3. Neither *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274 (4th Cir. 2000), nor *Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510 (4th Cir. 2006), supports that pleading rule. Both are summary-judgment decisions reviewing a developed record of the employer's contemporaneous criticism of the plaintiff. Neither holds that a plaintiff must plead the decisionmaker's subjective state of mind, and neither holds that an employer's own evaluations are irrelevant to whether an employee was meeting legitimate expectations. The Fourth Circuit treats an employer's own ratings, and the absence of documented criticism, as probative evidence that the employee was performing satisfactorily. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 224-25 (4th Cir. 2019).

The FAC pleads that evidence from five independent sources: the FY2024 appraisal rating her "Exceeds Most" overall and "Exemplary" in her most heavily weighted category; a merit increase with written commendation from the Laboratory Director; DOE's award of the laboratory's only two A-level ratings for work performed largely by her division; a contractual retention agreement, signed by SURA's CEO, whose performance floor she exceeded; and an Operations Audit conducted in the weeks immediately before her termination, finding that her division met all performance expectations and safety standards. FAC ¶¶ 27, 46, 67-68. The FAC further pleads that laboratory policy provides that dismissal for performance deficiency is "normally preceded by corrective action", that none was taken, that Dilling never discussed her leadership with her, and that in thirty years no one had ever raised a performance concern. FAC ¶¶ 44, 46, 74-75. An employer that bypasses its own normal practice of corrective action before a performance-based dismissal invites the inference that performance was not the real reason.

JSA's attempts to explain this evidence away are arguments for a jury, and several of them require the Court to find facts.

JSA contends that an "Exceeds Most" rating carries a "built-in acknowledgment" that Dr. Keppel "fell short of expectations in at least some areas," and offers an "internal arithmetic" analysis concluding that her scores in unnamed remaining categories must have been "materially lower." JSA Mem. 4-5. Nothing in the FAC supports that reconstruction. The FAC alleges that the rating placed her in the second-highest of five bands on the laboratory's published scale. FAC ¶ 46. JSA's arithmetic is an inference drawn against the plaintiff from a document not before the Court, which is precisely what Rule 12(b)(6) forbids.

JSA says the Sawyer appraisal is "inapposite" because Sawyer was a predecessor supervisor, citing *Irani v. Palmetto Health*, 767 F. App'x 399, 419 (4th Cir. 2019) (per curiam).

JSA Mem. 4-5. *Irani* says nothing about a predecessor's evaluation. It affirmed summary judgment against a medical resident whose record showed sustained, contemporaneous criticism of his patient care from faculty and staff—including from evaluators who otherwise viewed him favorably—and who was on a remediation plan when he was dismissed. The court held that the plaintiff's own view of his work, and an expert opinion built on his account, could not create a factual dispute about whether he met expectations. Nothing like that record is alleged here: Dr. Keppel received no improvement plan, warning, or counseling, and Dilling never completed her 2025 appraisal. FAC ¶¶ 44, 46, 74. In any event the appraisal is the laboratory's own document, issued by its own Laboratory Director eight months before the removal.

JSA argues that the Leadership Participation Agreement does not guarantee "perpetual tenure." JSA Mem. 5. Dr. Keppel has not claimed that it does. The Agreement is pleaded as evidence that Defendants themselves defined satisfactory leadership performance as a level-3 appraisal—a standard her most recent completed appraisal exceeded. FAC ¶¶ 27, 46.

JSA says the FAC does not identify the Operations Audit's "scope, its criteria, or its methodology" and that an operational audit is "not the same as an evaluation of an individual leader's performance." JSA Mem. 5-6. The FAC alleges what the audit found. FAC ¶¶ 46, 68, 99-101. An argument that the audit measured something other than what the FAC says it measured is an invitation to discovery, not a ground for dismissal—and it sits uneasily beside Dilling's decision to tell three hundred people that an external review of that same division "was not positive."

Finally, and most tellingly, the FAC pleads three different explanations for one decision—"alignment" in the notice, safety and money in the auditorium, and "restructuring" in JSA's brief. FAC ¶¶ 72, 93-100; JSA Mem. 4. An employer's shifting explanations are themselves evidence of

pretext. *EEOC v. Sears, Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001); *Haynes*, 922 F.3d at 225.

