**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **DR. CYNTHIA E. KEPPEL,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**JEFFERSON SCIENCE ASSOCIATES, LLC, ET. AL,**<br><br>**DEFENDANTS.** | **Case No.: 4:26-CV-00112-MSD-LRL** |

**DEFENDANT JENS DILLING'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendant Jens Dilling respectfully submits this Reply Memorandum in further support of his Motion to Dismiss the First Amended Complaint ("FAC"):

## INTRODUCTION

In the FAC, Plaintiff offers two counts and two theories of liability, but neither one works. Count XI alleges that Dilling aided and abetted unlawful discrimination in violation of the District of Columbia Human Rights Act ("DCHRA") and Count XII alleges post-employment defamation per se.

Count XII fails at every level of the analysis. The Town Meeting statements are evaluative characterizations of institutional conditions — a safety review, reserve figures, and organizational plans — not provably false accusations of personal misconduct. They lack the defamatory sting necessary to state a claim, they are not "of and concerning" Dr. Keppel, and they are protected by a qualified privilege that the Opposition's conclusory malice allegations do not overcome. As to the private publications, the FAC pleads no names, no titles, no affiliations, no context, and no words — just three surnames and a legal conclusion that no privilege attached. That is not a complaint; it is a placeholder for one.

Count XI fares no better. The DCHRA does not reach Dr. Keppel's Virginia employment simply because SURA maintains offices in the District. Every operative adverse action — the termination, the Town Meeting, the severance decision — occurred in Virginia and was experienced by a Virginia employee at a Virginia facility. The allegation that decisions were made "in substantial part" in D.C. is a conclusory legal formulation, not a factual allegation. And the aiding-and-abetting theory cannot survive without a predicate DCHRA violation reaching Dilling's conduct, which the FAC does not plead.

## ARGUMENT

## I. COUNT XII DOES NOT PLAUSIBLY ALLEGE ACTIONABLE DEFAMATION.

### A. The Town Meeting statements are not pleaded as actionable statements about Plaintiff.

To state a Virginia defamation claim, Plaintiff must allege publication of a false and defamatory statement concerning her. *See Schaecher v. Bouffault*, 290 Va. 83, 91–92 (2015). The Court decides as a threshold legal matter whether words are reasonably capable of the alleged defamatory meaning. *Id.* at 94.

At the heart of the defamation analysis is a problem the Opposition never confronts: the FAC does not reproduce what Dilling actually said. Instead, it splices together fragments of his remarks — a phrase about "safety related issues," two words from elsewhere about a result that "was not positive," a pair of reserve figures, and a reference to "plans and hopes" — separated by ellipses that conceal the connective tissue of the speech. FAC ¶ 93. As courts often tell *pro se* plaintiffs, "[d]istrict judges are not mind readers" and "cannot be expected to construct full blown claims from sentence fragments." *See Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). The word "line management," on which the entire "of and concerning" theory depends, does not even appear within the quoted fragments; it surfaces three paragraphs later as the FAC's

characterization of what Dilling "attributed" to an unspecified referent. FAC ¶¶ 95–96. What the FAC presents as Dilling's "statements" is not a transcript; it is an act of editorial reconstruction, in which Plaintiff's counsel selected words from what was allegedly a lengthy address to a room of three hundred people, stripped them of their surrounding context, and reassembled them into a narrative of personal accusation.

The Court cannot perform that analysis when the FAC withholds the actual words and substitutes a curated selection designed to maximize the appearance of a personal attack. If Dilling's Town Meeting remarks, delivered to an audience of hundreds in a broadcasted forum, contained a provably false accusation of personal misconduct against Dr. Keppel, the FAC should have quoted them. It did not; the reason it did not is that the remarks, read in full, are institutional commentary that does not say what the FAC and Opposition need them to say.

The Opposition's reliance on *Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127 (2003), does not salvage the defamation theory. ECF No. 51 at pp. 6–.7 In *Fuste*, the statements held actionable were direct, specific accusations leveled at identified physicians, namely Drs. Fuste and Vanden Hoek: that they had "abandoned" their patients and that there were "concerns about their competence." 265 Va. at 132–33. Those statements named a discrete group of individuals, attributed specific professional misconduct to them, and could be verified against a concrete, ascertainable factual record.

