**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **DR. CYNTHIA E. KEPPEL,**<br><br>**PLAINTIFF,**<br><br>**v.**<br><br>**JEFFERSON SCIENCE ASSOCIATES, LLC, ET AL.,**<br><br>**DEFENDANTS.** | **Civil Action No. 4:26-cv-00112** |

**DEFENDANT SEAN HEARNE'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendant Sean Hearne respectfully submits this Reply Memorandum in further support of his Motion to Dismiss the First Amended Complaint ("FAC"). In further support of his Motion to Dismiss, Hearne states as follows:

## INTRODUCTION

In the Opposition ("Opp."), Plaintiff confirms that the only count directed to Hearne is Count XI under the District of Columbia Human Rights Act ("DCHRA"), which imposes individual liability on a person who "aids, abets, invites, compels, or coerces" an unlawful discriminatory practice. *See* ECF No. 49 at p. 5. Under *Cole v. Boeing Co.*, 845 F. Supp. 2d 277 (D.D.C. 2012), and *Monteilh v. AFSCME*, 982 A.2d 301 (D.C. 2009), where an employee does not work in the District, the DCHRA applies only if the adverse employment decision was made in, or its effects were felt in, the District of Columbia. Neither prong is satisfied here. The FAC's own allegations establish that the termination was communicated by Jens Dilling ("Dilling") at Jefferson Lab in Newport News, Virginia (FAC ¶¶ 71–72); Plaintiff was escorted from the Virginia

facility (FAC ¶¶ 76–77); and every claimed injury—loss of her Virginia position, her Virginia laboratory, her standing in the Virginia scientific community—was experienced in Virginia. *See* FAC ¶¶ 71–72. The Opp.'s theory that Hearne's governance activities from SURA's Washington headquarters convert this Virginia termination into a District-based decision is precisely the argument *Cole* rejected. *See* ECF No. 49 at pp. 2, 9–10.

Second, the FAC does not plausibly allege that Hearne personally participated in discriminatory conduct. The Opp. identifies six categories of alleged participation—ordering an audit, receiving the audit report, participating in severance decisions, maintaining a position to TIAA that Plaintiff allegedly remained employed, directing Dilling's statements, and invoking an expired non-compete. *See* ECF No. 49 at pp. 11–12. However, even taken as true at the motion to dismiss stage, each category describes routine governance functions, not an individual who knew of and facilitated sex-based discrimination. The FAC does not allege that Hearne made any sex-based remark, issued any sex-based directive, or took any action that the FAC connects to Plaintiff's sex through non-conclusory factual allegations. *See generally* FAC ¶¶ 64–77 (no sex-based remarks alleged).

Aiding-and-abetting liability requires personal participation in discriminatory conduct with knowledge of its unlawfulness, a standard the FAC's conclusory assertions do not meet.

Third, the Opp.'s remaining allegations are conclusory labels—"upon information and belief […] directed and approved" (FAC ¶ 71), "in substantial part, made in the District […]" (FAC ¶ 199)—unsupported by the non-conclusory factual content that *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) requires. *See* ECF No. 49 at pp. 6–7, 11–13. The FAC does not identify who made the termination decision, when or where the decision was made, what specific decision was made in the District, or any facts connecting any District-based act to Plaintiff's sex. *See* FAC ¶¶

71–72, 199. Rule 8 does not require the Court to accept a conclusory allegation merely because it is paired with descriptions of SURA's corporate structure and Hearne's job title.

Plaintiff contends that the DCHRA's territorial limitation should be evaluated under Rule 12(b)(6), rather than Rule 12(b)(1). However, the Court need not resolve that characterization to grant the requested relief.