**2. The FAC Pleads Circumstances Supporting an Inference of Sex Discrimination.**

JSA reads the FAC as if it rested entirely on comparators and then argues the comparators are imperfect. The case JSA cites makes the opposite point: comparator evidence controls only where a plaintiff has "based their allegations completely upon a comparison to an employee from a non-protected class." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoted at JSA Mem. 6). Dr. Keppel has not.

The FAC provides sufficient facts to infer that JSA discriminated against Dr. Keppel on the basis of her sex:

*First*, the FAC alleges that Dr. Keppel was immediately replaced by a less-qualified man—"the least budget-experienced available candidate"—while her female deputy of ten years, a markedly more experienced woman, was passed over. FAC ¶¶ 82, 84. Replacement by a person outside the protected class is the paradigmatic fourth element of a discriminatory-discharge claim. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). *McCleary-Evans v. Maryland Department of Transportation*, 780 F.3d 582 (4th Cir. 2015), is not to the contrary. That was a failure-to-hire case in which the plaintiff alleged nothing about the successful candidates beyond their race and offered no facts about relative qualifications. *Id.* at 585-86. Here the FAC pleads the specific qualification on which the replacement and the bypassed deputy differed—budget experience—and pleads that the disparity ran in the direction opposite to the budget-stewardship rationale Defendants announced. FAC ¶ 84. The same is true of the DOE presentation, where the FAC pleads that the laboratory's own

Chief Communications Officer had asked Dr. Keppel to present because of her superior experience and communication ability. FAC ¶ 65.

*Second*, the FAC alleges a pattern. Dilling bypassed, interrupted, and dismissed Dr. Keppel and did none of those things to the men on the Council, FAC ¶¶ 57-59; other male executives followed his lead, FAC ¶ 60; and in October 2025 he insulted, scolded, and bullied the only other female scientific manager on the Council after she referred to Dr. Keppel, conduct Dr. Keppel never saw him direct at a man, FAC ¶¶ 61-62. Her removal left three women among roughly thirty senior supervisors in the laboratory's science arm. FAC ¶ 82(d). Evidence that a decisionmaker treated other members of the protected class the same way is classic circumstantial evidence of motive. *Ziskie v. Mineta*, 547 F.3d 220, 224-26 (4th Cir. 2008).

*Third*, the FAC alleges that Dr. Keppel was the only member of senior leadership restricted in the outside professional engagement that was the accepted norm for her male peers, and that when she raised an approach from competing bidders with Hearne in 2023 he told her that anyone considering such an association "doesn't deserve to be a part of the laboratory" and invoked a non-compete that turned out to be an expired document never invoked against any man. FAC ¶¶ 48-54. Selective enforcement of a rule against a woman is sex-based conduct whether or not anyone mentions her sex. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998).

*Fourth*, the FAC alleges that the process itself was irregular: an audit of her division alone; no corrective action despite a policy that performance-based dismissals are normally preceded by it; no completed 2025 appraisal; a termination inconsistent with the laboratory's Code of Conduct, Administrative Manual, and standard human-resources practice; a one-business-day ultimatum to resign and accept a gag provision; and a removal about which the two women on SURA's Board of Trustees were neither consulted nor informed. FAC ¶¶ 46, 64-69, 75, 78-79, 83. Departures

from an employer's own procedures support an inference of discriminatory motive. See *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

Against all of this, the Dean and reduction-in-force allegations are pleaded as context—that when a male Deputy Director departed, he received a severance package, and when eighty other employees were separated in a reduction in force, each was offered severance, but when the laboratory separated Dr. Keppel after thirty years, it did not. FAC ¶¶ 85-86. JSA's response, that Dean's departure was eight months later and may have been "voluntary or negotiated," JSA Mem. 7, depends on facts about why Dean left, what he was paid, and who decided—facts that are not in the FAC and are in JSA's exclusive possession. *Mitchell v. Booz Allen Hamilton Inc.*, No. 1:23-cv-00653, 2024 U.S. Dist. LEXIS 40649 (E.D. Va. Mar. 7, 2024), *aff'd*, No. 24-1223 (4th Cir. May 19, 2025) (per curiam), on which JSA relies, dismissed a *pro se* complaint whose own allegations recited performance and credibility concerns reported to human resources, and whose disparate-treatment theory rested on comparators with different job titles or no comparable conduct. That is not this case.