The Town Meeting statements here are materially different. Dilling did not accuse Dr. Keppel of anything; he did not name her, refer to her, or identify her position. He discussed institutional conditions — a board-ordered external review, laboratory-wide reserve figures, and organizational "plans and hopes" — in terms that, even accepting the FAC's allegations, describe a Lab Director's characterization of complex, multi-variable organizational performance, not an

accusation that a specific individual committed specific misconduct. The statement that an external review's result "was not positive" is an evaluative characterization of a nuanced document, not — as in *Fuste* — a discrete factual assertion about whether a named professional performed a specific act. Nor are the reserve figures comparable: stating that the laboratory had 23 days of reserve against a target of 41 describes an institutional financial condition set by the Laboratory Director, JSA, and SURA (FAC ¶ 100(d)–(f)) — a condition to which multiple organizational actors contribute — not an individual's identifiable misconduct.

*Fuste* held that statements carrying a "provably false factual connotation" are actionable despite their evaluative flavor; it did not hold that every institutional characterization becomes actionable merely because a plaintiff alleges that the underlying data could have been described differently.

> Under *Schaecher*, whether a statement carries a provably false factual connotation depends on the context. 290 Va. at 101–02. As with all evaluations of defamatory statements, however, ***context is of the utmost importance***. Reputation must be affected to a magnitude sufficient to render one odious, infamous, or ridiculous, or subject to disgrace, shame, scorn, or contempt. The context of the emails assists us in analyzing these two statements. In the first instance, Bouffault shares information with Planning Commission members concerning one question Schaecher had been asked about whether she has a commercial kennel operation. Schaecher apparently answered that she did not have a commercial kennel, but had six dogs of her own. Bouffault shared two prior kennel applications from Loudoun County that had been 'deferred,' as well as a link to a website for 3 Dog Farm, which Bouffault stated represented a commercial kennel offering. She then concludes, 'It would appear that Mrs. Schaecher was not totally truthful . . . .' Bouffault's email presents some evidence that appears to, but does not conclusively, contradict Schaecher's prior statement. Bouffault's concluding sentence is in the nature of a summary that hedges her prior statement ('. . . not *totally* truthful' (emphasis added)). While this characterization is unpleasant, '[m]erely offensive or unpleasant statements are not defamatory.' It is married to a single and relatively benign particular fact regarding whether Schaecher was operating a commercial kennel, and so does not necessarily impugn Schaecher's character as a whole. It does not meet the threshold for defamatory 'sting' to engender disgrace, shame, scorn, or contempt, or to render one odious, infamous, or ridiculous.")

(internal citations omitted) (emphasis added).

The statements the FAC quotes do not clear that threshold. Dilling allegedly told the Town Meeting audience that the laboratory had "some safety related issues," that the Board had brought in an external review whose result "was not positive," and that the laboratory had 23 rather than 41 days of reserve because "plans and hopes … hadn't worked out." FAC ¶ 93. Read in their ordinary sense — as *Schaecher* requires — those are institutional statements by a Lab Director about institutional conditions: a board-commissioned review, a laboratory-wide reserve shortfall, and organizational plans that fell short. Dilling did not name Dr. Keppel. He did not say she mismanaged a budget. He did not say she controlled the reserve level. He did not say she was responsible for any safety issue. The FAC's allegation that the audience *inferred* a personal accusation (FAC ¶ 96) does not transform what was said into what was not.

And even accepting the FAC's characterization, the statements lack the defamatory "sting" *Schaecher* demands. Saying that an external review's result "was not positive" is a hedged, evaluative characterization of a complex document — no different in kind from Bouffault's statement that the applicant was "not *totally* truthful," which *Schaecher* held non-actionable precisely because the hedging language and the relatively benign underlying fact did not "meet the threshold for defamatory 'sting' to engender disgrace, shame, scorn, or contempt.' *Id.* at 101–02. The budget-reserve statement fares no better: attributing a laboratory-wide shortfall to "plans and hopes" that did not work out is a management-level assessment of organizational performance, not an accusation of individual misconduct capable of rendering any person "odious, infamous, or ridiculous." *Id.* at 101.

In *Fuste*, the statements held actionable were direct accusations that named physicians had "abandoned" their patients — a specific, unhedged charge of individual professional dereliction. 265 Va. at 132–33. Nothing Dilling said at the Town Meeting approaches that level of specificity

or personal attribution. Plaintiff alleges that Dilling referred to "line management" and that the audience understood the term to mean her. FAC ¶¶ 95–96. The Court must consider that allegation together with the alleged identification of her division and the words spoken at the meeting. FAC ¶ 93. But the question remains whether those words, in context, reasonably conveyed a false factual accusation about Keppel personally, rather than whether Plaintiff has assigned them such a meaning. Innuendo may explain an implication fairly carried by the words; it cannot introduce new matter or extend the words beyond their ordinary meaning. *See Schaecher*, 290 Va. at 89–90.