## ARGUMENT

### I. The 12(b)(1) Versus 12(b)(6) Distinction Has No Practical Consequence and Does Not Save Plaintiff's DCHRA Claim

Hearne does not dispute that the allegations of the FAC are taken as true on a facial challenge, and he agrees with Plaintiff that the practical distinction between Rule 12(b)(1) and Rule 12(b)(6) is immaterial here. But the concession cuts both ways. Because the standard of review is the same on a facial challenge — the Court accepts the Complaint's allegations as true and asks whether they are sufficient, *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) — the label attached to the motion does not alter the analysis or the result. Hearne moved under both Rule 12(b)(1) and Rule 12(b)(6), and the DCHRA's territorial limitation warrants dismissal under either. Ultimately, the Court should proceed to the merits of the territorial question under whichever rule it deems appropriate.

### II. Count XI Does Not Plead the Required District of Columbia Nexus.

As set forth in more detail in the Memorandum in Support of the Motion to Dismiss, the FAC does not plausibly allege that a discriminatory or retaliatory employment decision occurred in the District of Columbia (ECF No. 41 at p. 4–7), that its effects were felt there (*Id.* at p. 5–7), or that Hearne personally committed conduct that gives rise to individual liability under the DCHRA (*Id.* at p. 7–12).

Instead, the Opp. relies on SURA's District headquarters (ECF No. 49 at p. 2, 9-10), Hearne's executive position (*Id.* at p. 2, 9), and conclusory characterizations of ordinary corporate acts as discriminatory (*Id.* at pp. 6-7, 11-13). Those allegations do not satisfy the governing test. Moreover, conclusory allegations do not satisfy the pleading requirements under Rule 8. In light of the pleading deficiencies, the Court should grant Hearne's Motion to Dismiss.

### A. The DCHRA requires a District-based discriminatory decision or District-felt effects.

The more important decision, which undersigned Counsel cited in the Memorandum in Support, is *Cole v. Boeing Co.*, 845 F. Supp. 2d 277 (D.D.C. 2012). In *Cole*, the Court dismissed DCHRA claims arising from alleged employment conduct in Virginia where neither the decision nor its effects were sufficiently alleged to have occurred in the District:

> Boeing moves to dismiss all allegations in Ms. Cole's Complaint that occurred after she was transferred from the NGA facility in D.C. to Virginia. Boeing argues that the Court lacks subject matter jurisdiction under the District of Columbia Human Rights Act ("DCHRA") for conduct that did not occur within the District of Columbia. Ms. Cole argues that subject matter jurisdiction is appropriate, given that many incidents occurred in the District of Columbia, and requests that the Court adjudicate her entire claim. Because the acts alleged in Virginia are separate and distinct from those alleged in the District of Columbia, and because those acts were neither made from nor felt within the District, the Court will dismiss all claims that occurred after Ms. Cole's transfer to Virginia.
>
> The intent of the DCHRA is "to secure an end *in the District of Columbia* to discrimination for any reason other than that of individual merit . . . ." D.C. Code § 2-1401.01 (emphasis added). "[T]he most important factor in determining whether a court has subject matter jurisdiction over a [DCHRA] claim is not whether the plaintiff was actually employed in the District of Columbia, but whether the alleged discriminatory acts occurred in the District." *Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 104 (D.D.C. 2009) (quoting *Quarles v. Gen. Inv. & Dev. Co.*, 260 F. Supp. 2d 1, 20 (D.D.C. 2009)). ***If an employee is not employed in the District, "[e]ither the [adverse employment] decision must be made, or its effects must be felt, or both must have occurred, in the District of Columbia" for there to be jurisdiction under the***

> ***DCHRA.*** *Monteilh v. AFSCME, AFL-CIO*, 982 A.2d 301 (D.C. 2009). ***The DCHRA is not extraterritorial; it does not and cannot secure an end to discrimination in jurisdictions outside of the District of Columbia.*** *See id; cf. Mann v. Dist. of Columbia,* 22 App. D.C. 138 (D.C. 1903) ("it is very plain that the commissioners of the District of Columbia are without authority of law to control [an individual] in the disposition which he makes of his property outside of this District. . . . The regulation cannot be allowed any extraterritorial force . . . .").