**B. The Hostile Work Environment Counts State a Claim (Counts III and VII).**

A hostile work environment claim requires unwelcome conduct, based on sex, sufficiently severe *or* pervasive to alter the conditions of employment, and imputable to the employer. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc). The standard is disjunctive, and the inquiry looks to the totality of the circumstances. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). Whether an environment is objectively hostile "is quintessentially a question of fact." *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994).

**1. The Conduct Is Adequately Alleged to Be Based on Sex.**

Plaintiff acknowledges that the FAC does not allege that Dilling used gendered epithets. It does not need to. The sex-based character of conduct may be inferred from disparate treatment of women and men, from a pattern of hostility directed at women in particular, and from selective enforcement. *Oncale*, 523 U.S. at 80-81. The FAC alleges all three: that Dilling's hostility fell on Dr. Keppel and on the only other female scientific manager on the Directors' Council, and not on the men, FAC ¶¶ 57-62; that the outside-work restriction was applied to Dr. Keppel and not to the men who did the same thing, FAC ¶¶ 48-54; and that no male-led division was ever audited, FAC ¶¶ 66, 68-69.

JSA's reliance on *Robinson v. Prince William-Manassas Regional Adult Detention Center*, No. 1:22-cv-00744, 2022 WL 17085916 (E.D. Va. Nov. 18, 2022), and *Carter v. Virginia Department of Game & Inland Fisheries*, No. 3:16-cv-661, 2017 WL 4413192 (E.D. Va. Sept. 29, 2017), JSA Mem. 10, misreads the FAC. Dr. Keppel does not sue for what Boehnlein experienced. She alleges that she personally witnessed the Laboratory Director publicly abuse the only other senior woman on the Council, in a meeting Dr. Keppel attended, after that woman invoked Dr. Keppel's name—and that this contributed to the environment Dr. Keppel herself experienced. That is exactly the use the Fourth Circuit approved in *Ziskie*, 547 F.3d at 224-26.

**2. The Alleged Conduct Is Severe or Pervasive.**

The FAC alleges a six-month course of conduct by the Laboratory Director directed at Dr. Keppel: repeated interruptions and dismissals in leadership meetings; deliberate bypassing of her authority by dealing directly with her male subordinates, which signaled to those subordinates that her leadership was not respected; the emulation of that conduct by other male executives; the reassignment of a high-visibility DOE presentation to a less-qualified man followed by a false

accusation of insubordination; the singling out of her division for an unprecedented audit; public abuse of the only other female scientific manager on the Council; and, finally, summary termination and an escort from the premises. FAC ¶¶ 55-70, 76-77, 151. That course of conduct followed Hearne's earlier invocation of an expired non-compete against Dr. Keppel alone, FAC ¶¶ 48-54, and was followed within weeks of her removal by Dilling's public statements to three hundred colleagues falsely blaming her for safety and budget failures, FAC ¶¶ 91-100. Both bear on whether the conduct in between was motivated by her sex.

JSA parses each incident separately and pronounces it "ordinary workplace friction." JSA Mem. 12. The Supreme Court has rejected that method; the incidents must be considered together. *Harris*, 510 U.S. at 23; *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008). And the hostile environment claims in the cases JSA cites rested on conduct far short of what is alleged here. In *Buchhagen v. ICF International, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (per curiam), the plaintiff alleged yelling, "snide comments," and unfair scrutiny that the court found largely conclusory—and even there the Fourth Circuit reinstated her discrimination and retaliation claims. *Id.* at 220-21. *Decoster v. Becerra*, 119 F.4th 332, 338-40 (4th Cir. 2024), described a difficult working relationship and unpleasant performance criticism—and reversed the dismissal of that plaintiff's retaliation claim; *Coleman v. Kettler Management*, No. 1:22-cv-84, 2022 U.S. Dist. LEXIS 223787 (E.D. Va. Dec. 12, 2022), dismissed hostile environment claims that fell outside the plaintiff's EEOC charge and, in the alternative, rested on allegations that gave no dates or frequency. A course of marginalization that ends in removal, replacement by a man, and public humiliation before the leadership of one's scientific field is not the *Decoster* "difficult working relationship." The FAC pleads dates, meetings, participants, and specific incidents throughout.