Identifying a division is not the same as accusing its head of misconduct — and Dilling's alleged words did not even stay within the division. According to Plaintiff, he told the audience that "*the laboratory*" had 23 days of reserve when it was supposed to have 41. FAC ¶ 93 (emphasis added). "The laboratory" is Jefferson Lab — an institution comprising a significant number of employees with multiple divisions, offices, and a Board that sets institutional policy. The Experimental Physics Division is one component of that institution. By Plaintiff's own allegations, the reserve and overhead rate "were set by the Laboratory Director and by JSA and SURA" (FAC ¶ 100(d)–(f)) — entities and officers above Dr. Keppel in the organizational hierarchy, none of whom the FAC alleges she controlled. A statement that the *laboratory* fell short of a *laboratory-wide* reserve target cannot reasonably be understood as an accusation that one division head committed personal misconduct — particularly when the FAC's own allegations establish that the metric was outside her control.

The Opposition bridges this gap with a single conclusory allegation: that "every member of the audience understood" the reference to "line management" to mean Dr. Keppel. FAC ¶ 96. But that allegation is precisely the kind of "unwarranted inference" the Court need not accept. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) ("We also

decline to consider "unwarranted inferences, unreasonable conclusions, or arguments.”). A plaintiff cannot convert a Lab Director’s assessment of what she purports to be institution-wide financial conditions into a personal defamation claim by alleging, after the fact, that listeners drew an inference the words themselves do not support. If the rule were otherwise, any organizational briefing that discussed an institution’s performance could become actionable defamation of a department head — a result that would chill every management communication in every institution in the Commonwealth.

The Opposition’s attempt to distinguish *Dean v. Dearing* fails on its own terms. Plaintiff calls *Dean* a group-libel case involving criticism of a police department. It is—but its *of-and-concerning* analysis illustrates why identification requires more than a plaintiff’s membership in a criticized organization. *See* ECF No. 51 at pp. 7–8. In *Dean*, the plaintiff was a police officer who claimed that the mayor’s public criticisms of the department’s performance were “of and concerning” him. 263 Va. at 485-86. The Supreme Court of Virginia held that the officer’s pleading failed because it alleged no facts connecting the departmental criticism to him specifically, apart from his status as an officer. *Id.* at 489–90. That is precisely the situation here. Dilling addressed the laboratory community and discussed institutional conditions — safety issues, an external review, a reserve shortfall — attributing them to “line management.” “Line management” at a national laboratory is at least as broad a group as a municipal police department: it encompasses division heads, department managers, group leaders, deputy directors, and others in the operational chain. The FAC does not allege the size of that group, and it is not self-evident that “line management” identifies a group so small that a defamatory imputation against the group necessarily reaches each member.

The Opposition also invokes *Ewell v. Boutwell* for the proposition that any member of a

"comparatively small" group may sue where the defamatory language is "so framed as to make defamatory imputations against all members." *See* ECF No. 51 at p. 8. But *Ewell* requires the plaintiff to establish two predicates the FAC does not plead: (1) that the group is "comparatively small," and (2) that the statement is "so framed" as to impute misconduct to every member of it. 138 Va. at 411. The FAC alleges neither. *See* FAC ¶¶ 91–96. It does not identify who constitutes "line management" at Jefferson Lab, how many people hold positions within that category, or how Dilling's institutional commentary about a laboratory-wide reserve shortfall and a board-commissioned external review was "so framed" as to accuse each of them of personal misconduct. The FAC's conclusory allegation that "every member of the audience understood" the reference to mean Dr. Keppel (FAC ¶ 96) is not an allegation about the size of the group or the framing of the statement — it is the very conclusion *Dean* holds insufficient to establish the "of and concerning" element.

The FAC also does not allege that the stated reserve figures themselves were false. *See* FAC ¶¶ 93, 100(d)–(f). It alleges that Plaintiff's division did not exceed its budget and asserts that the Laboratory Director, JSA, and SURA determined reserve levels and overhead rates. *See* FAC ¶ 100. Those allegations do not establish that the laboratory did not have 23 days of reserve or that the stated reserve target was false. Nor do they convert institutional reserve figures into an assertion that Plaintiff personally caused a shortfall.