845 F. Supp. 2d at 283-84 (emphasis added).[1][2][3]

Plaintiff's argument that the DCHRA applies whenever a company's executive functions are conducted in the District would be inapposite to *Cole*. The question is not whether SURA has a District office, whether Hearne worked there, or whether the entities conducted governance functions there. It is whether the FAC plausibly alleges that the discriminatory or retaliatory decision at issue was made there or that its effects were felt there.

[1] In the Memorandum in Support, undersigned Counsel inadvertently stated that *Elyazidi v. SunTrust Bank*, 780 F.3d 227 (4th Cir. 2015) dealt with the DCHRA. Undersigned Counsel has filed a Notice of Correction addressing the *Elyazidi* citation. *See* ECF No. 56.

[2] In the Opposition, Plaintiff appears to take issue with the Motion to Dismiss's lack of citation to *Monteilh v. AFSCME*, 982 A.2d 301, 305 (D.C. 2009). However, this argument fails to take into account that Defendant explicitly cited the portion of *Cole* that discusses *Monteilh*, which is expressly set forth above.

[3] Plaintiff also takes issue with *Johnson v. Flowers Industries, Inc.,* 814 F.2d 978 (4th Cir. 1987). Defendant did not offer *Johnson* as a case addressing the DCHRA. With regard to Plaintiff's assertion that it says "nothing […] about geography," that is not correct. In *Johnson*, the Court did in fact discuss geographic scope whether regard to a parent-subsidiary relationship. *Id.* at 982 ("Appellants contend, however, that Flowers controlled the Lynchburg employees because, when one subsidiary replaces another subsidiary in the same geographic market, the parent company must have initiated the changes. To strengthen this inference, the appellants allege that WVB gave its route books to Lynchburg, along with the WVB shelf space at the Kroger supermarkets. They also claim that Lynchburg hired several new employees to service their former routes and reopen the thrift store. Finally, appellants allege that the Flowers representative, Gary Harrison, orchestrated the redistribution of the Roanoke bakery routes from WVB to Lynchburg. Even if these allegations were correct, they might not raise a genuine issue as to whether Flowers employed the Lynchburg workers. Appellants' claims, however, do not find adequate support in the record. Although Lynchburg may have hired new employees, there is no evidence that Lynchburg hired these employees to work the old WVB routes. By contrast, the record shows that the WVB routes were merged with existing Lynchburg routes. In addition, WVB did not simply hand over its routes to the Lynchburg routemen. When WVB withdrew from the Roanoke market, Lynchburg had to compete for the vacated shelf space and actually lost some space to competing baking companies. Finally, the record does not show that Gary Harrison made the day-to-day business decisions of Lynchburg. As the district court found, there is "absolutely no evidence in the record that Flowers had control over Lynchburg personnel decisions.").

**B. The FAC alleges a Virginia employment relationship and Virginia-based effects, not a District-based discriminatory decision.**

The Opp. does not dispute that the alleged employment relationship and the claimed effects were centered in Virginia. *See* ECF No. 49 at p. 10. Instead, it relies principally on the FAC's assertions that SURA is headquartered in Washington, D.C.; Hearne served as its President and CEO there; and certain corporate and executive activities occurred there. FAC ¶¶ 19, 27–32, 43, 199. But headquarters and executive-office allegations do not themselves identify a discriminatory act.

The FAC's own allegations establish that the operative adverse employment decision—the alleged termination—was communicated by Dilling at Jefferson Lab in Newport News, Virginia (and as such, presumably made in Virginia): "this letter serves as formal notice that your employment with Jefferson Science Associates, LLC is terminated effective immediately," issued on the stated ground that 'the Lab Director (Dilling) determined that your ability to lead the division is not aligned with the direction of the organization." *See* FAC ¶¶ 71–72. The termination notice was delivered at the Virginia facility, security escorted Plaintiff from the Virginia building, and her badge was disabled on the spot at her Virginia worksite. FAC ¶¶ 76–77. Every effect of the termination was likewise felt in Virginia: Plaintiff lost her Virginia office, her Virginia laboratory, her Virginia position, and her standing in the Virginia scientific community where she had worked for thirty years. *See* FAC ¶¶ 14–15, 82.