JSA's treatment of the escort illustrates the problem with its approach. It asserts that the escort was "a facially neutral security measure accompanying an immediate separation." JSA Mem. 12. Whether escorting a thirty-year division head from a laboratory she had helped build, after disabling her badge and without adequate time to collect her belongings, FAC ¶¶ 76-77, was a neutral security measure or a humiliation is a question of fact. On a motion to dismiss the inference runs in Dr. Keppel's favor.

**3. The Conduct Is Imputable to JSA.**

Dilling was Dr. Keppel's supervisor: he was empowered to, and did, take a tangible employment action against her. Where a supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. *Vance v. Ball State University*, 570 U.S. 421, 424 (2013); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 762-63 (1998). JSA does not contend otherwise.

**C. The Retaliation Counts State a Claim (Counts V and IX).**

JSA's causation argument rests on a chart, JSA Mem. 14, showing that Dr. Keppel's protected activity followed her November 21 termination. That is the point. The FAC does not plead the termination as a retaliatory act. It pleads a sequence of adverse actions taken *after* counsel's November 26, 2025 notice of representation and December 3, 2025 assertion of her Title VII claims. Title VII protects former employees from post-termination retaliation. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

Those actions are: (1) on December 18, fifteen days after the December 3 letter, Dilling's statements to three hundred colleagues and field leaders attributing her removal to safety and budget failures, and, in the same period, his private statements to leaders of her field that she had mismanaged funds, FAC ¶¶ 91-102, 108-109; (2) on December 22, the offer of a "special advisor"

role at a substantial pay cut, conditioned on a non-disparagement obligation and removing her from the laboratory's scientific work, FAC ¶¶ 105, 110-111, 162(b), 187(b); (3) the position, communicated to TIAA and maintained through at least March 2026, that she remained employed and therefore could not access her vested retirement funds, FAC ¶¶ 127-133; and (4) the failure to provide any COBRA notice, which a male employee separated at the same time received, FAC ¶¶ 114-124.

Each is an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). JSA's answers do not hold.

JSA says the December 18 statements are not adverse because Dr. Keppel had already been terminated. JSA Mem. 13. *Robinson v. Shell Oil* forecloses that argument, and *Burlington Northern* confirms that the anti-retaliation provision reaches conduct beyond the workplace and beyond employment-related acts. 548 U.S. at 63-64, 67. Public disparagement before the leadership of a scientist's field is a textbook example.

JSA says the December 22 offer is not adverse because an offer "confers an option, not a detriment" and Dr. Keppel was free to decline it. JSA Mem. 13. The FAC pleads that the offer was the announced "solution" for a woman JSA had removed "effective immediately," that it cut her pay substantially, that it removed her from the laboratory's scientific work, and that it was conditioned on a non-disparagement obligation. FAC ¶¶ 104-105, 110-111, 162(b), 187(b). A demotion is no less a demotion because the employee may refuse it and take nothing instead, and an offer of re-employment only in a diminished role is materially adverse. *See Burlington Northern*, 548 U.S. at 70-71 (reassignment to less desirable duties may be materially adverse).

JSA says a COBRA notice failure merely "extends the election period." JSA Mem. 13. That argument does not dispute that, as of the filing of the FAC—nine months after the qualifying event—no notice had been provided and Dr. Keppel's election rights remained unresolved. It also does not address the FAC's allegation that a male employee separated at the same time received his notice. FAC ¶ 124.

As to knowledge, JSA asserts that the FAC "does not allege facts demonstrating that any decision maker was aware of Plaintiff's protected activity at the time of the adverse action," citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653 (4th Cir. 1998). JSA Mem. 15. The FAC alleges that Dr. Keppel's counsel wrote directly to JSA's General Counsel on November 26 and December 3, and that the assertion of Title VII claims was reported to SURA's leadership in the ordinary course. FAC ¶¶ 89-90. Every action listed above post-dates those letters. *Dowe* was decided on summary judgment.