### B. The FAC does not plead facts overcoming the qualified privilege apparent from its own allegations.

In the Opposition, Plaintiff argues that the privilege cannot be resolved on the pleadings.[1]

[1] Plaintiff's argument fundamentally ignores that District Courts regularly and routinely decide affirmative defenses through pleadings. For example, in the employment context, defendant-employers routinely ask courts to decide whether plaintiffs have exhausted their administrative remedies under federal and state anti-discrimination statutes, which is an affirmative defense.

*See* ECF No. 51 at pp. 4–5, 9–10. Dilling does not dispute that qualified privilege is an affirmative defense. However, Plaintiff's argument that it cannot be resolved on a motion to dismiss is patently incorrect and disregards the very case law that she cites. *Goodman v. Praxair, Inc.*'s holding does not prohibit early resolution — it permits it where the complaint's own allegations establish the defense. 494 F.3d 458, 464 (4th Cir. 2007) (en banc).

Here, the FAC's allegations do precisely that: they describe a Lab Director addressing the laboratory's professional community about institutional conditions at a meeting the community itself requested. FAC ¶ 91. Such circumstances are well within the recognized scope of qualified privilege. The question is whether the FAC pleads non-conclusory facts establishing abuse on any of the three grounds the Opposition advances. It does not.

**1. <u>Knowledge of Falsity</u>**

The Opposition's theory is that the Operations Audit and external review "said the opposite" of what Dilling told the room and that Defendants possessed both documents before he spoke. FAC ¶¶ 99–101, 103, 206. But the FAC does not quote either document, describe their findings with specificity, or allege what either document actually said — only that the division "met all performance expectations and applicable safety standards." FAC ¶ 99. The alleged falsity thus depends on equating two different inquiries. The Operations Audit assessed whether the division met operational compliance standards; Dilling's Town Meeting remarks addressed a board-commissioned external review of laboratory safety and a laboratory-wide reserve shortfall — subjects the audit did not purport to resolve.

A speaker who characterizes a complex, multi-factor external review as "not positive" is making an evaluative judgment about a nuanced document, and a characterization that differs from Plaintiff's preferred reading is not knowledge of falsity. *See Schaecher*, 290 Va. at 101–02. Rule

9(b) permits knowledge to be "alleged generally," but it does not eliminate the requirement that the underlying factual allegations make the inference of knowledge plausible rather than merely speculative. *See Iqbal*, 556 U.S. at 678. The FAC does not allege that Dilling read the audit report and knew it contradicted his statements; it alleges only that the report existed and was presumably in Defendants' possession. Possession of a document is not knowledge of its contents, much less knowledge that one's evaluative characterization of a different document is "false."

**2. <u>Excessive Publication</u>**

The Opposition argues that a "significant portion" of the audience consisted of outside scientists and laboratory users with no interest in why one employee was removed. *See* ECF No. 51 at pp. 10–11. But the Opposition's framing of the privileged subject is too narrow. Dilling did not address the audience about "why a particular employee had been removed"; he addressed them about laboratory safety, budget conditions, and organizational direction — subjects in which every scientist who uses a particle accelerator at a DOE national laboratory has a professional and, in many cases, a safety interest. The FAC's own allegations confirm this: the meeting was "convened at the request of the scientific user community" (FAC ¶ 91) — the very people the Opposition now argues should not have been told. The user community asked for the briefing because its members depend on the laboratory's safe and effective operation. Extending the privilege to communications responsive to the audience's own request, on subjects bearing directly on that audience's professional work, is not excessive publication; it is the ordinary operation of the privilege. *See Cashion v. Smith*, 286 Va. 327, 337 (2013) ("A qualified privilege attaches to '[c]ommunications between persons on a subject in which the persons have an interest or duty.'").

**3. <u>Improper Purpose</u>**

The Opposition's improper-purpose theory rests almost entirely on temporal proximity: the

Town Meeting occurred fifteen days after counsel's December 3 demand letter. *See* ECF No. 51 at pp. 11–12. But the FAC alleges that the Town Meeting was convened at the scientific user community's request to explain the leadership changes. FAC ¶ 91. A responsive briefing to a community that asked for it is not an act of retaliation simply because it falls within a window of protected activity.