The Opp.'s attempt to recharacterize this Virginia termination as a D.C. event rests on the allegation that Hearne, from SURA's Washington headquarters, "directed and approved" the termination and that the adverse decisions were made "in substantial part" in D.C. *See* ECF No. 49 at 9–10 (citing FAC ¶¶ 28–32, 199). The FAC's assertion that the challenged decisions were, "in substantial part, made in" the District (FAC ¶ 199) is a conclusion. In fact, the FAC does not

identify who made the termination decision, when or where a decisionmaker made it, what decision was made in the District, or facts supporting the conclusion that any District-based act was undertaken because of Plaintiff's sex or in retaliation for protected activity. *See* FAC ¶¶ 28, 71–72, 199. Rule 8 does not require the Court to accept a conclusory allegation merely because it is paired with descriptions of SURA's corporate structure and Hearne's job title. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

The remaining facts cited by Plaintiff do not cure that deficiency. The FAC alleges that Hearne signed a 2022 leadership agreement, chaired the search committee that selected Dilling, and earlier participated in Plaintiff's appointment. *See* FAC ¶¶ 27, 31–32, 43. Those alleged acts precede the challenged termination and do not plausibly establish that Hearne made a discriminatory or retaliatory decision in the District in 2025 or 2026. The allegation that Hearne ordered an audit likewise does not establish a DCHRA claim.

Moreover, this is precisely the argument *Cole* rejected. In *Cole*, the employer likewise maintained D.C. offices from which corporate officers participated in the challenged employment decisions, and the Court dismissed the claims because corporate governance activity at a D.C. headquarters does not convert a Virginia employment decision into one "made in" the District. 845 F. Supp. 2d at 284–85. The Opp.'s theory would render *Cole*'s territorial limitation meaningless: any employee of any subsidiary managed by a D.C.-headquartered parent could invoke the DCHRA by alleging that a corporate officer in Washington "participated in" or "directed and approved" the decision, because that is what corporate officers at headquarters do. The D.C. Council did not intend this result, and *Cole* expressly declined to adopt it.

Nor does the "effects" prong save the Opp. The FAC does not allege that any effect of the termination was experienced in the District of Columbia. *See* FAC ¶¶ 14–15, 76–77, 82, 91–93.

Dr. Keppel did not work there, did not report there, and did not suffer any adverse consequences there. By her own allegations, the Town Meeting was in Virginia (FAC ¶¶ 91–93); the escort was from the Virginia facility (FAC ¶¶ 76–77); and the reputational harm was to her standing among the Virginia laboratory community (FAC ¶¶ 91–93, 96, 107). The Opp.'s sole remaining D.C. effect—the alleged position taken by Hearn with TIAA, blocking retirement distributions—is an administrative consequence of a disputed employment-status question, not an "effect" of the termination "felt in" D.C. within the meaning of *Cole* and *Monteilh*. *See* ECF No. 49 at pp. 4, 12. Because neither the adverse employment decision was made in the District nor its effects were felt there, the FAC fails both prongs of the *Cole*/*Monteilh* test and Count XI must be dismissed.

Considering the foregoing, Plaintiff fails to plead sufficient facts to support extra-territorial application of the DCHRA.

## III. The FAC Does Not Plausibly Allege Hearne's Personal Participation in a DCHRA Violation.

The Opp. correctly observes that the DCHRA may permit individual liability in appropriate circumstances. *See* ECF No. 49 at p. 11. But the statute does not make a corporate officer liable merely because he occupies a senior position or performs governance functions. Instead, a plaintiff must *plausibly* allege the individual's involvement in conduct prohibited by the DCHRA. *See* D.C. Code § 2-1402.62; *see, e.g.*, *King v. Triser Salons, LLC*, 815 F. Supp. 2d 328, 332 (D.D.C. 2011) ("The complaint does not allege that Patel personally committed the discriminatory and harassing acts, so the issue before the Court is whether it states a plausible claim that Patel "aided, abetted, invited, compelled or coerced" the discriminatory behavior. D.C. Code § 2-1402.62. But the complaint is devoid of any allegations from which the Court could plausibly infer that Patel knew about and failed to stop the discrimination."). Here, the FAC contains no comparable factual

allegations of sex-based remarks, sex-based directives, or other personally discriminatory conduct by Hearne. *See generally* FAC ¶¶ 64–77, 199.