Causation is adequately pleaded under *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013). The FAC alleges that the Town Meeting statements were made "for the specific purpose of punishing Dr. Keppel for retaining counsel"; that the position maintained to TIAA was adopted after and in response to her assertion of Title VII claims; and that the December 18 assurance that Defendants were still working toward a solution in which she "stays at the lab" was crafted for audience consumption while the terms actually offered four days later removed her from scientific work at a substantial loss. FAC ¶¶ 102, 104-105, 132, 163, 188. Rule 9(b) permits motive to be alleged generally, and temporal proximity of fifteen days, combined with intervening conduct, suffices at this stage. *Strothers v. City of Laurel*, 895 F.3d 317, 335-36 (4th Cir. 2018). *Kennedy v. Nyx Entertainment, Inc.*, No. 8:25-cv-02035, 2025 U.S. Dist. LEXIS 212866 (D. Md. Oct. 28, 2025), on which JSA relies, dismissed a retaliation claim because the

post-termination acts alleged there—contesting the plaintiff's unemployment benefits and withholding his final wages—began months before his EEOC charge, the only protected activity pleaded. *Kennedy* held that those same kinds of post-termination acts are materially adverse; the claim failed only on sequence. Here the sequence runs the other way: all four adverse actions followed counsel's November 26 and December 3, 2025 letters.

**D. The VHRA Counts Rise or Fall With the Title VII Counts (Counts VII and IX).**

JSA argues only that the Virginia Human Rights Act claims fail for the same reasons as the Title VII claims. JSA Mem. 15-16. They therefore survive for the same reasons. Count VII also pleads a VHRA hostile work environment, FAC ¶¶ 174, 177, which survives for the reasons stated in Part II. Plaintiff notes that the VHRA now provides an independent private right of action and remedies, including uncapped compensatory damages and attorney's fees, that Title VII does not. Va. Code § 2.2-3908. JSA raises no VHRA-specific defense.

**E. The DCHRA Count States a Claim (Count XI).**

First, to start its argument, JSA offers "undisputed facts," at least two of which do not survive a check against the pleading. JSA states that "[t]he termination decision was made and communicated in Virginia," citing FAC ¶ 55 — this paragraph alleges Dilling's appointment as Laboratory Director in May 2025 and says nothing about termination. It states that "Plaintiff's day-to-day work was performed in Virginia," citing FAC ¶ 32 — this paragraph alleges that Dilling reports to and is evaluated by a board Hearne chairs. JSA Mem. 16-17. Neither citation to the FAC says what JSA attributes to it.

JSA then rests its entire DCHRA argument on *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002), cited with a parenthetical describing it as holding that "each discrete discriminatory act is independently actionable in the jurisdiction where it occurs." JSA

Mem. 16. *Morgan* holds no such thing. It concerns the timeliness of discrete acts under Title VII's charge-filing period, and the page JSA cites analyzes the text of that provision, 42 U.S.C. § 2000e-5(e)(1). *Morgan*, 536 U.S. at 109. The opinion says nothing about the DCHRA or the territorial reach of any statute; the only "jurisdiction" it discusses is whether the filing period is a jurisdictional prerequisite to suit. Kim Decl. ¶ 4 & Ex. A. The closest language, that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," *id.* at 113, addresses *when* a charge must be filed, not *where* a claim may be brought.

The governing rule comes from decisions JSA ignores. Where an employee is not employed in the District, "[e]ither the [adverse employment] decision must be made, or its effects must be felt, or both must have occurred, in the District of Columbia" for the DCHRA to apply. *Cole v. Boeing Co.*, 845 F. Supp. 2d 277, 284 (D.D.C. 2012) (quoting *Monteilh v. AFSCME*, 982 A.2d 301, 305 (D.C. 2009)). "[T]he most important factor . . . is not whether the plaintiff was actually employed in the District of Columbia, but whether the alleged discriminatory acts occurred in the District." *Id.* (quoting *Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 104 (D.D.C. 2009)). The FAC alleges that SURA is headquartered in the District; that its Washington office is the administrative and governance hub for the management of Jefferson Lab; that from that office Hearne appointed Dr. Keppel, executed the agreement governing her retention, chaired the committee that selected the Laboratory Director who removed her, ordered the audit that preceded her removal, and received its report; that Hearne and SURA directed and approved the termination; and that the adverse decisions were, in substantial part, made in the District. FAC ¶¶ 19, 28-32, 43, 71, 199. Because the decision JSA carried out was, as alleged, made in substantial part in the District, Count XI reaches JSA as well.