The fifteen-day gap reflects the user community's timeline, not retaliatory intent. The FAC's allegation that the statements were made "for the specific purpose of punishing Dr. Keppel for retaining counsel" (FAC ¶ 102) is a legal conclusion, not a factual allegation — and it is exactly the type of conclusory malice allegation that courts have rejected as insufficient. *See Echtenkamp v. Loudon Cnty. Pub. Schs.*, 263 F. Supp. 2d 1043, 1061–63 (E.D. Va. 2003). ("In considering whether this complaint meets that burden, it must first be noted that plaintiff's repeated assertions that each defendant charged with defamation acted "with malice" and with a "motive of personal spite and revenge" are not, by themselves, sufficient to state a claim of malice sufficient to overcome the qualified privilege. Although the facts as alleged in the complaint must be taken as true for the purpose of this motion to dismiss, such conclusory allegations do not state a claim for malice if the facts as alleged cannot otherwise support a finding of malice. […] Likewise, the allegations in the complaint that the defendants charged with defamation made the allegedly false statements with the intention of advancing their careers and currying favor with their supervisors also fall short of stating a claim of actual malice. After all, any time an employee reports misconduct by a co-worker one might say that the employee acted maliciously in trying to curry favor with supervisors at the expense of a co-worker. Were such bare allegations sufficient to state a claim of malice, virtually every claim of defamation based on a co-worker's report of misconduct would survive a motion to dismiss. ***Neither precedent nor common sense approve***

***of such a result*.") (emphasis added).

The Opposition argues that the FAC pleads a "broader, factually supported retaliatory scheme" rather than conclusory malice. But the factual predicate the Opposition identifies — that two documents "say the opposite of what Dilling said" — is the knowledge-of-falsity argument repackaged as improper purpose. *See* ECF No. 51 at pp. 9–12. It does not independently establish that Dilling's motive in addressing the user community was to punish Dr. Keppel for retaining counsel. See *Cashion,* 286 Va. at 338–39. The FAC does not allege that Dilling harbored personal animus toward Dr. Keppel or that the Town Meeting served any purpose other than the one the user community requested: an explanation of the leadership transition.

The FAC's labels of "actual malice," "retaliatory," and "defamatory" do not avoid the privilege. The complaint must plead factual content from which abuse of a privilege is plausibly inferred. *Cashion* recognizes that knowledge of falsity, communication to persons without a corresponding interest, personal spite, excessive language, or lack of good faith can defeat a privilege when properly proved. 286 Va. at 338–39. But the FAC does not plead facts showing that the alleged audience lacked an interest in the operational matters discussed. To the contrary, it alleges that the meeting occurred at the request of the scientific user community.

Nor does the FAC adequately allege knowing falsity. It characterizes the audit and external-review materials as inconsistent with Dilling's remarks but does not plead their text or facts showing that they contradicted the institutional statements he allegedly made. Plaintiff's conclusory characterization of unspecified reports cannot establish that the alleged statements about safety issues, an external review, or reserve levels were knowingly false.

**B. The purported private statements are not pleaded with sufficient specificity to state a claim.**

The FAC separately alleges that Dilling made private, "unequivocal statements" to

unspecified leaders in the nuclear-physics community that Plaintiff "had mismanaged funds." FAC ¶ 108. It does not state the words used, identify the time or place of any individual publication, or allege what Dilling actually said to any particular recipient. *See* FAC ¶¶ 108–109, 209.

Plaintiff is right that *Hatfill v. New York Times Co.*, 416 F.3d 320, 329–30 (4th Cir. 2005), applies Rule 8 rather than a heightened federal pleading rule to defamation claims. Her argument overlooks a consequential point, however: *Hatfill* was decided **before** *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Specifically, *Hatfill* was decided two years before *Twombly* and four years before *Iqbal*. At the time *Hatfill* was decided, federal courts still applied the permissive *Conley v. Gibson* standard, under which a complaint survived a motion to dismiss unless "no set of facts" could support the claim. 355 U.S. 41, 45–46 (1957). *Twombly* expressly retired that formulation, 550 U.S. at 563, and *Iqbal* confirmed that a plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, 556 U.S. at 678. Whatever inferences *Hatfill* may have permitted under the now-abrogated *Conley* framework, those inferences must today satisfy *Iqbal*'s plausibility threshold — a standard the Opposition makes no effort to reconcile with the case on which it relies. Although Plaintiff cites *Iqbal* in her general standard-of-review section, her defamation argument interestingly fails to include any discussion of how her allegations satisfy *Iqbal*/*Twombly*.[2] That omission is telling, because it is precisely the kind of conclusory, speculative pleading that *Iqbal*/*Twombly* was designed to screen out.