In the Opp., Plaintiff attempts to rely on the following six events to assert that she has plead sufficient facts to support her aiding and abetting theory:

1. **Targeted Audit**: Hearne allegedly ordered the first targeted operations audit of any laboratory division; no male-led division had been audited.

2. **Termination Despite Audit Result**: Hearne allegedly received the report clearing Dr. Keppel's division, then directed and approved her termination.

3. **Severance Disparity**: Hearne allegedly participated in withholding Dr. Keppel's severance while a departing male Deputy Director and employees affected by a later reduction in force were offered severance.

4. **Retirement-Account Access**: Hearne allegedly participated in maintaining to TIAA that Dr. Keppel remained employed, blocking her access to vested retirement funds.

5. **Statements To Professional Peers**: At Hearne's alleged direction, Dilling privately told nuclear physics leaders that Dr. Keppel had mismanaged funds.

6. **Selective Outside-Work Restriction**: Hearne allegedly invoked an expired non-compete against Dr. Keppel, while no male senior leader faced the same restriction.

ECF No. 49 at pp. 11-12. However, as set forth below, the following do not advance Plaintiff's claim from speculative to plausible:

## A. Targeted Audit

The FAC alleges that Hearne ordered an operations audit of the Physics Division and that no male Associate Director's division had been audited. FAC ¶¶ 64, 66–70. That allegation,

standing alone, is a statistics-of-one comparison that proves nothing. Jefferson Lab is a Department of Energy national laboratory that handles sensitive accelerator operations, and an operations audit of a division in that setting is a standard oversight function — not an inherently suspect act. The question under *Iqbal* is whether the FAC pleads facts that move the allegation from "possible" to "plausible." 556 U.S. at 678. It does not.

The FAC does not identify a single male Associate Director by name. It does not allege that any male-led division had the same operational profile, the same safety posture, the same budget structure, or the same audit-triggering circumstances as the Physics Division. It does not allege that any male-led division had been the subject of the same external review or the same DOE oversight concerns that might prompt an audit. And it does not allege that Hearne made any sex-based remark in connection with the audit, selected the Physics Division because its leader was a woman, or harbored any animus toward Dr. Keppel at the time. The FAC's conclusion that the audit was "gender-based discrimination" (FAC ¶ 70) is precisely the kind of conclusory recitation of a legal element that the Supreme Court has held does not survive a motion to dismiss.

*Wei Jiang v. Duke University* is directly on point:

> Here, the Complaint includes many allegations such as "[there were] no other such audits of researchers similarly situated to Plaintiff," (ECF No. 1 ¶ 44), "[there was no] attempt to involve any of the other white and male physicians in the audit process," (*id.* ¶ 68), and "[the adverse action] was unprecedented, and another example of how Plaintiff was treated differently from other researchers who were similarly situated to her except as to race, sex, age, and national origin," (*id.* ¶ 85). These allegations, however, do not plausibly plead the fourth element of a disparate treatment claim because they merely recite the element in a conclusory fashion rather than state facts to satisfy it. […] Reviewing the *factual* allegations, the Court finds that the Complaint does not specifically identify any individuals whom Plaintiff claims are appropriate comparators, nor does it state how such individuals were similar, anything regarding such individuals' conduct, or how Defendants treated those

> individuals. Absent such allegations, the Complaint's assertions of discrimination are mere speculation.

No. 1:22CV101, 2023 U.S. Dist. LEXIS 28914, at *8, *10 (M.D.N.C. Feb. 22, 2023).