**F. The Defamation Count States a Claim Against JSA (Count XII).**

**1. The Town Meeting Statements Are Provably False Assertions of Fact.**

Under Virginia law a statement is actionable if it contains a "provably false factual connotation." *Schaecher v. Bouffault*, 290 Va. 83, 98, 772 S.E.2d 589, 597 (2015). A statement framed as opinion is actionable if it implies undisclosed defamatory facts, *id.*, 772 S.E.2d at 599-601; *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-20 (1990). Whether a statement contains a provably false factual connotation is a question of law for the court. *Schaecher*, 290 Va. at 94-95, 772 S.E.2d at 595. But where a statement is reasonably capable of a defamatory factual meaning in the context in which it was made, whether it is false is a question for the factfinder and not one to be resolved on the pleadings. *Id.* That is this case.

That an external review of the division came back "not positive" is an assertion about what a document says, provable by producing the document—which, the FAC alleges, was in the Defendants' possession. FAC ¶¶ 101, 103. The statement that the laboratory "only had 23 days of reserve" when it was "supposed to have 41" is an assertion of two specific numbers during a meeting called to explain Dr. Keppel's removal. An assertion that Dr. Keppel's management produced the shortfall can be proved false as the FAC alleges her division never exceeded its budget and that the reserve level and overhead rate were set by the Laboratory Director, JSA and SURA. FAC ¶ 100(d)-(f). These statements are all actionable. *Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 132-33, 575 S.E.2d 858, 861-62 (2003).

**2. The Statements Are "Of and Concerning" Dr. Keppel.**

Virginia does not require that a defamatory statement name the plaintiff; it is enough that persons who knew her understood it to refer to her, which may be established by extrinsic facts pleaded by inducement and colloquium. *Gazette, Inc. v. Harris*, 229 Va. 1, 37, 325 S.E.2d 713,

738 (1985); *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7-8, 82 S.E.2d 588, 591-92 (1954). The FAC pleads those facts: the meeting was convened at the community's request to explain the abrupt leadership changes; Dilling opened by identifying Dr. Keppel's division as a focus of his remarks; his remarks were his explanation for the change; and every member of the audience understood the "line management" he blamed to be Dr. Keppel. FAC ¶¶ 91, 93, 96. *Dean v. Dearing*, 263 Va. 485, 490, 561 S.E.2d 686, 689 (2002), is a group-libel case about newspaper criticism of a police department; it does not govern a statement explaining the removal of an identified division head. Indeed, *Dean* recognizes that where defamatory language is directed toward "a comparatively small group of persons . . . and is so framed as to make defamatory imputations against all members of the small or restricted group, any member thereof may sue." *Id.* at 488, 561 S.E.2d at 688 (quoting *Ewell v. Boutwell*, 138 Va. 402, 411, 121 S.E. 912, 914 (1924)). The "line management" of a single division whose head had just been removed is such a group, and at a minimum its size and identity is a question of fact. *General Products Co. v. Meredith Corp.*, 526 F. Supp. 546, 550 (E.D. Va. 1981).

**3. Qualified Privilege Cannot Be Resolved on the Pleadings.**

Qualified privilege is an affirmative defense, and it is lost where the plaintiff shows common-law malice, which includes, among other things, knowledge of falsity or reckless disregard for the truth, publication to persons with no corresponding interest in the subject, or a purpose other than the one the privilege protects. *Cashion v. Smith*, 286 Va. 327, 338-39, 749 S.E.2d 526, 532-33 (2013). Whether a defendant has lost or abused the privilege is a question of fact for the jury. *Id.*, 749 S.E.2d at 533 (citing *Fuste*, 265 Va. at 135, 575 S.E.2d at 863). Dismissal on an affirmative defense is proper only where the defense appears on the face of the complaint. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc).

The FAC pleads abuse on each ground: that the audit report and the external review were in Defendants' possession before Dilling spoke and said the opposite of what he said, FAC ¶¶ 99-101, 103, 206; that a significant portion of the three-hundred-person audience were outside scientists and field leaders with no duty or interest in why one employee had been removed, FAC ¶¶ 91-92; and that the statements came fifteen days after counsel asserted Title VII claims and were made to punish her for asserting them, FAC ¶¶ 90, 102, 208. JSA's argument that the breadth of the audience "actually strengthens" the privilege, JSA Mem. 22, is a factual contention about the interests of three hundred people; and the privilege protects communications to persons with a corresponding interest in the specific subject of the statement, *Cashion*, 286 Va. at 337, 749 S.E.2d at 532—here, the reasons for one employee's removal.