Plaintiff also fails to comprehend that her allegations fail to satisfy the requirement under Rule 8. Starting with what the FAC actually says: Paragraph 108 alleges that Dilling made "private, unequivocal statements" to "leaders in the nuclear physics community, including its

[2] To be clear, these decisions did not impose a special defamation-pleading rule, but they require Rule 8 allegations to state a plausible claim supported by factual content, not merely a conclusion about what a speaker said.

governing organizations," that Dr. Keppel "had mismanaged funds in her capacity as Associate Director of Experimental Physics." Paragraph 209 states that "[t]he private publications to Shepherd, Napolitano, and Milner were likewise made to persons outside any employment relationship with Defendants, to whom no privilege of any kind attached." That is all. No first names. No titles. No institutional affiliations. No description of what "governing organizations" means or which organizations are involved. No allegation of when, where, or in what context each communication occurred. No allegation of whether the three were together or contacted separately, in person or by phone or email, in a single conversation or over the course of weeks. *See* FAC ¶ 209.

The deficiency is not merely the absence of verbatim wording. Even accepting Plaintiff's argument that Rule 8 does not encompass Virginia's *in haec verba* requirement governs, the FAC fails to provide the minimum factual content needed for the Court to evaluate any element of the defamation claim as to these three individuals. Without knowing who they are, the Court cannot assess whether the alleged statements were "of and concerning" Dr. Keppel in their eyes. Without knowing any context — a meeting, a phone call, a hallway conversation — the Court cannot evaluate whether the communications were privileged. Without knowing what was actually said, the Court cannot determine whether the alleged statement was a provably false assertion of fact or an evaluative opinion. And without knowing any factual basis for the assertion that "no privilege of any kind attached," the Court cannot accept that legal conclusion as anything more than what *Iqbal* warns against — a label dressed up as an allegation. Even under Rule 8, that is not enough.

## II. COUNT XI SHOULD BE DISMISSED BECAUSE THE FAC DOES NOT ALLEGE A DCHRA-COVERED ACT BY DILLING.

### A. The 12(b)(1) Versus 12(b)(6) Distinction Has No Practical Consequence and Does Not Save Plaintiff's DCHRA Claim.

Dilling does not dispute that the allegations of the FAC are taken as true on a facial

challenge, and he agrees with Plaintiff that the practical distinction between Rule 12(b)(1) and Rule 12(b)(6) is immaterial here. But the concession cuts both ways. Because the standard of review is the same on a facial challenge — the Court accepts the Complaint's allegations as true and asks whether they are sufficient, *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) — the label attached to the motion does not alter the analysis or the result. Dilling moved under both Rule 12(b)(1) and Rule 12(b)(6), and the DCHRA's territorial limitation warrants dismissal under either. Ultimately, the Court should proceed to the merits of the territorial question under whichever rule it deems appropriate.

**B. The DCHRA does not govern alleged discrimination occurring in Virginia merely because a corporate affiliate maintains an office in the District.**

The Opposition devotes considerable effort to recharacterizing Dilling's territorial argument, contending that Dilling cited only *Cole v. Boeing Co.*'s "result" rather than its "rule." Opp. at 14 (quoting *Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 104 (D.D.C. 2009)). But this reframing does not help Plaintiff — it defeats her.

In *Cole*, the Court dismissed DCHRA claims arising from alleged employment conduct in Virginia where neither the decision nor its effects were sufficiently alleged to have occurred in the District:

> The intent of the DCHRA is "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit . . . ." D.C. Code § 2-1401.01 (emphasis added). "[T]he most important factor in determining whether a court has subject matter jurisdiction over a [DCHRA] claim is not whether the plaintiff was actually employed in the District of Columbia, but whether the alleged discriminatory acts occurred in the District." *Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 104 (D.D.C. 2009) (quoting *Quarles v. Gen. Inv. & Dev. Co.*, 260 F. Supp. 2d 1, 20 (D.D.C. 2009)). ***If an employee is not employed in the District, "[e]ither the [adverse employment] decision must be made, or its effects must be felt, or both must have occurred, in the District of Columbia" for there to be jurisdiction under the DCHRA.*** *Monteilh v. AFSCME, AFL-CIO*, 982 A.2d 301 (D.C.

> 2009 [*sic*]). ***The DCHRA is not extraterritorial; it does not and cannot secure an end to discrimination in jurisdictions outside of the District of Columbia***. *See id; cf. Mann v. Dist. of Columbia*, 22 App. D.C. 138 (D.C. 1903) ("it is very plain that the commissioners of the District of Columbia are without authority of law to control [an individual] in the disposition which he makes of his property outside of this District. . . . The regulation cannot be allowed any extraterritorial force . . . .").