The FAC here suffers from the identical deficiency: it alleges that no male-led division was audited, but it does not identify who the male Associate Directors are, what their divisions do, whether those divisions faced comparable oversight questions, or how Hearne treated those divisions differently in any respect connected to sex. Absent those allegations, the assertion of discrimination is, as the *Wei Jiang* court concluded, "mere speculation." *Id.*

### B. <u>Termination Despite Audit Result</u>

The Opp.'s second category asks the Court to infer discriminatory intent from the sequence: Hearne received the audit report clearing Dr. Keppel's division, yet "shortly afterward directed and approved her termination." ECF No. 49 at p. 11. The argument proves the opposite of what the Opp. intends. If Hearne had commissioned the audit to manufacture a pretext for termination — as the FAC alleges (FAC ¶ 70) — one would expect the audit to produce adverse findings that could justify the removal. Instead, the audit allegedly exonerated the division, finding that it "met all performance expectations and applicable safety standards." FAC ¶¶ 46, 68, 99–101. That result is consistent with a good-faith compliance review, not a discriminatory pretext. The Opp. offers no explanation for why a CEO bent on sex-based termination would commission an audit, receive a clean bill of health, and then proceed to terminate on a different ground entirely – [in]ability to lead the division […] with the direction of the organization (FAC ¶ 72) that the audit did not address.

The Opp.'s own language underscores the speculative character of the allegation. It states that Hearne "participated in or ***was represented at*** its close-out." ECF No. 49 at p. 11 (emphasis added). The disjunctive phrasing is a concession: the Opp. does not know whether Hearne was

personally present at the close-out meeting or whether someone else attended on his behalf. If Plaintiff cannot allege with any confidence whether Hearne was in the room, the allegation that he used the audit result to facilitate discrimination lacks the factual foundation that *Iqbal* demands. 556 U.S. at 678.

More fundamentally, the FAC does not allege that Hearne made or directed the termination decision. The termination notice was issued by JSA on Dilling's authority: "the Lab Director (Dilling) determined that your ability to lead the division is not aligned with the direction of the organization." FAC ¶¶ 71–72. The FAC's allegation that "SURA and Hearne directed and approved" the termination (FAC ¶ 71) is pleaded on information and belief (FAC ¶ 28), and it is not accompanied by any factual content identifying what Hearne directed, when he directed it, to whom, or through what mechanism. The FAC does not allege a meeting at which the termination was discussed, a communication in which Hearne instructed Dilling to act, a vote by SURA's board, or any other specific act by Hearne concerning the termination decision. Conspicuously, FAC ¶ 28 identifies only two categories of Hearne's post-termination participation: "the decision to withhold severance" and "the position maintained to TIAA" — neither of which is the termination itself. The termination decision, the centerpiece of this case, is attributed to Hearne through nothing more than a conclusory label and a corporate title.

**C. <u>Severance Disparity</u>**

The Opp. argues that "Hearne participated in the decision to withhold severance from Dr. Keppel while a departing male Deputy Director received a severance package and each of the approximately eighty employees separated in the February 2026 reduction in force was offered severance." ECF No. 49 at p. 12. But the allegation that Hearne "participated" in a severance decision rests entirely on information and belief (FAC ¶ 28(c)), without identifying any meeting,

communication, directive, vote, or other specific act by Hearne concerning severance. That is not factual content; it is the same conclusory label the FAC attaches to every post-termination event.

The proposed comparators, moreover, are not comparable. The FAC identifies one male executive by name: David Dean, Deputy Director for Science and Technology, who departed Jefferson Lab approximately eight months after Dr. Keppel's termination, in July 2026, and who allegedly received severance "on information and belief." FAC ¶ 86. The FAC does not allege that Dean was terminated, that his departure was involuntary, that his position carried the same responsibilities as Dr. Keppel's, or that his separation occurred under remotely similar circumstances. The approximately eighty employees who received severance offers were separated in a February 2026 reduction in force. FAC ¶ 86. The FAC does not allege the RIF employees' positions, seniority, or sexes, and it does not allege that any decision attributed to Hearne was made because of Dr. Keppel's sex rather than because of the fundamentally different circumstances of her separation. A claim cannot proceed by substituting the conclusion of discriminatory intent for the facts from which that intent may reasonably be inferred.