JSA's contention that "ill will or improper motive is insufficient," JSA Mem. 23, does not meet the FAC. Dr. Keppel does not plead malice by label or by motive alone; she pleads two documents, in Defendants' hands, that contradicted what was said.

**4. The Private Statements, and JSA's Responsibility for Dilling's Statements.**

As to the private publications to Shepherd, Napolitano, and Milner, JSA argues that the exact words must be pleaded. JSA Mem. 24-25. In federal court the sufficiency of a defamation complaint is governed by Rule 8. *Hatfill v. New York Times Co.*, 416 F.3d 320, 329-30 (4th Cir. 2005); *see Hanna v. Plumer*, 380 U.S. 460, 471-74 (1965). The district court decisions JSA cites cannot displace *Hatfill*. In any event, the FAC identifies the operative accusation—that Dr. Keppel "had mismanaged funds in her capacity as Associate Director of Experimental Physics," FAC ¶ 108—the speaker, the period, and the three named recipients, FAC ¶ 209, and an accusation that a senior scientific administrator mismanaged funds is defamatory per se. If the Court concludes

otherwise, the defect does not reach the Town Meeting statements, which are quoted verbatim, and Plaintiff requests leave to amend.

Finally, Dilling spoke as Laboratory Director, at a laboratory forum, on laboratory business, explaining a laboratory personnel decision. Statements made within the scope of employment are attributable to the employer under ordinary respondeat superior principles, and JSA does not argue otherwise.

**G. The COBRA Count States a Claim (Count XIII).**

JSA and SURA have taken mutually exclusive positions on COBRA. JSA says the beneficiary-notice obligation belongs to SURA as plan administrator, while expressly declining to concede that SURA is the plan administrator. JSA Mem. 26. SURA says the obligation never arose because JSA, as employer, is not alleged to have notified SURA of the qualifying event under 29 U.S.C. § 1166(a)(2). SURA Mem. 26-27 (Dkt. 39). Neither Defendant disputes, for purposes of its motion, that Dr. Keppel experienced a qualifying event or that she received no election notice; each simply assigns the notice obligation to the other.

That is why Count XIII is pleaded against JSA and SURA together, alleging both that JSA never notified SURA and that SURA never notified Dr. Keppel, and that "to date neither Defendant has provided proper notice." FAC ¶¶ 117, 119-120, 213-216. Rule 8(d)(2) permits pleading in the alternative, and it is the appropriate course where the allocation of responsibility turns on internal communications between affiliated entities that are exclusively within their possession.

JSA's own framing establishes the claim against it. JSA concedes that under § 1166(a)(2) the employer must notify the plan administrator of a qualifying event within thirty days. JSA Mem. 26. The FAC alleges that JSA never did so. FAC ¶ 120. JSA's answer—that "the remedy for such a delay is a claim against the plan administrator," JSA Mem. 26—does not follow, and it would

leave a statutory duty with no consequence for its breach. Where the employer and the administrator are one enterprise, the combined period for notice is forty-four days from the qualifying event. *Roberts v. National Health Corp.*, 963 F. Supp. 512, 515 (D.S.C. 1997); *see* 29 C.F.R. § 2590.606-4(b)(2); FAC ¶ 213. The FAC alleges that JSA and SURA operate as a single integrated enterprise, that the health plan is one SURA sponsors and reports to the Department of Labor as a single-employer plan, and that SURA's certification that the plan is not a multiple employer welfare arrangement represents that the JSA workforce is within SURA's own control group. FAC ¶¶ 22, 26.

As of the filing of the FAC, nine months after the qualifying event, no notice had been provided by either Defendant, and a male employee separated at about the same time received his. FAC ¶¶ 120, 124. The FAC states a claim against one or both Defendants, and the Court need not decide which on the pleadings.

**H. The ERISA Count States a Claim (Count XIV).**

Section 510 makes it unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled." 29 U.S.C. § 1140. JSA's argument addresses only the second clause: it contends that § 510 reaches decisions taken "in order to prevent benefit accrual," such as terminating an employee shortly before vesting, and not "post-separation administrative disputes." JSA Mem. 27.