845 F. Supp. 2d at 283-84 (emphasis added).

The Opposition treats *Cole* as a lifeline. It is not. *Cole* applied that test and dismissed the DCHRA claims precisely because neither the decision to act, nor the effects of the acts were felt in the District of Columbia. *Id.* at 285. The dispositive question under *Cole* and *Monteilh* is not whether some corporate activity occurred at a D.C. headquarters, but whether the adverse employment decision itself — the act that caused the harm — was made in or had its effects in the District. The Opposition conflates the two.

Consider what the FAC actually alleges. The adverse employment actions at issue are Dr. Keppel's termination from her position as Associate Director at Jefferson Lab in Newport News, Virginia; the alleged post-termination defamatory statements; and the alleged withholding of severance and retirement-account access. Every one of these actions was directed at, experienced by, and took effect upon an employee working in Virginia (FAC ¶¶ 14, 15), at a Virginia facility (FAC ¶ 14), under Virginia-based supervision (FAC ¶¶ 14, 15, 32). Dr. Keppel was terminated in Virginia. FAC ¶¶ 71–72. She lost her position in Virginia. FAC ¶¶ 71, 76. She was escorted from a Virginia building. FAC ¶¶ 76–77. The Town Meeting occurred in Virginia. FAC ¶¶ 91–93. The alleged reputational harm was felt in the professional community in which she worked — in Virginia. FAC ¶¶ 91–92, 107, 210. That the FAC recites that decisions were made "in substantial part" in D.C., FAC ¶ 199, is the kind of conclusory allegation that *Iqbal* instructs the Court to set aside. 556 U.S. at 678.

The Opposition's catalogue of Hearne's activities at SURA's Washington office — interviewing candidates (FAC ¶¶ 29, 31), chairing committees (FAC ¶¶ 29, 31–32), signing agreements (FAC ¶ 27), ordering audits (FAC ¶¶ 28(a)–(b))— describes precisely the normal incidents of corporate governance that are distinguished from the situs of the adverse employment decision. *See* ECF No. 51 at pp. 14–16; *but see Cole*, 845 F. Supp. 2d at 284–85. A parent entity's CEO necessarily performs oversight functions from the parent's headquarters. If that alone were sufficient to bring every subsidiary employee nationwide within the DCHRA's reach, the statute's territorial limitation would be meaningless. Any multi-state employer headquartered in Washington — and there are many — would subject its entire workforce to D.C. employment law simply because corporate officers approve personnel actions from the District. Neither *Cole* nor *Monteilh* adopted so expansive a rule, and for good reason: the DCHRA protects against discrimination "in the District of Columbia," D.C. Code § 2-1402.11(a), not discrimination by entities that happen to maintain offices there.

The Opposition's fallback — that "whether the decision was 'made' in the District" is a "fact question that discovery into Hearne's and Dilling's communications will answer" — underscores the pleading failure rather than excusing it. *See* ECF No. 51 at p. 15. At the motion-to-dismiss stage, the question is whether the FAC's allegations, accepted as true, plausibly establish that the DCHRA applies. The FAC does not allege that the termination decision was made in D.C. as a factual matter; it alleges that adverse employment decisions were made "in substantial part" in D.C., a hedged legal conclusion that mirrors the statutory language without supplying the factual content *Iqbal* requires. The FAC does not identify who made the termination decision, where that person was when it was made, or what role the D.C. office played in the specific decision to remove Dr. Keppel from her position — as distinct from the general corporate

oversight that preceded it. *See* FAC ¶¶ 28, 71–72, 199.

The promise that discovery will fill these gaps is not a substitute for a plausible pleading. Plaintiff's assertion that discovery might identify communications between Hearne and Dilling does not alter the result. A complaint must state a plausible claim before discovery, and the FAC must supply factual allegations—not speculation about information that discovery might reveal—connecting Dilling's alleged conduct to the District.

**C. The aiding-and-abetting allegation cannot survive without a plausible underlying DCHRA violation reaching Dilling's conduct.**

Plaintiff does not dispute that her aiding-and-abetting theory against Dilling depends on a predicate DCHRA violation. Her response is that the theory necessarily survives if the DCHRA claim against the other defendants survives. But Count XI must still plausibly allege that Dilling aided or abetted conduct covered by the DCHRA. It does not.