**D. <u>Retirement-Account Access</u>**

The FAC does not allege that TIAA acted at Hearne's direction, that Hearne communicated with TIAA, or that Hearne took any specific action to maintain the employment-status position. It alleges only, on information and belief, that Hearne "participated in" the position. FAC ¶ 28(c). That is a legal conclusion, not a factual allegation. And critically, the FAC does not allege any facts connecting the employment-status position to Dr. Keppel's sex. An administrative dispute about whether a terminated employee who has been offered continued employment has "separated" for purposes of retirement-plan distributions is not, without more, evidence of sex discrimination or retaliation—it is an employment-status question with incidental benefits consequences.

### E. Statements To Professional Peers

The Opp.'s fifth category does not concern Hearne's conduct at all. *See* ECF No. 49 at p. 12. The FAC alleges that *Dilling*—not Hearne—privately told leaders of the nuclear physics community that Dr. Keppel had mismanaged funds. FAC ¶¶ 108–09. The only allegation connecting Hearne to those statements is a single sentence pleaded "[o]n information and belief": that Dilling made the statements "at the direction of Hearne and SURA." FAC ¶ 109. The FAC does not allege that Hearne told Dilling what to say, when to say it, or to whom; it does not allege that Hearne knew what Dilling said before or after the fact; and it does not identify any communication, meeting, or directive in which Hearne instructed Dilling to make the statements. Nor does the FAC allege any factual basis for the "information and belief" — no document, no witness account, no pattern of prior directives — from which the Court could infer that the belief rests on something more than the fact that Hearne occupies a senior position. An allegation that one person directed another's speech, supported by nothing beyond the first person's corporate title, is precisely the kind of conclusory assertion that *Iqbal* requires the Court to set aside. 556 U.S. at 678.

### F. Selective Outside-Work Restriction

The Opp.'s final category reaches back to a 2023 conversation — more than two years before the November 2025 termination — in which Hearne allegedly responded to Dr. Keppel's disclosure of potential outside opportunities by invoking an expired non-compete agreement. *See* ECF No. 49 at p. 12. The allegation fails on multiple levels.

As a threshold matter, the FAC does not allege that the non-compete discussion had anything to do with Dr. Keppel's sex. It alleges that Hearne told her that anyone considering another bidder "doesn't deserve to be a part of the laboratory" and invoked the expired agreement.

FAC ¶¶ 51–52. The statement on its face concerns competitive loyalty and contractual obligations — not sex. The FAC's assertion that "no male leader was told anything of the kind or had that document invoked against him" (FAC ¶ 53) is offered without identifying a single male leader who disclosed comparable outside opportunities and was treated differently. Without that factual predicate — who the comparator is, what he disclosed, and how Hearne responded — the allegation is not a factual comparison but a conclusory assertion of the legal element it is supposed to establish.

The 2023 exchange also predates every act of protected activity on which the Opp. relies: counsel's retention on November 25, 2025; the notification to JSA's General Counsel on November 26; and the December 3 demand letter. FAC ¶¶ 88–90. An act that occurred two years before the protected activity cannot establish that Hearne later acted with retaliatory intent in response to it. "Background evidence" is not a substitute for the non-conclusory factual allegations that *Iqbal* requires to cross the line from possible to plausible. 556 U.S. at 678.

## IV. The Court should decline supplemental jurisdiction if Count XI is not dismissed on the merits.

In the alternative, the Court may decline to exercise supplemental jurisdiction over Count XI. The claim invokes a local civil-rights statute to challenge the employment decisions of a Virginia-based laboratory concerning a Virginia-based position. The claim raises the application of the DCHRA's territorial limitation to the alleged facts, including the relationship between a District-based nonprofit's executive office and employment decisions concerning work performed in Virginia. Those District-law issues substantially predominate over any discrete claim against Hearne and are best addressed, if at all, by a court applying District law in the first instance. See 28 U.S.C. § 1367(c).