The FAC pleads a violation of the first clause. It alleges that after terminating Dr. Keppel "effective immediately," Defendants maintained to the plan's recordkeeper that she remained employed, for the purpose of preventing her from exercising her right under the plan to a

distribution upon termination of employment—a right the plan expressly confers and the only basis ever asserted for the three denials—and that they did so after and in response to her assertion of discrimination claims. FAC ¶¶ 126-133, 223-224. Interference with the *exercise* of an existing right is the core of the first clause; that the funds were already vested is not a defense to it. *Conkwright* itself recognizes that a § 510 claim by a vested worker may lie.

Nor is the conduct alleged an "administrative processing delay." JSA Mem. 28. The FAC alleges that Defendants adopted and repeated, three times over seven weeks, a statement of Dr. Keppel's employment status that was knowingly inconsistent with their own Termination Notice and with everything they had said since November 21, 2025, and whose only function was to block a plan right. FAC ¶¶ 126-134. That is not an "incidental effect" of an employment decision. *Conkwright*, 933 F.2d at 238-39.

As shown in the Introduction, *Dooley* does not contain the quoted language (Kim Decl. ¶ 5 & Ex. B), and the law of this Circuit requires specific intent. *Conkwright*, 933 F.2d at 239. *Conkwright* was decided on summary judgment and requires proof of specific intent at trial; it does not require that intent be pleaded with particularity, and Rule 9(b) provides that it may be alleged generally. The FAC pleads intent from the sequence of events, the falsity of the "remained employed" position, its repetition, and its knowing inconsistency with JSA's own notice.

**I. The Request for Attorney's Fees Should Be Denied.**

JSA asks the Court to award it attorney's fees, JSA Mem. 28, without identifying any statute, rule, or contract authorizing such an award. Under the American Rule each party bears its own fees absent express authority. *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015). A prevailing Title VII defendant may recover fees only upon a finding that the action was frivolous, unreasonable, or without foundation. *Christiansburg Garment Co. v. EEOC*, 434 U.S.

412, 421 (1978). A complaint that survives a motion to dismiss is not frivolous, and a motion to dismiss is not a vehicle for a fee award.

**J. Any Dismissal Should Be Without Prejudice and With Leave to Amend.**

If the Court concludes that any count is deficient in any respect, Plaintiff requests leave to amend under Rule 15(a)(2). Leave is to be "freely give[n] when justice so requires," and denial is appropriate only for futility, bad faith, or prejudice. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). The case is at its inception: the Rule 26(f) conference was held on September 10, 2026, the Rule 16(b) conference has not yet occurred, initial disclosures are not yet due, and no discovery has been taken. Nor would amendment be futile: among other things, Plaintiff can allege that her counsel's December 12, 2025 letter asserting sex discrimination was sent directly to Hearne and Dilling, six days before the Town Meeting. JSA's request that the claims be dismissed with prejudice is unsupported.

**V. CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant Jefferson Science Associates, LLC's motion to dismiss the First Amended Complaint (Dkt. No. 42) in its entirety, deny its request for attorney's fees, and, in the alternative, grant Plaintiff leave to amend. Finally, Dr. Keppel respectfully leaves to this Court's sound discretion and judgment what measures should be taken for the concerns raised in her introduction.

Dated: September 22, 2026

Respectfully submitted,

DR. CYNTHIA E. KEPPEL
By Counsel

/s/ Dawn C. Stewart
Dawn C. Stewart, Esq. (VSB No. 27717)

SOLOMON LAW FIRM, PLLC
1025 Connecticut Avenue, NW, Suite 1000
Washington, D.C. 20036
Tel: (202) 963-2116
Fax: (202) 688-1896
dstewart@fedemploylaw.com

/s/ Ronald J. Kim
Ronald J. Kim, Esq. (admitted *pro hac vice*)
SOLOMON LAW FIRM, PLLC
300 Great Oaks Blvd, Suite 312
Albany, NY 12203
Tel: (646) 475-3118
Fax: (202) 688-1896
rkim@fedemploylaw.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including Kristina H. Vaquera, Esq., Milena Radovic, Esq., and N. Winston West, IV, Esq., Jackson Lewis P.C., 701 E. Byrd Street, 17th Floor, Richmond, Virginia 23219, counsel for Defendants.

/s/ Dawn C. Stewart
Dawn C. Stewart, Esq.
SOLOMON LAW FIRM, PLLC