The cited allegations describe Dilling's alleged conduct in Virginia: managerial interactions at Jefferson Lab, implementation of the audit, the termination decision attributed to him, and remarks at the Virginia Town Meeting. FAC ¶¶ 57–78, 91–103. Relabeling those allegations as aiding and abetting does not establish the statute's required territorial nexus. Count XI should therefore be dismissed as to Dilling.

**III. The Court should decline supplemental jurisdiction Counts XI and XII are not dismissed on the merits.**

In the alternative, the Court may decline to exercise supplemental jurisdiction over Counts XI and XII. The claim invokes a local civil-rights statute to challenge the employment decisions of a Virginia-based laboratory concerning a Virginia-based position. The claim raises the application of the DCHRA's territorial limitation to the alleged facts, including the relationship between a District-based nonprofit's executive office and employment decisions concerning work performed in Virginia. Those District-law issues substantially predominate over any discrete claim

against Dilling and are best addressed, if at all, by a court applying District law in the first instance. *See* 28 U.S.C. § 1367(c). Similarly, Count XII asserts a Virginia common-law defamation claim. It raises no federal question and retaining it in the absence of a surviving federal claim against Dilling would serve not judicial economy.

## IV. The Court Need Not Reach Plaintiff's Request for Fees.

Plaintiff's argument concerning Dilling's request for fees does not cure either deficient count. If the Court dismisses Counts XI and XII, it need not adjudicate fees in resolving this Rule 12 motion. Dilling preserves any request for costs or fees authorized by applicable law and procedure.

## V. Plaintiff Has Not Established a Basis for Leave to Amend in Opposition.

Without identifying the amendments she seeks to make or attaching a proposed amended complaint, Plaintiff requests that the Court blindly grant her leave to amend her FAC. Granting Plaintiff's request for leave to amend her FAC would be futile. A Court may deny a motion to amend in the following circumstances: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Based on the arguments articulated in the respective Motions to Dismiss the FAC, Memoranda in Support, and Reply Memoranda, Plaintiff should not be granted leave to amend her FAC as any such amendments would be futile. In addition, Plaintiff fails to articulate what these amendments would be or how the amendments would cure the deficiencies in the Complaint. Accordingly, the Court should deny Plaintiff's request.

## CONCLUSION

For these reasons and as set forth in more detail in the Memorandum in Support of the

Motion to Dismiss, the Court should grant Dilling's motion and dismiss all claims asserted against him.

Date: September 28, 2026

**JENS DILLING**

By: /s/
Kristina H. Vaquera (VSB No. 43655)
Milena Radovic (VSB No. 91000)
N. Winston West, IV (VSB No. 92598)
Jackson Lewis P.C.

*Physical Addresses:*
701 E. Byrd Street, 17th Floor
Richmond, Virginia 23219

Dominion Tower
999 Waterside Dr., Ste. 2525
Norfolk, VA 23510

*Mailing Address:*
P.O. Box 85068
Richmond, Virginia 23285

Tel: (757) 648-1448
Fax: (804) 649-0403
Kristina.vaquera@jacksonlewis.com
Milena.radovic@jacksonlewis.com
Winston.west@jacksonlewis.com
*Counsel for Defendant Jens Dilling*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of September 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including

Ronald J. Kim, Esq. (*admitted pro hac vice*)
SOLOMON LAW FIRM, PLLC
300 Great Oaks Blvd, Suite 312
Albany, NY 12203
rkim@fedemploylaw.com

Dawn C. Stewart, Esq
SOLOMON LAW FIRM, PLLC
1025 Connecticut Avenue, NW, Suite 1000
Washington, D.C. 20036
dstewart@fedemploylaw.com

*Counsel for Plaintiff*

**JENS DILLING**

By: ______________/s/________________
Kristina H. Vaquera (VSB No. 43655)
Milena Radovic (VSB No. 91000)
N. Winston West, IV (VSB No. 92598)
Jackson Lewis P.C.

*Physical Addresses:*
701 E. Byrd Street, 17th Floor
Richmond, Virginia 23219

Dominion Tower
999 Waterside Dr., Ste. 2525
Norfolk, VA 23510

*Mailing Address:*
P.O. Box 85068
Richmond, Virginia 23285

Tel: (757) 648-1448
Fax: (804) 649-0403
Kristina.vaquera@jacksonlewis.com
Milena.radovic@jacksonlewis.com

Winston.west@jacksonlewis.com
*Counsel for Defendant Jens Dilling*