Plaintiff's assertion that Count XI is asserted against all defendants does not change the analysis as to Hearne. The Court may resolve the sufficiency of the claim against each defendant separately. Here, the FAC's allegations directed to Hearne do not plead a viable DCHRA claim.

**V. The official-capacity designation should be dismissed as duplicative.**

Plaintiff concedes that the official-capacity designation provides no independent basis for relief and states that she does not object to its being disregarded. The Court should therefore dismiss any official-capacity claim against Hearne as duplicative of the claim against SURA.

**VI. Plaintiff has not established a basis for leave to amend in Opp..**

Without identifying the amendments she seeks to make or attaching a proposed amended complaint, Plaintiff requests that the Court grant her leave to amend her FAC. Even taking into account, the one additional fact Plaintiff identifies in her Opp., that counsel allegedly sent Hearne a December 12, 2025 letter does not, standing alone, plead a District-based discriminatory decision, District-felt effects, or Hearne's personal participation in discriminatory conduct. The request should be denied.

Granting Plaintiff's request for leave to amend her FAC would be futile. A Court may deny a motion to amend in the following circumstances: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Plaintiff filed an amended complaint as of right under Federal Rule of Civil Procedure 15(a). The Amended Complaint still has not cured those deficiencies, and it is unlikely another amendment would do so either. In addition, Plaintiff fails to articulate what these amendments would be or how the amendments would cure the deficiencies in the Complaint.

Based on the arguments articulated in the respective Motions to Dismiss the FAC, Memoranda in Support, and Reply Memoranda, Plaintiff should not be granted leave to amend her FAC as any such amendments would be futile

**CONCLUSION**

For these reasons and as set forth in more detail in the Memorandum in Support of the Motion to Dismiss, the Court should grant Hearne's motion and dismiss all claims asserted against him. Plaintiff's failure to correct the above-deficiencies in their Amended Complaint shows amendment being futile under Rule 15.

Date: September 28, 2026

**SEAN HEARNE**

By: ______________/s/______________

Kristina H. Vaquera (VSB No. 43655)
Milena Radovic (VSB No. 91000)
N. Winston West, IV (VSB No. 92598)
Jackson Lewis P.C.

*Physical Addresses:*
701 E. Byrd Street, 17th Floor
Richmond, Virginia 23219

Dominion Tower
999 Waterside Dr., Ste. 2525
Norfolk, VA 23510

*Mailing Address:*
P.O. Box 85068
Richmond, Virginia 23285

Tel: (757) 648-1448
Fax: (804) 649-0403
Kristina.vaquera@jacksonlewis.com
Milena.radovic@jacksonlewis.com
Winston.west@jacksonlewis.com
*Counsel for Defendant Sean Hearne*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of September 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including

Ronald J. Kim, Esq.
SOLOMON LAW FIRM, PLLC
300 Great Oaks Blvd, Suite 312
Albany, NY 12203
rkim@fedemploylaw.com

Dawn C. Stewart, Esq
SOLOMON LAW FIRM, PLLC
1025 Connecticut Avenue, NW, Suite 1000
Washington, D.C. 20036
dstewart@fedemploylaw.com

*Counsel for Plaintiff*

**SEAN HEARNE**

By: ______________/s/________________
Kristina H. Vaquera (VSB No. 43655)
Milena Radovic (VSB No. 91000)
N. Winston West, IV (VSB No. 92598)
Jackson Lewis P.C.

*Physical Addresses:*
701 E. Byrd Street, 17th Floor
Richmond, Virginia 23219

Dominion Tower
999 Waterside Dr., Ste. 2525
Norfolk, VA 23510

*Mailing Address:*
P.O. Box 85068
Richmond, Virginia 23285

Tel: (757) 648-1448
Fax: (804) 649-0403
Kristina.vaquera@jacksonlewis.com
Milena.radovic@jacksonlewis.com

Winston.west@jacksonlewis.com
*Counsel for Defendant Sean Hearne*